**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 2 2 2024

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

SUTTER & GILLHAM, P.L.L.C.;
LUTHER SUTTER, and
LUCIEN GILLHAM                                                    **PLAINTIFFS**

v.                              No. _4:24-cv-911-BSM_

EMILY RUNYON;
MUNSON, ROWLETT, MOORE AND BOONE, P.A.;
ANNIE DEPPER; BLAKE HENDRIX;
FUQUA CAMPBELL, P.A.; DAVID WILSON;
FRIDAY, ELDREDGE & CLARK, LLP;
MEL SAYES; MATTHEWS, SANDERS & SAYES, P.A.;
AND JOHN DOES 1-100                              **DEFENDANTS**

This case assigned to District Judge _Miller_
and to Magistrate Judge_Volpe_

## NOTICE OF REMOVAL

Please take notice that Defendant Friday, Eldredge & Clark, LLP ("Defendant") hereby removes the above-captioned case from the Circuit Court of Jefferson County, Arkansas to the United States District Court for the Eastern District of Arkansas, Central Division, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, on the basis of the following facts which demonstrate the existence of subject matter jurisdiction in this Court:

1.      On or about June 3, 2024, Plaintiffs commenced this civil action, which was assigned Case No. 35CV-24-455 in the Circuit Court of Jefferson County, Arkansas by filing a Complaint.  Service of process occurred on Defendant on September 23, 2024, and this Notice of Removal is being filed within 30 days of that service.  Defendant attaches as Exhibit 1 copies of all process, pleadings, and orders served upon the Defendant in the Circuit Court of Jefferson County, Arkansas.

Page **1** of **6**

11328084.v1

2.     This Notice of Removal is timely since it is being filed within 30 days of service of the Complaint, the initial pleading setting forth the purported claims for relief.   28 U.S.C. § 1446(b).

3.     In short, this case is brought by attorneys and their law firm that for a time represented Gena Downey Baker, the mother of Luke Baker, who died in 2015 as a result of a gunshot wound sustained at a hunting lodge in Jefferson County, Arkansas.   Complaint at ¶¶ 8, 29-30.   Certain relatives of Luke Baker filed a wrongful death action in Jefferson County Circuit Court.   That case was dismissed with prejudice by the Jefferson County Circuit Court.   *Id.* at ¶ 31.   The Defendants in the present case are some of the licensed attorneys and their firms (or former firms) that represented certain defendants in that wrongful death case.   *Id.* at ¶¶ 15.

4.     As more fully described below, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the Constitution and laws of the United States.   *See, e.g.,* Complaint ¶ 4 (stating "[e]ach Plaintiff brings action to redress deprivation of their rights under the First Amendment to the United States Constitution [and] Fourteenth Amendment to the United States Constitution … as permitted by … 42 U.S.C. § 1983 and 1985"); *see also id.* at ¶ 3 (asserting the "denial of each Plaintiff's constitutional rights assured them under the United States Constitution").

5.     In Count I, Plaintiffs allege retaliation for exercising their First Amendment rights to freedom of speech and access to courts.   *Id.* at ¶¶ 80-86.   The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Page **2** of **6**

11328084.v1

6.      In support of Count I, Plaintiffs claim "[e]ach Plaintiff had a clearly established right to freedom of speech and access to courts under the 1st Amendment[.]" *Id.* at ¶ 81.   They allege that the "issue of whether Luke Baker committed suicide or was murdered is an issue of public concern, as well as whether there was public corruption in Jefferson County."   *Id.* at ¶ 82. They further contend that if Baker was murdered, "covering that up involved both state action and some of the defendants participating in and inducing that state action."   *Id.*   Plaintiffs then conclude that "Defendants deprived each Plaintiff of their constitutional rights without Due Process by obtaining an Order designed to smear the Plaintiffs" and that Defendants' actions "would chill [the speech of] a reasonable person of ordinary firmness."   *Id.* at ¶¶ 83-84.

7.      In Count II, the Complaint alleges a conspiracy to violate Plaintiffs' constitutional rights and seeks relief pursuant to 42 U.S.C. §§ 1983 and 1985.   *Id.* at ¶¶ 87-117.   In pertinent part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.   Section 1985 provides a federal claim for conspiracy to interfere with civil rights.

8.      In support of Count II, Plaintiffs allege they "had a liberty and property interest in their reputation and law license which Defendants intentionally damaged without Due Process." Complaint at ¶ 92.   Plaintiffs contend that when Defendants allegedly conspired with Jefferson County Circuit Judge Alex Guynn, Defendants "conspiring with the judge were acting under color of state law."   *Id.* at ¶¶ 93-101.   Additionally, Plaintiffs allege that "[e]ach Defendant was a

11328084.v1

willful participant in the corrupt conspiracy which resulted in the order Judge Guynn gladly signed and entered to bring the conspiracy to a final success." *Id.* at ¶ 102.

9.    Accordingly, Plaintiffs allege claims "arising under the Constitution [and] laws … of the United States." 28 U.S.C. § 1331.   Therefore, this Court has original jurisdiction over Plaintiffs' Complaint.

10.    In addition, the Court has supplemental jurisdiction over Plaintiffs' state-law claims because they "are so related to the claim in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a).   Plaintiffs allege state-law claims of defamation, interference with contracts, abuse of process, malicious prosecution, civil conspiracy/barratry, and civil felony tort.   Those claims are related to and based on the same facts and events as those alleged and supporting Plaintiffs' federal claims. Thus, this Court has original jurisdiction over those claims as well.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1446(a) because it is the district and division embracing the place where the state-court action is pending.   28 U.S.C. § 83(a)(1); 28 U.S.C. § 1441(a).

12.    No previous application has been made for the relief requested herein.

13.    This Notice of Removal has been served on all named parties to the removed case.

14.    All Defendants have been contacted and all join and consent to this removal, without objection.

15.    A written Notice of Filing of Notice of Removal, together with a copy of this Notice, will be filed with the Clerk of the Court for the Circuit Court of Jefferson County, Arkansas, and will be served upon Plaintiffs, as required by 28 U.S.C. § 1446(d).

WHEREFORE, Defendant respectfully requests that the Court acknowledge this Notice of Removal, that this Court assume jurisdiction over this matter, and for all other appropriate relief to which they may be entitled.

Respectfully submitted,

Dylan H. Potts, No. 2001258
Hannah W. Howard, No. 2021212
Gill Ragon Owen, P.A.
425 W. Capitol Ave., Ste. 3800
Little Rock, AR 72201
(501) 376-3800
(501)372-3359 (Fax)
potts@gill-law.com
howard@gill-law.com

*Attorney for Defendants Friday, Eldredge & Clark, LLP and David Wilson*

## CERTIFICATE OF SERVICE

I, Dylan H. Potts, hereby certify that a copy of the foregoing was sent via email and U.S. First Class mail to the following known counsel of record on this 22 day of October, 2024:

Luther Sutter
Sutter & Gillham, P.L.L.C.
15001 N. Pierce, Ste. 105
Little Rock, Arkansas 72207
501-315-1910 (phone)
501-315-1916 (fax)
Luthersutter.law@gmail.com

and

Lucien Gillham (and via U.S. Mail)
Sutter & Gillham, P.L.L.C.
15001 N. Pierce, Ste. 105
Little Rock, Arkansas 72207
501-315-1910 (phone)
501-315-1916 (fax)
lucien.gillham@gmail.com

*Attorneys for Plaintiffs, Sutter & Gillham, P.L.L.C,*

11328084.v1

*Luther Sutter and Lucien Gillham*

David Donovan, No. 81184
WDTC Law, P.A.
2120 Riverfront Drive, Suite 275
Little Rock, AR 72202
(501) 850-7090
(501) 372-1209 (Fax)
david.donovan@wdtc.law

*Attorney for Defendants Emily Runyon and*
*Munson, Rowlett, Moore and Boone, P.A.*

Justin Joy, No. 2005288
Lewis Thomason, PC
40 S. Main St. #2900
Memphis, TN 38103
(901) 525-8721
(901) 525-6722 (Fax)
jjoy@lewisthomason.com

*Attorney for Defendants Annie Depper,*
*Blake Hendrix, and Fuqua Campbell, P.A.*

Michael P. Vanderford, No. 93086
Anderson, Murphy & Hopkins, L.L.P.
101 River Bluff Drive, Suite A
Little Rock, AR 72202
(501) 372-1887
(501) 372-7706 (Fax)
vanderford@amhfirm.com

*Attorney for Mel Sayes and*
*Matthews, Sanders & Sayes, P.A.*

*/s/ Dylan H. Potts*
Dylan H. Potts

Page **6** of **6**

11328084.v1

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Jun-03 17:33:46
35CV-24-455
C11WD05 : 31 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
### CIVIL DIVISION

**SUTTER & GILLHAM, P.L.L.C.; LUTHER SUTTER, and
LUCIEN GILLHAM**                                              **PLAINTIFFS**

VS.                      CASE NO: 35CV-24 - _____

**EMILY RUNYON; MUNSON, ROWLETT, MOORE AND BOONE, P.A.; ANNIE
DEPPER; BLAKE HENDRIX; FUQUA CAMPBELL, P.A.; DAVID WILSON;
FRIDAY, ELDREDGE & CLARK, LLP; MEL SAYES; MATTHEWS, SANDERS
& SAYES, P.A.; AND JOHN DOES 1-100**

**DEFENDANTS**

### COMPLAINT

COME THE PLAINTIFFS, by and through Counsel, and for this Complaint each states:

### JURISDICTION

1. Plaintiffs, Luther Sutter ("Sutter"), and Lucien Gillham ("Gillham"), are each a resident and citizen of Pulaski County, Arkansas, who are associated with **SUTTER & GILLHAM, P.L.L.C.**, ("S&G"), an Arkansas Limited Liability company with its principal place of business in Pulaski County, Arkansas.

2. Defendants are all residents of the State of Arkansas, who, at all times relevant hereto were acting under color of law in a conspiracy to deny Plaintiffs the Due Process guaranteed them by the Fifth Amendment, as applied to the states through the Fourteenth Amendment.

3. This is also an action for tortious interference with contract, malicious prosecution, abuse of process, defamation, barratry, champerty, maintenance, conspiracy, and for denial of each Plaintiff's constitutional rights assured them under the United States Constitution and the Arkansas Constitution.

**EXHIBIT**

**1**

_____

1

4. Each Plaintiff brings this action to redress deprivation of their rights under the First Amendment to the United States Constitution, Fourteenth Amendment to the United States Constitution, and Article II Section 22 of the Arkansas Constitution, as permitted by the Arkansas Civil Rights Act of 1993 (ACRA) and 42 U.S.C. §1983 and 1985.

5. Since the acts giving rise to this action arose within this County, venue is proper.

6. This Court has subject matter jurisdiction over these claim

7. This action is filed within one year of an involuntary dismissal without prejudice on Rooker Feldman grounds by the United States District Court without prejudice, thereby invoking the savings statute.   Therefore, the federal court does not have jurisdiction.

## **PARTIES**

8. Plaintiffs LUCIEN GILLHAM (Gillham) and LUTHER SUTTER (Sutter) are lawyers licensed to practice law in the State of Arkansas, who are associated with an Arkansas Professional Limited Liability Company, SUTTER & GILLHAM, PLLC (S&G).

9. The Lawyers representing the Adamses acted at all times relevant with the express permission of the ADAMSES and the express or apparent authority granted them by the Adamses.

10. ERIC BELL is a lawyer employed by the Adamses and their associated companies as a lawyer in their Conway office, who conspired with the Adamses and one or more of the Defendants to deny Plaintiffs their constitutional rights by recruiting his friend and fellow Chris Burks to sue the Plaintiffs frivolously.

11. EFREM NEELEY is a lawyer licensed to practice law in the State of Arkansas. Neeley was a former law partner of ALEX GUYNN (Judge Guynn), a sitting Circuit Judge for

Jefferson County, Arkansas, who referred David Westbrook, in conjunction with Henry and one or more of the lawyer Defendants, to WH Law to sue the Plaintiffs to smear the Plaintiffs. Judge Guynn was presiding over the lawsuit attached as *Exhibit "A."* The John Doe Defendants are identified in the John Doe Affidavit filed herein and incorporated by reference, as allowed Rule 10(c).

12. NEELEY was hired primarily to be a conduit to Judge Guynn and because he was Judge Guynn's former law partner. NEELY also intentionally mislead David Westbrook into hiring Burks, who then associated WH LAW[1] to file a frivolous counterclaim against the Plaintiffs on 2/4/2020 in Saline County Circuit Court to cause Plaintiffs to withdraw at hearing in the Jefferson County Circuit Court on 2/4/2020.

13. SKYLAR ADAMS, BRYAN ADAMS, AND BRANDON ADAMS are residents of Arkansas who retained the lawyers to destroy Sutter and his family for an improper purpose and who has sued Plaintiffs in the frivolous lawsuit attached as *Exhibit "B*."

14. TOMMY WILLIAMS is a lawyer licensed to practice law in the State of Arkansas, who has stated his intent to destroy Sutter since at least 2019. He is a lawyer associated with Quattlebaum, Grooms, and Tull PLLC (QGT).

15. EMILY RUNYON is a lawyer licensed to practice law in the State of Arkansas associated with Munson, Rowlett, Moore and Boone, P.A., ANNIE DEPPER and BLAKE HENDRIX( each a lawyer Defendant) are associated with FUQUA CAMPBELL, P.A, are lawyers licensed to practice law in the State of Arkansas. DAVID WILSON (a lawyer Defendant) is a lawyer licensed to practice law in Arkansas associated with FRIDAY, ELDREDGE & CLARK,LLP. MEL SAYES and MATTHEWS, SANDERS & SAYES, P.A. are

---

[1] No claims are brought against WH lawyers because that matter has been settled for $175,000.00.

also lawyer licensed to practice law in the State of Arkansas who joined in Henry's factually basis Motion.

## **GENERAL ALLEGATIONS OF FACT**

16.    Every lawyer and judge, including Judge Clark and Judge Guynn, knows, and was taught in law school, that is it immoral to participate in an *ex parte* communication between a lawyer and a judge, where that communication includes discussing a pending case when the judge is presiding over the case and the lawyer represents a party in the case.

17.  *Ex parte* communications about the merits of the Jefferson County case, hereafter discussed in great detail, between Judge Guynn and Neeley took place on more than one occasion.

18.    Other defendants not only were aware the *ex parte* communications were taking place between Judge Guynn and Neeley, they encouraged the communications.

19.    Greg Stephens (Stephens) was the lawyer who filed the lawsuit attached as ***Exhibit "A"*** - the Jefferson County case.    Stephens also was the lawyer for the Estate of Luke Baker, pending before Judge David Clark in Faulkner County.

20.       After a hearing, Stephens was also sanctioned by Judge David Clark, shortly after Clark met with Bryan Adams at Adams' office.  After that hearing, the Adamses approached Baker's private investigator, Allen Noble, and threatened him.

21.       Upon information and belief, a reasonable inference is that Adams and Clark agreed that Clark, sitting as a judge presiding over the Estate of Luke Baker, would sanction Stephens because of their social relationship.

4

22.    There was substantial evidence that Luke Baker, whose tortious, and possibly criminal, wrongful death was the subject matter of the Jefferson County case, did not commit suicide. So, Greg Stephens brought an action on behalf the Estate of Luke Baker for wrongful death and other torts, and by his family members, individually for torts directly committed against them after the death of Luke Baker as more particularly set out below.

23.    Plaintiffs never represented the Estate.

24. The defendants in the Jefferson County case included Bryan Adams ("Bryan"), Skylar Wilson ("Wilson"), Travis Jones, Carson Cook ("Carson"), Karla Cook ("Ms. Cook"), Todd Ross ("Ross"), Austin Tate ("Young Tate" or "Austin"), John Tate ("the elder Tate"), Mary Tate, and Christie Adams ("Ms. Adams") and they reside in Faulkner County.

25. The Jefferson County case defendant Brandon Adams ("Brandon") owns the real estate which was the location of Luke's wrongful death in Jefferson County, Arkansas. He is also an officer and director of Reliance Health Care, Inc. ("Reliance, Inc."), an Arkansas business.

26. Jefferson County case defendants, Prairie Wings South, LLC ("P.W. South") and Prairie Wings Lodge, LLC ("P.W. Lodge") are Arkansas companies doing business in this state and own or manage the property known as the Prairie Wings Duck Club ("The Club") in Jefferson County where Luke Baker ("Luke") died.

27. Reliance Health Care, Inc. and perhaps a John Doe company, were the employers of Travis Jones at times, as were some of the other defendants, and directed the activities of some of the co-defendants at times relevant hereto.

28. Kerry Baker, surviving father and Administrator, Savannah Baker Case, surviving sister, and Gena Downey Baker, surviving mother, are the immediate familial survivors of Luke,

5

and are all adults. They were each represented by separate counsel in the Jefferson County case.

29.      Plaintiffs herein only represented, for a time, Gena Downey Baker.

30. In the Jefferson County case, the Plaintiffs believed the evidence was sufficient to prove the following:

a. On October 24, 2015, four friends, Wilson, Austin, Carson, and Luke went on a joint venture, a hunting trip, with drugs and alcohol to the Prairie Wings Duck Club near Altheimer, Arkansas in Jefferson County.

b. The joint ventures were invited as guests of their hosts, the owners of the Duck Club, who were Brandon, Bryan, Ross, Whicker, P.W. South LLC, P.W. Lodge LLC, and one or more Doe defendants.

c. These owners of the property control the operations thereon as though the property was solely theirs, despite the fact that base legal title and management of the company rests in the names of P.W. South LLC, managed by P.W. Lodge LLC, which also has a property right therein.

d. Near the end of the evening on October 24, 2015, around 10:30 p.m., give or take a few minutes, there was evidence of an altercation or event, between Wilson and Luke wherein a physical confrontation and struggle ensued, resulting in the death of Luke by gunshot wound to the head.

e. Luke did not commit suicide.

f. Death was instantaneous or within seconds.

g. Whether anyone other than Wilson actually visually witnessed the event is known only to Wilson, Carson, and young Tate.

h. Whether Carson heard the shot, or was in the room also, is known only to him and Wilson.

i. Austin claims the shot woke him but that he thought someone was test firing a blank powder cartridge and so he did not respond until summoned by Carson and Wilson.

j. The evidence of this event was in the exclusive control of these persons and the death could not have ordinarily occurred without tortious, negligent or criminal action since Luke did not commit suicide.

k. Austin admitted Luke was not depressed. All who knew him knew he was not

6

depressed, and Austin has stated Luke was not suicidal that evening or at any other time.

l. False rumors of depression have been circulated by other Jefferson County case defendants.

m. Upon recognizing that Luke was dead, there was no rushed effort to contact authorities, call 911, or get help for Luke.

n. It was over 30 minutes before any such action was taken.

o. Carson insisted upon action by the three surviving friends to protect himself and his family as partners in the duck hunt.

p. Wilson demanded adherence to his version of events that the wound was self-inflicted, which was a lie to prevent an investigation, arrest, or prosecution, for the felonies being committed.

q. Given what Wilson had just done, and the resulting condition of Luke, and the continued presence of a gun, there was no resistance by the young Tate to the demands to cover up any evidence that would implicate any of the defendants, and there was no mood to dissent.

r. At some point between Luke's death and 11:15 p.m., the Jefferson County case Defendants may have removed the murder weapon and replaced it with Luke's gun, which had been in the bedroom hanging on the bed post.

s. This fraudulent behavior is a felony crime and constitutes an overt act by Wilson, Carson, and young Tate, thereby forming a conspiracy by the three at that time. Others joined in the conspiracy later in the evening.

t. The three surviving friends over the next hours contacted directly or indirectly, through intermediaries, and by various available means, Jefferson County case co-defendants, Bryan, Karla Cook ("Ms. Cook"), Christie Adams ("Ms. Adams"), Jones, Mary Tate, John Tate ("the elder Tate"), Brandon, Ross, Whicker, and others.

u. Such contacts began before any action to summon authorities to the scene.

v. The purpose of those contacts was to enlist persons in the conspiracy to cover up the crimes committed before police authorities could investigate, which they did.

w. Whicker, Bryan, Brandon, Ross, P.W. South, P.W. Lodge, and Doe defendants, or at least one of them acting for them all, gave instructions as to what

7

actions should be taken to protect the Jefferson County case co-defendants from liability.

x. Wilson, Austin and Carson followed the instructions they were given.

y. One of the Adams Jefferson County case defendants, in his role as an executive of Reliance, Inc. and on behalf of Reliance, Inc., contacted Travis Jones, an employee of Reliance, Inc., an agent of Bryan personally, supplier of things illegal, and all around "fixer", to speed to the scene and protect the interests of the other defendants, and also himself, by removing evidence, destroying evidence, stealing evidence, absconding with evidence, and helping to mislead authorities, prevent detection of what had actually transpired, and to hide evidence of the drugs that were supplied by him or other defendants, and to dispose of other contraband.

z. The other defendants either knew about the post-death conspiracy, fully agreed with it, or when learning about it, joined in and cooperated with it completely.

aa. Reliance, Inc. is responsible for the acts of Jones, Bryan, Brandon or other agents that were used on behalf of Reliance.

bb. The activities of the Club were for the benefit and entertainment of Reliance and its associates and guests, and the costs thereof constituted a deduction on the tax returns of Reliance, Inc.

cc. The actions taken by the conspirators were, among other things, spoilation, false reporting to authorities, compounding, hindering, aiding, abetting, obstructing, theft, and other criminal offenses, all of which went undetected due to a lack of truth or any renunciations by any of the Jefferson County case co-defendant conspirators, whether real persons or companies.

dd. The crimes committed from the moment Luke was killed through the present date, and the names of the various Jefferson County case defendants who likely participated in the commission of those crimes are as follows:

   i. Manslaughter (reckless homicide) or more (Skylar Wilson);

   ii. False Report (Skylar Wilson) (A.C.A. § 5-54-122(c)(1)(D) for lying to authorities "to conceal his own criminal activity";

   iii. Hindering (Bryan Adams, Carson Cook, young Tate, the elder Tate, Karla Cook, Travis Jones, Mary Tate, and others) (A.C.A. § 5-54-105) in that with purpose to hinder a prosecution of Skylar Wilson for a homicide for felony they hindered by (i) concealing, altering, suppressing facts or things relevant to the investigation, or

8

(ii) supplying false information to law enforcement (§105(a)(6)); or (iii) providing erroneous facts, documents, or instrumentalities (as in a fake gun) to distract or inhibit the true course of the investigation (§105(a)(7));

iv. Compounding (Travis Jones, Reliance, Bryan) (A.C.A. § 5-54-107) by Travis accepting or agreeing to accept a benefit and for the other two providing or agreeing to provide same in return for silence about a crime;

v. Delivery (several defendants including Jones, Reliance, Bryan, Wilson, Carson) (A.C.A. § 5-64-438);

vi. Conspiracy to Commit or Aid any Class C Felony listed herein (all defendants including Christie Adams) for agreeing at least one of them will, commit or aid in a felony or its planning or commission, and commit an overt act (A.C.A. § 5-3-401);

vii. Aiding or being an Accomplice to any of these listed offenses, or any other felony, felony conspiracy (all defendants) (A.C.A. § 5-2-403) by advising, encouraging, failing to prevent, or attempting to aid in the planning or commission thereof;

viii. Illegally moving or handling of a body (A.C.A. § 5-60-101 provides that a person commits a class C felony if he, except as authorized by law, removes a corpse) (Wilson, Austin, Carson, et al).

ee. What is sure is that wholesale sanitizing of the scene, prior to arrival of the team of crime scene investigators occurred.

ff. Contraband was destroyed, removed, stolen, or hidden to avoid detection of the truth.

gg. Lies were told to authorities and others to conceal the truth that this was a homicide.

hh. All Jefferson County case co-defendants were generally aware of the actions of each other, did not object, leave the conspiracy, or cure the damage.

ii. The deputy coroner and sheriff's investigator were intentionally misled, and some degree of "persuasion" took place by one or more of the Jefferson County case defendants to convince others, some perhaps reluctantly, to go along.

jj. The Jefferson County case defendants whose overt acts in furtherance of the

9

conspiracy involved lying to authorities would be Wilson, Carson, young Tate, Bryan, Ms. Cook, and Doe.

kk. When many associates of the Jefferson County case defendants in the 2-3 days after the homicide complained of the incredulity of the Russian Roulette story, the Jefferson County case defendants, to keep the conspiracy going, created an alternate false story that Jefferson County case defendants felt would quiet these objections among associates.

ll. This second false story that was circulated among the Jefferson County case defendants was that Wilson and Luke were at the card table playing a game with Wilson's gun and that Wilson accidentally shot Luke, and that due to fear that no one would believe this, the suicide story was concocted.

mm. This story circulated at parties and among Reliance employees and associates with the explanation that the suicide story was necessary to prevent Wilson from being "ruined" for what was just an accident.

nn. The Jefferson County case defendants whose overt conspiratorial acts involved knowingly lying about the cause of death or helping others to lie includes every Jefferson County case defendant except possibly P.W. Lodge, P.W. South, Ross, Whicker, elder Tate, and Mary Tate.

oo. These six Jefferson County case defendants, except perhaps Ross, committed overt acts toward helping the "clean up", and thereby destroying evidence, in aid of the conspiracy.

pp. Ross became aware of the false stories, and as owner of the premises had an affirmative duty to disclose what he knew.

qq. Luke's body was removed from the scene, over thirty minutes after death, illegally, and by instruction and intention.

rr. None of the conspirators ever notified authorities, even during a sixteen-minute 911 phone call, that Luke was dead.

ss. The body was taken to a hospital 20 miles away to divert the investigators to an emergency room instead of the Club.

tt. The gates to the Club were locked by Wilson, Carson, and young Tate upon instruction by an owner to prevent entry by the authorities.

uu. The failure to send the body to the crime lab for autopsy was outrageously accomplished by the conspirators by lying to the deceased's father Kerry Baker, and pressuring him to refrain from asking for an autopsy, so the decision not to

10

have one could be blamed on him, when the decision was not his to make by law, especially under the devastatingly grave circumstances.

vv. The hospital ER doctor was coerced into signing the death certificate in an attempt by the conspirator Jefferson County case co-defendants to obviate the autopsy requirement of the law that applies to coroner cases.

ww. The chief coroner, the Sheriff, and the ranking Major were not fully informed until the body was cleaned, in the morgue, and after evidence was destroyed.

xx. The Jefferson County case co-defendants divided their labor, some acting at the hospital, some contacting law enforcement, others instructing witnesses, and others cleaning and removing evidence from the scene, the body, the hospital, and elsewhere.

yy. The Jefferson County case defendants know where the actual weapon is and still they remain silent.

zz. Illegal substances and guns were supplied by Jefferson County case defendants Wilson, Carson, Bryan, Reliance, Inc., Travis Jones, and by the owners of the property by their agent(s), Reliance agents other than Jones, and one or more Doe defendants, either directly, as agents, or indirectly by their agent(s).

aaa. The Jefferson County case Defendants' undertook spoliation of evidence, of the homicide itself, of the drinking and drugging attendant thereto, and of all actions taken by them.

bbb. The Jefferson County case defendants conspired and hid evidence because they knew they were guilty.

ccc. The illegal substances and items provided by some of the conspirators did foreseeably result in the intoxication of Wilson, who had a mental condition, and a propensity towards violence, especially when intoxicated, which was known to all   Jefferson County case defendants.

ddd. The drugs also impaired Carson and young Tate from protecting Luke from Wilson, who was unable alone to protect himself from the stronger and violent Wilson.

eee. It was determined the gunshot wound was a "distant" wound as that term is used by medical examiners and excludes close up or contact wound scenarios, such as the death by suicide Russian roulette lie told by Wilson to authorities.

fff. Wilson's statements to authorities on October 24, 2015 and later were false,

11

and intentionally so, further implicating the spoliation inference of liability from the disposing of the real weapon.

ggg. Some of the Jefferson County case defendants were, upon information and belief, involved to some degree in the illegal supplying of drugs, alcohol, and other substances or items to those present at the Duck Club on October 24, 2015 and at times prior thereto.

hhh. Those implicated in this include Travis Jones, Wilson, Carson Cook, the club owners, Reliance, Inc. which supplied the finances for the illegal substances and subsidized the activities at the Club, and Doe defendant delivering substances to the lodge, and any Jefferson County case defendant who controlled the premises who supplied, or arranged, or allowed the supply thereof to the hunters.

iii. Law enforcement reports after the event, attributed by the Sheriff's office to information provided by the Jefferson County case defendants themselves, indicated an evening of drugging, drinking, and partying was involved in the resulting death.

31. In a grave miscarriage of justice, Defendants herein unconstitutionally and corruptly procured an order of the Jefferson County Circuit Court, entered on June 22, 2021, sanctioning the Plaintiffs and dismissing the Jefferson County case with prejudice. See Order in docket number 35CV-18-1077, ***Exhibit "C"*** attached hereto. That case has been appealed and is docket number CV-22-102, currently in the Arkansas Court of Appeals.

## FACTS ESTABLISHING LIABILITY TO PLAINTIFFS

32. In November of 2018, the Jefferson County Coroner decided that Baker's death certificate should be amended, since there was evidence that he clearly had not committed suicide. [2]

33. In December of 2018, Stephens asked Sutter to enter his appearance in the Jefferson County case as conflict counsel for Gina Baker, a statutory beneficiary under the Arkansas

---

[2] Indeed, Sutter eventually developed corroborating evidence that Baker did **not** commit suicide. See Affidavit of Sperry attached as ***Exhibit "L."*** Defendants slandered, and continued to slander, Plaintiffs with their allegations of misconduct, which caused Plaintiffs to lose business and reputation.

wrongful death statute.

34.    Sutter agreed to appear for that limited purpose, so Sutter entered his appearance in December of 2018.

35.    Shortly thereafter, Williams approached Sutter and said that the Adamses would destroy Sutter if he didn't withdraw. Sutter was not intimidated and ignored this threat.

36.    Over time, the threat became real, with the lawyer defendants assisting the Adamses in a campaign to deny Plaintiff his state and federal constitutional rights..

37.    The first indication of the efforts to come to destroy Sutter was Henry's false allegation that Sutter assaulted her.

38.    Henry has a well-earned reputation for abusive litigation tactics, some examples being false allegations against other lawyers like Kevin Keech.

39.    With the approval of Bell and the Adamses, Henry's and Williams' first step was to hire Efrem Neeley (Neeley), a lawyer who conveniently was formerly a law partner with Judge Guynn.

40.    Judge Guynn did not hear Neeley's cases because of this relationship.

41.    Neeley was hired for the specific purpose of influencing Judge Guynn and because he was black.

42.    Although Judge Guynn had recused on every other case in which Neeley appeared, Neeley appeared as counsel of record in the Jefferson County case nonetheless.

43.    Neeley has no significant experience prosecuting complex civil cases such as the case in **_Exhibit "A."_**

44.    Plaintiffs trusted Judge Guynn to be impartial, so Sutter recommended to his client

13

that any conflict caused by Neeley's entry into the case be waived. That was a mistake.

45.  Neeley's appearance in the case was another substantial step in a conspiracy to deny Plaintiffs, the Nobles, and Stephens their constitutional rights.

46.  Neeley was hired simply to provide a conduit of information between himself and Judge Guynn and because Neeley was black.

47.  Neeley and Guynn met after hours at Neeley's law office during the pendency of the Jefferson County litigation.

48.  Neeley was paid tens of thousands of dollars by the Adamses.

49.  Neeley was hired on the recommendation of WLJ.

50.  During the course of the Baker case, Neeley and Judge Guynn communicated about the case *ex parte*.

51.  The Adamses also communicated directly with sitting, and long-time friend, Circuit Judge David Clark in Faulkner County, Arkansas.   Clark visited with the Adamses regularly, but he failed to disclose this fact to the parties to the Probate.

52.  The Adamses and Bell knew what the respective judges would do on several occasions before the Plaintiffs and their client, Gina Baker.

53.  On occasion, Judge Guynn discussed the case with Neeley at Neeley's office after hours, and Neeley then would contact Eric Bell or the Adamses and report what the Judge's decisions would be.

54.  The lawyer defendants would then craft their representation of the Adamses based upon the "inside" information they had but that Plaintiffs and their clients did not.

55.  Bell, Henry, Neeley, and Williams then recruited other lawyers like Chris Burks,

who then associated BRANDON HAUBERT, to make spurious allegations against the Plaintiffs, thereby committing barratry, champerty, and maintenance.

56. Henry then used the Westbook counterclaim that falsely alleged that Plaintiffs had "sold out" a client, David Westbrook, to bribe the Jefferson County Coroner to change the manner of death in the Luke Baker death certificate to create a conflict for the Plaintiffs. Her false representations to the Court are attached as *Exhibit "M."*

57. Henry intentionally failed to disclose to the Court that Defendants had encouraged, aided, and abetted the filing of the false Westbrook counterclaim. Thus, the Westbrook allegation were an intentional attempt to create a conflict for the Plaintiffs, after one or more Defendants discovered the Westbrook case had been settled.

58. Henry failed to disclose that Efrem Neely, acting with the approval of Henry and Williams, approached David Westbrook, after he settled his case, and falsely suggested to Westbrook that Plaintiffs had sold him out.

59. Henry failed to disclose that Efrem Neely, acting with the approval of Henry and Williams, arranged a meeting with Williams or the WLJ lawyers at the offices of WLJ.

60. Henry failed to disclose that at that meeting, Efrem Neely, acting with the approval of Henry and Williams, then convinced Westbrook to contact Chris Burks, whom had been recruited by Bell at the requests of the other Defendants, for the purpose of filing a frivolous suit against the Plaintiffs for free.

61. Then, Henry and Williams convinced the Defendants, other than Sayes, to sign pleadings that accused Plaintiffs of heinous activities to fabricate a basis for the Faulkner County litigation. See *Exhibit "D,"* for example. The Sayes Defendants did not serve *Exhibit "N"* on

15

the Plaintiffs.  Although these other lawyers declined to sign the frivolous Faulkner County Complaint, they did sign the Motion attached as *Exhibit "D."* The Motion was not served on the Plaintiffs, even though Plaintiffs had a clearly established right to Due Process. Defendants violated Plaintiffs' right to Due Process. One egregious example is Irby, a lawyer employed by WLJ and a former law clerk to a federal judge and clearly was well versed in Due Process rights.

62.  A hearing was held on June 2, 2021, at which none of the Plaintiffs were present, but one or more of Defendants were present. See Transcript attached hereto as *Exhibit "E."* The transcript reveals that, acting at the Defendants' insistence, Judge Guynn entered an Order under Ark. R. Civ. P. 11 and 37 sanctioning the Plaintiffs without ever having given Plaintiffs notice.

63.    The Bakers' lawyers, Eric Buchanan and Marion Humphrey, did not introduce a single piece of evidence at the hearing. As a result, these attorneys were not sued by the ADAMSES, even though they approved and executed the joint decisions made by all counsel in the Baker litigation.

64.  Henry drafted the order, but her draft sets forth reasoning for the decision which differs in important ways from what Judge Guynn actually ruled from the bench.   Judge Guynn signed the order anyway.

65.  As soon as Sutter found out about Judge Guynn's sanctions order, he filed a Motion to Intervene, attached as *Exhibit "F."* The lawyer Defendants(with the exception of Sayes) then filed a Response, attached as *Exhibit "G."* Sutter then filed a Reply, attached as *Exhibit "H."* MATTHEWS, SANDERS & SAYES, P.A. did not respond and took no action to address its failure to give Plaintiffs' notice of the hearing, even though it had specific knowledge of the scheme outlined herein.

16

66.   Any reasonable and honest judge, as well as all the lawyers involved, would give lawyers like the Plaintiffs notice and a meaningful opportunity to be heard, but not a single lawyer representing the Bakers objected to the absence of Sutter and Gillham. Why? Because all Defendants achieved their goal - INTIMIDATION! All of these actions were intended to deny Plaintiffs' Due Process and their First Amendment rights to access to courts.  All Defendants abused the judicial process and interfered with Plaintiffs' contract rights.   The result would have been different had Burks and BRANDON HAUBERT not filed the frivolous lawsuit, and such filing was a substantial step in the conspiracy.

67.   Upon information and belief, in furtherance of the illegal conspiracy between all Defendants, acting under the influence of Neely and to further Neely's financial interests, Judge Guynn then denied Sutter's Motion to intervene at the Adamses', lawyer Defendants' request, just as he had denied the Bakers' absolute right to nonsuit the case under Ark. R. Civ. P.  41 multiple times.  The Order sanctioning the Plaintiffs sets forth no reason for the decision and was drafted by Henry.  The Order denying Intervention was a further denial of Plaintiff's Due Process rights and was procured by all lawyer Defendants by virtue of a frivolous motion filed on June 2, 2021.

68.   Using the void Order, Williams, Ed Lowther, Fair, Henry, Irby and the Adamses then caused to be filed ***Exhibit "B."*** Exhibit B is sometimes referred to as the Faulkner County case and a frivolous complaint with the Arkansas Committee on Professional Conduct. Indeed, in response to a Motion to Disqualify him in the Faulkner County litigation, Neeley stated, "By virtue of Rule 11, plaintiffs' attorneys have already affirmed that they believe the allegations of the first amended complaint to be true. If required to testify, plaintiffs' attorneys would support

17

those allegations and plaintiffs' claims."  But Neeley will also testify, "You should tell Mr. Sutter that I have nothing bad to say about him. I think he's a great attorney, I just think this was a bad situation he was in."  How can this be?

69.    Defendants will argue in the Faulkner County case that Plaintiffs should be collaterally estopped from relitigating most issues, even though Plaintiffs have never had the opportunity to present uncontroverted evidence that they did not engage in improper conduct. Indeed, the issue of whether Plaintiffs breached their duty to David Westbrook has already been litigated. See *Exhibit "I.*"  Plaintiffs were obviously successful because Burks, in association with BRANDON HAUBERT, filed the lawsuit at the request of his friend Eric Bell for free at the request of the Adams, with the advice and consent of Williams and Henry, without a factual basis so that Plaintiffs could not defend themselves in the Jefferson County proceedings.

70.    Bell, acting through Neeley, had referred David Westbrook to Chris Burks, who, along with BRANDON HAUBERT, then sued Plaintiffs for malpractice and breach of fiduciary duty without a factual basis for free, even though there was no reasonable basis in fact or law for the lawsuit.

71.    The WLJ Defendants then caused the allegations of that lawsuit to be publicized throughout the State, through Arkansas Business and others.

72.    Arkansas Business is a publication that has an established business relationship with WLJ.  Plaintiffs have none.

73.    Upon information and belief, Henry, and perhaps others, influenced Arkansas Business to run a slanted story in an attempt to destroy each Plaintiff's reputations.

74.    Then, Ed Lowther, Williams, Fair, Henry, and Irby filed the frivolous Faulkner

18

County lawsuit attached, going so far as defaming Sutter's son, Jacob, accusing him of conspiring to suborn perjury.

75. Jacob had only flown a jet to pick up independent counsel to assure ethical and proper conduct in the Baker case. Jacob also ran a slide show during the taking of the Coroner's deposition in the Baker case.

76. To further add insult, Henry sent a FOIA request to Jacob's law school, which the law school allegedly lost. Upon information and belief, Henry and other Defendants obtained information about Jacob protected by FERPA.

77. Jacob Sutter has been forced to disclose the lawsuit against his father, ***Exhibit "B,"*** to the Arkansas Supreme Court and its committee, which could, but hopefully won't, delay his licensure.

78.     The reference to Jacob in ***Exhibit "B"*** was gratuitous and outrageous, and designed to anger Sutter.

79. Despite warnings, WLJ and its lawyers continue to falsely accuse Sutter of unethical conduct in order to force him to withdraw. *Cheatwood v. Horan* is an example. In that case, Michele Browning falsely accused Sutter of unethical conduct. This allegation then forced Sutter to withdraw, and then a defense verdict was rendered. As a result of each Defendant's actions, Plaintiffs have lost millions of dollars in fees, as well as incurred attorney's fees and costs.

## COUNT I-RETALIATION

80.     Each Plaintiff realleges the foregoing as if fully set out herein.

81.     Each Plaintiff had a clearly established right to freedom of speech and access to courts under the 1st Amendment and to remonstrate under the Arkansas Constitution, as well as

19

to participate in an investigation designed to determine whether a homicide occurred.

82.    The issue of whether Luke Baker committed suicide or was murdered is an issue of public concern, as well as whether there was public corruption in Jefferson County.  If Luke Baker was murdered, covering that up involved both state action and some of the defendants participating in and inducing that state action.

83.    Defendants deprived each Plaintiff of their constitutional rights without Due Process by obtaining an Order designed to smear the Plaintiffs.

84.    The actions undertaken by the Defendants would chill a reasonable person of ordinary firmness.

85.    By virtue of the facts alleged herein, each Plaintiff has lost wages, lost fringe benefits, lost fees, and incurred other damages in an amount to be proven at trial.

86.    Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages in their respective individual capacities.

## COUNT II-CONSPIRACY TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS

87.    Plaintiffs reallege the foregoing in support of their claims under the ACRA and 42 USC §1983 and 1985 as if fully set out herein.

88.     Plaintiffs were hired under a contingency fee contract in the Baker case, and Plaintiffs were assigned the right to collect attorney's fees.   Plaintiffs had a property right in this contract.

89.    In the absence of the conspiracy, Plaintiffs would have prevailed for their client, as would have the Estate of Luke Baker.

90.    Upon their entry of appearance, Plaintiffs acquired a statutory lien under Arkansas

law.   Judge Guynn's order deprived Plaintiffs of that lien.

91.   "[I]n any §1983 action the initial inquiry must focus on whether the two essential elements to a §1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities, secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

92.   Plaintiffs had a liberty and property interest in their reputation and law license which Defendants intentionally damaged without Due Process.

93.   Defendants all acted under color of law.

94.   To act "under color of" state law for §1983 purpose does not require that the defendant be an officer of the State. It is enough that Defendants were willful participants in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.

95.   The Order attached as ***Exhibit "J"*** executed and entered by Judge Guynn was the product of a corrupt conspiracy involving the illegal influence of Judge Guynn, as well as another Judge in Faulkner County.

96.   The lawyer Defendants approved and submitted an Order to Judge Guynn they knew was void for lack of Due Process and was false, even though the issues had been determined by the Circuit Court of Saline County.

97.   Judge Guynn denied Sutter's Motion to Intervene because he was corruptly influenced by Neely. There is substantial evidence Luke Baker did not commit suicide, but the

21

Judge had been influenced by Neeley (who was doing so at the behest of the other lawyer defendants) to render an unjust decision at the behest of the Adamses and Bell.

98.   Here, the private parties conspiring with the judge were acting under color of state law.

99.   Private parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of state law within the meaning of § 1983. *Dennis v. Sparks*, 449 U.S. 24, 27-29, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

100.   An attorney who participates in corrupt proceedings by continuing to practice in front of a judge who is known to have preordained an outcome in the attorney's favor serves only to compound the corruption. *DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999).

101.   For purposes of determining the liability of private parties, it does not matter whether the state official is motivated by avarice or favoritism. Given Judge Guynn's failure to disclose his wife's employment in the Lee Davis case described as ***Exhibit "K,"*** Plaintiff alleges avarice.

102.   Each Defendant was a willful participant in the corrupt conspiracy which resulted in the order Judge Guynn gladly signed and entered to bring the conspiracy to a final success.

103.   All defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding," and provided facts which would establish a "meeting of the minds." *White v. Walsh*, 649 F.2d 560, 561 (8th Cir. 1981).

104.   The Due Process Clause of the Fourteenth Amendment "requires that action by a state through any of its agencies must be consistent with the fundamental principles of liberty and justice which lie at the base of our civil and political institutions, which not infrequently are

22

designated as 'the law of the land.' " *Buchalter v. New York*, 319 U.S. 427, 429, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943) (quoting *Herbert v. Louisiana*, 272 U.S. 312, 316-17, 47 S.Ct. 103, 71 l.Ed. 270 (1926)).

105.   Judge Guynn's Order was not consistent with the law of the land.

106.   In his argument before the Supreme Court in the Dartmouth College Case, Daniel Webster gave what is perhaps the most often quoted definition of the phrase "law of the land." *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 4 Wheat. 518 (1819). "By the law of the land, is most clearly intended, the general law; a law, which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial." *Id*. In this case, many hearings were meaningless and the resulting judgments predetermined.

107.   An attorney who participates in corrupt proceedings by continuing to practice in front of a judge who is known to have preordained an outcome in the attorney's favor serves only to compound the corruption.

108.   Each of the ADAMSES' attorneys knew that Neeley had specifically being hired to provide a conduit between Judge Guynn and the Defendants, since he had no significant experience in complex litigation. Indeed, the Adamses and Bell, with Williams' and Henry's approval, specifically hired Neeley to provide the conduit between Judge Guynn and the Defendants.

109.   Due process requires at a minimum that a person be given notice and a reasonable opportunity for a hearing before he or she is deprived of property by state action. *State of Wash. v. Thompson*, 339 Ark. 417, 6 S.W.3d 82 (1999).

110.   The United States Supreme Court has recognized that "the requirements of

23

procedural due process must be met before a State can exclude a person from practicing law." *Wilner v. Comm. on Character and Fitness*, 373 U.S. 96, 102, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963).

111.   Attorneys are licensed by the state to practice their profession. One who practices his profession has a property interest in that pursuit which may not be taken from him or her at the whim of the government without due process. *State ex rel. Stephan v. Smith*, 242 Kan. 336, 747 P.2d 816 (1987).

112.   The practice of law is a privilege and not a right, but one cannot summarily restrict a lawyer's ability to exercise the privilege. *Donovan v. Sup. Ct. Comm. on Prof'l Conduct*, 375 Ark. 350, 290 S.W.3d 599 (2009).

113.   Here, Judge Guynn's order was procured by a corrupt conspiracy, and without Due Process and it stigmatized Plaintiffs in Jefferson County, causing them to lose business, fees, and costs.

114.   One example is Lee Davis. Dr. Davis fired the Plaintiffs because of Judge Guynn's Order. See ***Exhibit "K."***

115.   Upon information and belief, WLJ, and one or more of its lawyers, filed a frivolous Complaint against the Plaintiffs with the Committee on Professional Conduct, using the Order at issue as a basis. As a result, Plaintiffs have been unable to apply to practice their profession in other States.

116.   In this case, each lawyer approving the corrupt Order knew that there was no factual basis for the Order and intended that the Order be the basis to collaterally estop the Plaintiffs from litigating the matter in Faulkner County and to provide a basis for the Committee

on Professional Conduct to file a cat's paw Complaint against the Plaintiffs. The Adamses and Bell then caused Westbrook to retain Chris Burks, a local lawyer, to file a frivolous counterclaim in the Saline County litigation, which was ultimately dismissed with prejudice. Burks ultimately executed the Affidavit attached as *Exhibit "O".*

117. By virtue of the facts alleged herein, each Plaintiff has lost wages, lost fringe benefits, lost fees, incurred attorneys' fees, incurred litigation costs, and incurred other damages in an amount to be proven at trial. Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT III-DEFAMATION

118. Plaintiff S&G and Lucien Gillham realleges against all Defendants the foregoing as if it were fully set out herein.

119. Each Defendant abused the process by procuring the Order without granting Plaintiffs Due Process. Each action was done to defame Plaintiffs and deny them a jury trial in conspiracy with the other Defendants.

120. One or more Defendants made defamatory statements outside the pleadings in order to destroy S&G.

121. S&G and Gillham each has lost reputation and lost business as a result of Defendants' defamatory statements.

122. Plaintiffs S&G and Gillham sue for defamation resulting from Defendants knowingly making false statements about their character and ethics.

123. By virtue of the facts alleged herein, S&G and Gillham each has lost wages, lost fringe benefits, lost fees, incurred fees and costs, incurred attorney's fees, incurred litigation

25

costs, and incurred other damages in an amount to be proven at trial.

124.   Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

### COUNT IV-INTERFERENCE WITH CONTRACTS

125.   Each Plaintiff realleges the foregoing against Williams, Henry, WLJ, and the Adamses, as if it were fully set out herein.

126.   Defendants Henry and Williams, acting within the scope of the authority granted them by the Adamses and WLJ, embarked on a calculated course of action designed to destroy the Plaintiffs and interfere with their contracts and business expectancies.

127.   One example is Lee Davis. Dr. Davis fired the Plaintiffs without cause because of the Order filed in this matter and the defamatory statements outside the pleadings. There are many others.

128. By virtue of the facts alleged herein, Plaintiffs have lost wages, lost fringe benefits, incurred attorney's fees, incurred litigation costs, lost fees and profits, and incurred other damages in an amount to be proven at trial.

129.   Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

### COUNT V-ABUSE OF PROCESS/MALICIOUS PROSECUTION

130.   Even though the ADAMSES actions, on their face, appear to be in proper form, the procedures they used to accomplish an ulterior purpose for which those procedures were not designed - the procurement of an order which is false and in violation of Due Process.   As a part of this abuse, Burks was then encouraged and requested, by one or more of his co-Defendants, to

26

file a frivolous counterclaim in Saline County against the Plaintiffs on 2/4/2020 without probable cause.   The counterclaim Burks and BRANDON HAUBERT filed was dismissed with prejudice, but the abuse of process occurred through the issuance of sanctions Order.

131.   The judicial process was turned upside down by Defendants with BRANDON HAUBERT and Burks' filing of the Saline County Counterclaim in 2020 and Guynn's corrupt order in 2022.   Instead of using the process for that which it was designed - seeking truth - the judicial process was used to suppress the truth and to insure the wealthy and powerful are above the law.

132.   Acting in conspiracy with another, the judicial process was used by Defendants to both coerce and extort the Plaintiffs as shown by the facts pleaded above.

133.   Defendants abused process for the express purpose of damaging Plaintiffs concerning reputation in their profession and personally.

134.   By virtue of the facts alleged herein, Plaintiffs have lost wages, lost fringe benefits, lost fees and profits, incurred attorney's fees, incurred litigation costs and incurred other damages in an amount to be proven at trial.

135.   Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT VI-CIVIL CONSPIRACY/BARRATRY

136.   Plaintiffs bring this count against all Defendants because the facts set forth I paragraphs 18-81 show that two or more of the Defendants entered agreements which included the following purposes: (1) obtain a result in the Baker litigation which protected any of the defendants from monetary or reputation damages; (2) obtain a result falsely determining Luke

27

Baker committed suicide; (3) engage in barratry, champerty, and maintenance, and (4) destroy Sutter and anyone associated with him by filing frivolous pleadings maliciously. The counterclaim was dismissed on summary judgment, and Plaintiffs ultimately received summary judgment against Westbrook for malicious prosecution and defamation. Defendants should be collaterally estopped from denying the facts established therein.

137. At various times between August of 2019, the Adamses, Williams, Henry, WLJ, Bell, Neeley, BRANDON HAUBERT, and Burks advised, procured, encouraged and stirred up David Westbrook who was at such time, and who remains, a pauper and in indigent circumstances, to commence and prosecute an action for legal malpractice and breach of fiduciary of duty as described in *Exhibit "I"* against Plaintiffs.

138. In so doing, the Adamses, Williams, Henry, WLJ, Bell, Neeley, and Burk maliciously intended to injure, harass, and damage Plaintiffs, and to put Plaintiffs to great vexation and expense, unlawfully, maliciously, and without reasonable or probable cause, and without having any interest in the suit against Plaintiffs.

139. By and through defendant's above-mentioned advice, procurement, instigation, encouragement, and stirring up of Westbrook, Westbrook commenced and prosecuted the action described in *Exhibit "I"* against Plaintiffs, without reasonable or probable cause.

140. Plaintiffs appeared in the above-mentioned action, denied the allegations of the complaint and any liability as alleged in the complaint, and employed an attorney, Richard Glassman whose office is located in Memphis Tennessee to defend the action.

141. As described in *Exhibit "I,"* proceedings were had in the action and a judgment was duly made and entered granting summary judgment against Westbrook and is now final. A

copy of the judgment is attached to this complaint, marked ***"Exhibit I"*** and incorporated by reference.

142. By reason of defendant's acts, advice, procurement, instigation, and stirring up of Westbrook to prosecute the above-mentioned action against plaintiff without probable cause, plaintiff was put to great trouble, vexation, and expense in the defense of the action and was obliged to pay thousands of dollars for the defense and cost of the action.

143. By reason of the poverty and indigence of Westbrook, each plaintiff was and is unable to obtain satisfaction from for the costs of suit so adjudged against such party and such costs remain wholly unpaid and unsatisfied.

144. Two or more of the defendants used their agreements to undertake actions which to the casual observer would appear lawful on their face, but those actions were actually oppressive and grossly immoral.

145. The actions of two or more of the defendants used their agreements to undertake actions were in, in actuality, unlawful, oppressive and immoral. Eventually, in February of 2020, Burks and BRANDON HAUBERT filed a frivolous lawsuit against Sutter so that Judy Henry could make these allegations in the Jefferson County Circuit Court and in the Faulkner County Circuit Court. So, Sutter was forced to withdraw from Jefferson County case.

146. The actions of the Defendants, acting in concert to achieve the result they sought, which was a suppression of justice and the truth about the Luke Baker murder, was a civil conspiracy which purposely injured Plaintiffs, and others.

147. By virtue of the facts alleged herein, Plaintiffs have lost wages, lost fringe benefits, lost fees and profits, incurred attorney's fees, incurred litigation costs and incurred other

29

damages in an amount to be proven at trial.

148. Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT VII-CIVIL FELONY TORT

149. Plaintiffs bring this count against all Defendants because the facts set forth in paragraphs 18-81 show that two or more of the Defendants entered into agreements to bribe or illegally influence a state judicial officer, so a claim is brought under ACA 16-118-107.

150. Defendants aided or abetted a felony, the bribery or illegal influence of a state judicial officer. The actions of the Defendants, acting in concert to achieve the result they sought, which was a suppression of justice and the truth about the Luke Baker murder, was a civil conspiracy which purposely injured Plaintiffs, and others.

151. By virtue of the facts alleged herein, Plaintiffs have lost wages, lost fringe benefits, lost fees and profits, incurred attorney's fees, incurred litigation costs and incurred other damages in an amount to be proven at trial.

152. Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## DEMAND FOR TRIAL BY JURY

153. Plaintiffs demand trial by jury on all issues so triable.

**WHEREFORE,** Plaintiffs, each pray for appropriate compensatory damages, nominal damages, and punitive damages against each of the named Defendants in the maximum constitutional amount, for a trial by jury, for a Declaratory Judgment that each of the Defendants, individually and as a group or groups, engaged in a corrupt conspiracy in an attempt to suppress

the truth that Luke Baker did not kill himself and to prevent Plaintiffs from exercising their state and federal constitutional rights, for reasonable attorneys' fees, for costs and for all other proper relief.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
1501 N. Pierce, Ste. 105
Little Rock, AR 72207
501-315-1910 Office
501-315-1916 Facsimile
*Attorneys for the Plaintiff*

By:    */s/ Luther Oneal Sutter*
Luther Oneal Sutter, Ark. Bar No. 95031
Luthersutter.law@gmail.com

By:    */s/ Lucien R. Gillham*
Lucien R. Gillham, Esq. ARBN 99-199
lucien.gillham@gmail.com

31

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Jun-03 17:33:46
35CV-24-455
C11WD05 : 13 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
5 DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY                PLAINTIFFS

V.                          CASE NO. 35CU-18-1077

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE ADAMS,
MARY TATE, RELIANCE HEALTH CARE INC,
BRANDON ADAMS, TODD ROSS, JOE WICKER                DEFENDANTS

## COMPLAINT

### INTRODUCTION

This lawsuit is a cause of action against the defendants for wrongful death, intentional infliction of emotional distress, civil liability for harmful acts committed during commission of a felony, premises liability, negligence, social host liability, conversion of evidence and property belonging to plaintiff, Luke Baker, and other torts as more particularly set out in the following allegations. Liability herein is for direct action, through agents, or vicarious as joint partner venturees, or by conspiracy. This action is brought by the Estate of Luke Baker, and by his family members individually for torts directly committed against them after the death of Luke Baker as more particularly set out below. All defendants are not alleged to have participated in every act of tort herein described, but the proof will show the degree of participation for each.

### JURISDICTIONAL ALLEGATIONS

1. The death of Luke Baker occurred on the evening of October 24, 2015 in Jefferson County, Arkansas at the Prairie Wings Duck Club where he was a guest of the defendants who owned, directly or indirectly, said property, and Skylar Wilson, co-host, who had also invited him there. Present at the time of the death were Skylar Wilson, Carson Cook, and Austin Tate. The actions of one or more of the defendants

FILED IN MY OFFICE AND SUMMONS
ISSUED AT 9:41 O'CLOCK M
10-23-2018 DATE
LAFAYETTE WOODS, SR., CLERK

1

EXHIBIT
A

led to the death of Luke Baker. Immediately after Luke's death, a combination among some of the defendants by conduct or agreement occured in Jefferson County, Faulkner County, and perhaps other locations within the State of Arkansas and overt acts were committed in Jefferson County and elsewhere in furthermore of that combination, and acts in furtherance thereof constituted torts in themselves under several different legal theories outlined below, and other defendants may have joined therein later.

2. The defendants Bryan Adams, Skylar Wilson (who may go by the name Skylar Adams at times), Travis Jones (who may go by the name Travis Jefferson at times), Carson Cook, Karla Cook, Todd Ross, Austin Tate, John Tate, Mary Tate, and Christie Adams reside in Faulkner County. The defendant Brandon Adams resides in Arkansas and owns the subject location in Jefferson County, Arkansas. Joe Wicker resides and owns land in Jefferson County, Arkansas. Prairie Wings South, LLC and Prairie Wings Lodge, LLC are Arkansas companies doing business in this state and own or manage the property known as the Prairie Wings Duck Club in Jefferson County. Reliance Health Care, Inc. and perhaps a John Doe company or other defendants were the employers of Travis Jones at times and directed his activities at times relevant hereto, and thereby are principals to his agency and responsible for any actions taken by him in furtherance of orders by them or by executives of any defendant company, which included actions taken in furtherance of the combined effort outlined herein. All defendants who are not natural persons do business in this state and in Jefferson County and Faulkner County, Arkansas.

3. The John Doe Company is an as yet unidentified company or companies who directed its employees in furtherance of the combination or conspiracy as either an employer or principal of defendant(s) or owner. John or Jane Doe, a natural person (or persons), is an agent of or co-conspirator with others herein and responsible for acts taken relative to this cause of action as either principal, agent, or owner. Both sets of defendants will be identified after discovery but could not as yet be determined due to obfuscation of other defendants and spoliation of evidence. Upon information and belief said defendants were in some manner responsible for the events herein and the resulting

2

damages and each are aware of the involvement of each other herein. Heritage Center or Heritage Square may or may not be such a company.

4. The plaintiffs are all residents of Faulkner County, Arkansas. Kerry Baker, surviving father and Administrator, Savannah Baker Case, surviving sister, and Gena Downey Baker, surviving mother, are the immediate familial survivors of Luke Baker, and are all adults.

5. This Court has personal jurisdiction of all parties hereto, as well as subject matter jurisdiction over this matter. This county is the focal point of most of the acts complained of, and pursuant to law, venue lies herein. At all times herein the defendants were agents of their co-defendants in regard to all acts committed.

## FACTUAL BACKGROUND

6. On October 24, 2015, four friends, Skylar Wilson, Austin Tate, Carson Cook, and Luke Baker went on a joint venture, a hunting trip, to the Prairie Wings Duck Club near Altheimer, Arkansas in Jefferson County. The joint venturees were invited guests of their hosts, the owners of the Duck Club, who were Brandon Adams, Bryan Adams, Todd Ross, and Joe Wicker. These four owners of the property control all operations thereon as though the property was solely theirs, despite the fact that bare legal title and management of the company rests in the names of Prairie Wings South LLC and Prairie Wings Lodge LLC.

7. Near the end of the evening on October 24, 2015 around 10:30 p.m., give or take 15 minutes, there was an event, while Skylar Wilson and Luke Baker were in the same room resulting in the death of Luke Baker by gunshot wound to the head. Death was instantaneous or within seconds. Whether anyone still living other than Skylar Wilson witnessed the event is known only to Wilson, Cook, or young Tate.

8. Immediately upon recognizing that Luke was dead, there was no effort to contact authorities, or call 911, or get help for Luke for some period of time. Cook or Wilson insisted upon action by the three surviving friends to protect themselves first, ahead of their duty to Luke or his family as partners in the hunting outing. Wilson created a version of events that the wound was self-inflicted. There was apparently no resistance by Mr. Cook or young Tate to this version. Both claimed they were asleep at the moment of the shooting. It is believed that then began a cover up of any

3

evidence that might have implicated any of the defendants, in any way, or cause them to be investigated.

9. Upon information and belief, the three surviving friends called, in various order, directly or indirectly, through intermediary, by various available means, co-defendants Bryan Adams, Karla Cook, Christie Adams, Mary Tate, John Tate, and indirectly Brandon Adams, Todd Ross, maybe Joe Wicker, and others possibly, with such contacts ensuing before any action to summon authorities to the scene. The owners, or at least one of them acting for them all, gave instructions as to what action should be taken to protect the interests of co-defendants. The three surviving who were at the scene, followed the instructions they were given, and therein took overt acts in concert, and in full agreement and in furtherance of the plan, both tacit and explicit, both understood and acknowledged by word or conduct, both implied and inferred, thereby forming an agreement or conspiracy among all defendants to protect their own interests, above all else, including their duty to obey the law or discharge their respective duties of care and conduct.

10. One of the Adams defendants, and possibly other defendants, contacted Travis Jones, an employee, agent, supplier of things illegal to supply, and all around fixer, to speed to the scene and protect the interests of the other defendants, and also himself, by removing evidence, destroying evidence, and acting to mislead authorities and prevent detection of all of what had actually transpired, and to hide evidence of the drugs that were supplied by one or more defendants, and of other contraband. The other defendants either knew about the post-death conspiracy, fully agreed with it, or when learning about it, joined in and cooperated with it. As such, all defendants are agents of each other as co-conspirators as defined by law. The actions taken by the defendants resulted in spoliation, false reporting to authorities, compounding, hindering, aiding, abetting, obstructing, and other criminal offenses which went undetected due to a lack of any renunciations by any of the co-defendants, whether real persons or companies.

11. The specific acts are numerous, and the identities of which co-defendants committed which overt acts, here or there, is difficult to determine; but what is sure is that wholesale sanitizing of the scene, prior to arrival of the team of crime scene

4

investigators, occurred. Contraband was destroyed, removed, stolen, or hidden to avoid detection. Lies were told to authorities and others to conceal the truth. All co-defendants were generally aware of the actions of each other, did not object, leave the conspiracy, or cure the damage. The deputy coroner and sheriff's investigator were intentionally misled, and some degree of persuasion took place by at least some of the defendants to convince others to accept the suicide story being proffered.

12. Luke's body was removed from the scene, over thirty minutes after death, illegally, and by instruction and intention. None of the conspirators ever notified authorities, even during a sixteen-minute phone call, that Luke was dead, until an hour after his death upon arrival with the body in Pine Bluff at the hospital. If they had, they would have been ordered not to move or disturb the body, which they very much wanted to relocate in order to prevent a crime scene investigation at the club which would have revealed facts and evidence which the conspiracy was formed to hide. For this reason, the body was taken long after death to a hospital 20 miles away to relocate the investigators to the hospital emergency room instead of the Club. The gates to the Club were locked by Wilson, Carson Cook, and young Tate to prevent entry by the authorities or anyone.

13. These actions prevented any real investigation, led to the failure to follow normal investigative protocol, failure to follow normal coroner's procedure, all because they relied upon false information from Wilson and others in furtherance of the conspiracy. The failure to send the body to the crime lab for autopsy was accomplished by the conspirators by misleading authorities and the deceased's father, Kerry Baker, to pressure him to refrain from demanding an autopsy, so the decision not to have one could be blamed on him, when the decision was not his to make, especially under the devastatingly grave circumstances.

14. The relocation of the body caused the hospital ER doctor to sign the death certificate which could have been an attempt by the conspirator co-defendants to obviate the autopsy requirement.

15. The co-defendants divided their labor with some acting at the hospital, some in contacting law enforcement, and others by instructing witnesses, and others by

5

cleaning or removing evidence from the scene, the body, the gun, the hospital, and elsewhere.

16. The conspiracy remains to this day, and will until dismantled or renounced.

17. More specific allegations and the connection to each tort violation follow below.

<u>Factual Allegations Common to All Counts</u>

18. Luke Baker died at the Prairie Wings Duck Club on October 24, 2015 within a few minutes of 10:30 p.m. in Jefferson County. The identified actors in this event are Skylar Wilson and others acting together who offer a scenario where Luke Baker died as a result of his own action while evidence indicates he died of a non-self-inflicted gunshot wound as a direct and proximate result of acts by others that were at least negligent, constituting a wrongful death as defined by A.C.A. 16-62-102 (2016) which statute is incorporated herein by reference.

19. Luke Baker did not commit suicide, accidental or otherwise, although the defendants could be liable nonetheless if he had under certain circumstances. Therefore, pursuant to the doctrine of res ipsa loquitur and assuming the only eye witness to the death was Skylar Wilson, such death would not have occurred but for the acts of Wilson or one or more of the defendants which were negligent or greater, and therefore one or more defendants are responsible for the wrongful death absent presenting proof to overcome the presumption of the doctrine of res ipsa loquitur.

20. Wilson has given various accounts including suicide by close contact wound to the head, death by a game of solitaire Russian roulette, death by accidental dropping of the gun by either Luke or by Wilson himself, and another version where Wilson may not have witnessed the event at all. The results of the belated private autopsy and investigation by the State Crime Lab, the Jefferson County Sheriff, and the Coroner's Office, when complete, will refute any of these versions told by Wilson at various times. As of now, these investigations remain open and Plaintiffs have been unable to as of yet get the final crime lab report or the investigative files of authorities.

21. Plaintiffs believe upon information that Wilson, young Tate, Carson Cook, and Luke Baker were joking with each other around 10:15 p.m. Wilson was the brunt of much of the joking about various aspects of his social life. Luke was one of those teasing

6

Wilson. At some point, with the other two survivors either witnessing, or asleep, depending upon the proof, actions ensued which resulted in Luke being shot fatally.

22. The conduct by Wilson or other defendants, negligent, reckless, grossly negligent, or worse are a proximate cause of the gunshot wound, and thereby, Luke's death.

23. Even in the event of an accidental death, whether by accidental homicide, or otherwise for that matter, the three at the scene, young Tate, Carson Cook, and Wilson were also liable for the wrongful death due to both consuming and providing illegal drugs and alcohol to each other while on a joint venture hunting trip, such that each owed a common duty of reasonable care to the others, which they all three breached under the circumstances, which led to the intoxication of all three, diminished judgment, dangerous behavior, for which all are responsible as agents of each other. The drugs they consumed were illegal, all three were under the age of 21 so the alcohol was also illegal, such that any defendant who was a supplier thereof is responsible for attendant damage proximately caused. These illegal substances were believed to have been supplied by one or more defendants or by their agent, possibly Travis Jones or one or more of the owners. All defendants were negligent, or worse, in promoting, providing, and accommodating, or by eventually covering up the underage illegal substance abuse by those possessing deadly weapons, some of which weapons were the property of the defendants supplying the substances. Liability follows under the applicable statutory and case law.

24. The landowners, Prairie Wings South, LLC, Prairie Wings Lodge, LLC, Ross, Brandon Adams, Joe Wicker, and Bryan Adams, and Doe defendants, are liable to invitees or licensees for the dangerous conditions they created or allowed on their property, and the Recreational Land Use Statute does not shield their liability due to their gross negligence or illegal behavior. In the event the Recreational Use Statute applies, even non-licensees are owed a duty by landowners or hosts to refrain from grossly negligent or illegal behavior, so defendants are nonetheless jointly liable for damages that were proximately caused by them or their agents.

25. Evidence of defendants' liability can be inferred from their spoliation of evidence, of the circumstances of the death itself, of the drinking and drugging attendant thereto,

7

and from all actions taken in concert by the defendants, by the Res Ipsa Loquitur doctrine, and by common sense, circumstantial evidence, and more.

26. As a direct, and proximate result of defendants' actions and omissions, plaintiff Luke Baker died. As a further proximate result, Luke's estate and heirs, plaintiffs herein, have been deprived of the presence, kindness, love, companionship, care, protection, advice, assistance, and support they would have otherwise enjoyed, or the comfort of a male offspring line to continue the family name. They have been severely damaged in an amount to be established according to proof and according to law. The estate has incurred expenses as a result as well due to the death of Luke Baker. In addition to liability for wrongful death to the estate and heirs through the Administrator, defendants are also directly liable to the three individual plaintiffs directly for torts directly against them committed after Luke's death.

27. Plaintiffs request and demand judgment as set forth below.

28. All paragraphs in the Complaint are incorporated into each individual Count in this Complaint by reference as if set out specifically therein.

### COUNT ONE – WRONGFUL DEATH

#### Skylar Wilson or Others

29. Skylar Wilson allegedly witnessed the death of Luke Baker on October 24, 2015. Whether anyone else was in the same room with them is yet to be determined. The circumstances of Luke's death indicate he did not die freely of his own hand, leaving the only conclusion that he did so at the hands of or due to the negligence of another or others. Such a death could not have occurred but for the negligence or wrongful act of others.

30. The doctrine of Res Ipsa Loquitur applies to the circumstances of this case to apply the presumption of negligence or more upon those responsible and shifts the burden of production to defendant Wilson or other defendants to overcome or rebut said presumption.

31. The gunshot wound is believed to be a distant wound as that term is used by medical examiners to exclude close or contact scenarios, and to indicate a distance of two feet or more, possibly much more. This means that Skylar Wilson's statements to

authorities on October 24, 2015 and later were false, further implicating the inference of liability due to spoliation and res ipsa application. To the extent others were involved in the acts, they too would be liable.

### Suppliers of Illegal Substances or Dangerous Conditions

32. Several of the defendants, upon information and belief, were involved in some degree in the illegal supplying of drugs, alcohol, and other substances to those present at the duck club on October 24, 2015. Those implicated in this are Travis Jones, Wilson, young Tate, Carson Cook, one or more owners, any Doe defendant delivering any substances to the lodge, and any defendant who controlled the premises who supplied, or arranged, or allowed the supply thereof to the hunters, who knew or should have known that the result would be the dangerous scenario of underage substance abuse and intoxication by 20-year-olds possessing firearms in a remote, isolated, and inaccessible location where the events that occurred were foreseeable and proximately caused by this negligence. Any defendant so involved is liable for wrongful death as well, regardless of the specific manner of death so long as it was proximity caused by drug or alcohol intoxication facilitated by said defendants.

33. Law enforcement reports after the event, attributed to information provided by the defendants themselves, indicated an evening of drugging, drinking, and partying was involved in the resulting death.

34. As such, the defendants so involved are jointly and severally liable for wrongful death damages caused by their acts or omissions.

35. All other paragraphs in the Complaint are herein incorporated.

### COUNT TWO-PREMISES LIABILITY

36. The defendants who are owners or persons in control of the premises or hosting the guests at the duck club owed a duty of reasonable care to their guests.

37. Whether the guests were invitees, licensees, non-licensee guests under the recreational use statute, or even trespassers, there is some degree of care owed to each of these four classes of persons who are present on the property of another.

38. Regardless of which status of the above four is imputed to Luke Baker, the duty of care imposed upon the responsible defendants was violated, and breach of the applicable duty of care proximately caused his death. This Count Two incorporates

9

the allegations above, as well as those following, to establish the breach of duty of care, and liability to those defendants responsible for the conduct or omissions at the club and lodge. It is unclear as to all of the defendants responsible, but since guests were sometimes charged a fee to use the club, were often supplied with liquor, and the club was used to entertain business associates of the companies who are defendants, and used for entertainment expenses, any of the defendants are potentially liable, subject to proof.

COUNT THREE-HOST LIABILITY

39. Illegal intoxicating substances were supplied to underage guests by the hosts of the club or lodge on the date in question. To the extent that intoxication of anyone, including the deceased himself, was a proximate and foreseeable result of Luke's death, those supplying intoxicating substances would be liable for the damage resulting therefrom.

40. Liability ensues to any defendant herein acting as a social host who provides alcoholic beverages or drugs to a person who cannot lawfully possess them; and there is no immunity from civil liability under the clear negative implication of A.C.A. 16-126-106 (1999). To the extent there exists a cause of action under Arkansas law under any statutory provision or case law, (be it Act 1596 (1999), civil liability for felony acts or otherwise) in addition to a cause of action for negligence already stated in Count One, this Count is in addition to that; and the allegations herein shall also apply to the other counts, and vice versa.

41. Arkansas law would allow social host liability under general negligence for providing alcohol (or drugs) to those who cannot "lawfully possess" same, A.C.A. 16-126-106, and comments thereto. This Act allows damage awards to an intoxicated person as well if underage, especially for drugs.

42. Even if a separate cause for social host liability, or for recovery in general negligence under Count One, is not applicable in this case, the possibility that such an action could, under certain circumstances be brought, is relevant to the defendants' state of mind and potential motive to spoliate or conspire.

10

## COUNT FOUR

43. Pursuant to A.C.A. 16-118-107, any plaintiff herein damaged by reason of conduct, of one or more defendants herein, that would constitute a felony under Arkansas law, may recover damages caused or based on that conduct. Even defendants who are not responsible for Luke's death may be responsible under this Count based upon their own conduct aiding any crime, if their conduct in connection therewith damages a plaintiff, under Arkansas law.

44. The acts committed relevant to this Count include but are not limited to actions which would be proven by a preponderance to constitute:
    a. Negligent Homicide or more (Title 5, Chapter 10).
    b. False Report (A.C.A. 5-54-122(c)(1)(D)).
    c. Hindering (A.C.A. 5-54-105).
    d. Compounding (A.C.A. 5-54-107).
    e. Theft (if more than $200 by some defendants).
    f. Delivery (A.C.A. 5-64-438).
    g. Conspiracy to Commit any Class C Felony (A.C.A. 5-3-401).
    h. Aiding or an Accomplice to any of the above, or any other felony (A.C.A. 5-2-403).

45. If any of the above conduct occurred and caused damage to any plaintiffs, including any of the three surviving family members individually, liability would ensue, apart from any liability for wrongful death, in that it falsely portrayed and alleged Luke as a suicide victim, knowingly asserted, when it was known this would damage the survivors financially, emotionally, health-wise, and otherwise, all of which was foreseeable and proximately caused by such conduct.

46. Liability under this Count allows for attorneys' fees and costs herein.

47. The exact criminal provisions violated by each defendant will be subject to proof.

## COUNT FIVE

### Intentional Infliction of Emotional Distress

48. All other paragraphs herein are incorporated in this Count.

11

49. The actions of the defendants at the time of Luke's death and after, which would have constituted slander if he had survived, and which were done to falsely label Luke as a suicide victim, to protect the other defendants from threats of liability, loss of reputation, loss of advantage or opportunity, loss of social position, and other things desirable, led to actions individually and in concert by defendants which knowingly inflicted emotional distress and mental anguish upon the three living plaintiffs, and this was done intentionally by defendants to protect themselves, without legal right or purpose, was likely directed by an agent in charge, as the primary control person, and fueled by selfish personal concerns and a total disregard for those damaged and with total disregard for the value of human life, specifically, Luke Baker's. This was accomplished by falsification, misrepresentation, spoliation, and other wrongful acts.

50. As such the plaintiffs are entitled to recover damages for the distress intentionally inflicted, regardless of the verdict on other Counts.

## DAMAGES

51. Plaintiffs are entitled to damages for pain and suffering, grief, emotional distress, loss of all the things Luke would have provided including but not limited to support, love, advice, companionship, and all things referred to above previously stated in this Complaint. Plaintiffs are entitled to recover damages personally and as heirs as stated above, and all plaintiffs are entitled to recover any direct financial loss or expense to which they were put as a result of defendants' conduct, and for costs and attorneys fees as allowed by law, plus interest and any other recovery allowed by law, that may be proved, inferred, presumed, or established. Plaintiffs also claim that punitive damages should be awarded against any defendant against whom the proof may show acted intentionally and in willful disregard of the rights of others, and such that damage ensued by such willful conduct, and causing punitive damages to be necessary to punish and deter such actions by tortfeasors acting willfully.

52. Trial by jury is respectfully demanded.

12

Wherefore, premises considered, the Plaintiffs pray for relief as stated above, for damages, punitive damages, costs, attorneys' fees and all other appropriate relief to which they may be entitled as to each defendant who may be found liable on any count herein.

Respectfully submitted,

Greg Stephens, Attorney (AR 85-153)
P.O. Box 1048 (mailing)
1422 Caldwell- Suite J (office)
Conway, AR 72034
Ph. 501-339-5388 (office)
318-453-9707 (cell)
501-615-8388 fax
gregstephens80@aol.com
Attorney for Estate and Kerry Baker

Date: October 24, 2018

And

Hon. Marion Humphrey
108 South Rodney Parham
Little Rock, AR 72205
501-801-7612
501-801-7613 (fax)
marionhumphreysr@gmail.com
Attorney for Gena Baker and
Savannah Case
AR Bar No. 80066

Date: October 24, 2018

13



## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
_____ DIVISION

BRYAN ADAMS; BRANDON ADAMS; AND
SKYLAR WILSON                                              **PLAINTIFFS**

VS.                      CASE NO _____

LUTHER SUTTER; LUCIEN GILLHAM;
SUTTER & GILLHAM, PLLC;
KENNETH GREGORY STEPHENS;
K. GREGORY STEPHENS P.A.;
KERRY BAKER, INDIVIDUALLY;
KERRY BAKER, AS ADMINISTRATOR
OF THE ESTATES OF JAMES LUKE BAKER;
SAVANNAH BAKER CASE;
GENA DOWNEY BAKER; MICHAEL NOBLE;
ALLEN NOBLE; NOBLE INVESTIGATIONS, INC.;
DENVER ROLLER, INC. D/B/A ROLLER-MCNUTT FUNERAL HOME;
AND CHAD KELLEY, IN HIS CAPACITY
AS JEFFERSON COUNTY CORONER
AND INDIVIDUALLY                                           **DEFENDANTS**

### COMPLAINT

Plaintiffs Bryan Adams, Brandon Adams, and Skylar Wilson, for their

complaint against defendants, state:

### PARTIES, VENUE, AND JURISDICTION

1.     Plaintiff Bryan Adams is an individual residing in Faulkner County,

Arkansas.

2.     Plaintiff Brandon Adams is an individual residing in Washington

County, Arkansas.

2282717-v1



3. Plaintiff Skylar Wilson is an individual residing in Faulkner County, Arkansas.

4. Upon information and belief, defendant Luther Sutter is an individual residing in Saline County, Arkansas.

5. Upon information and belief, defendant Lucien Gillham is an individual residing in Saline County, Arkansas.

6. Upon information and belief, defendant Sutter & Gillham, PLLC is a professional limited liability company doing business in Saline County, Arkansas.

7. Upon information and belief, defendant Kenneth Gregory Stephens is an individual residing in Faulkner County, Arkansas.

8. Upon information and belief, defendant Kenneth Gregory Stephens P.A. is a for profit corporation doing business in Faulkner County, Arkansas.

9. Upon information and belief, defendant Kerry Baker is an individual residing in Faulkner County, Arkansas.

10. Upon information and belief, defendant Kerry Baker is the duly appointed administrator of the Estates of James Luke Baker.

11. Upon information and belief, defendant Savannah Baker Case is an individual residing in Faulkner County, Arkansas.

12. Upon information and belief, defendant Gena Downey Baker is an individual residing in Faulkner County, Arkansas.

13. Upon information and belief, defendant Michael Noble is an individual residing in Faulkner County, Arkansas.

2

2282717-v1

14.    Upon information and belief, defendant Allen Noble is an individual residing in Faulkner County, Arkansas.

15.    Upon information and belief, defendant Noble Investigations, Inc. is a for profit corporation doing business in Faulkner County, Arkansas.

16.    Upon information and belief, defendant Denver Roller, Inc. d/b/a Roller-McNutt Funeral home, is a for profit corporation doing business in Faulkner County, Arkansas.

17.    Upon information and belief, defendant Chad Kelley is an individual residing in Jefferson County, Arkansas, and the publicly elected coroner of Jefferson County, Arkansas.

18.    This Court has jurisdiction over the subject matter of this litigation and the parties to this lawsuit.

19.    Venue is proper in this Court pursuant to Ark. Code Ann. § 16-60-101.

20.    Bryan Adams, Brandon Adams and Skylar Wilson are hereby sometime referred to collectively as the "Adams Plaintiffs" in connection with this Faulkner County case, or as "Jeff Co Defendants" as part of the named defendants in a Jefferson County Lawsuit, *Kerry Baker et al vs Bryan Adams, et al,* case no. 35CV-18-1077 ("Jeff Co Lawsuit").

21.    Defendants Luther Sutter, Lucien Gillham, Sutter & Gillham, PLLC, Kenneth Gregory Stephens, Gregory Stephens P.A., Kerry Baker, individually and as the administrator of the Estate of James Luke Baker, Savannah Baker Case, Gena Downey Baker, Michael Noble, Allen Noble and Noble Investigations, Inc. and

3

Chad Kelley, individually and in his capacity as Jefferson County Coroner, are sometimes collectively referred to herein as "Abuse of Process Defendants" or "Defendants".

22. Defendants Kerry Baker, individually and as the administrator of the Estate of James Luke Baker, Savannah Baker Case, Gena Downey Baker are sometimes collectively referred to herein as "Jeff Co Plaintiffs" or "Baker Family".

23. Defendants Luther Sutter, Lucien Gillham, Sutter & Gillham, PLLC, Kenneth Gregory Stephens, and Gregory Stephens P.A., are sometimes collectively referred to herein as "Jeff Co Attorneys".

24. Defendants Michael Noble, Allen Noble and Noble Investigation Inc. are sometimes collectively referred to herein as "Noble Defendants".

25. Defendants the Baker Family, Jeff Co Attorneys, Noble Defendants, and Roller are sometimes collectively referred to herein as "Exhumation Defendants".

## FACTUAL BACKGROUND

26. During the day of October 24, 2015, four close friends, all 20 at the time, Luke Baker ("Luke"), Carson Cook ("Carson"), Austin Tate ("Austin"), and Skylar Wilson ("Skylar") went to a hunting lodge called the Prairie Wings Duck Lodge in Altheimer, Arkansas ("Prairie Wings" or "Lodge").

27. Luke was invited to bow hunt for deer at Prairie Wings.

28. Unbeknownst to the owners of the Lodge or Skylar, Kerry Baker ("Kerry") gave permission for his son, Luke, to take one of Luke's many guns—a

4

2282717-v1

Taurus 0.38 Special Ultra Lite revolver that Kerry had recently purchased—and ammunition with him to the Lodge.

29.     Luke had been to Prairie Wings on previous occasions, and Kerry was always comfortable with Luke going because Kerry has known Skylar's father, Bryan Adams ("Bryan"), for more than 40 years.

30.     Late on the night of October 24, Luke was injured as a result of an accidental self-inflicted gunshot wound to the head.

31.     Skylar, Carson, and Austin jointly decided to take Luke immediately to the closest hospital—Jefferson Regional Medical Center ("JRMC")—to try and save Luke.

32.     On the way to JRMC, the boys called 911 to report the accident and advise of their rush to JRMC. The boys followed the directions of the 911 operator while the operator was trying to arrange for an ambulance to meet them in transit, which did not occur.

33.     At 11:50 p.m., Luke was pronounced dead at JRMC.

34.     At that time, Bryan and his wife/Skylar's mother, Christy Adams, were over 230 miles away in Fayetteville, Arkansas for the weekend, along with Skylar's uncle, Brandon Adams ("Brandon"). Bryan contacted a pilot in Conway, Arkansas, and requested a flight from Fayetteville to Pine Bluff where he landed and went to JRMC to meet his son Skylar. Bryan did not go to the Lodge at any time on October 25, 2018.

5

2282717-v1

35.    Brandon remained in Fayetteville and did not travel to Pine Bluff or the Lodge at any time on October 25, 2015.

36.    On October 24, 2015, Jefferson County Deputy Coroner Kimberly Phillips was on call that night for the Coroner's office and was called to JRMC. Investigator Kaleisha Wise and Deputy Terry Wingard, both of the Jefferson County Sheriff's Office also arrived at JRMC. Investigator Wise took photographs of Luke's body, his possessions and the vehicle that transported Luke to JRMC. Investigator Wise, the emergency room physician, Deputy Wingard and Deputy Coroner Phillips examined Luke's body. A true and correct copy of the Jefferson County Sheriff file containing 77 grainy photographs, 4 to a page, report of Wise, report of Deputy Coroner Phillips, and others is attached and incorporated herein by reference. (**Exhibit 1**, Jefferson County Sheriff's Office file produced to Jeff Co Defendants)[1].

37.    As a result of her investigation, Investigator Wise reported that she, "Observed burn marks from what appeared to be gun powder residue on the right side of Baker's head." Investigator Wise also reported that she "noticed a faint straight line on Baker's right hand and a groove impression on Baker's right thumb." She also reported that she "did not notice any signs of a struggle or any defensive wounds on [Luke] Baker's body." *Id.*

---

[1] The 77 grainy/blurry paper photographs were received in the Sheriff's file and are **Exhibit 54.** These photographs are removed from **Exhibit 1** as duplicative.

6

38.     After examination of Luke, Deputy Coroner Phillips reported as follows:

> Upon my arrival I observed a GSW to the right temple w/ stippling around it. On his right hand a faint straight line was observed on his index finger and a groove on his thumb. After speaking to the decedent's father I notified the funeral home.

*Id.*

39.     Upon arriving at JRMC, Kerry was informed of Luke's death. He spoke with Deputy Coroner Phillips and decided not to send Luke's body to the Arkansas State Crime Lab for an autopsy. Instead, he directed that Luke's body be sent to defendant Roller-McNutt Funeral Home in Conway, Arkansas ("Roller"). *Id.*

40.     A Sheriff's Deputy left JRMC and traveled to the Lodge where a deputy took 35 mm photographs inside and outside the Lodge and secured Luke's gun. *Id.*

41.     Shortly thereafter, the Jefferson County Sherriff's Office released the Lodge.

42.     Bryan, Christy, and Skylar, and others left JRMC in the early morning hours of October 25 and drove to their homes in Conway, Arkansas.

43.     Sometime later on Monday, October 26, 2015, Jefferson County Coroner Chad Kelley ("Kelley" or "Coroner Kelley") called Sgt. Mickey Buffkin of the CID of Jefferson County Sheriff's Office and asked whether Sgt. Buffkin was satisfied with the investigation that had occurred. In response, Sgt. Buffkin stated that he was satisfied per Kelley. Sgt. Buffkin also informed Kelley that Deputy Coroner Phillips had drawn fluids from Luke's body after confirming they were in

7

2282717-v1

the morgue refrigerator. A true and correct copy of the original version of the Jefferson County Coroner file as produced to Jeff Co Defendants by Kelley is attached and incorporated herein by reference. (**Exhibit 2**, Jefferson County Coroner file produced to Jeff Co Defendants).

44.    The original death certificate confirmed the cause of death was a gunshot wound to the head. A true and correct copy of the original death certificate is attached and incorporated herein by reference. (**Exhibit 3**, Original Death Certificate).

## THE PROBATE ESTATE PROCEEDINGS IN FAULKNER COUNTY

45.    On January 19, 2016, Kerry petitioned the Faulkner County Circuit Court to open a probate estate for Luke and sought appointment as special administrator, Case No. PR-2016-37 ("First Probate Case"). A true and correct copy of the Faulkner County First Probate Case docket sheet, petition, order appointing Kerry and order authorizing settlement are attached and incorporated herein by reference collectively as **Exhibit 4.** In the petition, Kerry stated "James Luke Baker was killed by an **accidental gun shot wound** which occurred on or about October 24, 2015." (emphasis supplied). *Id.* Kerry was appointed special administrator and received accidental death benefits from the Baker Family's homeowner's insurance policy as a result of Kerry's petition and representations to the Court. *Id.* As of the filing of this complaint this First Probate Case remains open. *Id.*

8

46.     Over two years later, on September 6, 2018, Kerry, through attorney Kenneth Greg Stephens and K. Gregory Stephens, PA (collectively, "Stephens"), filed a new and separate petition to probate the Estate of James Luke Baker (the "Second Estate"), in Faulkner County Circuit Court, Case No. 23PR-18-562 (the "Second Probate Case"). A true and correct copy of the Faulkner County Second Probate Case docket sheet, petition, and order appointing Kerry are attached and incorporated herein by reference collectively as **Exhibit 5.**

47.     In this Second Probate Case, Kerry was appointed as the personal administrator of the Second Estate on September 13, 2018. *Id.*

48.     The petition in the Second Probate Case lists Luke's heirs as Kerry, Gena Downey ("Gena"), and Savannah Baker Case ("Savannah"), and disclosed that Luke owned no real property, had an undetermined amount of personal property and had no debts. *Id.*

49.     Adams Plaintiffs were not creditors of the Second Estate. Adams Plaintiffs were non-parties, had no known claim against the Second Estate, and possessed no information that would assist Kerry, as the administrator, in distributing the assets of the Second Estate.

50.     On September 18, 2018, despite the Adams Plaintiffs having no relationship to the Second Estate, Stephens issued various subpoenas and notices of depositions to Bryan, Skylar, Travis Jones, Carson, his mother Karla Cook, Austin, and his father John Tate. He also issued a subpoena for Brandon, and attempted unsuccessfully to serve it. True and correct copies of all of these subpoenas and

9

2282717-v1

notices of deposition issued in the Second Probate Estate are collectively attached and incorporated herein by reference as **Exhibit 6**.

51.    During their attempts to serve the subpoenas on behalf of the Second Estate, individuals were threatened and harassed by process servers/investigators.

52.    Also on September 18, 2018, Stephens, for the Second Estate,  issued subpoenas duces tecum to New Cingular Wireless PCS, LLC a/k/a New AT&T Wireless PCS, LLC a/k/a ATT Wireless a/k/a AT&T Mobility ("AT&T") and Verizon Wireless (VAW), LLC ("Verizon") seeking to obtain cell phone records for sixteen (16) phone numbers, including the personal cell phone records of Adams Plaintiffs. True and correct copies of the subpoenas are collectively attached and incorporated herein by reference as **Exhibit 7**.

53.    Adams Plaintiffs were forced to spend time and money to defend themselves against these wrongfully issued individual and records subpoenas.

54.    Bryan and Skylar each filed motions to quash the subpoenas and notices of depositions and the Adams Plaintiffs separately filed motions to quash the subpoenas to AT&T and Verizon.  True and correct copies of these motions to quash are collectively attached and incorporated herein by reference as **Exhibit 8**, ("Motions to Quash").

55.    Before the Court could set and conduct a hearing on the Motions to Quash, Kerry, the Second Estate, and Stephens proceeded with a deposition of Karla Cook, one of the Jeff Co Defendants, on September 27, 2018, despite written notice that none of the deponents noticed in the Second Probate Case for depositions

10

would appear until a hearing had been conducted on their Motions to Quash. The requisite notice had not been provided to anyone of the intent to take Ms. Cook's deposition which was a basis to quash her notice and subpoena. Kerry, Second Estate, and Stephens pressed forward, refusing to cancel Ms. Cooks' deposition, despite the lack of notice and pending motion. At the deposition, in an attempt to annoy, oppress, intimidate, coerce or otherwise harass Adams Plaintiffs, their counsel, and any witness, or whoever might appear for the Adams Plaintiffs, and to leverage the Adams Plaintiffs into a settlement, the Noble Defendants were present, and at least one of them was visibly armed. One of them sat right next to counsel for Adams Plaintiffs and one sat at the end of the table to the right of counsel for Adams Plaintiffs. Having armed investigators present for a civil deposition of Ms. Cook being defended by a female attorney after the Adams Plaintiffs advised no witness would appear with counsel was an abuse of the deposition process designed for an improper purpose.

56.     The Court held a hearing on the Motions to Quash on October 9, 2018, and at the conclusion of the hearing, the Court granted the Motions and entered an order quashing all of the subpoenas issued to individuals, including the ones served on Adams Plaintiffs and Karla Cook. A true and correct copy of the Order dated October 24, 2018, is attached and incorporated herein by reference as **Exhibit 9,** ("Order Quashing Subpoenas").

11

57. The Motions to Quash were granted, among other reasons, because the discovery requested by Kerry, Second Estate, and Stephens was not in any way relevant to the Second Probate Case or otherwise proper.

58. The Order Quashing Subpoenas discusses the alleged purpose of the requested discovery in the Second Probate Case as argued at the hearing by Kerry, the Estate, and Stephens. Specifically, paragraph 3 of the Order Quashing Subpoenas found as follows:

> The Estate's argument was that in order to serve the Movants in the future with process, it needed the full legal names, domiciliary physical addresses and current cell phone numbers of all Movants, and a reasonably clear, current and accurate color photo of Skylar Wilson and Travis Jones. The Movants opposed allowing the Estate to conduct discovery in the probate estate for the same reasons asserted in the Motions to Quash the Individual Subpoenas and Briefs and in the Motions to Quash Subpoena to AT&T and Verizon and Briefs. The Court inquired of counsel for Movants whether they were willing to accept service of a summons and complaint for their current clients if the Estate files a separate civil action against some or all of them, and counsel for Movants, Marcus Vaden and Judy Simmons Henry agreed they would. The Court declined to grant the Estate's proposed request that the Court require the Movants to answer the first two interrogatories set forth in the Estate's Response.

*Id.*

59. The opening of the Second Probate Case was an improper invocation and use of judicial processes because the First Probate Case remained open. Upon information and belief, Kerry, Second Estate and Stephens opened the Second Probate Case to conceal from the Adams Plaintiffs that in the First Probate Case they had settled with an insurance carrier and received accidental death benefit

12

payment for the death of Luke based on representations under oath to the Court and world that Luke's death was the result of an accident. Upon information and belief, some or all of the Abuse of Process Defendants were aware of the actions being taken by Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and also insulate the Jeff Co Plaintiffs from adverse rulings.

60.    The *issuance of process* by Kerry, Second Estate and Stephens against the Adams Plaintiffs in Second Probate Estate was for an improper use of the judicial processes. *Id.* Upon information and belief, some or all of the Abuse of Process Defendants were aware of the actions being taken by Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and insulate the Jeff Co Plaintiffs from adverse rulings.

61.    The *service of process* by Kerry, Second Estate and Stephens on the Adams Plaintiffs in the Second Probate Estate was for an improper use of the judicial processes. *Id.* Upon information and belief, at least some of the Abuse of Process Defendants were aware of the actions being taken by Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and insulate the Jeff Co Plaintiffs from adverse rulings.

62.    By issuing process to seek the phone records of Adams Plaintiffs and others, Kerry, Second Estate, and Stephens engaged in a fishing expedition as pretext to filing a civil complaint against Adams Plaintiffs. *Id.* Upon information and belief, Abuse of Process Defendants were aware of the actions being taken by

13

Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and insulate the Jeff Co Plaintiffs from adverse rulings.

63.    AT&T and Verizon were asked to produce phone records and information without a complaint or any claims pending against Adams Plaintiffs. Upon information and belief, Abuse of Process Defendants were aware of the actions being taken by Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and insulate the Jeff Co Plaintiffs from adverse rulings.

64.    All of the preceding judicial processes were an abuse of process by and for the benefit of everyone involved because the processes involved the issuances of subpoenas, notices and/or processes for improper purposes, including but not limited to seeking information without a complaint or claim pending, were designed to annoy, embarrass, oppress, or otherwise harass Adams Plaintiffs and attempt to leverage them into a settlement, were not relevant to the Second Probate Case and were the initial attempts to bludgeon the credibility of Adams Plaintiffs for use in a prospective wrongful death lawsuit against Adams Plaintiffs and others. *Id.*

## SANCTIONS ENTERED IN FAULKNER COUNTY AGAINST STEPHENS

65.    On November 29, 2018, over a month after the Faulkner County Probate Court entered its Order Quashing Subpoenas, and after the Estate had filed a maligning and baseless Jeff Co Lawsuit against Adams Plaintiffs and others, the Estate and Stephens filed a motion for sanctions ("Motion for Sanctions") in the

14

2282717-v1

Second Probate Case seeking to hold Skylar in contempt related to the subpoena issued to him that had already been quashed. The Estate argued that the Court should impose sanctions against Skylar for allegedly lying to the Court and his counsel about not being served with the quashed subpoena issued to him. A true and correct copy of the Motion for Sanctions is attached and incorporated herein by reference as **Exhibit 10.**

66.    Specifically, the Estate alleged that it properly served Skylar with a subpoena on September 21, 2018. Skylar filed a response ("Response") to the Motion for Sanctions denying that any sanctions against him were proper, and requested an evidentiary hearing and for the Court to use its inherent authority to issue sanctions against the Estate and its counsel. A true and correct copy of the Response to Motion for Sanctions is attached and incorporated herein by reference as **Exhibit 11.**

67.    On February 11, 2019, the Faulkner County Circuit Court held a hearing on the Estate's Motion for Sanctions against Skylar and his response.

68.    Marion A. Humphrey, another of the attorneys representing some of the Jeff Co Plaintiffs, and Gillham appeared at the hearing in support of an effort to sanction Skylar. At the outset of the hearing, the Judge warned everyone that he was going to award fees if he was forced to waste time on the Motion for Sanctions. The Estate proceeded with the Motion for Sanctions.

69.    The Court verbally denied the Motion for Sanctions, awarded attorneys' fees and costs to Skylar and then issued a letter to address certain

15

aspects of the ruling that were not addressed from the bench. On March 15, 2019, the Court issued an order denying the Motion for Sanctions ("Order 1"). A true and correct copy of Order 1 is attached and incorporated herein by reference as **Exhibit 12**.

70.    By subsequent order entered on July 26, 2019 ("Order 2"), the Court made several additional findings relevant to this case. A true and correct copy of Order 2 is attached and incorporated herein by reference as **Exhibit 13**. Specifically, the Court made the following findings in Order 2:

- The Court finds that the Motion for Sanctions had nothing to do with the need for an estate to be opened or an administration of the Estate. (Paragraph ¶ 7);

- The Court finds that the filing of the Motion for Sanctions was an improper attempt to engage in an improper fishing expedition to file a wrongful death lawsuit [which they did]. (Paragraph ¶ 8);

- Subpoenas duces tecums were issued to Skylar, his family and friends, and to two telephone service providers by the Estate, commanding them under the authority of the courts to appear and answer questions and produce documents. The Estate indicated that it had other subpoenas issued but not yet served on others. The Court finds that such tactics related to the Estate Discovery are not justified in our judicial system. At the first hearing this Court conducted on all of the individuals' motions to quash the Estate Discovery, the Estate informed the Court that it only needed one question to be answered, "What is the address of the individuals who had been subpoenaed." This would provide the Estate with a proper address to have them served with the Estate's complaint in the Jefferson Circuit Action. Rather than going forward with the depositions and answering the now one question of the Estate, all individuals already subpoenaed agreed through their attorneys that they could be served through with the Jefferson Circuit Court complaint by and through their attorneys. This was more of a benefit to the Estate than having an address for each individual as service could be perfected with ease. By separate order, this Court granted Skylar and the other individuals' motions to quash the Estate Discovery. (Paragraph ¶ 9);

16

- After the first hearing and rulings on the motions to quash, counsel for the Estate then filed the Motion for Sanctions against Skylar under Rule 11. The basis of the Motion for Sanctions was that Skylar had filed a pleading (the motion to quash the Estate Discovery) that allegedly contained a false statement that Skylar had not been served with the Estate Discovery. In the Motion for Sanctions, the Estate sought findings of fraud and misrepresentations by Skylar, among other things and relief. (Paragraph ¶ 10);

- Rule 11 sanctions are typically reserved for matters of great importance. The Court finds that the purpose of the Motion for Sanctions filed by Mr. Stephens was not to benefit the administration of the Estate. Rather, the Court finds that the Motion for Sanctions had nothing to do with the Estate and was an attempt by the Estate for this Court to make a finding that Skylar had materially misled the Court. Although such a finding would in no way benefit the administration of the Estate, particularly since the motions to quash the Estate Discovery had been granted, and the Estate Discovery was moot, it would provide the plaintiffs (including the Estate) in the wrongful death lawsuit in the Jefferson Circuit Action a club to bludgeon Skylar every step of the way. After every answer the plaintiffs did not like, Skylar would be hit over the head with the findings of this Court that he had materially misled the Court. The Court finds that the award of attorneys' fee is clearly warranted under both Rule 11 as well as the Court's inherent ability to police against frivolous pleadings. (Paragraph ¶ 11);

- The Court finds that Skylar had no choice but to expend the time and money that he did in opposing the Motion for Sanctions. Had he not, he risked providing the plaintiffs in the wrongful death lawsuit with a weapon from which he could never defend himself. (Paragraph ¶ 12);

- The Court finds that the total amount requested in the Motion, $33,343.50, is reasonable in light of the facts and circumstances of this Estate and the Jefferson Circuit Action. The Court finds that the Motion for Sanctions was completely unnecessary to have the Estate administrated, yet the Estate chose to pursue this matter in an attempt to bolster the plaintiffs' case in the wrongful death lawsuit, and they should bear the entire cost for such a frivolous and unnecessary action. (Paragraph ¶ 13);

- At the hearing on the Motion for Sanctions, the Court asked if all attorneys at counsel table represented the Estate, and Mr. Stephens

17

2282717-v1

responded that "Today they do, yes." This indicated that Mr. Stephens, Mr. Gillham, and Marion Humphrey all represented the Estate. After a short break, Mr. Gillham clarified that he was not representing the Estate but rather Savannah Baker. As such, Mr. Gillham should not be held liable for the attorneys' fees requested in the Motion as he was not a party or an attorney for the Estate. Hon. Humphrey made no such clarification that day; therefore, the Court must conclude that he was present at the hearing on behalf of the Estate. However, Hon. Humphrey did not file the Motion for Sanctions and was not active in the prosecution of the Motion for Sanctions. For these reasons, the Court finds that Hon. Humphrey should not be personally liable for the attorneys' fees requested in the Motion. (Paragraph ¶ 17);

- The Court finds that total amount request in the Motion should not be passed onto the Estate as it was in no way related to the administration of the Estate. Instead, it was a tactical decision by Mr. Stephens to bolster the Jefferson Circuit Action. Mr. Stephens has argued to the Court that the Motion for Sanctions was "made to protect the right of Mike Noble to continue to earn a living as a process server and private investigator by clearing his name." The Court finds that this rationale is equally as frivolous as the rationale stated in the Motion for Sanctions. The Estate owes no duty to Mr. Noble, and the Estate has no interest in "protecting his name." If Mr. Noble feels he has been slandered, he has avenues he can use to seek remedies and relief, but they are not found in the Estate. The Court finds that the Motion for Sanctions has been a frivolous endeavor by Mr. Stephens and had no benefit to the Estate. For these reasons, the Court finds that the total amount requested in the Motion should be paid by Mr. Stephens. (Paragraph ¶ 18); and,

- Skylar Wilson is hereby awarded a judgment against Greg Stephens in the total amount of $33,343.50 ("Judgment"). The Judgment must be paid within ten (10) straight days of the entry of this order on the Court's docket. (Paragraph ¶ 19).

71.    On September 16, 2020 the sanction Judgment against Stephens of the

Circuit Court of Faulkner County and the Judgment were affirmed by the Court of

Appeals, Case No. CV-19-927.

72.    The Judgment covered only the part of the fees and costs of Adams

Plaintiffs as related to the Motion for Sanctions. The Adams Plaintiffs incurred

18

2282717-v1

additional fees and costs in connection with the Second Probate Case and suffered an emotional toll on them and their families by the abuses of process employed in the entire Second Probate Case, which should never have been filed.

73. All of the preceding judicial processes, including the deposition, sanction motions, hearings and trial, were an abuse of process because they involved the issuances of subpoenas, notices, processes, hearings, trial, appeal, and other acts for improper purposes, including but not limited to seeking information without a complaint or claim pending or for use in the separate Jefferson County Circuit Court proceeding to benefit Jeff Co Plaintiffs and Jeff Co Attorneys, were designed to annoy, embarrass, oppress, or otherwise harass Adams Plaintiffs, were an attempt to leverage the Adams Plaintiffs into a settlement, were not relevant to the Second Probate Case, and were continued attempts to bludgeon the credibility of Adams Plaintiffs for use in a prospective wrongful death lawsuit against Adams Plaintiffs and others, among other wrongful motives.

## COMPLAINT AND AMENDED COMPLAINT FILED IN JEFFERSON COUNTY, ARKANSAS

74. On October 24, 2018, Jeff Co Plaintiffs' and their counsel, Stephens and K. Gregory Stephens P.A. (collectively, "Stephens") and Marion A. Humphrey ("Humphrey") filed the first outrageous and fabricated complaint ("Complaint") for Kerry as administrator of the estate of Luke Baker and individually, Savannah and Gena, containing allegations with no factual basis, in the Jeff Co Lawsuit. A true and correct copy of the Complaint in the Jeff Co Lawsuit is attached and incorporated herein by reference as **Exhibit 14**. Although the Complaint was

19

2282717-v1

placed under seal shortly after it was filed, the allegations in it were broadcast by local news media in the hometowns of Adams Plaintiffs.

75.     Facing dismissal of the Complaint, Stephens, Humphrey and their newly expanded legal team that now included Luther O'Neal Sutter II and Sutter & Gillham P.L.L.C. (collectively, "Sutter"), Lucien Gillham and Sutter & Gillham P.L.L.C. (collectively, "Gillham"), and Sutter and Gillham's colleague, Tona DeMers, filed an amended complaint on December 31, 2018 ("Amended Complaint"), asserting claims that were even more outrageous than those contained in their original Complaint.  A true and correct copy of the Amended Complaint in the Jeff Co Lawsuit is attached and incorporated herein by reference as **Exhibit 15**.  The Complaint and Amended Complaint are sometimes collectively referred to as the "Complaints."

## UNLAWFUL EXHUMATION AND SECRET PRIVATE AUTOPSY

76.     Approximately two months before the Jeff Co Lawsuit was filed, Stephens facilitated the exhumation of the body of Luke from its grave in Crestlawn Cemetery owned by Roller.  Some of the persons and entities involved with and/or who had knowledge of this exhumation included the Exhumation Defendants, (Baker Family, Jeff Co Attorneys, Noble Defendants, and Roller) Roller's representatives (including Mike Frazier), Wilbert Burial Vault Company, Inc., Ruff Mortuary Service, LLC, Dr. Frank Peretti (an Arkansas State Crime Lab employee) ("Dr. Peretti"), and Steve Nawojczyk (a former Pulaski County Coroner and investigator for Jeff Co Plaintiffs) ("Nawojczyk").  None of Defendants disclosed that

20

either the exhumation and autopsy had been performed until well after the completion of these acts.

77.    As demonstrated below, the paperwork to exhume the body of Luke was obtained by Kerry, Stephens and Roller using false information, and the exhumation that followed was illegally and secretly accomplished under the ruse of a "disinterment." **(Exhibit 16,** Disinterment Agreement signed by Kerry Baker 9/6/18, PERETTI – 000028.)

78.    Rather than comply with applicable laws and regulations for an exhumation (raising and opening a casket to remove the body, distinct from disinterring / moving a casket from one place to another), at least Jeff Co Plaintiffs, Estate, Stephens, Roller, and possibly others, simply ignored them and instead submitted paperwork, which contained false statements, to illegally exhume and remove Luke's body from its casket to conduct the secret private autopsy. Not only were these actions intended to preclude the Jeff Co Defendants and their consultants/experts from being present for the exhumation and autopsy, it is undisputed that these actions also resulted in the destruction of the body of Luke, thereby prejudicing Jeff Co Defendants by preventing any further testing and by the spoliation of key evidence.

79.    The illegal exhumation allowed to occur at Roller's cemetery was the initial act from which all of the other events described herein occurred and resulted in this lawsuit.

21

2282717-v1

80.    Adams Plaintiffs discovered that after exhumation, a secret, private autopsy took place at Ruff Mortuary Service, LLC, in North Little Rock, Arkansas, and Adams Plaintiffs were not notified or allowed to attend the autopsy. This was a single opportunity and those Defendants who were involved with it knew full well the autopsy would destroy any future opportunity for Adams Plaintiffs to conduct an investigation of the body. In the Jeff Co Lawsuit, Stephens described for the Court that there is only a "finite" amount of tissue that could have been examined in the autopsy, so any chance that Adams Plaintiffs could observe, participate or conduct their own testing was taken from them. (**Exhibit 17**, February 21, 2019 Hearing Transcript, p. 176.)

81.    Jeff Co Plaintiffs and Jeff Co Attorneys, knowing they were going to file a lawsuit, had a duty to preserve such evidence, and they should have provided notice of the exhumation, autopsy, and potential for destructive testing. They knew that secretly exhuming a body, conducting a private autopsy on a heavily decayed body that included sawing the skull and severing the entrance wound of the bullet, and then returning the remaining body parts to the cemetery for re-burial in the casket, would yield the corpse essentially useless to Jeff Co Defendants for their testing. These actions amount to blatant and intentional spoliation of evidence by involved Defendants.

82.    Furthermore, tampering with evidence is a criminal offense in Arkansas if a person "alters, destroys, suppresses, removes, or conceals any record,

document, or thing with the purpose of impairing its verity, legibility, or availability in any official proceeding or investigation." *See* Ark. Code Ann. § 5-53-111.

### FRAUDULENT PAPERWORK TO "DISINTER" LUKE'S REMAINS

83.     At least by August 29, 2018, Stephens was representing that he was acting as both the attorney and a medical doctor[2] in the Luke Baker case.  Stephens had arranged to exhume the body with the assistance of Roller and its representatives, including Mike Frazier[3] ("Frazier").

84.     Roller had embalmed and prepared Luke's body for the funeral and conducted the funeral service and burial.  Roller owns Crestlawn cemetery where Luke was buried, exhumed and re-buried.

85.     In a memo of August 29, 2018, prepared on his letterhead, "Greg Stephens, J.D. M.D" enclosed a $4,200 deposit for "James Luke Baker Disinternment (sic) and Reinternment (sic)" for September 7 and September 10, 2018, respectively.  He further misrepresented that, *"[t]he medical examiner's office will retrieve and return the remains from and to the gravesite."* (**Exhibit 18,** Stephens' disinterment request and Roller case activation, ADAMS 1995, 1991.)

86.     Based on this false information, Stephens asked Roller/Frazier to execute a required document, "ARKANSAS DEPARTMENT OF HEALTH

---

[2] **Exhibit 18,** Stephens Disinterment Request and Roller case activation.  This was not the only document touting Stephens as a physician.  He also signed the Roller Statement of Funeral Goods and Services Selected as "Dr. Greg Stephens M.D" and the Buyer as "Greg Stephens, M.D" (**Exhibit 19,** Statement of Funeral Goods and Services, ADAMS 1998.)

[3] Frazier is an experienced funeral home district manager for Roller.  He carries multiple funeral designations including CCO and CCP.  (**Exhibit 20,** Email from Frazier to Booker re Disinterment, ADAMS 2035.)  At his deposition on September 26, 2019, he testified he had been a funeral embalmer, and in 1991 he was licensed by the State of Arkansas as a funeral director; **Exhibit 21,** Deposition of Frazier, September 26, 2019, p. 12.)

23

DEPARTMENT Vital Records REQUEST TO DISINTER" for the State of Arkansas to issue a disinterment permit, which Roller did. (**Exhibit 22**, Disinterment Request to Department of Health, ADAMS 1996, and **Exhibit 23**, Roller fax confirmation of Disinterment Request, ADAMS 2003.)

87.     The Request to Disinter, which was signed by Kerry for the Baker Family represented that the body was going to be taken from Crestlawn "to Crime Lab for Autopsy and the re-interment to Crestlawn." However, the body was never going to the State Crime Lab for an autopsy.

88.     On September 1, 2018, "Greg Stephens, JD MD" sent a memo to Dr. Peretti with a copy to Frazier at Roller. (**Exhibits 24 and 25**, Memo from Stephens to Peretti re Disinterment, PERETTI – 000076 and ADAMS 1993.)  In this memo, Stephens confirmed that he had scheduled the "disinterment" for Friday, September 7, 2018, with Frazier / Roller, that Dr. Peretti was arranging transportation for the body with the State Crime Lab for an autopsy, and the body would be returned to Crestlawn cemetery the following Monday. *Id.*

89.     On September 6, 2018, Kerry executed a "Disinterment Agreement" for himself and for the Baker Family, and Wilbur Burial Vault Company, Inc. was authorized to supply personnel and equipment to "disinter" the vault with casket at the Crestlawn Cemetery. (**Exhibit 16**, Disinterment Agreement signed by Kerry Baker 9/6/18, PERETTI – 000028, ¶ 1 and 3.)  But this was no disinterment. It was instead the exhumation of a body for a private autopsy by Dr. Peretti. *Id.* at ¶ 4. Frazier testified he was aware that Dr. Peretti conducts private autopsies.

24

2282717-v1

(**Exhibit 21**, Deposition of Frazier, September 26, 2019, p. 78.)  The Baker Family authorized Frazier of Roller to get the permits required by law (**Exhibit 16,** Disinterment Agreement signed by Kerry Baker 9/6/18, PERETTI – 000028 at last ¶), which Roller failed to do.  Roller, acting through its assistant manager Edward Ferguson, ignored the required administrative procedures and instead executed Kerry's fraudulent Request to Disinter, thereby assisting Stephens and the Exhumation Defendants in securing an inappropriate disinterment permit from the State to conduct an exhumation.  (**Exhibit 22**, Disinterment Request to Department of Health, ADAMS 1996.)

90.    The Disinterment Permit was issued by the State upon false representations.  The Permit specifically provided that the body was permitted to go to the State Crime Lab for autopsy.  (**Exhibit 26**, State permit for disinterment, ADAMS 2036.)  An official state autopsy never occurred because this was actually a private autopsy that required the parties to obtain a Court order.

91.    From the outset of this body retrieval process, the Baker Family, and Stephens provided false information to accomplish their improper goals.  From the earliest dates discovered so far, April 28, 2017, Michael Noble of Conway, an investigator for the Baker Family and Jeff Co Attorneys, contacted Roller for information, advising that the Baker Family may request a "disinterment."

92.    On August 28, 2018, a quote was issued by Wilbur Burial Vault for expense to "Disinter Vault, Open Vault, Help Remove Wood Casket, Directors Will Transport Body / Casket to Crime Lab for Autopsy…".  Everyone involved

25

misrepresented that (1) a disinterment was taking place instead of an exhumation; and (2) that the Arkansas State Crime Lab was conducting an autopsy. (**Exhibit 27**, Email from Roller re burial and disinterment, ADAMS 2034; **Exhibit 28**, Fees and itemization from vault company re disinterment, ADAMS 2005.)

93.    The repeated statements in the various forms and memos about retrieving and returning the body to Crestlawn should have been confirmation to everyone involved that the body was not being disinterred to bury it elsewhere. Indeed, all of the participants in fact knew the body was being exhumed for autopsy because Kerry and Stephens had represented this to them. (**Exhibit 18**, Stephens' disinterment request and Roller case activation, ADAMS 1995, 1991; **Exhibit 25**, Memo from Stephens re Disinterment, ADAMS 1993; **Exhibit 22**, Disinterment Request to Department of Health, ADAMS 1996.)

94.    Roller not only failed to comply with Arkansas law, it also failed to have and follow policies and procedures to conduct due diligence to verify the information included in the paperwork prepared by Roller with the Baker Family and Stephens prior to presenting the documentation to the State of Arkansas to request a state permit to allow a disinterment (even though this was not a disinterment of Luke's body). (**Exhibit 21**, Deposition of Frazier, September 26, 2019, pp. 83 - 91.) Here, the information included was never verified by Roller, and it conspired with the Baker Family and Stephens by using falsely completed disinterment forms to conceal their actions from Adams Plaintiffs.

## UNLAWFUL EXHUMATION AT CEMETERY IN FAULKNER COUNTY

95.    Under Arkansas law, an unlawful disinterment or exhumation is an abuse of a corpse, which is a class D felony, see Ark. Code Ann. § 5-60-101(a)(1).

96.    Present at the Crestlawn Cemetery on September 7, 2018 were (a) Roller representatives- Frazier, Anthony Williamson, Tyler Garland, and William Zumalt; (b) Stephens; (c) Stephens' unidentified female associate;[4] (d) an unidentified Wilber Vault representative; and (e) Roller contract grave digger Mark Chambers. (**Exhibit 21**, Deposition of Frazier, September 26, 2019, pp. 114 - 118.) After they gathered, the grave was dug.  The vault was raised, broken open, and the casket was removed.  *Id.*  The casket was carried to a warehouse in the cemetery and opened.  Garland and Zumalt took the body "in the advanced state of decomposition" and put it in a plastic bag.  *Id.*  The bag was loaded into a white Dodge minivan bearing no company markings and was not an Arkansas Crime Lab vehicle.  *Id.*  Per Frazier, "Dr. Stephens" and Dr. Peretti had arranged for the van to transport the body.  *Id.*  Stephens and his associate followed the white van out of the cemetery.  *Id.*

97.    The body was not taken to the Arkansas State Crime Lab as represented in all the various paperwork provided by the Baker Family, Stephens and Roller to the Department of Health and according to the Department of Health Permit issued.  Instead, the body was taken to Ruff Mortuary Service LLC in North

---

[4] "Dr. Stephens" and his associate were also present when the body was returned to Crestlawn for re-burial per the testimony of Frazier. (**Exhibit 21**, Deposition of Frazier, September 26, 2019, pp. 123 - 124.) The Faulkner County Coroner was not present because the exhumation was not disclosed to her as is required.

27

Little Rock for the secret autopsy that night, with Dr. Peretti, Nawojczyk and others in attendance. (**Exhibit 29**, Deposition of Peretti, September 18, 2019, p. 69.)

98.     Conspicuously absent from the exhumation was the Faulkner County Coroner, Jessica C. Thorn. Although Frazier has admitted "that the Coroner of the county of the burial was to be notified" before an exhumation, he admitted that *he did not inform her*. (**Exhibit 21**, Deposition of Frazier, September 26, 2019, pp. 103, 119 - 123.) According to Frazier, he "forgot" to provide the lawful notice to the Coroner. *Id.*

99.     One of the Coroner's deputies discovered the exhumation had occurred and reported the illegal activity to her. Upon discovering this after the exhumation and autopsy, Coroner Thorn contacted Frazier, whom she knew to be an experienced funeral director from her previous work with him at Roller. *Id.* Coroner Thorn inquired of Frazier and was informed that the exhumation had occurred, without notice to or permission of her, and without a court order. Despite his initial testimony that Coroner Thorn did not request any information from Roller about the exhumation, she did. When shown the documents Roller produced to Thorn, Frazier admitted that three days after the exhumation and private autopsy, he faxed the Arkansas Department of Health Disinterment Permit and original Certificate of Death to Coroner Thorn at her request. *Id.;* (**Exhibit 30**, 9/10/2018 facsimile re disinterment permit with Roller facsimile ribbon and death certificate, ADAMS 0476 – 0477.) The Permit contained false information that

28

2282717-v1

originated from Jeff Co Plaintiffs, Stephens and Roller about where the body was being taken and that the State of Arkansas was conducting the autopsy. Upon information and belief, Coroner Thorn was never informed by any of them that the body really did not go to the State Crime Lab and that a private secret autopsy had taken place.

100.    Frazier also admitted under oath that there is not a form permit for an exhumation. (**Exhibit 21**, Deposition of Mike Frazier, September 26, 2019, pp. 139 - 141.) Further, he testified that Roller had no policies or procedures to allow, conduct, or otherwise participate in an exhumation to ensure that it is lawfully and legally conducted. For an exhumation, Frazier testified that he was aware that a court order is required in Arkansas. *Id.* He acknowledged that the procedure followed in the exhumation of Luke was not one of the legally allowed procedures to exhume a body. *Id.* As a Rule 30(b)(6) representative for Roller, Frazier further testified that Roller had a duty to use the correct paperwork, and it did not. *Id.* pp. 152 – 158. Further, there was no reason to open the casket and remove the body in the cemetery (risking contamination), other than the casket would not fit in the white van. *Id.* Frazier's confirmation of Roller's lack of policies and procedures allowed not only an illegal exhumation and autopsy but also spoliation of key evidence.

101.    Stephens, who upon information and belief was there in his capacity as both a doctor and a lawyer, and Roller knew that they were illegally opening the casket in the cemetery. Handling the body in the warehouse and bagging it

29

seriously compromised the integrity of the body, and hence the autopsy, which is analogous to breaking the chain of custody in a criminal proceeding. Further, in their capacities as funeral home representative, attorney and physician, they all knew the Faulkner County Coroner was required to be notified of any exhumation, with an opportunity to approve or contest the process in a court. They also all knew that a court order was required, but to keep the Adams Plaintiffs from knowing what was occurring, they did not get a court order. Public notice would have ensured that the Adams Plaintiffs knew of the exhumation, giving them the same opportunity to participate as the Jeff Co Plaintiffs and their attorneys and experts.

102. Even the experts engaged by the Baker Family knew what occurred was illegal. Nawojczyk testified in his deposition in the Jeff Co Lawsuit that the exhumation of Luke from a Faulkner County cemetery for an autopsy was illegally accomplished. Nawojczyk confirmed under oath that he advised the Baker Family and Stephens that a court order was required to exhume a body from a cemetery, and despite notice, no such court order was ever obtained. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 239–240, 259-261.) Nawojczyk also testified that he was misled by Stephens into believing that the proper protocol including a court order before the exhumation had been followed. *Id.*

103. Additionally, Dr. Peretti, who actually conducted the private autopsy with his assistants and Nawojczyk (among others who have not been identified) present, also testified that he was under the impression from Jeff Co Plaintiffs that they had followed the proper protocols and obtained a court order permitting the

30

2282717-v1

exhumation of Luke's body.  (**Exhibit 29**, Deposition of Peretti, September 18, 2019, p. 63.)

104.   Nawojczyk and Dr. Peretti both testified that, prior to being deposed in the Jeff Co Lawsuit by the Jeff Co Defendants, they were unaware Jeff Co Plaintiffs had neither sought nor obtained a court order allowing for the exhumation.

## CONCEALMENT OF AUTOPSY

105.   The private secret autopsy of Luke's body occurred on the night of September 7, 2018.  Dr. Peretti took the physical samples known as wound cuts, which were in "very poor condition," to the State Crime histology lab to be processed and then stored in his State office.  *Id.* at pp. 65 – 74.[5]  One week later, on September 14, 2018, the autopsy report was completed and signed by Dr. Peretti. *Id.*  The conclusions reached by Dr. Peretti were that Luke had died due to the gunshot wound to the head, but that the manner of death was inconclusive (no opinion possible) because of the "rotten" decomposition of the body and Roller's preparation of the wound including cleaning it and suturing it closed.  *Id.* pp. 65-74, 136-142.

106.   As described by Dr. Peretti, "It was not a good sample." *Id.*  Dr. Peretti further concluded that, other than the gunshot wound to the head, there was no evidence of any external or internal trauma to Luke's body.  Despite having the autopsy results from Dr. Peretti and his opinion, the Jeff Co Plaintiffs and Jeff Co

---

[5] From review of the Arkansas State Crime Lab file produced to Defendants per a FOIA request, Defendants discovered that Stephens had been communicating with the Crime Lab, and when the Assistant Director discovered it, she instructed the employees to stop communicating with Stephens.  (**Exhibit 32**, Email from Moran re ballistics test December 17, 2018, ADAMS 0264.)

31

Attorneys falsely alleged that Luke had been involved in a physical altercation prior to his death, supposedly evidenced by additional trauma to his body. *Id.*

107.   The Jeff Co Plaintiffs and Jeff Co Attorneys had the autopsy report from their own paid expert and his findings prior to their filing of the Complaint and Amended Complaint.

108.   Not only did Dr. Peretti find the manner of death inconclusive, the two other experts for the Jeff Co Plaintiffs and Jeff Co Attorneys also agreed. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020 pp. 88 – 108.)

> Q:    Okay.   Mr. Steve, you've talked about reviewing all of the information that was provided to you, and reviewing the documents that were provided to you, and reviewing photographs that were provided to you, and not really being able to form some opinions but coming to some other conclusions.
>
> Is there anything in all of your investigative work that would keep you from believing that Luke Baker died of an accidental gunshot wound to the head?
> A.    Could very well have been.
> Q.    Do you know of any facts that would cut against that finding?
> A.    Not that exist in this case. I mean, there's, there's nothing to lead you one way or the other. That's why I told Mr. Stephens that had to be done by statements, because the physical evidence was, was not there anymore.
>
> It had been changed.  So the scene was different after the body was moved.  So then it depended on the autopsy and on the wound itself, is what drew down to be so important.
>
> And that was – – once Peretti ruled it as inconclusive, which I agreed with, Greg [Stephens] seemed to not like that, you know, like that conclusion. And that's when he told me he was looking for another pathologist, so.
> Q.    I want to make sure I asked the question correctly, because I think I left out something very important.
>
> **Do you know of any fact that would be contrary to a finding that this was a self-inflicted accidental gunshot wound to the head?**
> A.    No.

Q.    From the facts of which you are aware, do those facts support this being a self-inflicted gunshot wound to the head?

Q.    Accidental self-inflicted gunshot wound to the head?

A.    There's no facts to refute that.

Q.    And the facts you do know would support that finding?

A.    Maybe. Maybe.

Q.    Why do you say "maybe"?

A.    Well you – – I mean you're giving me a hypothetical that, you know, that I can't answer.

Q.    Well, I, I don't want a hypothetical I want – –

A.    The, the, – –

Q.    – – exactly what you know and all of your work, all of your investigation, all of the facts that you have determined in this matter. Take those facts. Those are not hypotheticals.

A.    It could have been an accident.

Q.    An accidental self-inflicted – –

A.    Yes.

Q.    – – gunshot wound to the head?

A.    Yes.

Q.    The facts you know would support that conclusion?

A.    Yes.

Q.    At any point did you ever tell anyone there that this was a distant gunshot wound to the head?

A.    No. I told them it was not a contact gunshot wound to the head. That's all I could tell them about it.

Q.    And I think you testified earlier that when you say a contact wound to the head, you are talking about the gun actually touching the head?

A.    Yes, ma'am.

\* \* \* \* \*

A.    ...And then when they [the two pathologists at the Tac Air meeting, *infra*] did talk about the case, Peretti ran through his, what he did, and, and [pathologist Dr. Kris] Sperry said, you know, he agreed with, with the inconclusive, that there was no conclusion about the gunshot wound and where, the distance, which was the big question, the distance of the gunshot wound.

\* \* \* \* \*

A.    I don't think Mr. Stephens said much. Luther was doing all the talking.

33

2282717-v1

\* \* \* \* \*

Q.    Were there any comments made by anyone about the findings that these two physicians had disclosed to everyone?
A.    No, not – – other than they both agreed it was inconclusive.

*Id.* pp. 82-85, 93-94, 95. (Objections omitted and emphasis supplied.)[6]

109.    Despite having full knowledge that a) the autopsy report did not support the theories promoted in the Jeff Co Lawsuit, b), the autopsy report, the stippling photographs and other evidence exonerated the Jeff Co Defendants, and c) both of Jeff Co Plaintiffs' experts, Dr. Peretti and Nawojczyk, could not support the claims, the Jeff Co Plaintiffs and Jeff Co Attorneys filed their false Complaint and one month later, their Amended Complaint, and continue to maintain these false allegations two years later.  Not only were the allegations in the Complaints absolutely contrary to Dr. Peretti's findings in his completed, written autopsy report, Jeff Co Plaintiffs and Jeff Co Attorneys hid the autopsy report for the next ten months.   They also lied to the Jeff Co Defendants and the Court about the existence of the written autopsy report.  One clear and unequivocal example of Jeff Co Plaintiffs and Jeff Co Attorneys' efforts to deliberately mislead Jeff Co Defendants and that Court about the existence of the written autopsy report occurred at the February 21, 2019, hearing where the following exchange took place between that Court and Stephens:

---

[6] Nawojczyk testified that Dr. Peretti and Dr. Sperry had a private meeting without all the attorneys. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, p. 95.)  When Dr. Peretti was asked to disclose the private meeting discussions, it drew objections from Jeff Co Attorneys and Peretti's as well, and instructions not to answer. Dr. Peretti would only say they talked for approximately five minutes about the case and then he left. (**Exhibit 29**, Deposition of Peretti, September 18, 2019, p. 159.)

34

THE COURT:        While we – –while we're on that.  It was a second autopsy done, I believe – –

MR. STEPHENS: No.  They never did the first one.  I'm glad you mentioned – –

THE COURT:        You're talking – – the reason I'm – – remember – – the defense said that you – – you didn't place your – – was it autopsy or – – or lab result in the complaint.  Can you address that while – –

**MR. STEPHENS: They're not based on that, and we don't have a report.  We don't have a written report.  We didn't – – that's not what we – – that's not what we did.  He gave us a very brief oral report** because we – – we asked him to do two things....

\*\*\*\*\*\*

THE COURT:        Okay.  So you exhumed the body.

MR. STEPHENS: That's correct.

THE COURT:        For – – and the person didn't do a report?  And – –

MR. STEPHENS: He [Dr. Peretti] gave us an oral report.  He – – I'm sure he's got some written report at his – – at his place.

THE COURT:        Okay.

MR. STEPHENS: We were not asking for that because we were asking two questions.  I guess I could ask for it.

THE COURT:        You said at his place.  Is this– –

MR. STEPHENS: He – – he's got a private autopsy location in Little Rock.  And we asked two question, (sic) and that – – he answered those two questions for us.  The reason I didn't ask for a preliminary report is because I wanted one report.  I'm going to have some more questions to ask him, but the slides that he got have to be prepared.  And – – and he has those.  But we are not sure – – and we're – – actually, we're waiting for the answer, to see what they say, and then we know what tests to run.  And so it's in process really.  I – –

THE COURT:        Well, when was it – – I'm – –

MR. STEPHENS: It was in September [2018].

**Exhibit 17**, February 21, 2019 Hearing Transcript, pp. 173 – 175 (emphasis supplied).

110.   In addition to Stephens, Sutter and Humphrey were present for Jeff Co Plaintiffs at this hearing, and neither corrected the statements of Stephens, including maybe the most critical lie of all - that there was no written autopsy report.

35

2282717-v1

111.   At the time of that February 2019 hearing, despite expressly telling the Court otherwise and concealing its existence from the Jeff Co Defendants, at least the Jeff Co Plaintiffs, the Estate and Jeff Co Attorneys were in possession of Dr. Peretti's written autopsy report. Nawojczyk emailed the autopsy report to Stephens and his associate Lynli Carlin the day it was finalized and signed by Dr. Peretti, September 14, 2018. Nawojczyk, Plaintiffs' second expert, also advised that he had read the report and concurred with Dr. Peretti's findings. (**Exhibit 33**, Email from Nawojczyk to Stephens re review of Dr. Peretti Autopsy Report 9/14/2018, PERETTI – 000109; **Exhibit 34**, Peretti Autopsy Report, PERETTI – 000022-000027.) On September 15, 2018, Nawojczyk also stated the gun powder and stippling were inconclusive so distance of gun to wound are a "question mark"; and cautioned that "we must make theory fit facts not the other way around." (**Exhibit 35**, September 15, 2018 Email from Nawojczyk to Noble re distance unable to be determined, PERETTI – 000110.)

112.   Stephens, Carlin, and Nawojczyk even met with Dr. Peretti about the autopsy report on September 17, 2018. (**Exhibit 36**, Stephens, Carlin, Nawojczyk met with Dr. Peretti about autopsy report, PERETTI – 000104.) By October 8, 2018, Stephens was pressing Dr. Peretti for distance findings, which the Jeff Co Plaintiffs desperately needed to support their frivolous claims. (**Exhibit 37**, Stephens asking for distance findings, PERETTI – 000097.) An appointment was set for Stephens and Carlin to discuss the autopsy report with Dr. Peretti on October 22, 2018. (**Exhibit 38**, Email from Peretti to Stephens re 6:30 meeting,

36

PERETTI – 000098.) The autopsy report was also distributed to another of the Jeff Co Plaintiffs' "experts" in Georgia, Dr. Kris Sperry on or about October 30, 2018. (**Exhibit 39**, Email from Peretti to Stephens autopsy report distributed 10/30/18 and invoice, PERETTI – 000101 and PERETTI – 000096; **Exhibit 29**, Deposition of Peretti, September 18, 2019, pp. 83-84.) Nawojczyk texted his "raw notes" (texts that were never produced in discovery to Jeff Co Defendants) based on the autopsy report to Stephens on November 7, 2018. And on November 8, Nawojczyk provided his corrected, not final report to Stephens and Carlin with copies to Dr. Peretti, another undisclosed expert Peter Valentin Consultants, and Noble Defendants. (**Exhibit 40**, Email from Nawojczyk with draft report and notes, PERETTI – 000085 - 000087.) Stephens, Nawojczyk and Dr. Peretti again met to discuss the autopsy report on November 10, 2018 at Rosalinda's in Little Rock. (**Exhibit 41**, November 8, 2018 Email from Nawojczyk to Peretti re meeting PERETTI - 000084.)

113. Jeff Co Plaintiffs and Jeff Co Attorneys, at the very least, should have produced the autopsy report to Jeff Co Defendants in discovery, but instead they intentionally hid it. Jeff Co Attorneys lied to that Court about the existence of the written autopsy report and their possession of it.

114. At the September 4, 2019 hearing in the Jeff Co Lawsuit,[7] the issue of whether there was an expert autopsy report was again raised. Despite having been

---

[7] Sutter, Gillham, Humphrey and Eric Spencer Buchanan and The Buchanan Firm, P.A. (collectively, "Buchanan") were present at this hearing. Buchanan had substituted for Jeff Co Plaintiffs, Kerry and the Estate of Luke Baker, after Stephens was held in contempt for making misrepresentations to the Court in his efforts to try to prevent Jeff Co Defendants from deposing Kerry. Clearly, Stephens never actually stopped representing the Jeff Co Plaintiffs and remained actively involved in the case, particularly in manipulating witnesses and communicating with Jeff Co Coroner Kelley. *See,* Verizon summary, *infra.*

2282717-v1

present at the February 21, 2019 hearing where Stephens told that Court there was no written autopsy report, Sutter finally admitted over six months later that Jeff Co Plaintiffs had an autopsy report but that he had made the decision to withhold the autopsy report from Jeff Co Defendants, because, according to Sutter, the report was not "final". (**Exhibit 42**, September 4, 2019 Hearing Transcript, pp. 61 - 64.) It was not until September 18, 2019, after Dr. Peretti had engaged independent counsel and appeared for a deposition, that Jeff Co Defendants learned that those representations were untrue. At that deposition, Dr. Peretti self-disclosed the written autopsy report and testified, contrary to the statements to the Court by Jeff Co Attorneys, the autopsy report that he prepared and sent to Jeff Co Attorneys on September 14, 2018, was in fact a final report and the only autopsy report Dr. Peretti was ever asked to render. (**Exhibit 29**, Deposition of Peretti, September 18, 2019, p. 164 – 165.) The findings in the autopsy report, which were even supported by the other two experts for Jeff Co Plaintiffs, defeated the fabricated theories in their Complaints and the manufactured allegations contained in their filed pleadings.

**OBSTRUCTION OF FOIA AT SHERIFF'S OFFICE,
MISREPRESENTATIONS ABOUT THE AUTOPSY AND REPORT,
AND THE ORIGIN OF THE RE-OPENED CASE**

115.     On September 28, 2018, one of Defendants' Counsel in the Jeff Co Lawsuit served a FOIA letter to the Jefferson County Sheriff's office ("Jeff Co Sheriff") in an attempt to obtain the investigation file on Luke's death. (**Exhibit 43**, September 28, 2018 FOIA Request Letter from B. Hendrix to Jeff Co Sheriff.)

38

The Jeff Co Sheriff's response to this FOIA request represented that Jeff Co Defendants' counsel could come and retrieve the file, indicating that the file was closed. (**Exhibit 44**, October 2, 2018 Jeff Co Sheriff's Response to B. Hendrix FOIA.) On October 3, 2018, twenty-four hours after Jeff Co Defendants received notification that copies of the file could be picked up, the Jeff Co Sheriff sent a second response to the FOIA request indicating the file was no longer available because the investigation had been reopened. (**Exhibit 45,** October 3, 2018 Jeff Co Sheriff's Response No. 2 to FOIA from B. Hendrix.)[8] This second response was the direct result of the obstruction of justice activities orchestrated by Jeff Co Plaintiffs and Jeff Co Attorneys, specifically designed to prevent Jeff Co Defendants from receiving a copy of the public file they had properly requested—the same file Jeff Co Plaintiffs had received years earlier upon letter request of Kerry dated November 23, 2015. (**Exhibit 50**, November 23, 2015 Letter from Baker to Jeff Co Sheriff.)

116.   In early November, 2018, according to a videotaped interview of the sheriff-elect of Jefferson County, Lafayette Woods, Jr.,[9] he received a "visit from an attorney that used to be a judge that I knew" [Marion Humphrey] who "came in

---

[8]   Another FOIA request letter was served on the Sheriff's office by Jeff Co Defendants on December 11, 2018. (**Exhibit 46**, December 11, 2018 FOIA Request to Jeff Co Sheriff from B. Hendrix.) On December 13, 2018, the Sheriff's office responded that the file could not be released because the case was not closed. (**Exhibit 47**, December 13, 2018 Response to B. Hendrix FOIA from Jeff Co Sheriff.) Other FOIA requests were also served on the Jefferson County Sheriff by other of Defendants' counsel. (**Exhibit 48**, December 21, 2018 FOIA letter of M. Shannon, ADAMS 0102-0105; **Exhibit 49**, January 17, 2019 FOIA letter of J. Henry to Jeff Co Sheriff.) When the file was finally produced, each time, a different set of documents was provided. At no time did the Sheriff's office ever produce to Jeff Co Defendants the 81 jpeg images received by Kerry in his original November 23, 2015 FOIA request to the same office. *See, infra.*

[9] At the time these representations were made to him, Lafayette Woods, Jr. was serving as a Major in the Sheriff's Office. He became the Sheriff of Jefferson County in January 2019.

39

with another [unidentified] attorney in the same case",[10] and it was represented to Sheriff Woods that the Baker Family had petitioned the Court for a court order authorizing Luke's body to be exhumed for the purpose of an autopsy. (**Exhibit 51**, DVD of videotaped interview of Woods.)  Based upon the information above regarding the "disinterment" of Luke's body, this was not true because no such court order was ever sought or issued and the illegal exhumation of Luke's body had already taken place two months earlier on September 7, 2018.  Sheriff Woods further stated that these attorneys also represented to him that they were waiting on the autopsy results.  *Id.*  That representation was also a lie because the autopsy report was finished, signed and provided to Stephens on September 14, 2018 and circulated to Stephens and his colleague Lynli Carlin on September 14, 2018. (**Exhibit 33**, Email from Nawojczyk to Stephens re review of Dr. Peretti Autopsy Report 9/14/2018, PERETTI – 000109.)

117.  Sheriff Woods confirmed in the video that he had received a FOIA request from counsel for Jeff Co Defendants (B. Hendrix) and because the investigation was closed, he advised Mr. Hendrix that he could review the files during regular business hours.  Sheriff Woods further stated that a couple of days later is when Humphrey and another of Plaintiffs' Jeff Co Attorneys visited the sheriff's office and "revealed" that the Jefferson County Prosecuting Attorney had authorized the sheriff's investigative unit to reopen the investigation.  This was yet

---

[10] The identity of this individual and his role will be the subject of discovery in this case and Adams Plaintiffs reserve the right to add parties and/or claims for at least obstruction, conspiracy, or whatever causes of action the facts support.

40

2282717-v1

another lie. The facts are, according to the Jefferson County Prosecuting Attorney,

he did not have a file on this matter and did not "reopen" an investigation in his

office or for the Jeff Co Sheriff. However, based on that misrepresentation of

counsel, Sheriff Woods informed counsel for Jeff Co Defendants that he could not

release his file under FOIA because the investigation had been reopened. (**Exhibit**

**45**, October 3, 2018 Jeff Co Sheriff Response No. 2 to FOIA from Hendrix.) These

false statements, in particular, that the prosecutor was reopening the case,

effectively stopped Jeff Co Defendants from being able to receive any FOIA

production from the Sheriff during the early and critical stages of defending the Jeff

Co Lawsuit. Jeff Co Defendants were not allowed to retrieve a copy of the file until

December 17, 2018. Jeff Co Plaintiffs intentionally and effectively stalled Jeff Co

Defendants' ability to defend against the false and vicious accusations by shielding

the exonerating information contained in the requested files, including certain jpeg

photographs in the Sheriff's file. The significance of these photographs, of the

interference of production of them, and of the active concealment of the photographs

is outlined below.

## THE OBFUSCATION, DELIBERATE CONFUSION, CONCEALMENT AND LIES AROUND THE 81 EXONERATING PHOTOGRAPHS A/K/A THE STIPPLING COVERUP

118. One of the more absurd allegations concocted and pled by Jeff Co

Plaintiffs and Jeff Co Attorneys in their Complaints was that the wound to Luke's

head did not demonstrate evidence of a "close range" gunshot wound. This was a

critical element to the allegation that someone other than Luke pulled the trigger

2282717-v1

on the gun that killed him. In an effort to promote this false narrative, Jeff Co Plaintiffs and Jeff Co Attorneys knowingly and intentionally misrepresented both in pleadings and in statements made in open Court, that there was no evidence of stippling around the gunshot wound on Luke's right temple. (**Exhibit 17**, February 21, 2019 Hearing Transcript pp. 176-178, 217-218, 237–241.) They also hid the best evidence of whether stippling existed from Jeff Co Defendants, their own experts and that Court.

119. The Complaint stated the wound was *"believed to be* a distant wound" per medical professionals, and the Amended Complaint stated it *"was* a 'distant' wound" per medical professionals. *See* **Exhibits 14 and 15**, Complaint ¶ 31 and Amended Complaint ¶ 36 (emphasis supplied). Neither distance statement was factual nor had any medical professional reached that conclusion.

120. Jeff Co Plaintiffs and Jeff Co Attorneys had 81 crystal-clear jpeg photograph images taken with a 35 mm camera by Jeff Co Sheriff deputies, including photos of Luke at JRMC the night of the incident, and photos of the accident site at Prairie Wings Lodge taken the night of the incident and the next morning. (**Exhibit 52**, 81 jpeg photographs, requested to be filed under seal.) Included among these photographs are several vivid photographs showing stippling on Luke's right temple and face around the gunshot wound. These 81 crystal clear photographs, however, were never produced by Jeff Co Plaintiffs or Jeff Co Attorneys despite discovery requests that required production of them, nor were they provided in response to multiple FOIA requests to Coroner Kelley.

42

2282717-v1

121.    It was not until the deposition of Kerry on June 10, 2019, that Jeff Co Defendants uncovered the fact that Kerry, in February 2016, had received a CD of these remarkable 81 photographs from the Jeff Co Sheriff. (**Exhibit 53**, Deposition of Kerry, June 10 and 26 and July 1, 2019, pp. 66-69, 99, 139, 330-340)   Initially Kerry testified that upon receipt of the CD he placed it in his home safe and "it has been sitting in my safe since I got it from Jefferson County." *Id.*, p. 331-332. He then changed his testimony revealing that the file he received from Jeff Co Sheriff, including the [77] paper copies of photos and the CD of [81] photos, had been given to Stephens prior to May 2016. *Id.*, p. 332-333. Upon further examination, Kerry again altered his story to reveal he had actually removed the CD from his safe and taken it to work with him where he "had a girl at the office [Diana White] download a copy of the CD" and "[s]he made [three or four] copies for me." *Id.*, at 335. These copies were then distributed to Stephens, the Noble Defendants, and Jeff Co Attorneys per Kerry's testimony. *Id.*, at 335-337. Both Stephens (who, while having previously withdrawn as counsel in the case, was present for this deposition anyway) and Buchanan stated at the June 10, 2019 deposition of Baker that they had the CD with photos too. *Id.* at 99. The CD had never been provided by Jeff Co Plaintiffs or Jeff Co Attorneys in discovery, and a copy was requested at the deposition of Kerry. *Id.*

122.    Sixteen days later, on June 26, 2019, Kerry finally produced the CD of photographs he received in early 2016. *Id.* at 339-340. The deposition on that day was adjourned for a break, during which time Jeff Co Defendants were allowed for

43

2282717-v1

the first time ever to review Kerry's CD from the Jeff Co Sheriff. *Id.* It was clear from these newly produced 81 digital photographs that stippling was present around the gunshot wound to Luke's head. Prior to this discovery, the only photographs Defendants had ever received in response to their discovery the Jeff Co Plaintiffs, and multiple FOIA requests to the Jeff Co Sheriff and Coroner Kelley, were from the Jeff Co Sheriff - 77 poor quality/grainy, 4-to-a-page photographs taken at JRMC and at the lodge. These 77 paper copies were not provided to Jeff Co Defendants until after the Jeff Co Sheriff had "re-closed" the file and finally allowed Jeff Co Defendants to review it in December 2018. (**Exhibit 54,** Grainy/blurry 77 paper photographs Jeff Co Defendants received from Sheriff, ADAMS 0058 – 0077, which will be requested to be filed under seal.)

123.    Coroner Kelley participated in the concealment of these 81 high-resolution jpeg photographs. Coroner Kelley testified he had received these high-resolution images from the Jeff Co Sheriff in October 2015 (just days after the accident according to his testimony), but he failed to ever produce these 81 photographs pursuant to multiple, separate FOIA requests submitted directly to him and his office by Jeff Co Defendants. (**Exhibit 55,** November 1, 2018 FOIA letter from B. Hendrix; **Exhibit 56,** December 3, 2018 preservation letter to Coroner Kelley; **Exhibit 57,** January 23, 2019 FOIA and preservation letter to Coroner Kelley; **Exhibit 58,** July 16, 2019 FOIA Letter of J. Henry to Coroner Kelley.) It now appears that the reason Coroner Kelley, an elected public official, violated Arkansas FOIA law and concealed documents and photographs that were

44

in his possession and in the possession of the Jeff Co Plaintiffs and Jeff Co Attorneys was for Kelley's own personal gain. The facts evidencing this are outlined below.

124. Importantly, because the photographs offered direct support to contradict the allegations in the Complaints, Jeff Co Attorneys hid the photos from Jeff Co Defendants and even from their own expert witnesses - Nawojczyk and Dr. Peretti. Neither was aware of the existence of these photographs until they were deposed, and they both agreed the photographs reflected stippling around the gunshot wound.

125. Former Pulaski County coroner Nawojczyk, who certainly knows stippling when he sees it, testified he had never been shown the stippling photographs by Jeff Co Plaintiffs. (Exhibit 31, Deposition of Nawojczyk, February 7, 2020, p. 257.) Nawojczyk was visibly shaken when presented with the photos for the first time in his videotaped deposition and, not only did he acknowledge that the photographs were new to him, he admitted he could see stippling around the wound on Luke's head. *Id.* Nawojczyk further testified that one of these newly produced photographs was the best photograph of the wound in the case. *Id.* at p. 258.

126. In fact, Nawojczyk went so far as to testify that he believed he had been duped in his work for Plaintiffs in the Jeff Co Lawsuit because he was not given everything he should have received (and which Jeff Co Plaintiffs and/or their Attorneys had) before reaching conclusions. *Id.* at pp. 115-116.

45

127. Similarly, Dr. Peretti, who testified he was qualified to identify stippling, also testified that he was never provided with the stippling photograph by Jeff Co Plaintiffs. (**Exhibit 29**, Deposition of Peretti, September 18, 2019 pp. 254 - 258.) He too was visibly shaken, and stated he was "shocked" when he saw the stippling photographs for the first time during his videotaped deposition.[11] *Id.*

128. Critically important, even Coroner Kelley, whose Addendum and Second Supp. Death Report stated otherwise, testified at his deposition upon cross-examination that he observed stippling on Luke's face in the jpeg photographs. (**Exhibit 59**, Deposition of Coroner Kelly, March 5, 2020 pp. 306–309.; **Exhibit 60**, Two Stippling photographs,[12] requested to be filed under seal.)

## WRONGFULLY ATTEMPTING TO INFLUENCE EXPERT WITNESSES AND PUBLIC OFFICIALS

129. Nawojczyk also testified under oath that Stephens tried to get him to convince Dr. Peretti to change the conclusion Dr. Peretti reached in his autopsy report. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 116, 206.) Specifically, Dr. Peretti had concluded there was no evidence of trauma to Luke other than the actual gunshot wound, and he would not determine the manner of death to be "murder". (*Id.;* **Exhibit 34**, Peretti Autopsy Report, PERETTI 000022 –

---

[11] At the now infamous Tac Air meeting, *infra,* Dr. Peretti called Nawojczyk aside to reveal Dr. Peretti "was very paranoid, and he said, Something's going on in this case. They didn't give us all of the information. And I mean, it was really kind of - - it took me kind of a little, a little bit, you know - - it surprised me to hear him say that. And he said, They're trying to set us up. And I didn't know what that meant. But that - - and Peretti - - that day is the day that Peretti told me Luther Sutter told him to hire, he needed to hire an attorney. And I always wondered why, you know, a witness had to have an attorney. Now I know." (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 96 – 97.)

[12] These stippling photographs were contained in **Exhibit 52**, the 81 jpeg photographs, image numbers 2647 and 2648.

46

000027.) These conclusions were problematic for Plaintiffs because their fabricated

claims in the Amended Complaint included an alleged physical altercation leading

to a fatal gunshot wound to Luke's head. The following are excerpts from and

summaries of the deposition testimony of Nawojczyk: "Greg [Stephens] wanted me

to try to convince Dr. Peretti to come to a different conclusion, and I couldn't, and I

didn't try, because I was of the same opinion." (**Exhibit 31,** Deposition of

Nawojczyk, February 7, 2020, p. 116–122.) Stephens tried to get Nawojczyk to

convince Dr. Peretti to form an opinion of the manner of death when Dr. Peretti was

firm that he could not. *Id.* Over the repeated "objections as to form" by Jeff Co

Attorneys, Nawojczyk testified that he was unwilling to compromise his integrity

for the Baker Family or Jeff Co Attorneys. *Id.* Nawojczyk testified Stephens would

come up with all different theories of the case with no supporting evidence and

Stephens was even "witness shopping" to get the proof needed to fit his theories,

which Nawojczyk discouraged. *Id.* Nawojczyk testified that he "grew blue in the

face" repeating to everybody that "[y]ou have to take your facts that you have and

fit your theory into those facts." *Id.* Nawojczyk further testified that Stephens tried

to get Nawojczyk to conceal documents from Jeff Co Defendants but Nawojczyk

refused stating, "Judy's probably already got them, and I'm not going to put myself

in a position of giving her a report that's different than the one she already has. I

am just not going to do that. Good or bad, however it felt, that's what I told

[Stephens]. That's what I was going to do. So as we were leaving Panera Bread he

47

2282717-v1

said, So I guess you don't want to be an expert in this?  And I said, That's what I've been trying to say.  And that's the last, really, time that we talked." *Id.*

130.    Stephens played out hypothetical testimony scenarios with Nawojczyk for the various theories of the case.  Nawojczyk would provide an answer but then inform Stephens that "as soon as Ms. Henry gets up and says, "Well, could it have been this" I would have to say, Yes, it could have been..." Stephens said, "*No, you can't say that, because that will ruin my case.*"  And I said, you know, I'm here to tell you my opinion.  You hired me, and you paid me.  I'm your witness, but I'm not going to alter facts or misconstrue facts for anyone."  *Id.*  Emphasis supplied.

131.    Stephens also tried to get Nawojczyk and Dr. Peretti to help him convince Coroner Kelley to prepare an amended death certificate that included a laundry list of "findings" related to the death of Luke Baker.  *Id.*  Nawojczyk pleaded with Stephens that what he was proposing was improper and told Stephens specifically "you can't do that on a Death Certificate.  You put what the Death Certificate calls for, and it doesn't call for you to do a paragraph of the case file.  And that's what he wanted Dr. Peretti and me both to do.  I mean, that - - you just don't do that, but only the facts of your, that you have in hand."  *Id.*  Stephens went so far to even request that Nawojczyk get Kelley to change the death certificate to "murder."

> Q.    So Mr. Stephens was trying to get you to talk to Dr. Peretti
> to change his testimony or his conclusions, and he was trying to
> get you to go to Chad Kelley to get him to change the Death
> Certificate to murder?
> A.    Yes.

48

**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, p. 206.

132. Unfortunately, Kelley eventually did in fact change the death certificate to include a lengthy, bizarre epistle of "findings" that unsurprisingly matched at least two critical theories Stephens was espousing:

> Q. Is the language that Mr. Kelley put on the Death Certificate dated July 10th of 2019 consistent with what Mr. Stephens was telling you he was wanting on the Death Certificate?
> A. Yes, a couple of those things.
> Q. Which ones?
> A. The non-self-inflicted and stippling.
> Q. And no stippling?
> A. No stippling.

*Id.* at p. 179.

133. Defendant Sutter tried hard to preclude Defendants in the Jeff Co Lawsuit from deposing Nawojczyk, going so far as to advise Nawojczyk to ignore subpoenas and a Court Order denying Sutter's motion to quash. (**Exhibit 61**, September 23, 2019 Letter to Nawojczyk; **Exhibit 62**, October 16, 2019 Order Denying Motion to Quash; **Exhibit 63**, October 16, 2019 Letter to Nawojczyk (third attempt) re subpoena; **Exhibit 64**, October 16, 2019 Email from Nawojczyk to Sutter; **Exhibit 65**, October 17, 2019 Email from Nawojczyk to Jeff Co Defendants; **Exhibit 66**, October 18, 2019 Email from Nawojczyk re not producing documents; **Exhibit 67**, October 18, 2019 Email from Sutter to Jeff Co Defendants re not communicating with consultants.)

2282717-v1

134.    All of these actions amount to at least witness tampering and influencing a public official because Coroner Kelley did in fact change the death certificate as Stephens wanted.

## OTHER INSTANCES OF OBFUSCATION, DELIBERATE CONFUSION, CONCEALMENT AND DISCOVERY ABUSES, INCLUDING DIRECTING WITNESSES TO IGNORE A COURT ORDER AND CHANGE TESTIMONY, A/K/A WITNESS TAMPERING

135.    In discovery, Jeff Co Plaintiffs and their respective Jeff Co Attorneys disclosed Nawojczyk and Dr. Peretti as their two expert witnesses,[13] whose alleged findings and testimony would purportedly support Plaintiffs' fabricated lawsuit allegations.  This was a lie as neither of these individual's opinions support the allegations of the Complaints.

## ATTEMPTS TO INVOLVE NAWOJCZYK IN OBSTRUCTION

136.    On July 22, 2019, Jeff Co Defendants served a subpoena duces tecum on Nawojczyk as a fact witness to the unlawful autopsy, and requested that Nawojczyk produce, among other things, documents, communications, e-mails, and text messages that were in any way related to the death of Luke, within five (5) business days of service.  Nawojczyk failed to comply with the subpoena and did not produce any documents.

---

[13] In Dr. Peretti's file production, it was discovered that Jeff Co Plaintiffs had another expert, Peter Valentin Consultants.  (**Exhibit 40**, November 8, 2018 Email from Nawojczyk with draft report and notes, PERETTI – 000085 - 000087.)  The same correspondence indicates that Nawojczyk also texted his "raw notes" to Stephens on November 7, 2018. Those text messages were withheld by Jeff Co Plaintiffs and have never been produced.

50

137.    On July 29, 2019, Sutter filed a motion to quash the subpoena to Nawojczyk in the Jeff Co Lawsuit, which that Court denied at a hearing on September 4, 2019.

138.    On September 23, 2019, in a good faith effort to obtain the previously subpoenaed documents, Jeff Co Defendants informed Nawojczyk, by letter, that the Court had orally overruled the motion to quash the subpoena issued to him and. demanded that Nawojczyk comply with the Subpoena within five (5) business days. (**Exhibit 61**, September 23, 2019 Letter to Nawojczyk.)  Once again, Nawojczyk failed to respond to the letter, Subpoena and Court order.

139.    On October 16, 2019, the Court entered a written Order denying Sutter's motion to quash.  (**Exhibit 62**, October 16, 2019 Order Denying Motion to Quash.)   On the same day, Jeff Co Defendants made a third good faith attempt to obtain the requested documents and information, including providing Nawojczyk a copy of the Order and demanding compliance with the subpoena by October 18. (**Exhibit 63**, October 16, 2019 Letter to Nawojczyk (third attempt) re subpoena.) Defendants also informed Nawojczyk that failure to comply would result in a motion to compel.  *Id.*  Nawojczyk promptly forwarded the Jeff Co Defendants' correspondence to Sutter, inquiring, "What do you advise?"  (**Exhibit 64**, October 16, 2019 Email from Nawojczyk to Sutter.)

140.    Nawojczyk responded to Jeff Co Defendants, copying Stephens with his correspondence, and began his letter, "Hello: I am in receipt of your letter of demand.  I am currently awaiting direction from my client.  I will be sending you

51

links to satisfy your request as soon as I can..." (**Exhibit 65**, October 17, 2019 Email from Nawojczyk to Defendants re Direction of Clients.)  Based on this communication, Nawojczyk appeared poised to comply with the Subpoena and court order.

141.    However, Nawojczyk, after consulting with Sutter, quickly changed his tune.  Correspondence from Nawojczyk to Defendants on October 18, 2019 at 4:01 p.m., stated, "I spoke to Mr. Sutter at 4 PM and he has instructed me to advise you that I am a consulting expert witness and will not be called to testify, therefore, as instructed, I am not responding to this order for documents.  Thank you." (**Exhibit 66**, October 18, 2019, Email from Nawojczyk re not producing documents.)

142.    Then, just minutes later at 4:04 p.m., Sutter reinforced Nawojczyk's message and chimed in, "That is correct.  Please refrain from communicating with my consultants directly, Ms. Henry." (**Exhibit 67**, October 18, 2019 Email from Sutter.)  This all occurred after Nawojczyk had already been disclosed as an expert for Jeff Co Plaintiffs in discovery.

143.    At the direction of Jeff Co Attorneys, Nawojczyk repeatedly failed to comply with a subpoena and a Court Order[14]; however, he finally appeared for his deposition on February 7, 2020.  There, he testified that both Sutter and Stephens not only tried to prevent him from testifying, but they also tried to keep him from producing his file per the Jeff Co Defendants' subpoena and the Court's order. *Supra.* (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 105-122.)

---

[14] Nawojczyk is a former coroner and no stranger to the judicial process or the importance of following the law, including complying with a subpoena and court order.

144.    Jeff Co Attorneys' efforts to keep Nawojczyk from testifying and hide his file contents did not stop at simply directing him to ignore subpoenas and court orders.  They also included more proactive steps, like trying to sanitize Nawojczyk's file of documents that were harmful to the fabricated and unsupported allegations contained in their Complaints.  Specifically, after the first time Jeff Co Plaintiffs' motion to quash was denied, Stephens set a meeting with Nawojczyk at Panera Bread in Little Rock.  *Id.* at pp. 112-117.  At that meeting, Stephens attempted to remove documents from Nawojczyk's file to keep Nawojczyk from producing documents to Jeff Co Defendants.[15]  *Id.*  Nawojczyk testified that he told Stephens he intended to comply with Jeff Co Defendants' subpoena and the Court's order. The meeting became "heated" according to Nawojczyk. *Id.*

145.    Jeff Co Attorneys also attempted to influence Nawojczyk's testimony and opinions.  In correspondence, Nawojczyk informed Dr. Peretti that he agreed with Dr. Peretti's inconclusive findings in the autopsy report shortly after it was signed. **(Exhibit 68**, September 14, 2018 Email from Nawojczyk to Dr. Peretti re autopsy report, PERETTI - 000113.)  He also confirmed that, like Dr. Peretti, gun powder residue and stippling would not be found during the autopsy because of the cleaning of the body, suturing of the wound, and the impact of three years of deterioration of the body.  **(Exhibit 35**, September 15, 2018 Email where Nawojczyk concurs with Peretti's findings, PERETTI – 000110.)  Nawojczyk

---

[15] At the time of this meeting, Stephens had allegedly withdrawn in the case and was no longer representing Jeff Co Plaintiffs.  However, it is clear from the correspondence discovered and from his actions, Stephens was very much still involved in the case for Jeff Co Plaintiffs.

2282717-v1

confirmed his opinion to Stephens and Carlin by email correspondence. (**Exhibit 33**, Email from Nawojczyk to Stephens re review of Peretti Autopsy Report 9/14/2018, PERETTI – 000109.)

146.   Not satisfied with Nawojczyk's opinion, Stephens also tried to get Nawojczyk to alter his anticipated testimony about the manner of death. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, 117–121.)   Stephens' actions of improperly attempting to influence witnesses and manufacture expert witness testimony, as well as the actions of other Jeff Co Attorneys in this matter, clearly show the Jeff Co Lawsuit was never about seeking the truth of what occurred in relation to the death of Luke, but was instead a charade fabricated for money.[16] Sutter summed up the motivations best when he declared to the Court and Jeff Co Defendants: "Because I can guarantee you, your honor, I'm not in this for - - for my health. *__I'm in it to make a check__*." (**Exhibit 69**, June 6, 2019 Hearing Transcript, at p. 28) (emphasis supplied).   Sutter wasn't the only attorney "in it for the money" as Kerry testified that he paid Stephens *__over $100,000.00__* over a period of four – five months beginning about August 2018. (**Exhibit 53**, Deposition of Kerry Baker, June 26, 2019, pp. 552-554.)

---

[16] In pursuit of their motives, Jeff Co Plaintiffs have made misrepresentations to that Court [i.e. *See* Order June 26, 2019 sanctioning Stephens], about both the existence and concealment of an expert report [September 4, 2019 transcript of Sutter admitting Jeff Co Plaintiffs had Dr. Peretti's autopsy report dated September 14, 2018 and he made the decision to conceal it.   Jeff Co Plaintiffs and Jeff Co Attorneys sat idly by while representations were made to the Court by other counsel that there was no written report. (**Exhibit 17**, February 21, 2019 hearing transcript.)   The discovery abuses have been chronicled in other Jeff Co Lawsuit filings, including in the October 17, 2019 Defendants' Joint Response to Plaintiff Gena Baker's Memorandum Motion to Compel, Motion for Protective Order and Motion for Sanctions.

2282717-v1

## NOBLE OBSTRUCTION

147.    Jeff Co Attorneys efforts to sanitize files and hide documents that should have been produced in discovery were not restricted to Nawojczyk's file. At his Court ordered deposition on September 6, 2019, at the law offices of Wright, Lindsey & Jennings ("WLJ"), one of Jeff Co Plaintiffs' investigators, Michael Noble, arrived over an hour late. Present at the deposition were counsel for all Jeff Co Defendants, as were Gillham, Buchanan and Humphrey for Jeff Co Plaintiffs. As Jeff Co Defendants were searching and waiting for Michael Noble, Gillham left from the WLJ premises for a period of time. As it turns out, and per Michael Noble's deposition testimony, Gillham had slipped off the premises so he could meet with Michael Noble and sanitize the investigation file, all while Jeff Co Defendants and their counsel were upstairs in a conference room, waiting for Michael Noble's arrival. (**Exhibit 70**, Deposition of Michael Noble, September 6, 2019, pp. 40-42.) Michael Noble testified that while he and Gillham were off the WL&J premises, Gillham took the file around to the back of Michael Noble's truck to a spot where Michael Noble could not see what Gillham was removing from the file. *Id.* Michael Noble, of course, just let this happen and only mentioned it when specifically questioned about it during his deposition.

148.    Michael Noble was also questioned extensively in his deposition about his and his father Allen Noble's communications with Jeff Co Plaintiffs and Jeff Co Attorneys. He provided only one email address for himself and one for his father, Allen, which he claimed were the only email addresses they used for their

55

communications about the Baker Family's cases. However, after receiving Dr. Peretti's file, Jeff Co Defendants discovered that the Noble Defendants and Plaintiffs' counsel were communicating using another email address. (**Exhibit 40,** Email from Nawojczyk, PERETTI 00085 – 000087.) Michael Noble failed to produce any documents that included this email address. When questioned about other missing documents, Michael Noble repeatedly testified that his father Allen had the subpoenaed documents and Michael Noble did not have access to them even though they are partners in the same investigation business and both grown men.[17] (**Exhibit 70,** Deposition of Michael Noble, September 6, 2019, p. 51.)

## ATTEMPTS TO INVOLVE DR. PERETTI IN OBSTRUCTION

149.    On December 10, 2018, Stephens directed Dr. Peretti not to respond to Defendants' FOIA request served on Dr. Peretti's employer, the Arkansas State Crime Lab, where by all accounts Jeff Co Plaintiffs espoused they had taken Luke Baker's body for autopsy. (**Exhibit 71,** Stephens email to Peretti to not respond to FOIA request 12/10/18, PERETTI - 000080.) Then on December 12, 2018, Stephens misrepresented to Dr. Peretti Jeff Co Defendants' rights to issue FOIA requests to the State Crime Lab and the obligations to respond. Stephens further lied to Dr. Peretti by misrepresenting that, "the gun does not match is making [Jeff Co

---

[17] There is a substantial gap from February 21, 2019 – December 17, 2019 in the investigative records produced by Michael Noble. It is unclear if this gap reflects those records Gillham removed from Michael Noble's file or if they are the records that had not been produced because they were allegedly in the possession of Michael Noble's father, Allen. Either way, there is a glaring 10-month gap in records that no one has adequately explained. These are the same investigators who were involved in the Second Probate Case for Plaintiffs, who served the subpoenas in a harassing manner and who appeared armed at Karla Cook's deposition as previously outlined in more detail.

56

Defendants] scared." *Id.* Dr. Peretti was directed by Stephens to tell Jeff Co

Defendants to contact Sutter and Humphrey about the case and to also copy them

on correspondence. **(Exhibit 72,** Email from Stephens to Peretti re Do Not Release

Info 12/12/18, PERETTI - 000077.) When the Jeff Co Defendants finally received

Dr. Peretti's file, they discovered in it that Jeff Co Plaintiffs had possession of a

specific type of bullet Luke used in the gun that, up until the ridiculous allegations

in this lawsuit, everyone agreed was the gun used by Luke when he accidentally

shot himself. Jeff Co Defendants further learned that photographs of the bullets

were sent by Stephens to Dr. Peretti on December 6, 2018. **(Exhibit 73,** December

6, 2018 Email from Stephens to Peretti re bullets, PERETTI – 000082.) As it turns

out, these are very unique bullets; however, it was not until Kerry was finally

ordered to sit for a deposition that Jeff Co Defendants learned that Kerry had a

partial box of these bullets. Defendants requested a bullet in discovery but Jeff Co

Plaintiffs and Jeff Co Attorneys stonewalled the production. The existence of these

specific bullets destroys another of the wildly fabricated theories Jeff Co Plaintiffs

have advanced throughout the Jeff Co Lawsuit—the "drop gun" theory, which is

discussed below. Jeff Co Plaintiffs' attempts to involve Dr. Peretti in obstructing

Jeff Co Defendants' discovery was just another attempt to hide evidence.

### CONCEALMENT AND EVOLUTION OF THEORIES REGARDING THE MANNER OF DEATH

150. Jeff Co Plaintiffs and Jeff Co Attorneys knew when they filed the

Complaint and Amended Complaint that the evidence confirmed this was an

accidental self-inflicted gunshot wound to the head.

57

151.    Jeff Co Plaintiffs asserted a barrage of inconceivable theories, one of which involved a "drop gun" as they describe it.  In the Amended Complaint, Jeff Co Plaintiffs allege that "Defendants removed the murder weapon and replaced it with Luke's gun." Amended Complaint, ¶ 9. "[Jeff Co] Plaintiffs have been unable to get the final crime lab report or the investigative files of authorities, but have learned that the gun defendants proffered as a suicide weapon did not fire the fatal bullet.  This leaves as the only logical conclusion that Wilson threw the gun away after killing Luke." *Id.* at ¶ 23. Jeff Co Plaintiffs then summarize by alleging that Wilson "disposed of the homicide weapon to cover his crime, and it was replaced by Luke's revolver which was used as what is referred to as a drop gun." *Id.* at ¶ 3.

152.    Jeff Co Plaintiffs hid the information about the bullets from Jeff Co Defendants because the bullets reveal that this theory about a "drop gun" is a complete fabrication.  The bullets found in Kerry's safe were (i) the same type of unique bullets accessed and taken by Luke to the lodge, and (ii) consistent with the bullet examined by the Arkansas State Crime Lab that came from the body of Luke, removed at the autopsy by Dr. Peretti. (**Exhibit 74**, Arkansas State Crime Lab Report, ADAMS 0240.)  The evidence supports the fact that Luke used his own revolver when he accidently shot himself.  This is simply another of Jeff Co Plaintiffs' outrageous and factually inapposite theories to wrongfully pursue Jeff Co Defendants, and their efforts to hide evidence from Jeff Co Defendants and the Court and to otherwise conspire and conceal their lies.

2282717-v1

153.    Likewise, the lies alleged in the Complaints by the Jeff Co Plaintiffs and Jeff Co Attorneys about the adults, including Bryan and Brandon engaging in a conspiracy to cover up a homicide, providing drugs to the four friends, and other unfounded allegations that were plead and pursued in Jeff Co Lawsuit were abusive, malicious, and designed for an ulterior purpose including to extort a settlement from the Adams Plaintiffs.

### CHANGES TO THE EVOLVING MANNER OF DEATH: DEATH CERTIFICATE, FIRST SUPPLEMENTAL REPORT OF CAUSE OF DEATH, THE ADDENDUM TO CASE FILE INCLUDING SECOND SUPPLEMENTAL REPORT OF DEATH REPORT, AND CONSPIRACY OF JEFF CO PLAINTIFFS AND JEFF CO ATTORNEYS WITH CORONER KELLEY

154.    At the very top of the list of unbelievable impropriety in this case are the actions of Jeff Co Plaintiffs, Jeff Co Attorneys and Coroner Kelley, all of whom conspired together to hide and manipulate evidence so they could manufacture a "manner of death" that Kelley could incorporate into Luke's death certificate to support Jeff Co Plaintiffs' ridiculous and outrageous allegations of murder, drug dealing and conspiracy to coverup a murder.

155.    To understand this part of the story, context is essential. First, it should be noted that Kelley was just a few blocks away from the JRMC, yet he never viewed Luke's body for the days it remained there following the death, nor did he ever discuss the manner and cause of death with the medical staff, officers or his own deputy coroner, all of whom *were* present at the hospital the night of the accident. He discussed it with none of them. Not once. Not ever.

59

2282717-v1

156.    Second, the initial Certificate of Death ("Death Certificate") dated October 24, 2015 reported the death of Luke by "GSW Head" meaning gunshot wound to the head. (**Exhibit 3**, Original Death Certificate.) This manner and cause of death was reached by all who reviewed the scene of the accident and who were present at JRMC with Luke and all his friends, each of whom were separately interrogated there by officers.

157.    And then, on November 30, 2018, over three years after the accident, only one month after Jeff Co Plaintiffs' filed their first frivolous complaint, and completely out of the blue to Jeff Co Defendants, Coroner Kelley issued a Supplemental Report of Cause of Death ("First Supp. Death Report"). Again, he took this step without ever speaking to anyone actually involved in the investigation of Luke's death, including his own, well-respected Deputy Coroner Kim Phillips, who participated in the examination of the body the night of the accident. (**Exhibit 75**, Kelly First Supp. Death Report, 11/28/18.) In Coroner Kelley's First Supp. Death Report the cause of death did not change, "Gunshot Wound to Head." *Id.* However, Kelley omitted the description of how the injury occurred that was on the Death Certificate. *Id.* He added that an autopsy had been performed but that the autopsy findings were not available, although he never contacted Dr. Peretti to request them even though they had been completed over two months earlier. *Id.* "Investigation by Law Enforcement" was listed as the basis for issuing the First Supp. Death Report. *Id.* (**Exhibit 59**, Deposition of Kelly, March 5, 2020, pp. 213-216.) Importantly, after zero investigation, Coroner Kelley

60

arbitrarily changed the "manner of death" from "Accident" to "Could not be determined." *Id.*

158.    The alleged basis for issuing the First Supp. Death Report disappeared on or about December 17, 2019, when the Sheriff closed his file a second time with no charges, but Kelley left his file open.  When questioned under oath why Kelley kept his file open after the Sheriff closed his, Kelley changed his story and testified that the basis to keep his file open was that Jeff Co Plaintiffs had filed a civil suit, and he wanted to wait for the outcome. *Id.* (**Exhibit 76**, Kelley file notes, ADAMS 1914-1915.)

159.    Inexplicably, on July 10, 2019, Kelley issued a second Supplemental Report of Cause of Death ("Second Supp. Death Report") to state the death was due to a "Non-Self-Inflicted Gunshot Wound to Head," which matched what Jeff Co Plaintiffs alleged in their Complaints. (**Exhibit 77**, Second Supp. Death Report, July 10, 2019.)  Coroner Kelley also included a new description of how the injury occurred: "Non-Self-Inflicted Gunshot Wound to Head – No Stippling / Muzzle Impression or Burn Mark Leads One to Believe Distant Wound and Not Self-Inflicted." *Id.* (emphasis supplied).  Coroner Kelley included within the Second Supp. Death Report another "new" document of the same date, July 10, 2019, which he titled "Addendum to Case File Regarding James Luke Baker" ("Addendum").  When the Addendum including the Second Supp. Death Report was first provided to Jeff Co Defendants on July 15, 2019, they were, needless to say, shocked.  Considering that the Sheriff had long since closed his file on the matter, Jeff Co

2282717-v1

Plaintiffs' Amended Complaint remained pending and unresolved, and nothing factually had changed or been favorably discovered (because it did not exist) for Jeff Co Plaintiffs in the past four years, there was, *at that time*, no apparent explanation why Coroner Kelly would issue this Second Supp. Death Report.

160.    Since the issuance of the Addendum with Second Supp. Death Report, however, there have been two significant events uncovered during the course of Jeff Co Defendants' investigation and discovery in the Jeff Co Lawsuit that demonstrate why these changes were made—a desperate conspiracy by Jeff Co Plaintiffs, Coroner Kelley and Jeff Co Lawyers, and Coroner Kelley's desire for self-preservation.

161.    In Nawojczyk's testimony, he revealed a part of the conspiracy between Jeff Co Attorneys and Coroner Kelley that was designed to concoct "facts" that would lend support to Jeff Co Plaintiff's allegations in their Amended Complaint. Specifically, Nawojczyk testified that he attended a meeting with Jeff Co Attorneys and their experts at a private airport, Tac Air, in Little Rock on July 5, 2019. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, p. 191, et seq.) As of the date of this meeting, Kelley's First Supp. Death Report stated the cause of death as a "Gunshot Wound to Head" and cited that the reason for the supplement as "Further Investigation by Law Enforcement" (which investigation had closed over six months earlier). Also, the Addendum related to the manner of death of Luke

62

Baker had not yet been issued. Present at this airport meeting were Stephens, Sutter, Humphrey, Buchanan, Dr. Peretti, Nawojczyk, and Dr. Kris Sperry.[18]

162.   Nawojczyk testified that at the airport meeting Stephens gave him some "notes" about the aforementioned 81 photo images with handwriting across the top that said, "Greg Stephens Notes Work Product" (the "Photo Notations"). *Id.* Stephens asked Nawojczyk to e-mail the Photo Notations to those gathered at Tac Air, and Nawojczyk took photographs of the Photo Notations and emailed the Photo Notations to Sutter, Humphrey, and Buchanan during the meeting. (*Id.* at pp. 206-208; 212-213; **Exhibit 78,** July 6, 2019 emails from Nawojczyk attaching photos with the notations "Greg Stephens Notes Work Product," NAWOJCZYK 645, 652, and 659.)

163.   These Photo Notations were a compilation of Stephens' notes (and perhaps Jeff Co Plaintiffs' investigator Michael Noble's notes), reflecting **Stephens'** elaborate and graphic description of **his** "interpretation" of what each photograph reflected. The Photo Notations identify each photograph by a corresponding jpeg number. *Id.*

164.   On July 10, 2019, five days after the airport meeting, Coroner Kelley issued his Addendum on the cause of Luke's death, citing the new cause of death as

---

[18] According to media accounts, Dr. Sperry, Georgia's Chief Medical Examiner, resigned from office while he was on leave and under investigation for filing false timesheets claiming he was working for the State when he was actually giving private depositions and court testimony in private cases. Dr. Sperry had reportedly been engaged in moonlighting in more than 500 private cases as a paid forensic expert, creating conflicts of interest and undermining his scientific and medical judgment. *See* "'Embarrassed' Medical Examiner Abruptly Retires", The Atlanta Journal-Constitution, Sept. 23, 2016, Judd, Alan.

63

2282717-v1

"non-self-inflicted gunshot wound to head." To support his findings on this new cause/manner of death, Kelley attached a detailed description of what he claims were "his Jefferson County Coroner" findings related to each of the 81 photographs, which miraculously and inexplicably were virtually identical to the Photo Notations Stephens had prepared and circulated to the participants at the Tac Air meeting to Jeff Co Attorneys and other attendees a few days earlier. Notably, and as will be shown below, Jeff Co Defendants' data expert found that a document titled "photo notations" had been loaded onto the computer used by Coroner Kelley, eight months earlier on November 5, 2018. However, the document was not saved and the external thumb drive from which the photo notations were downloaded was never produced by Kelley to the Jeff Co Court appointed data expert for download or analysis. *See,* section 3.H., infra. This was a further concealment and spoliation of evidence.

165. Throughout the course of the Jeff Co Lawsuit, Coroner Kelley was given several opportunities to "come clean" about the fact that the Photo Notations relating to these 81 photographs that he claims he prepared in his role as Coroner and which "support" the conclusions in his July 10, 2019, Addendum, were actually created by Stephens. In each instance, Kelley chose not to tell the truth.

166. On July 23, 2019, three days before Sutter's deposition of Kelley when Jeff Co Defendants were retrieving FOIA documents from Kelley, Kelley told Melody Piazza, Jeff Co Defendants' consultant, that he wrote his Addendum, including "his" photo notations, in one sitting the night of July 9, 2019, after

64

Stephens came to Kelley's personal residence with a copy of the September 14, 2018 Dr. Peretti autopsy report. (**Exhibit 79**, Piazza Affidavit ¶ 9.) Kelley also stated that he did not provide "his" photo notations to anyone before he wrote the Addendum which included the photo notations on the night of July 9, 2019. (**Exhibit 59**, Deposition of Coroner Kelly, March 5, 2020, pp. 230–233.) Once again, this portion of the Addendum that Kelley purported to Ms. Piazza was his creation is, for all intents and purposes, identical to the Photo Notations prepared by Stephens and passed around at the Tac Air meeting five days earlier on July 5, 2019. It is obvious that this portion of the Addendum was authored by Stephens and simply recreated by Kelley to include in his Addendum. At his deposition, Coroner Kelley admitted the photo notations show where someone attempted to "white out" the handwritten notation across the top that state, "Greg Stephens Notes Work Product". (**Exhibit 78**, July 6, 2019 emails from Nawojczyk to Plaintiffs' attorneys attaching photos with the notations "Greg Stephens Notes Work Product," NAWOJCZYK 645, 652 and 659; **Exhibit 80**, Photo Notations; **Exhibit 59**, Kelley Deposition, March 5, 2020, pp. 143-144.)

167.    Nawojczyk testified about two other facts directly linking Stephens to the Photo Notations in the Kelley Report. First, Nawojczyk testified that the Tac Air meeting was the third time he had seen the Photo Notations. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 189–204.) The first time he saw at least the first page of the Photo Notations was in a strange series of email correspondence dated June 11, 2019, when Stephens had claimed them as his work

65

product. *Id.* at 190.  The second time he saw them was at a meeting in Stephens' office on McKinley in Little Rock that occurred about June 26, 2019.  *Id.* at pp. 203-204.  Those in attendance at that meeting were Nawojczyk, Stephens, two new private investigators Stephens had hired, and an associate of Stephens.  According to Nawojczyk's sworn deposition testimony, Stephens presented the Photo Notations to the group for them to read at that meeting.  *Id.*

168.    The second point Nawojczyk made about the Photo Notations in the Addendum was that the notations contained strange descriptions one would not expect to see from a coroner, an elected government official.  *Id.* at 204-205.  For instance, the notations refer to a sex tape between Luke and his girlfriend, and "Kelley" surmises that perhaps sexual activities between those two might have resulted in a possible bite mark reflected in one of the photos.  *Id.*  Photo Notation for jpeg Image 2640 was, "Photograph of Luke's left hand has a mark on it, possible tooth impression.  Not sure if this what caused the injury or not.  It is my understanding that he and his girlfriend made a sex tape that morning.  I would look at the tape to see if it could be seen in it."  *Id.*  Nawojczyk not only pointed out that this notation had nothing to do with the case or Luke's death, but he was repulsed by its inclusion in the Addendum.  He also recalled that the only time he had ever heard any reference to any sex tape had been in a previous discussion with Stephens.  Nawojczyk remembered that Stephens had previously been discussing the sex tape and testified:

> Q.    Is that a description of an image that you would expect to see from a Coroner?

66

2282717-v1

A.    No. I would never expect to see stuff about the sex tape. I mean, that just — it was — it was irrelevant to me, and I didn't, I didn't ever look at it. Didn't care to look at it.

Q.    And is it your testimony that the only person in the entire investigative process who ever mentioned a sex tape to you was Greg Stephens?

A.    Yes.

Q.    Did you ever talk to Mr. Kelley about a sex tape?

A.    No ma'am. I never talked to anybody about it.

Q.    Other than Mr. Stephens?

A.    Right.

*Id.*

169.    Buchanan also referenced during a court proceeding in the Jeff Co Lawsuit something about sexually graphic photos that were on Luke's phone. **Exhibit 42** September 4, 2019 Hearing transcript, pp. 128, 130. Kelley testified that Stephens and Michael Noble told Kelley there was a sex tape, which ties Michael Noble and Noble Investigation to the Photo Notations as well. (**Exhibit 59,** Deposition of Kelley, March 5, 2020, pp. 147-148.) So, without Stephens or his/Jeff Co Plaintiffs' investigator Michael Noble, Kelley would not be privy to the existence of any sex videos on Luke's phone.

170.    Despite Jeff Co Plaintiffs' various motions and tactics to try to stop it, in early 2020, Jeff Co Defendants finally got their opportunity to depose Kelley. When confronted with the question of how on July 5, 2019, Stephens could have Photo Notations identical to the photo notations that Kelley had previously informed Ms. Piazza were the product of his work and that he prepared on July 9, 2019, Kelley changed his story. Kelley then testified that he had not prepared his photo notations the night of July 9, 2019, but instead had prepared them nearly

67

four years earlier on or around the date of death, October 24 up to October 27, 2015, which was around the timeframe he claims he would have received the photographs from the Jeff Co Sheriff. (*Id.*, pp. 297-301.) This testimony cannot be true because these Photo Notations refer to the autopsy report prepared by Dr. Peretti—the same autopsy report that was prepared three years later in September of 2018. [19]

171.  Another discovery was made by the data expert regarding what is most likely the Photo Notations discussed above. In reviewing the information recovered from the devices Kelley produced pursuant to a Jeff Co Court Order, the expert uncovered a file named "James Luke Baker JRMC ER Photograph Notations". *Infra.* The details of this file show that it was first accessed by Kelley on his computer from an external USB device on November 5, 2018. Kelley did not save this file to his computer. *See infra.*, Sect. H for more details.

172.  In hindsight, another series of events lend further support that Kelley did not prepare the Photo Notations and further, that Jeff Co Plaintiffs knew Kelley was about to produce the Addendum and Second Supp. Death Report with the Photo Notations prominently displayed. It is clear Sutter was planning the premier

---

[19] In addition to Stephens' hand-written notation on the top of two pages of these Photo Notations, Stephens also claimed these to be his notes and work product in a series of bizarre email correspondence with Nawojczyk and Michael Noble. On June 11, 2019, at 11:57 a.m., Stephens emailed these three persons with the Photo Notations document demanding to know "...ASAP where this report came from and whose it is ASAP." Responses were sent by Dr. Peretti and Nawojczyk that these were not their photo notations. Strangely, no response can be seen from Michael Noble, leaving the question of whether he assisted with the preparation of the Photo Notations. Shortly thereafter, at 12:42 a.m., Stephens replied and stated, "Then it must be mine so consider it work product from me for your review and consideration." (Exhibit 81, June 11, 2019 email from Stephens to Peretti, Nawojczyk and Noble, PERETTI 000064)

68

release of the Photo Notations, as shown by a series of Sutter-driven deposition notices issued in this case. On July 8, 2019, just three days after Sutter received the Photo Notations at the Tac Air meeting, he messaged the Jeff Co Defendants curiously withdrawing his previously adamant demand to take the deposition of Skylar on July 26, 2019. Sutter also declared that he was going to take a non-party deposition on that date, but mysteriously did not disclose the identity of the witness. (**Exhibit 82**, July 8, 2019 Email from Sutter re taking a deposition on July 26.) Stephens visited Kelley at his personal residence on July 9, 2019, and both the Addendum and Second Supp. Death Report were notarized the following day, July 10, 2019. The Addendum with Second Supp. Death Report was provided to Defendants on July 15, 2019, and the very next day, July 16, 2019, Sutter emailed a notice of his non-party deposition for Kelley on July 26. (**Exhibit 83**, July 16, 2019 Email from Sutter re Kelley notice of deposition.) So even before Coroner Kelley released the Addendum with Photo Notations and Second Supp. Death Report in which he claimed the Photo Notations as his own, Sutter had knowledge of their actual origin via the Tac Air meeting and distribution. Clearly, Jeff Co Plaintiffs already knew the bombshell Coroner Kelley was about to drop on Jeff Co Defendants by changing the death certificate and then claiming the Photo Notations as his own "Addendum" to the death certificate during Sutter's deposition of Kelley.

173.   Astonishingly, during Sutter's incredibly strange deposition of Kelley, and even though Sutter was at the Tac Air meeting and had received the Photo Notations before the date Kelley claimed under oath he prepared them, Sutter

elicited six hours of extensive testimony of Kelley, during which time Sutter repeatedly elicited testimony from Kelley that he, Coroner Kelley, had prepared the Photo Notations.  Every single lawyer sitting on Jeff Co Plaintiffs' side of the table had received the Photo Notations at Tac Air and should have known that Sutter was eliciting perjured testimony from Kelley, but never said a word. (**Exhibit 84,** Deposition of Kelley, July 26, 2019 with DVD, pp. 1–3, noting attorney appearances and DVD of videotaped deposition of Coroner Chad Kelley by L. Sutter)[20].

174.   When Jeff Co Defendants finally got an opportunity to depose Kelley on March 5, 2020, he was asked about the conclusions in his Addendum and in the Second Supp. Death Report that there was "no stippling" on the body of Luke and that death was from a "non-self-inflicted gunshot wound." (**Exhibit 77,** July 10, 2019 Kelley Second Supp. Death Report.)  When confronted with the stippling photograph of Luke's face and wound entrance over seven months after Sutter's deposition of him when he testified there absolutely was no stippling, Kelley conceded that there was in fact stippling on Luke's face. (**Exhibit 59,** Deposition of Kelly, March 5, 2020, pp. 307-308.)  Kelley testified that it was "a mistake on my part" to state that there was "no stippling" in the Addendum and on the Second Supp. Death Report, the latter of which was filed with the Arkansas Department of Health.

> Q.     Okay.  You see stippling there.  Why is that slight?  I see lots and lots of dots in the top picture.  Isn't that stippling, each little red spot?
> A.     Because it's more spread out in the bottom, is my opinion.

---

[20] The DVD of the complete video deposition contained in **Exhibit 84** will be requested to be filed under seal.

2282717-v1

Q.     Okay. But, but both photos show stippling. The red spots or marks around the entrance wound; true?
A.     Uh-huh.
Q.     Yes?
A.     Yes.
Q.     All right. And so you would agree that is stippling in Exhibit 26; right?
A.     (Witness nods head.)
Q.     Yes?
A.     Yes.

\*\*\*\*\*

Q.     Okay. So let me hand you 27. And acknowledging that not all stippling looks the same, you see this photograph of Luke Baker; right? You've seen this picture before?
A.     Yes.
Q.     All right. And you see the little arrow on there?
A.     Yes.
Q.     And it points to the gunshot wound which is in the hair; correct?
A.     Yes.
Q.     And around the part that's not in the hair, do you see stippling, Mr. Kelley, honestly?
A.     Slight.
Q.     Okay. So you do see slight stippling?
A.     Yes.
Q.     Okay. So why on the report that you filed with the Health Department in the State of Arkansas do you say, your Supplemental Report of Cause of Death July 10th, 2019, do you say "No stippling"?
A.     A mistake on my part.
Q.     A big mistake; isn't it? It's a big mistake?
A.     Yes.

*Id.* at pp. 306-307.

175.     Despite the references to them in the Addendum, and despite having the autopsy images on his laptop as will be shown below, Kelley , brazenly and incredibly, testified that he did not have these photographs. *Id.* at. p. 152. Kelley could offer no logical explanation as to how information about these photos could be

71

included in "his" Addendum if, as he testified under oath, he had no access to the photographs about which he was expressing an opinion. *Id.* There was no logical explanation for the inconsistencies in Kelley's testimony.

176. When Kelley was deposed by Jeff Co Defendants and ultimately faced with the impossible testimony about his Addendum with Photo Notations he claimed he wrote but which could not possibly be true, Kelley acknowledged that he could not explain the irregularities in the Addendum. *Id.* at pp. 307-309.

177. These references in Kelley's Addendum further demonstrate that Kelley's testimony that (a) he was never provided any photographs from the exhumation of Luke's body; and (b) he had never seen any photographs from the autopsy of Dr. Peretti, was deliberately false testimony, designed to bolster Jeff Co Plaintiffs' evolving case theories. (**Exhibit 77**, July 10, 2019 Kelley Second Supp. Death Report.)

178. A review of the July 10, 2019 Addendum issued by Kelley expressly refers to autopsy photographs from the September 7, 2018 exhumation that Kelley testified he did not attend and photos he testified he had not seen. For example, on page 5 of 15 in the Addendum, it reads "See exhumation photograph 2018-09-07 15-58-57." *Id.*

179. Another set of facts also lends further support that Kelley did not prepare the Photo Notations. In the Photo Notations, there are comments made about all 81 photographs known to exist, each identified by a jpeg number. (**Exhibit 52**, 81 jpeg photographs.) Two comments in the Photo Notations identify

72

2282717-v1

2 distorted photos by jpeg numbers (2672 and 2674), and one comment identifies one photo by jpeg number (2675) where the image was unsupported and would not open. Kerry's CD contains 81 photographs identified by the same jpeg numbers (2672 and 2674), which are both distorted, and one photo would not open (2675), specifically matching the Photo Notations. (**Exhibit 77**, July 10, 2019 Kelley Second Supp. Death Report.) The Jeff Co Sheriff's file received by Jeff Co Defendants in December 2018 (three years after Kelley allegedly received his photos), however, contains only 77 paper photographs, none of which are distorted, and the image that would not open in Kerry's CD (photo of the money from Luke's pocket) is present in the Sheriff's paper file. (**Exhibit 54**, Grainy/blurry 77 paper photographs Jeff Co Defendants received from Sheriff, ADAMS 0058 – 0077.) So clearly the Photo Notations were prepared from Kerry's CD provided to at least Stephens, Buchanan and the Nobles, and could not possibly have been prepared from the Sheriff's file.

180.    Under oath, Kelley also testified that he was going to amend the cause of death in the Second Supp. Death Report to remove the language that it was a "non-self-inflicted gunshot wound" because that was "incorrect."

> Q.    Well, then why did you put "Leads one to believe distant wound" on the report with the Supplemental Report of Cause of Death filed with the Arkansas Department of Health?
> A.    I just didn't think it was -- again, okay, it was a mistake on my part.
> Q.    Yeah, it was a mistake that we -- it was a mistake that was helpful to the Bakers in their lawsuit against all of these Defendants, even though there was no evidence for it; true? And that's the long and short of it.

73

A.    If you say it is. I mean, I don't have anything against these people. I don't even know them. I mean, what would I have to gain from this lawsuit?

Q.    Well, what would you have to gain from, from just not leaving things just as they were?

A.    I can go back and amend it.

Q.    Okay. Have you thought about doing that today?

A.    I can do it.

Q.    I mean, the Supplemental Report of Cause of Death as we agreed should say gunshot wound to the head, cause of death; correct?

A.    Uh-huh.

Q.    Yes? Yes?

A.    Yes.

Q.    And you should remove "non-self-inflicted" because that's speculation; correct?

A.    Correct.

Q.    And then all of this stuff, describe how injury occurred, down at the bottom, that should be removed; shouldn't it?

A.    Okay.

Q.    Do you agree with that?

A.    Yes.

Q.    Okay. Are you going to do that? Are you going to go amend the Report of Cause of Death one more time?

A.    Yes.

**Exhibit 59,** Deposition of Kelley, March 5, 2020, at pp. 307-309.

181.    Over a year later, Coroner Kelley has still not amended the Second Supp. Death Report. The same outrageous allegations against the Adams Plaintiffs continue to float around, and Coroner Kelley's changing of death in public documents has fueled those blatant lies.

182.    In public records, Defendants discovered allegations and facts that form the basis of a complaint which may explain why Kelley would be motivated to engage in this conduct with Plaintiffs.[21] (**Exhibit 85,** *Westbrook vs Kelley*

---

[21] **Exhibit 85** consists of a Docket Sheet, Complaint, Notice of Deposition of Kelley, and Order of Dismissal in *Westbrook vs. Kelley*, Jeff. Co. Cir. Ct. Case no. 35CV-14-541-2, filed November 10, 2014.

74

pleadings.) In 2014, Kelley was sued by a former deputy coroner David Westbrook ("Westbrook") for sexual harassment. *Id.* Kelley was represented by a county attorney, and Westbrook was represented by Sutter. *Id.* After the case sat dormant for five years, on April 4, 2019, Sutter served a notice of deposition to depose Kelley in the *Westbrook* case. *Id.* However, the deposition was never taken because Sutter encouraged Westbrook to settle with Kelley for what Westbrook alleged (in a separate case) was a pittance of the damages Sutter had represented to Westbrook he could expect to receive from Westbrook's lawsuit against Kelley.[22] (**Exhibit 86,** Westbrook Counterclaim and Order in 63CV-19-1060.) This settlement prevented Westbrook's harassment case against Kelley from going to trial, and Kelley avoided the embarrassment and humiliation of the graphic and public disclosure of the allegations of sexual advances asserted by Westbrook. (**Exhibit 85,** *Westbrook vs Kelley* pleadings.) An order dismissing Westbrook's case against Kelley was filed on May 13, 2019, and became a final order on June 12, 2019. *Id.* Kelley was now poised to assist Jeff Co Plaintiffs and Jeff Co Attorneys and become the star witness for them. Indeed, just one month later, on July 10, 2019, Kelley in fact issued the Second Supp. Death Report identifying "non-self-inflicted gunshot wound" as the new cause of death, presumably "giving legs" to allegations of the Amended Complaint against Jeff Co Defendants. (**Exhibit 15,** Amended Complaint.)

---

[22] **Exhibit 86** consists of Westbrook's Amended Counterclaim against Sutter and Gillham PLLC and Third Party Complaint against Sutter and Gillham for Breach of Fiduciary Duties, Breach of Contract, Fraud, Unjust Enrichment and Piercing the Veil filed February 18, 2020, and Order of Dismissal, in *Sutter & Gillham PLLC vs. David Westbrook,* Saline Co. Cir. Ct., 63 CV 19-1060.

75

183.    In his amended counterclaim/third party complaint that Westbrook filed against Sutter and Gillham PLLC, Sutter and Gillham, Westbrook alleged he had no idea when he settled his case against Kelley upon Sutter's urging, that Kelley was going to become the lynchpin of Sutter's case against Defendants here. (**Exhibit 86**, Westbrook Counterclaim and Order in 63CV-19-1060.)  Although an order was entered dismissing Westbrook's malpractice counterclaim/third party complaint against Sutter, Gillham and their firm, *(Id.)* the allegations raised by Westbrook suggest why Coroner Kelley would take the following actions, all of which were so beneficial to Jeff Co Plaintiffs and Jeff Co Attorneys:

- Knowingly giving perjured testimony about the origin of the Photo Notations included in the Addendum in furtherance of Jeff Co Plaintiffs' allegations
- Admitting in sworn testimony that the death certificate should be changed but, one year later, still failing to do so
- Knowingly giving perjured testimony about minimum contact with Jeff Co Lawyers and Jeff Co Plaintiffs' investigators when he spent over 105 hours talking to them, and exchanged 154 text messages with investigator Michael Noble for the time periods for which records were produced; See footnote 17 for record gaps
- Falsely amending public records to attempt to turn a self-inflicted accidental shooting into a homicide for the benefit of monetary gain for private parties in a civil lawsuit, without regard for the destruction of lives of young men and their families
- Knowingly creating a Second Supp. Death Report with false factual statements and opinions unsupported by any case facts, but which were favorable to Jeff Co Plaintiffs' Lawsuit
- Knowingly "creating" (or adopting) a bizarre and factually unsupported Addendum favorable to Jeff Co Plaintiffs' Lawsuit using the work product of Stephens or others associated with Jeff Co Plaintiffs
- Finally admitting that the photographs he had in his possession before he changed the original Death Certificate revealed stippling yet, preparing the First and Second Supp. Death Reports and an Addendum declaring there was no stippling and the gunshot wound was distant

76

- Intentionally failing to comply with numerous FOIA requests from Jeff Co Defendants by withholding part of the County Coroner file including exonerating stippling photographs that destroyed Jeff Co Plaintiffs' false claims
- Deleting files and text messages related to this case *after* Jeff Co Defendants served preservation letters on Coroner Kelley
- Withholding electronically stored information on devices used in the Coroner's duties from the Court appointed data expert, Avansic, *See infra.*

## THE DATA ANALYSIS OF CORONER'S DEVICES SUPPORTS THE CIVIL CONSPIRACY AND INTENTIONAL TORTS

184.    On October 16, 2019, Jeff Co Court appointed Avansic Inc. ("Avansic") as an IT expert to download the electronic devices of Kelley used in the county business of the coroner.  On August 10, 2020, Jeff Co Court enter an order authorizing Avansic to produce the collected data to the parties.

185.    Jeff Co Defendants engaged a forensic IT consultant, Downstreem, to review the data collected from the devices produced by Kelley to Avansic.  The data collected by Avansic was transferred by it to Downstreem for examination and analysis.  After careful and thorough review, Downstreem prepared a Declaration of its findings.  (**Exhibit 87**, Downstreem Declaration.)  Kelley failed to produce all of the data to Avansic, and it is clear that he erased data from the devices used for County Coroner business.

186.    A summary of the analysis of Downstreem reveals the following:

- Downstreem was unable to examine the files outlined in its Declaration related to Luke because those files were absent from the coroner devices provided to and imaged by Avansic.  In fact, there were no files (word documents, PDFs, etc.) related to Luke that were located on any of the devices Kelley provided to Avansic.

77

- Kelley utilized several USB devices to create, review and edit files related to Luke because the computer file system logs revealed dozens of interactions with files relating to Luke.

- Although Kelley was able to create, review and edit files related to Luke from the USB devices listed in Section 13 of the Declaration, Downstreem was not able to examine the same USB devices or their contents because these devices were not produced by Kelley for forensic examination and analysis.

- A file with the name of "James Luke Baker JRMC ER Photograph Notations" has a "date created" of November 5, 2018. This does not mean that the file contents were originally created on Kelley's computer. Rather, the "date created" represents the date this file was first accessed on Kelley's computer from a USB device—November 5, 2018. Kelley did not save this file to his computer. A file with the same name was accessed on Kelley's computer from a USB device on July 10, 2019. Kelley did not save this file to his computer either. Because the file was never saved to Kelley's computer, Downstreem was not able to examine and analyze the contents of this file.

- Although testimony by the pertinent individuals has been inconclusive on the date, they agree a meeting occurred between Kelley, Michael Noble (Jeff Co Plaintiffs' investigator), and Stephens sometime on or close to November 5, 2018. Moreover, based on an analysis of the cell phone records from Verizon for Kelley's cell phone, several calls were made around November 5, 2018, between (i) Michael Noble and Kelley, and (ii) Stephens and Kelley. Kelley last opened this file from a USB device on July 10, 2019 at 4:18:07 PM (CST). Upon information and belief, these notations were what eventually became part of the Second Supp. Death Report, (sometimes referred to as the "Chad Kelley Report") issued on July 10, 2019, and containing the Photo Notations.

- Based on the analysis of the Verizon phone records of Kelley for an Apple iPhone XS Max device, at least 150 text messages were exchanged between Michael Noble and Kelley. All of these text messages were deleted from the device prior to Kelley producing the device per the Court order. Many of these deleted messages were after Kelley was served with the FOIA requests and preservation letters of Jeff Co Defendants.

- The illegal autopsy of Luke occurred on September 7, 2018.

78

2282717-v1

- Kelley testified that he waited until July 10, 2019 to issue his Addendum changing the death certificate because he was waiting to receive the September 7, 2018 autopsy photographs. (**Exhibit 59**, Deposition of Kelly, March 5, 2020, pp. 292-293.) However, a file with the name "2018-09-07 15-39-00.jpeg" was accessed from an external device, such as a USB device, connected to Kelley's computer at "F:\Luke Baker Photographs 01\Autopsy\" on November 4, 2018 at 7:31 a.m. (CST). Downstreem was not able to examine or analyze this USB/external device or its contents because it was not produced by Kelley as ordered by the Court.

- Analysis also revealed an additional 10 photographs stored on the same USB device that were opened on Kelley's computer, starting on November 4, 2018, at 7:31 a.m. (CST). These photographs were located in the following subfolders under "Luke Baker Photographs 01": (1) Autopsy; (2) Prairie Wings; and (3) JRMC-ER. Again, Downstreem was not able to examine or analyze this USB/external device or its contents because it was not produced by Kelley as ordered by the Court.

187. The Jeff Co Court also entered an order on October 16, 2019, requiring Kelley's phone provider, Verizon, to identify, protect, and preserve everything responsive to the subpoena duces tecum issued and served by Jeff Co Defendants on Verizon. An order was entered on October 27, 2020 directing Verizon to turn over the phone records. Verizon produced the phone records, which have been summarized. (**Exhibit 88**, Summary of Verizon phone records of Kelley.)

188. The Verizon records reveal just how involved Kelley was with Jeff Co Plaintiffs, apparently conspiring with them to bolster their claims against Jeff Co Defendants. The contacts were voluminous and inconsistent with the testimony and claims of Jeff Co Plaintiffs that Kelley, as the elected Jefferson County Coroner, was acting independently in this case. For example:

2282717-v1

- September 25, 2018 and October 23, 2020[23] - Kelley and Michael Noble exchanged approximately 175 telephone calls[24] totaling approximately 2803.07 minutes or 46.72 hours

- December 17, 2019 and October 1, 2020 - Kelley and Michael Noble exchanged approximately 154 text messages

- November 9, 2018 and October 29, 2020 - Kelley and Stephens exchanged approximately 511 telephone calls totaling approximately 3487.38 minutes or to 58.13 hours[25]

- January 23, 2019 and July 26, 2019 - Kelley and Kerry exchanged approximately 7 telephone calls totaling approximately 406 minutes or 6.77 hours

- February 21, 2019 - day of critical Jefferson County hearing before Judge Guynn on Defendants' Motion to Dismiss and the Motion for Stay on the Emergency Sealing of case

  o  2/20/2019 - 3 calls from Michael Noble to Kelley totaling approximately 38 minutes

  o  2/21/2019- 3 calls from Michael Noble to Kelley totaling approximately 50 minutes

  o  2/20/2019 - 5 calls exchanged between Kelley and Stephens totaling approximately 16 minutes

  o  2/21/2019 - 3 calls exchanged between Kelley and Stephens totaling approximately 16 minutes

---

[23] There is an unexplained gap in the phone records of Kelley produced by Verizon. From the date of the accident, October 24, 2015 through March 21, 2016, no records were produced although the subpoena covered this gap. Therefore, the number of calls and time reflected in the analysis of the Verizon documents are likely far less than actual number of calls and time because of this missing data.

[24] Kelley testified that he had minimal contact with Michael Noble, which was a lie. (Exhibit 88, Summary of Verizon phone records of Kelley.) Kelley's files show no notes of any calls with Michael Noble. Interestingly, Kelley meticulously documented in his file the very few calls of one of Defendants' attorneys who was trying to make contact with Kelley to produce the files per the various FOIA requests. (Exhibit 76, Kelley file notes, ADAMS 1914-1915.)

[25] Kelley testified that he had minimal contact with Stephens, which was a lie. (Exhibit 59, Deposition of Kelly, March 5, 2020, pp. 234-235.)

80

2282717-v1

- <u>July 6, 2019</u> - Tac Air meeting arranged by Sutter and Stephens on June 21/22, 2019 (**Exhibit 89,** Email re TAC Air meeting June 21, 2019, PERETTI – 000072) for Stephens, Sutter, Gillham, Humphrey, Buchanan, Nawojczyk, Dr. Peretti & Dr. Sperry to meet; the Photo Notations bearing the hand-written notations of author Stephens claiming the Photo Notations as his "work product" were given by Stephens to Nawojczyk who was asked to and did circulate them to Sutter, Humphrey, and Buchanan (**Exhibit 78,** July 6, 2019 emails from Nawojczyk attaching photos with the notations "Greg Stephens Notes Work Product," NAWOJCZYK 645, 652 and 659.) On June 28, 2019, Sutter also confirmed he had secured the location for the Tac Air meeting by email to stiffdoc@bellsouth.net, Dr. Peretti, Stephens, Humphrey, Gillham and Ehodge@sglaws.com. (**Exhibit 89,** Email re TAC Air meeting June 21, 2019, PERETTI – 000072.)

  o   <u>7/2/2019</u> - 1 call between Stephens & Kelley
  o   <u>7/3/2019</u> - 2 calls between Stephens & Kelley
  o   <u>7/4/2019</u> - 3 calls between Stephens & Kelley
  o   <u>7/6/2019</u> - 3 calls between Stephens & Kelley
  o   <u>7/7/2019</u> - 3 calls between Stephens & Kelley
  o   <u>7/8/2019</u> - 1 call between Stephens & Kelley

- <u>July 9, 2019</u> - the night Stephens went to Kelley's house and allegedly took Dr. Peretti's autopsy report; also, the date Kelley told Melody Piazza that he prepared the Addendum throughout that night

  o   <u>7/9/2019</u> - 0 calls between Stephens & Kelley

- <u>July 10, 2019</u> - 15 page Addendum executed by Kelley and notarized; date Second Supp. Death Report executed by Kelley and notarized; and on
- <u>July 15, 2019</u> - Kelley faxed Addendum to Defendants' counsel.

  o   <u>7/8-10/2019</u> - 15 calls between Kelley and Stephens around the time of preparation and issuance of the Addendum including Photo Notations

  o   <u>7/11-15/2019</u> - 8 calls between Kelley and Stephens after the Addendum was issued and then faxed to defense counsel on July 15, 2019 shortly before 9:00 p.m.

  o   <u>7/15/2019</u> - 2 calls between Kelley and Stephens after the Addendum was faxed to defense counsel that exact night

81

2282717-v1

- o    7/15/2019 - 2 calls between Kelley and Kerry totaling 59 minutes after the Addendum was faxed to defense counsel shortly before 9:00 p.m.

- July 26, 2019 - Kelley deposition taken only by Jeff Co Plaintiffs' attorney Sutter (Kelley developed a back ache, abruptly ending the deposition after Sutter finished his examination, and no one else was allowed to depose Kelley; took from then to March 5, 2020, for Jeff Co Defendants to get Kelley back under oath for deposition despite repeated efforts); Sutter and Kelley displayed each of the 81 photos and Kelley "read" the Photo Notations about each image. Kelley often stumbled in reading some of the words which made it appear obvious he had not prepared them. Although Sutter, Humphrey, Sutter's son, Jacob Sutter, Sutter's investigator/bug sweeper David Singer, and Buchanan were present, not one single attorney, representative or investigator of Jeff Co Plaintiffs ever disclosed that these Photo Notations about which Kelley was testifying under oath were the work product of Stephens and that each attorney had been previously provided a full copy of them at Tac Air. **Exhibit 84**, Deposition of Kelley, July 26, 2019 with DVD by Sutter.

  - o    7/26/2019 - 4 calls from Kelley to Stephens at 7:23 am, 8:15 am, 8:29 am, and 3:32 pm totaling approximately 49 minutes of talk time

  - o    7/26/2019 - 2 calls exchanged between Kelley and Stephens after the deposition was concluded totaling approximately 11 minutes of talk time and 1 call from Kelley to Stephens on July 27, 2019 for 29 minutes of talk time

  - o    7/26/2019 - 1 call from Kelley to Kerry on July 26, 2019 at 10:30 p.m. totaling approximately **255 minutes or 4.25 hours of talk time**

- September 4, 2019 - Jefferson County Hearing on gathering the data from all of Kelley's electronic devices and various motions related to discovery, motions to quash depositions subpoenas of Dr. Peretti, Nawojczyk, Michael Noble and Deputy Coroner Kim Phillips, motion for protective order related to Gena's mental health history, and motion to quash subpoena to AT&T for Jordan Case's records

  - o    9/4/2019 - 5 calls exchanged between Kelley and Stephens, including during the lunch recess; Stephens was not in

82

2282717-v1

attendance at this hearing as he had allegedly withdrawn from representing Plaintiffs on July 26, 2019

- Of the approximately 848 total calls and text messages exchanged between Kelley with Michael Noble, Stephens or Kerry, approximately 411 occurred after regular business hours of 8:00 a.m. – 5:30 p.m.

## OBSTRUCTION IN JEFFERSON COUNTY CIRCUIT COURT

189.    In Jefferson County, the Court recognized and expressed its displeasure with the actions of Jeff Co Plaintiffs and some of their counsel, including Stephens lying to the Court regarding Kerry's medical condition and physical capabilities and Sutter's threatening and attempt to intimidate Jeff Co Defendants' counsel Judy Henry following a Court hearing.  Each time the Court chastised Jeff Co Plaintiffs:

THE COURT: How do you know what was going on with him [Kerry Baker]?

MR. STEPHENS: Well, I am a medical doctor, and so I know -- I -- what, I was seeing, but I did not want to diagnose him. And so I wanted him to go to his doctor and have his doctor diagnose him. I did talk to the doctor, and he said, Yes, he's under stress; I've already seen him before; I've talked to him; I know he's under stress. And then I described what he was going to be facing over the next week, and I asked him what I should do with regard to his health care, which is what I think I should have done.

THE COURT: Mr. Stephens, I -- I understand you're a doctor. I'm not a wrestler either, but I'm trying not to jump off this top rope on you. I – I just –

*****

THE COURT: ... But -- but out of all this that's been going on, I -- I think you're lying to me. I go out of my way to make sure everybody has a fair -- fair trial  ...  You know, just -- but for a man to be driving around all day and -- and having -- say he had shingles and can't be around pregnant women, and now, all of a sudden, y'all come here and

83

change your story. And I don't appreciate that, and I could have been doing something else today. And it just – it don't feel right and it don't look right. And, quite frankly, it's unprofessional and you don't treat people like that ... But what's going on here, it's not right.

And -- and Mr. Sutter know, when somebody is trying to take advantage of somebody else, I'm going to come off the top rope and it ain't going to be good. As a matter of fact, somebody was doing him wrong, and I -- I got at them. And so -- and I told you that when I first met you.

**Exhibit 69**, June 6, 2019 Hearing Transcript, pp. 78-81.

190.    In another instance, the Court had to warn Sutter for inappropriate

conduct of trying to intimidate Defendants by getting up in the face of their counsel

in the courtroom and speaking inappropriately to her:

THE COURT:  ...  Now, I got -- Mr. Sutter, I got one thing that doesn't have anything -- at the last hearing, before I left the bench, I told y'all to be civil and to get along. And I walked out the door. And Jerrie, my trial court assistant, said you came up to Ms. Henry and you pointed your finger in her face, you said something to her.

Now, she didn't hear everything that was said, but she did tell me she thought it was inappropriate. So if she could have told me what all was said and confirmed it and –

MR. SUTTER: You want me to tell you?

THE COURT: And my court reporter told me too. Told me something as well.    But --

MR. SUTTER: I'll be glad to tell you.

THE COURT: What did you say then? What -- no. I don't need to know. But if it was inappropriate, you might not want to tell me. Okay.

MR. SUTTER: All I'm saying is -- okay.

THE COURT: Just listen to me. I – they couldn't confirm what was said. But they just said it felt like you was trying to intimidate her.

MR. SUTTER: Was not.

THE COURT: All Right. But these -- my court reporter and from TCA, they don't have anything to do with this. But I just want you to know, I don't appreciate that if that was your intent. All Right.

MR SUTTER: No. My intent -- I said basically the same –

84

THE COURT: I'm just -- I'm not -- I'm just -- just leave it alone. What I'm telling you how I -- we're professionals. It's the second time I've done told you that. If you're going to pick on somebody, find one of these big guys around her to pick on. If that was -- if that happened. But I wasn't in there. I was out here. So I'm just telling you what they told me. All Right. And I'm done with it. All Right.

**Exhibit 42,** Sept. 4, 2019 Hearing Tr., pp. 193 - 195

191.    The defense efforts of Jeff Co Defendants were further obstructed by Jeff Co Plaintiffs and Jeff Co Attorneys, particularly during the deposition of primary plaintiff, Kerry. In addition to attempting to prevent Kerry's deposition entirely, after he was ordered to appear for his deposition, all of the Jeff Co Attorneys continually interrupted the examination, inserting objections, and directing Kerry not to answer, collectively over 1,150 times.

192.    Importantly, Kerry, a key witness and lead plaintiff for Jeff Co Plaintiffs, refused to disclose any facts or proof to substantiate any of the primary allegations in the Amended Complaint as to the Adams Defendants. **Exhibit 53,** Deposition of Kerry Baker, July 1, 2019, pp. 808-809, 811-818, 821-828, 833-836,886, 976 (all objections omitted).

193.    The Jefferson County Lawsuit is still pending although Jeff Co Defendants' motion to dismiss with prejudice is pending. The Jeff Co Plaintiffs have asked to dismiss the Amended Complaint without prejudice, and Jeff Co Defendants are requesting it be dismissed with prejudice.

## COUNT I – ABUSE OF PROCESS

194.    Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing.

2282717-v1

195.    The tort of abuse of process is alleged against the Abuse of Process Defendants.

196.    Some of the Abuse of Process Defendants were parties and counsel of record in the Jeff Co Lawsuit and others were participants in using and abusing judicial processes as more specifically set forth above.

197.    Filing the Second Probate Case while the First Probate Case was opened was an abuse of process and designed to conceal that the Baker Family had already filed and settled their claims for Luke's death on the basis that it was an accident, not a murder.

198.    The Second Probate Case, including the filing and prosecution of the motion for sanctions, was willfully initiated and directed towards the Adams Plaintiffs by at least Stephens, Kerry and the Estate for improper reasons.

199.    As evidenced by the Faulkner County Circuit Court's findings in Order 2, Stephens abused the discovery process by willfully issuing notices of depositions to the Adams Plaintiffs and their telephone providers in the Second Probate Case for the ulterior purpose of obtaining leverage in the Jefferson County Lawsuit, which was designed to benefit some or all of the other Abuse of Process Defendants.

200.    Further, as evidenced by the Court's findings in Order 2, Stephens, Kerry and the Estate improperly and willfully filed and attempted to prosecute the Motion for Sanctions for the ulterior purpose of obtaining leverage against Adams Plaintiffs in the Jefferson County Lawsuit, which was designed to benefit some or all of the Abuse of Process Defendants.

86

201.    The judicial processes in the Second Probate Case were used to extort or coerce Adams Plaintiffs and obtain leverage over Adams Plaintiffs in the Jefferson County Lawsuit or for other ulterior purposes.

202.    The purpose of the Second Probate Case was supposed to be to administer assets of the Estate and not to develop, manufacture and prosecute claims that should have been brought by a separate non-probate proceeding.

203.    The Jeff Co Lawsuit was willfully initiated and carried out for an improper purpose towards the Adams Plaintiffs by some or all the Abuse of Process Defendants.

204.    The judicial processes in the Jeff Co Lawsuit were used to attempt to extort or coerce Adams Plaintiffs and obtain leverage over Adams Plaintiffs in the Jeff Co Lawsuit.

205.    Abuse of Process Defendants' actions caused Adams Plaintiffs to suffer compensatory damages in the form of attorneys' fees and costs, reputational harm, emotional distress, and other damages. The amount of damages will be determined at trial.

206.    The Abuse of Process Defendants also knew that their conduct would naturally and probably result in damages to Plaintiffs. The Abuse of Process Defendants acted with malice and/or reckless disregard of these consequences, from which malice may be inferred. As such, Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

87

2282717-v1

## COUNT II – CIVIL CONSPIRACY

207.   Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

208.   The civil conspiracy is plead against Abuse of Process Defendants and Exhumation Defendants based on some or all of their agreements to accomplish a purpose that is unlawful, oppressive and/or immoral, all as more specifically outlined above.

209.   Upon information and belief, some or all of the Abuse of Process Defendants knowingly entered into an agreement to pursue the Second Probate Case, including the filing of the motion for sanctions, for the ulterior purpose of gaining an advantage in the Jefferson County Lawsuit, unjustly oppressing the reputations of Adams Plaintiffs, and leveraging them for personal or financial gain.

210.   Upon information and belief, some or all of the Abuse of Process Defendants knowingly entered into an agreement to pursue the Jefferson County Lawsuit for the ulterior purpose of obtaining leverage over the Adams Plaintiffs for personal or financial gain.

211.   Some or all of the Abuse of Process Defendants and Exhumation Defendants committed abuse of process against Adams Plaintiffs.

212.   Abuse of Process Defendants, individually and/or collectively, and Exhumation Defendants, individually or collectively, committed overt acts in the Second Probate Case and/or in the Jefferson County Lawsuit and/or by filing numerous pleadings with misrepresentations and false allegations, issuing notices

88

2282717-v1

of deposition and subpoenas to Verizon and AT&T, intimidating witnesses, parties and counsel, and/or by engaging in an unlawful exhumation, a secret private autopsy and aa concealment of the autopsy report, concealing other evidence, destroying evidence, abusing the judicial process by fraud, lies and misrepresentations, and/or all other abusive, oppressive, immoral and unlawful conduct, as more specifically set forth above.

213. Abuse of Process Defendants initiated these actions in the Probate Case with the sole intent of harming Jeff Co Defendants which was to the benefit of the Abuse of Process Defendants.

214. Exhumation Defendants' actions started a chain of events and were done with the sole intent of harming Jeff Co Defendants and the Exhumation Defendants' actions lead to other actions that harmed Jeff Co Defendants.

215. Abuse of Process Defendants initiated the action in the Jefferson County Lawsuit with the intent of leveraging Adams Plaintiffs to recover monetary damages from them and/or for other personal gain.

216. Abuse of Process Defendants and Exhumation Defendants caused damages to Adams Plaintiffs as participants in the civil conspiracy.

217. Adams Plaintiffs have suffered damages by being forced to devote extraordinary amounts of time, and financial and emotional resources to uncover, refute and defend the baseless allegations in the Probate Case and the Jefferson County Lawsuit, including substantial attorneys' fees and costs. Adams Plaintiffs

89

2282717-v1

have also suffered reputational harm and other damages. The amount of compensatory damages will be determined at trial.

218. The Abuse of Process Defendants and the Exhumation Defendants committed the tort of civil conspiracy independently and/or in connection with all of the other torts alleged against them.

219. The individual Defendants acted for themselves, and for the benefit of their respective company Defendants, in committing the torts and engaging in the civil conspiracy.

220. The Abuse of Process Defendants and Exhumation Defendants also knew that their conduct would naturally and probably result in damages to Adams Plaintiffs. The Abuse of Process Defendants acted with malice and/or reckless disregard of these consequences, from which malice may be inferred. As such, Adams Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

## COUNT III – NEGLIGENCE

221. Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

222. The conduct of Defendants as more specifically outlined above was at best, negligent, and at worst fraudulent.

223. Defendants owed Adams Plaintiffs duties, among others, of professional responsibility, candor, ethical conduct, to abide by laws, rules, regulations, and public trust, and compliance with policies and procedures governing them and their respective businesses and professions.

90

2282717-v1

224. Defendants failed to abide by the duties governing them and their respective businesses and professions.

225. Because of Defendants' conduct, operating unilaterally or collectively, they breached their respective duties to Adams Plaintiffs and caused harm and damages to Adams Plaintiffs as outlined in this complaint.

226. Adams Plaintiffs suffered compensatory damages in the form of attorneys' fees and costs. The amount of compensatory damages will be determined at trial.

## COUNT IV – FRAUD

227. Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

228. The conduct of Defendants as more specifically outlined above as to each Defendant, separately and collectively, involved a series of fraudulent actions, misrepresentations and other intentional conduct, and includes but not limited to the following:

- Unfounded allegations against long-standing family friends of a homicide, conspiracy to hide a murder, and drug dealing to children of the families;
- Allegations of homicide made in Jeff Co Lawsuit which were 180 degrees contrary to the allegations made in First Probate Estate of accidental death to recover accidental death insurance benefits;
- Illegal and concealed exhumation of Luke's body accomplished through lies, misrepresentations, and fraud;
- Secret private autopsy resulting in spoliation of key evidence;
- Misrepresentations and concealment of a written autopsy report that does not support Jeff Co Plaintiffs and Jeff Co Attorneys' allegations;
- Concealment of a CD (hidden in Kerry's home safe and with copies in the possession of Jeff Co Plaintiffs' and Jeff Co Attorneys' and their

91

2282717-v1

investigators) containing key exonerating photographs of Luke evidencing facial stippling, indicating a close-range gunshot wound;

- Concealment of unique bullets used by Luke which further exonerate Defendants;
- Lies and misrepresentations to and fraud on the Jefferson County Circuit Court, State and County public officials, Jeff Co Plaintiffs and Jeff Co Attorneys' own experts, and Defendants;
- Witness tampering and sanitizing files of witnesses;
- Public corruption of and collusion and conspiracy with the Jefferson County Coroner to turn an accidental self-inflicted gunshot wound into a homicide;
- Manipulation of other State and County officials by lies, misrepresentations and fraud; and
- Many other false representations of material facts.

229. When the fraudulent actions were taken, Defendants knew of the falsity of the representations and/or lack of basis for taking the actions.

230. When the fraudulent actions were taken, Defendants intended to induce reliance of Adams Plaintiffs on the false representations and or fraudulent actions taken.

231. Adams Plaintiffs relied on the representations and actions of Defendants as Defendants were in positions of trust, private or public, and Defendants expected them to not make misrepresentations, such as, there is no written autopsy report, when in fact there was and some or all of Defendants knew there was and that the autopsy report provided results unfavorable to Jeff Co Plaintiffs' claims.

232. Adams Plaintiffs were damaged by the misrepresentations and fraudulent conduct of Defendants.

233. Adams Plaintiffs suffered compensatory damages in the form of attorneys' fees, costs and other damages. One of the results of the

92

2282717-v1

misrepresentations and allegations of fraud and illegal conduct alleged against Adams Plaintiffs is that their insurance carriers denied coverage, requiring Adams Plaintiffs to be responsible for the cost of defense. The amount of compensatory damages will be determined at trial.

234. Defendants also knew that their conduct would naturally and probably result in damages to Plaintiffs. The Abuse of Process Defendants acted with malice and/or reckless disregard of these consequences, from which malice may be inferred. As such, Adams Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

### COUNT V – FOIA VIOLATIONS AND OTHER TORTS

235. Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

236. Coroner Kelley was served with numerous FOIA requests by Adams Plaintiffs.

237. Coroner Kelley failed to timely and fully comply with the obligations of the FOIA.

238. Coroner Kelley concealed photographs he had or to which he had access that exonerated Adams Plaintiffs. To this day, Kelley has never produced to the Adams Plaintiffs these photographs clearly showing stippling, debunking the false and fraudulent allegations against Adams Plaintiffs.

239. Coroner Kelley's actions not only violated FOIA law, they violated other laws regulating public officials and requiring honest services.

93

2282717-v1

240. The actions of Kelley harmed Adams Plaintiffs who suffered compensatory damages in the form of attorneys' fees, costs and other damages. One of the results of the misrepresentations and allegations of fraud and illegal conduct alleged against Adams Plaintiffs and which Kelley offered false testimony and support, is that the insurance carriers denied coverage, requiring Adams Plaintiffs to be responsible for the cost of defense. The amount of compensatory damages will be determined at trial.

241. Kelley also knew that his failure to comply with FOIA law would naturally and probably result in damages to Adams Plaintiffs. He acted with malice and/or reckless disregard of the consequences of his actions, from which malice may be inferred. As such, Adams Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

## COUNT VI - CIVIL ACTION BY CRIME VICTIMS

242. Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

243. The Arkansas Code allows a crime victim to bring a civil claim for damages caused by conduct that would be a felony under Arkansas law, which, upon a showing by a preponderance of the evidence, the victim who was injured or damaged may recover damages and attorney fees. *See* Ark. Code Ann. § 16-118-107. The Arkansas "civil action by crime victim" statute provides:

94

(a)(1) Any person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct.

(2) The burden of proof for showing conduct that constituted a felony shall be a preponderance of the evidence.

(3) If the person who is injured or damaged prevails, he or she shall be entitled to recover costs and attorney's fees.

(b) The action may be maintained by the person who was injured or damaged or, after the person's death, the executor, administrator, or representative of his or her estate.

(c) The remedy provided in this section shall be in addition to any other remedies in law or equity.

*Id.*

244.    Defendants engaged in actions that constitute felonious conduct under Arkansas law, which directly caused harm to the Plaintiffs. Defendants conduct, as more specifically set forth above, creates a civil cause of action and provides for liability as a result of their damage to Plaintiffs.

245.    The actions of Defendants as previously described above as to each of them constitute at least, but not limited to, some or all of the following felonies:

Ark. Code Ann. § 5-60-101, Abuse of a corpse

Ark. Code Ann. § 5-53-110, Tampering

Ark. Code Ann. § 5-54-121, Tampering with a public record

95

2282717-v1

Ark. Code Ann. § 5-53-111, Tampering with physical evidence

Ark. Code Ann. § 5-53-108, Witness bribery

Ark. Code Ann. § 5-53-102, Perjury

Ark. Code Ann. § 5-52-107, Abuse of office

Ark. Code Ann. § 5-52-101, Abuse of public trust

Ark. Code Ann. § 16-118-107, Conspiracy

246.    The conduct of Defendants who knowingly unlawfully exhumed the body of Luke under the guise of a disinterment constitute an abuse of corpse under Ark. Code Ann. § 5-60-101.

247.    The conduct of Defendants who induced or attempted to induce Kelley, Dr. Peretti, Nawojczyk, or others to testify or inform falsely constitute tampering under Ark. Code Ann. § 5-53-110.

248.    The conduct of Defendants who with the purpose of impairing the verity or availability of a public record made a false entry in or falsely altered public records or erased, obliterated, removed, destroyed or concealed a public record constitutes tampering with a public record under Ark. Code Ann. § 5-54-121. The public records at issue include but are not limited to the disinterment application, disinterment permit, the Coroner's file, content of Coroner's devices, First Supp, Death Report, Second Supp. Death Report, Addendum and 81 jpeg photographs.

249.    The conduct of Defendants who altered, destroyed, suppressed, removed, or concealed any record, document, or thing with the purpose of impairing its verity or availability in connection with the Jeff Co Lawsuit constitutes

96

tampering with physical evidence under Ark. Code Ann. § 5-53-111. The records, documents, things at issue include but are not limited to the disinterment application, disinterment permit, the Coroner's file, content of Coroner's devices, First Supp. Death Report, Second Supp. Death Report, Addendum, 81 jpeg photographs, Noble files, and bullets.

250. The conduct of Defendants who offered, conferred, or agreed to confer any benefit upon Kelley as a witness or a person Defendants believed may be called as a witness with the purpose of influencing Kelley's testimony, or induced Kerry to absent himself from his deposition, or solicited, accepted, or agreed to accept any benefit and the conferring of the benefit constitutes witness bribery under Ark. Code Ann. § 5-53-108.

251. Defendants Kelley and Mike Noble knowingly made false material statements under oath in their depositions in connection with the Jeff Co Lawsuit and committed perjury under Ark. Code Ann. § 5-53-102.

252. Defendant Kelley's conduct as a public servant with the purpose of benefiting in a pecuniary fashion or of harming Adams Plaintiffs, knowingly committed unauthorized acts purporting to be acts of his office including but not limited to making false oaths, baselessly changing public documents related to the death of Luke, destroying public record evidence, and concealing public record evidence, and omitted to perform his duty imposed on his by law or clearly inherent in the nature of his office to correct the series of death related documents to show Luke's death occurred by accidental self-inflicted gunshot wound to the head. This

97

2282717-v1

conduct constitutes an abuse of the Coroner's office under Ark. Code Ann. § 5-52-107.

253.   Defendant Kelley accepted, or agreed to accept a benefit or consideration for having given as an elected servant, a decision or opinion favorable to Jeff Co Plaintiffs and Jeff Co Attorneys for having otherwise exercised Kelley's discretion in favor of them, and his conduct constituted an abuse of public trust under Ark. Code Ann. § 5-52-101

254.   Defendants conspired to harm the Adams Plaintiffs with the purpose promoting or facilitating the commission of any one or more of the previously stated criminal offenses by agreeing with one or more other Defendants or with other persons that one of more of them will engage in conduct that constitutes that offense, or that the person will aid in the planning or commission of that criminal offense and the Defendants or another person with whom they conspired did an overt act in pursuing the conspiracy.  The conduct of Defendants constitutes criminal conspiracy under Ark. Code Ann. § 16-118-107.

255.   Plaintiffs are entitled to recover their damages, fees and costs in this Faulkner Co case, and any other relief allowed under this civil action by crime victims statute and Count VII.

## COUNT VII – TORT OF OUTRAGE

256.   Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

257.   The tort of outrage is asserted against all Defendants.

98

258.    Adams Plaintiffs have sustained damages in defending against the false and defamatory allegations against them, suffered emotional distress of having to confront the false allegations and fraudulent conduct, and also suffered reputational harm and other damages.

259.    The conduct of Defendants and the actions taken by them in the illegal exhumation and autopsy, destruction and spoliation of evidence, concealing exonerating photos, reports, and other information, tampering with witnesses, improperly influencing public officials, opening a Second Probate Case for improper purposes, filing baseless claims in the Jefferson County Lawsuit, and for all of the other fraudulent acts, misrepresentations and other intentional torts, all as more specifically outlined above, are outrageous in character and extreme in degree. The conduct goes beyond all possible bounds of decency, was atrocious and utterly intolerable.

260.    Defendants willfully and wantonly engaged in extreme and outrageous conduct as more specifically outlined above for the purposes of personal and financial gain.

261.    Defendants knew or should have known that in the light of the surrounding circumstances that their conduct would naturally and probably result in damages and emotional distress and continued such conduct in reckless disregard of the consequences for over two years.

262.    Defendants proximately caused damage to Adams Plaintiffs in the nature of emotional distress.

2282717-v1

263.    Defendants also knew that their conduct would naturally and probably result in damages to Adams Plaintiffs, acting with malice and/or reckless disregard of these consequences, from which malice may be inferred.   As such, Adams Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

## JURY TRIAL DEMAND

264.    The Adams Plaintiffs demand a trial by jury.

WHEREFORE, plaintiffs Bryan Adams, Brandon Adams, and Skylar Wilson, pray that this Court award (i) a judgment against Defendants, jointly and severally, in an amount to be determined at trial; (ii) punitive damages against Defendants, jointly and severally; (iii) their attorneys' fees and costs incurred herein; and (v) all other relief to which they are entitled.

100

2282717-v1

Respectfully submitted,

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
(501) 376-9442 FAX
jhenry@wlj.com
sirby@wlj.com
jfair@wlj.com

By: /s/ Judy S. Henry
    Edwin L. Lowther, Jr. (81107)
    Judy Simmons Henry (84069)
    Scott A. Irby (99192)
    Jacob P. Fair (2015167)

    *Attorneys for Plaintiffs*
    *Bryan Adams, Brandon Adams and*
    *Skylar Wilson*

NEELY LAW FIRM
1514 South Poplar
Pine Bluff, AR 71601
(501) 823-0621
(870) 619-1690 FAX
ebneely@neelylaw.net

By: /s/ Efrem B. Neely, Sr.
    Efrem B. Neely, Sr. (2008047)

    *Attorneys for Plaintiffs*
    *Bryan Adams, Brandon Adams and*
    *Skylar Wilson*

101

2282717-v1

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street | Suite 1900
Little Rock, AR  72201
(501) 379-1700
(501) 379-1701 FAX
twilliams@qgtlaw.com
jprice@qgtlaw.com


By: /s/ Thomas G. Williams
   Thomas G. Williams, Bar I.D. #88186
   Joseph W. Price, II, Bar I.D. #2007168

   *Attorneys for Plaintiffs*
   *Bryan Adams, Brandon Adams and*
   *Skylar Wilson*

102

2282717-v1

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Jun-03  17:33:46
35CV-24-455
ELECTRONICALLYFILED ages
Jefferson County Circuit Court
Barbara A. Collins  Circuit Clerk
2021-Jun-22  12:59:36
35CV-18-1077
C11WD01 : 8 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
### 1ST DIVISION

| | |
|---|---|
| KERRY BAKER, AS ADMINISTRATOR OF THE ESTATE OF JAMES LUKE BAKER, AND KERRY BAKER INDIVIDUALLY, AND SAVANNAH BAKER CASE INDIVIDUALLY, AND GENA DOWNEY BAKER INDIVIDUALLY | PLAINTIFFS |

VS.                    CASE NO. 35CV-18-1077

| | |
|---|---|
| BRYAN ADAMS, SKYLAR WILSON, TRAVIS JONES, CARSON COOK, KARLA COOK, PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE, AND CERTAIN JOHN DOE COMPANIES AND INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS, MARY TATE, RELIANCE HEALTH CARE, INC. BRANDON ADAMS, TODD ROSS, AND JOE (SIC) WHICKER | DEFENDANTS |

### ORDER GRANTING DEFENDANTS' JOINT RENEWED AND AMENDED MOTION TO DISMISS CASE WITH PREJUDICE AND FOR PRESERVATION OF INFORMATION

Before the Court is Defendants'[1] Joint Renewed and Amended Motion to Dismiss Case With Prejudice and for Preservation of Information, with 81 exhibits, and Brief in Support, all filed on April 13, 2021, (collectively, the "Motion"). On April 14, 2021, separate defendants Austin Tate, John Tate, and Mary Tate ("Tate Defendants") filed a joinder in and adoption of the Motion. On April 21, 2021, and

---

[1] "Defendants" includes Bryan Adams, Skylar Wilson, Travis Jones, Carson Cook, Karla Cook, Prairie Wings South LLC, Prairie Wings Lodge, LLC, Christy Adams, Brandon Adams, Reliance Health Care, Inc., Todd Ross and Joel Whicker.

EXHIBIT
C

April 26, 2021, responses to the Motion were respectively filed by the Estate of James Luke Baker, Kerry Baker, and Savannah Baker Case (collectively, the "Responses"). On April 27, 2021, a reply ("Reply") was filed by Defendants with legal authorities and optional pathways to a dismissal with prejudice. *Pro se* plaintiff Gena Baker filed a motion for extension of time to respond to the Motion on April 30, 2021.

The Court held a hearing on the Motion and Responses on June 2, 2021. Upon consideration of the Motion, Responses, Reply, arguments of counsel, other evidence and proof, and being fully knowledgeable about this case from prior hearings and filings, and for the reasons stated at the conclusion of the hearing on the record during the June 2, 2021 hearing, which are attached as Exhibit A and incorporated herein, the Court FINDS and ORDERS as follows:

1. Based on the arguments, and the legal authorities, including both case law and Arkansas Rules of Civil Procedure, that provide this Court with discretion as and optional pathways provided by Defendants in their Motion, Reply, and in argument at the hearing, the Motion is hereby GRANTED. The complaint and amended complaint filed by Plaintiffs against Defendants and Tate Defendants are hereby dismissed with prejudice.

2. The Motion was supported by 81 exhibits evidencing misconduct and a pattern of the abuse of the judicial process by the Plaintiffs and at least some of their counsel and certain conduct warranting the dismissal of the complaint and amended complaint with prejudice, including at least the following:

2

- Baseless allegations pending for over two years resulting in a miscarriage of justice;

- Use of fraudulent paperwork to allegedly disinter a body;

- Misrepresentations to government officials regarding illegal exhumation of a body in Faulkner County;

- Failure to comply with Arkansas exhumation law including failure to notify Faulkner County Coroner and failure to obtain a court order authorizing an exhumation;

- Spoliation of key evidence;

- False representations regarding a secret autopsy, concealment of the autopsy report and misrepresenting the status of the autopsy report to the Court and Defendants;

- Obstruction of FOIA at the Jefferson County Sheriff's Office, misrepresentations to Sheriff about the autopsy and report, and the origin of the re-opened case;

- Concealment and false representations regarding exonerating photographs;

- Wrongfully attempting to influence a public official, the Jefferson County Coroner, who was to be used as Plaintiffs' expert witness;

- Deliberate concealment and false representations regarding the Photo Notations (as defined in the brief supporting the Motion), allowing the Jefferson County Coroner to include the Photo Notations as a public record in a July 10, 2019 Addendum as if he were the author;

- Knowingly eliciting false testimony from the Jefferson County Coroner regarding the Photo Notations;

- Discovery abuses including but not limited to directing witnesses to ignore a subpoena duces tecum and Court Order and attempting to improperly influence fact and expert witness testimony;

- Discovery abuses including concealing documents and information from witnesses and Defendants, and removing or attempting to remove documents and information from witnesses' files; and

3

- Witness tampering including attempts to have witnesses change their testimony.

3.      In Responses filed by Plaintiffs and on the record at the hearing, Plaintiffs did not dispute or refute the allegations set forth in the Motion or presented at the hearing. Instead, Plaintiffs solely relied on Rule 41(a)(1) of the Arkansas Rules of Civil Procedure as their basis to request dismissal of the case without prejudice. None of the facts stated in the Motion and supported by the 81 exhibits were refuted with any evidence other than blanket arguments of counsel for Plaintiffs present at the hearing that they did not personally participate in the conduct.

4.      The Court FINDS that (i) it has the inherent authority under the Rules and authorities cited by Defendants to protect the integrity of the court in actions pending before it, and (ii) Rule 41(a)(1) is not intended to be a bar from a Court exercising its inherent authority by dismissing a case with prejudice when unique facts and circumstances of misconduct, abuse of process, fraud, misrepresentations, spoliation, and other misconduct, to address the miscarriage of justice are present.

5.      The Court FURTHER FINDS that abuse of process, fraud, misrepresentations, spoliation, and other misconduct resulting in a miscarriage of justice occurred in this case, all of which warrant dismissal of the case with prejudice.

4

6. The Court FURTHER FINDS that it has the authority to dismiss the case with a prejudice as one remedy for the misconduct as set out in the Motion and Reply.

7. The Court hereby FURTHER FINDS AND ORDERS that Plaintiffs', Plaintiffs' current and former attorneys, investigators, witnesses, experts and consultants (including the Jefferson County Coroner Chad Kelley), and anyone acting with Plaintiffs or at their direction, immediately identify, and indefinitely protect and preserve any and all documents, data and other information in any way related to this case or the death of Luke Baker. Plaintiffs are ORDERED to immediately notify all of their current and former attorneys, investigators, witnesses, experts and consultants (including the Jefferson County Coroner Chad Kelley) of this Court's order.

8. Rule 11 of the Arkansas Rules of Civil Procedure allows the Court to impose an appropriate sanction on its own initiative.

9. The Court may also utilize Rule 11 of the Arkansas Rules of Civil Procedure on its own initiative to sanction Plaintiffs and their attorneys in its sole discretion. The Court is greatly concerned that the complaint, amended complaint, and other filings may be in violation of Rule 11. One example of such conduct would be the filing of numerous pleadings that contained allegations Plaintiffs and their counsel knew were entirely inconsistent with the photographs and the autopsy report that were in their possession but not timely disclosed or provided to Defendants in discovery.

5

10.    Although the Court is ORDERING the dismissal with prejudice on the Defendants' Motion on other grounds, the Court alternatively FINDS that another pathway to achieve the same result could be to conduct a Rule 11 hearing. The Court offered Plaintiffs this alternative, and they chose not to address the alternatives.

11.    *Pro se* plaintiff Gena Baker appeared at the hearing on June 2, 2021, and had the opportunity to be heard on her request for extension of time to respond to the Motion. The Court FINDS that the motion for extension of time filed by *pro se* plaintiff Gena Baker is hereby DENIED as MOOT. Any other motions currently pending before the Court and not addressed at the hearing on June 2, 2021, if any, are hereby DENIED as MOOT.

12.    This is a final order under Rule 54 of the Arkansas Rules of Civil Procedure.

IT IS SO ORDERED.

_____
HONORABLE ALEX GUYNN

_____
DATE

6

PREPARED AT THE COURT'S REQUEST BY:

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL:  jhenry@wlj.com
        sirby@wlj.com
        jfair@wlj.com

By: /s/ Judy S. Henry
    Judy Simmons Henry (84069)
    Scott A. Irby (99192)
    Jacob P. Fair (2015167)

    *Attorneys for Bryan Adams, Skylar Wilson, Travis Jones,*
    *Carson Cook, Karla Cook, Prairie Wings South, LLC,*
    *Prairie Wings Lodge, LLC, Christy Adams, Reliance Healthcare, Inc.,*
    *Brandon Adams and Todd Ross*

Copies provided to:

Terry F. Wynne (via email: tfwynne@cablelynx.com)
Eric Buchanan (via email: eric.buchanan@thebuchananfirm.com)
Hon. Marion Humphrey (via email: marionhumphreysr@gmail.com)
Efrem Neely (via email: efneely@neelylaw.net)
Blake Hendrix (via email: bhendrix@fc-lawyers.com)
David D. Wilson (via email: wilson@fridayfirm.com)
Martin A. Kasten (via email: mkasten@fridayfirm.com)
Tommy Williams (via email: twilliams@qgtlaw.com)
Emily Runyon (via email: emily.runyon@mrmblaw.com)
Carter Fairley (via email: cfairley@barberlawfirm.com)
Andy Turner (via email: andy@turnerlawfirmpa.com)
Kaleb Jones (via email: kaleb@turnerlawfirmpa.com)
Mel Sayes (via email: msayes@msslawfirm.com)
Jay Sayes (via email: jsayes@msslawfirm.com)
Gena Baker, *pro se* (via U.S. mail)

7



Arkansas Judiciary

**Case Title:**   KERRY BAKER ET AL VS BRYAN ADAMS ET AL

**Case Number:**   35CV-18-1077

**Type:**   ORDER MOTION GRANTED

So Ordered

Alex V. Guynn, 11th W Circuit Division
I Judge

Electronically signed by AVGUYNN on 2021-06-22 12:59:46    page 8 of 8

ELECTRONICALLY FILED
Jefferson Circuit Court
Jefferson County Circuit Clerk
2024-Jun-06   17:33:46
35CV-18-1077
C11WD01 : 12 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## 1ST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY                    **PLAINTIFFS**

VS.                          NO. 35CV-18-1077

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS,
MARY TATE, RELIANCE HEALTH CARE, INC.
BRANDON ADAMS, TODD ROSS,
AND JOE (SIC) WHICKER                                 **DEFENDANTS**

### DEFENDANTS' JOINT RENEWED AND AMENDED
### MOTION TO DISMISS CASE WITH PREJUDICE AND
### FOR PRESERVATION OF INFORMATION

Defendants Bryan Adams, Skylar Wilson, Travis Jones, Carson Cook, Karla

Cook, Prairie Wings South, LLC, Prairie Wings Lodge, LLC, Christy Adams,

Reliance Health Care Inc., Brandon Adams and Todd Ross (collectively,

"Defendants"), for their joint renewed and amended motion to dismiss with

prejudice and for preservation of information state:

1.     The purpose of this renewed motion to dismiss with prejudice is to

clearly and factually demonstrate for the Court those instances of inappropriate

conduct by Plaintiffs uncovered throughout the course of defending this lawsuit and

2272695-v1



to demonstrate that this conduct warrants dismissal of Plaintiffs' claims, ***with***

***prejudice***. These facts also warrant that Plaintiffs and all their attorneys, experts

and witnesses be ordered to identify, protect and preserve documents, data and all

information related to this case prior to a dismissal.

2.    Defendants renew and amend all of their prior motions and requests to

dismiss the case with prejudice and seek an order dismissing the case with

prejudice and directing Plaintiffs and their counsel, consultants and experts to

preserve all evidence as the only appropriate remedy based on the facts and

circumstances of this case as set forth in detail in the accompanying brief.

3.    The egregious conduct warranting dismissing with prejudice includes,

without limitation, the following:

- Baseless allegations pending for over two years;

- Use of fraudulent paperwork to allegedly disinter a body;

- Misrepresentations to government officials regarding illegal exhumation of a body in Faulkner County;

- Failure to comply with Arkansas exhumation law including failure to notify Faulkner County Coroner and failure to obtain a court order;

- Spoliation of key evidence;

- False representations regarding a secret autopsy, concealment of the autopsy report and misrepresenting the status of the autopsy report to the Court;

- Obstruction of FOIA at sheriff's office, misrepresentations to Sheriff about the autopsy and report, and the origin of the re-opened case;

- Concealment and false representations regarding 81 exonerating photographs;

2

2272695-v1

- Wrongfully attempting to influence a public official, the Jefferson County Coroner, to be used as Plaintiffs' expert witness;

- Deliberate concealment and false representations regarding the Photo Notations (as defined in the brief supporting this motion), allowing the Jefferson County Coroner to include the Photo Notations as a public record in a July 10, 2019 Addendum as if he were the author;

- Knowingly eliciting false testimony from the Jefferson County Coroner around the Photo Notations;

- Discovery abuses including directing witnesses to ignore a subpoena duces tecum and Court Order and attempting to improperly influence fact and expert witness testimony; and

- Discovery abuses including concealing documents and information from witnesses and opposing counsel, and removing or attempting to remove documents and information from witnesses' files.

4. To avoid further spoliation of the information collected by the Court appointed expert and in the possession of the Plaintiffs and Plaintiffs' current and former attorneys, investigators, experts and consultants, and to prevent further spoliation of potentially key evidence, Defendants request that prior to dismissal with prejudice, the Court enter an order directing all of these individuals and their firms, businesses and companies to identify and indefinitely preserve and protect any and all documents, data and other information in any way related to this case.

5. This motion is supported by a brief incorporated herein and the following exhibits:

**Exhibit 1**    June 6, 2019 Hearing Transcript

**Exhibit 2**    September 4, 2019 Hearing Transcript

2272695-v1

3

**Exhibit 3**   Order Directing Avansic to Produce Data

**Exhibit 4**   Disinterment Agreement signed by Kerry Baker 9/6/18, PERETTI – 000028

**Exhibit 5**   Deposition of Peretti, September 18, 2019

**Exhibit 6**   Statement of Funeral Goods and Services, ADAMS 1998

**Exhibit 7**   Email from Frazier to Booker re Disinterment, ADAMS 2035

**Exhibit 8**   Deposition of Frazier – September 26, 2019

**Exhibit 9**   Stephens' disinterment request and Roller case activation, ADAMS 1995, 1991

**Exhibit 10**   Disinterment Request to Department of Health, ADAMS 1996

**Exhibit 11**   Roller fax confirmation of Disinterment Request, ADAMS 2003

**Exhibit 12**   Memo from Stephens re Disinterment, PERETTI - 000076

**Exhibit 13**   Memo from Stephens re Disinterment, ADAMS 1993

**Exhibit 14**   State permit for disinterment, ADAMS 2036

**Exhibit 15**   Email from Roller re burial and disinterment, ADAMS 2034

**Exhibit 16**   Fees and itemization from vault company re disinterment, ADAMS 2005

**Exhibit 17**   9/10/2018 facsimile re disinterment permit w/fax ribbon, ADAMS 0476 – 0477

**Exhibit 18**   Deposition of Nawojczyk, February 7, 2020

**Exhibit 19**   Email from Moran re ballistics test December 17, 2018, ADAMS 0264

**Exhibit 20**   February 21, 2019 Hearing Transcript

**Exhibit 21**   Email from Nawojcyk to Stephens re review of Paretti Autopsy Report 9/14/2018, PERETTI – 000109

**Exhibit 22**   Peretti Autopsy Report, PERETTI – 000022-000027

4

**Exhibit 23**    September 15, 2018 Email where Nawojczyk concurs with Peretti's findings, PERETTI – 000110

**Exhibit 24**    Stephens, Carlin, Nawojczyk met with Paretti about autopsy report, PERETTI – 000104

**Exhibit 25**    Stephens asking for distance findings, PERETTI – 000097

**Exhibit 26**    Email from Peretti to Stephens re 6:30 meeting, PERETTI – 000098

**Exhibit 27**    Email from Paretti to Stephens report distributed 10/30/18 and Invoice, PERETTI – 000101 and PERETTI – 000096

**Exhibit 28**    November 8, 2018 Email from Nawojczyk with his draft report and notes, PERETTI – 000085 – 000087

**Exhibit 29**    November 8, 2018 Email from Nawojczyk to Peretti re meeting, PERETTI – 000084

**Exhibit 30**    September 28, 2018 FOIA Request Letter from Hendrix to Jefferson County Sheriff's Office

**Exhibit 31**    October 2, 2018 Jefferson County Sheriff's Office Response No. 1 to FOIA from Hendrix

**Exhibit 32**    October 3, 2018 Jefferson County Sheriff's Office Response No. 2 to FOIA from Hendrix

**Exhibit 33**    December 11, 2018 FOIA Request to Jefferson County Sheriff's Office from Hendrix

**Exhibit 34**    December 13, 2018 Response to Hendrix FOIA from Jefferson County Sheriff's Office

**Exhibit 35**    December 21, 2018 FOIA letter of Shannon

**Exhibit 36**    January 17, 2019 FOIA letter of Henry to Jefferson County Sheriff's Office

**Exhibit 37**    November 23, 2015 Letter from Baker to Sheriff's Office

**Exhibit 38**    DVD of Videotaped Interview of Sheriff Woods

**Exhibit 39**    81 jpeg Photographs *(filed Under Seal)*

5

2272695-v1

**Exhibit 40**   Deposition of Kerry Baker, June 10, 2019

**Exhibit 41**   Grainy/Blurry photographs Defendants received from Sheriff's office, ADAMS 0058 – 0077 *(filed Under Seal)*

**Exhibit 42**   November 1, 2018 FOIA Request of Hendrix to Coroner Kelley

**Exhibit 43**   December 3, 2018 preservation letter to Coroner Kelley

**Exhibit 44**   January 23, 2019 FOIA and preservation letter to Coroner Kelley

**Exhibit 45**   July 16, 2019 FOIA Letter of Henry to Coroner Kelley

**Exhibit 46**   Piazza Affidavit

**Exhibit 47**   March 2, 2018 email of Sgt. Wingard to Crime Lab, ADAMS 0248

**Exhibit 48**   Deposition of Coroner Kelly, March 5, 2020

**Exhibit 49**   Two Stippling Photographs, Image numbers 2647 and 2648 *(filed Under Seal)*

**Exhibit 50**   September 23, 2019 Letter to Nawojczyk

**Exhibit 51**   October 16, 2019 Order Denying Motion to Quash

**Exhibit 52**   October 16, 2019 Letter to Nawojczyk (third attempt) re subpoena

**Exhibit 53**   October 16, 2019 Email from Nawojczyk to Sutter

**Exhibit 54**   October 17, 2019 Email from Nawojczyk to Defendants re Direction of Clients

**Exhibit 55**   October 18, 2019 Email from Nawojczyk to Defendants re not producing documents

**Exhibit 56**   October 18, 2019 Email from Sutter to Defendants re not communicating with consultants

**Exhibit 57**   September 14, 2018 Email from Nawojczyk to Peretti re autopsy report, PERETTI – 000113

**Exhibit 58**   Deposition of Michael Noble, September 6, 2019

6

**Exhibit 59**   Stephens email to Peretti to not respond to FOIA request 12/10/18, PERETTI – 000080

**Exhibit 60**   Email from Stephens to Peretti re Do Not Release Info 12/12/18, PERETTI – 000077

**Exhibit 61**   December 6, 2018 Email from Stephens to Peretti re bullets, PERETTI – 000082

**Exhibit 62**   Petition for Appointment as Special Administrator, ADAMS 1934-1935

**Exhibit 63**   Petition to Approve Settlement, ADAMS 1941–1942

**Exhibit 64**   AR State Crime Lab Report, ADAMS 0240

**Exhibit 65**   Death Certificate 10/24/15

**Exhibit 66**   Kelley Supplemental Report re cause of death 11/28/18

**Exhibit 67**   Coroner Kelley file notes, ADAMS 1914-1915

**Exhibit 68**   July 10, 2019 Coroner Kelley Second Supplemental Death Report

**Exhibit 69**   July 6, 2019 emails from Nawojczyk attaching photos of the Photo Notations labeled, "Greg Stephens Notes Work Product," NAWOJCZYK 645, 652 and 659

**Exhibit 70**   Photo Notations

**Exhibit 71**   June 11, 2019 email from Stephens to Peretti, Nawojczyk and Michael Noble, PERETTI 000064

**Exhibit 72**   July 8, 2019 Email from Sutter re taking a deposition on July 26

**Exhibit 73**   July 16, 2019 Email from Sutter re Kelley notice of deposition

**Exhibit 74**   Deposition of Coroner Kelley, July 26, 2019 with DVD *(DVD filed*

*Under Seal)*

**Exhibit 75**   Westbrook Docket, Complaint, Notice of Deposition of Kelley and Order in 35CV-14-541-2

7

2272695-v1

**Exhibit 76**    Westbrook Counterclaim and Order in 63CV-19-1060

**Exhibit 77**    Downstreem Declaration

**Exhibit 78**    Summary of Verizon phone records of Coroner Kelley

**Exhibit 79**    Email re TAC Air meeting June 21, 2019, PERETTI – 000072

**Exhibit 80**    Deposition of Kerry Baker, June 26, 2019

**Exhibit 81**    Deposition of Kerry Baker, July 1, 2019

WHEREFORE, Defendants respectfully request the entry of an order dismissing the amended complaint ***with prejudice***, and prior to dismissal, requiring Plaintiffs, and Plaintiffs' current and former attorneys, investigators, experts and consultants, and their firms, businesses and companies to identify and indefinitely preserve and protect any and all documents, data and other information in any way related to this case, and awarding all other relief to which Defendants are entitled.

8

2272695-v1

Respectfully submitted,

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
(501) 376-9442 FAX
jhenry@wlj.com; sirby@wlj.com;
jfair@wlj.com

By: /s/ Judy S. Henry
   Judy Simmons Henry (84069)
   Scott A. Irby (99192)
   Jacob P. Fair (2015167)

   *Attorneys for Bryan Adams,*
   *Skylar Wilson, Travis Jones,*
   *Carson Cook, Karla Cook,*
   *Prairie Wings South, LLC,*
   *Prairie Wings Lodge, LLC,*
   *Christy Adams,*
   *Reliance Healthcare, Inc.,*
   *Brandon Adams, Todd Ross and*
   *Joel Whicker*

Neely Law Firm
10515 W. Markham, Suite J2
Little Rock, AR 72205
(501) 823-0621
(870) 619-1690 FAX
ebneely@neelylaw.net

By: /s/ Efrem B. Neely, Sr.
   Efrem B. Neely, Sr. (2008047)

   *Attorneys for Bryan Adams,*
   *Skylar Wilson, Travis Jones,*
   *Carson Cook, Karla Cook,*
   *Prairie Wings South, LLC,*
   *Prairie Wings Lodge, LLC,*
   *Christy Adams,*
   *Reliance Healthcare, Inc.,*
   *Brandon Adams, Todd Ross and*
   *Joel Whicker*

9

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street | Suite 1900
Little Rock, AR 72201
(501) 379-1700
(501) 379-1701 FAX
twilliams@qgtlaw.com


By: /s/ Thomas G. Williams
    Thomas G. Williams, Bar I.D. #88186

*Attorneys for Prairie Wings South, LLC*


FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201-3522
(501) 376-2011
(501) 376-2147 FAX
wilson@fridayfirm.com
mkasten@fridayfirm.com

By: /s/ David D. Wilson
    David D. Wilson (90112)
    Martin A. Kasten (99100)

*Attorneys for Prairie Wings South, LLC and
Prairie Wings Lodge, LLC*

10

Munson, Rowlett, Moore and Boone, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR  72201
501-374-6535
501-374-5906 Fax
emily.runyon@mrmblaw.com

By: /s/ Emily M. Runyon
    EMILY M. RUNYON (2005172)

    *Attorneys for Karla Cook and
    Carson Cook*

FUQUA CAMPBELL, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
501-374-0200
EMAIL: bhendrix@fc-lawyers.com
            adepper@fc-lawyers.com

By: /s/ Blake Hendrix
    Blake Hendrix (86066)
    Annie Depper (2009267)

    *Attorneys for Skylar Wilson*

11

2272695-v1

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2021, a copy of the foregoing was served by first class United States mail, postage prepaid, upon the following:


Eric S. Buchanan
P.O. Box 166643
Little Rock, AR 72216

*Attorneys for Estate and Kerry Baker*


Hon. Marion Humphrey
108 South Rodney Parham
Little Rock, AR 72205

*Attorney for Savannah Case*


Gena Baker
44 Hawk Drive
Vilonia, AR 72173

*Pro se Plaintiff*


Mel Sayes
Jay Sayes
825 West 3rd St
Little Rock, AR 72201

*Attorneys for John Tate and Austin Tate*


/s/ Judy S. Henry
Judy Simmons Henry


12

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Jun-03 17:33:46
35CV-24-455
C11WD05 : 60 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
FIRST DIVISION

KERRY BAKER, AS ADMINISTRATOR                              PLAINTIFFS
OF THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER, INDIVIDUALLY; AND
SAVANNAH BAKER CASE, INDIVIDUALLY;
AND GENA DOWNEY BAKER, INDIVIDUALLY

VS.                          35CV-18-1077

BRYAN ADAMS; SKYLAR WILSON; TRAVIS JONES;                  DEFENDANTS
CARSON COOK; KARLA COOK; PRAIRIE WINGS
SOUTH, LLC; AUSTIN TATE; JOHN TATE; AND
CERTAIN JOHN DOE COMPANIES; AND INDIVIDUAL
JOHN AND JANE DOES TO BE DETERMINED; AND
PRAIRIE WINGS LODGE, LLC; CHRISTIE ADAMS;
MARY TATE; RELIANCE HEALTH CARE, INC.;
BRANDON ADAMS; TODD ROSS; AND JOE (SIC)
WHICKER

**RECORD OF HEARING**

BE IT REMEMBERED, That on the 2nd day of June 2021, came on for hearing the captioned cause before the Honorable Alex Guynn, Circuit Judge, First Division of the Eleventh Judicial Circuit-West of Arkansas, of which Jefferson County, Arkansas, is a part; the following proceedings transpired with said hearing being reported by LaJuana Grady, Arkansas Supreme Court Certified Court Reporter, the Official Reporter for said First Division of the Circuit Court, for the Eleventh Judicial Circuit-West of Arkansas.



EXHIBIT
E

2

APPEARANCES:


ON BEHALF OF THE PLAINTIFFS:

    MR. ERIC BUCHANAN
    Attorney for Estate and Kerry Baker
    BUCHANAN LAW FIRM
    1700 Main Street
    Little Rock, Arkansas 72206

    HON. MARION HUMPHREY
    Attorney for Savannah Case
    ATTORNEY AT LAW
    108 South Rodney Parham Road
    Little Rock, Arkansas

    GINA BAKER
    Gina Downey Baker, Individually
    PRO SE
    44 Hawk Drive
    Vilonia, Arkansas 72173


ON BEHALF OF THE DEFENDANTS:

    MS. JUDY SIMMONS HENRY
    MR. JACOB FAIR
    Attorneys for all Defendants excluding John Tate and
    Austin Tate
    WRIGHT, LINDSEY, & JENNINGS LLP
    200 West Capitol Avenue, Suite 2300
    Little Rock, Arkansas 72201

    EFREM B. NEELY
    NEELY LAW FIRM
    For all named defendants, other than John and Mary and
    Austin, and the Doe defendants
    1514 South Poplar Street
    Pine Bluff, Arkansas 71601

    MR. THOMAS G. WILLIAMS
    Attorney for Prairie Wings South, LLC; Prairie Wings
    Lodge, LLC
    QUATTLEBAUM, GROOMS, & TULL PLLC
    111 Center Street, #1900
    Little Rock, Arkansas 72201

APPEARANCES CONTINUED:

    MR. JAY SAYES
    Attorney for John Tate and Austin Tate
    MATHEWS, SANDERS & SAYES
    825 West 3rd Street
    Little Rock, Arkansas 72201

    MR. CARTER FAIRLY
    Attorney for Joel Whicker
    BARBER LAW FIRM
    425 West Capitol Avenue, Suite 3400
    Little Rock, Arkansas 72201

    MS. EMILY RUNYON
    Attorney for Karla and Carson Cook
    MUNSON, ROWLETT, MOORE, BOONE
    400 West Capitol, Suite 1900
    Little Rock, Arkansas 72201

    MR. MARTIN KASTIN
    Attorney for Prairie Wings South, LLC and Prairie Wings
    Lodge, LLC
    FRIDAY, ELDREDGE & CLARK
    400 West Capitol, Suite 2000
    Little Rock, Arkansas 72201

    MR. ANDY TURNER
    Attorney for Todd Ross
    TURNER LAW FIRM
    2796 South 2nd Street
    Cabot, Arkansas 72023

    MR. ERIC BELL
    Attorney for Reliance Health Care, et al.
    ATTORNEY AT LAW

Also Present:

Mr. Kerry Baker, Plaintiff; Ms. Savannah Baker Case, Plaintiff

Mr. Bryan and Brandon Adams, Defendants; Karla and Carson Cook, Defendants; John Tate, Defendant

REPORTER'S NOTE:
All parties were present for hearing via Zoom.

4

# TABLE OF CONTENTS

Style and Caption                              1

Appearances                                    2

Proceedings                                    5

Arguments by Ms. Henry                         5

Arguments by Mr. Buchanan                     35

Arguments by Mr. Humphrey                     38

Ruling of the Court                           48

Arguments by Mr. Fair                         52

Ruling of the Court                           57

Conclusion of Proceedings                     59

Certificate of Reporter                       60

5

**PROCEEDINGS**

**JUNE 2, 2021**

THE COURT:  First case is 18-1077, Kerry Baker versus all.  All right.  I got a bunch of homework from you guys.  Where is Ms. Henry at?  Okay.  I see.  How are you doing, Ms. Henry?

MS. HENRY:  Good morning, Judge.  I am not able to see anyone on the screen at this time.  We had the video of everyone and then everyone disappeared.

THE COURT:  All right.  Now, you work for that big law firm and y'all can't get y'all's screen together.  I know y'all got money over there to fix it.

MS. HENRY:  I don't think it's my screen, Judge Guynn.

THE COURT:  Okay.  All right.  Well, we'll go ahead and get started.  We can see you and if --

MS. HENRY:  Okay.

THE COURT:  -- you need something.  It's your motion, I believe.

MS. HENRY:  Yes, sir.

THE COURT:  Tell me where you want to get started.

MS. HENRY:  Yes, sir.  I have a motion to dismiss with prejudice the law suit on behalf of

6

Bryan Adams; Skylar Wilson; Travis Jones; Carson Cook; Karla Cook; Prairie Wings South, LLC; Prairie Wings Lodge, LLC; Christie Adams; Reliance Health Care Inc.; Brandon Adams and Todd Ross.

Your Honor, this case is absolutely different than any other reported case on the books. And we submit that it warrants a dismissal with prejudice. Your Honor --

THE COURT: Just a second. I read through this and that last motion you filed. And I thought -- felt like I was on one of those Dateline NBC shows on Friday evenings. And you made some allegations that were severe. And if you need some extra time for it, I have a funeral to go to at 12:00. So I got to leave here about 11:30. But I can come back after that if needed. So I'm just letting you know before you get into your spill to far. That's a lot of information, so if you need some additional time, just let -- that's fine. I can come back and Lajuana, we can finish it so take your time. That's all I wanted to say before you got started.

MS. HENRY: Thank you, Judge. And that's very gracious because I was planning to ask everyone to fasten their seatbelt and I was going to fly as fast I could through this. But you are absolutely

correct. This is probably the most critical motion in the case and warrants a thorough review, I think, by the Court for a lot of reasons not just factually but on the legal basis as well.

Your Honor, I don't disagree that this case is different and maybe it looks like a Dateline case, but unfortunately for my clients it has been an absolute horror and nightmare for the last two and a half years that they have had to endure going through what are really unsupported and not in good faith allegations against them. What defendants have presented here in the motion to dismiss is really unrefuted with any proof by the defendants in their responses. There has been absolutely no factual support for anything that they have said in their complaint or amended complaint. This is the first time, Judge, that we've been able to collect all of the -- I'll just call it bad conduct collectively, everything that has happened -- either before the lawsuit was filed or during the time the lawsuit has been impending. We collected all of this. And you're absolutely right that it is a substantial motion and brief. And what the Court will note is that every allegation of the complaint is supported by 81 exhibits attached -- I'm sorry. The

8

allegations of the motion are supported by 81 exhibits attached to the motion.  Those consist of deposition testimony, public documents, expert data reviews, affidavits.  And what defendants have uncovered are facts throughout the course of this dealing that will demonstrate two things to the Court.  One, that the case should be dismissed with prejudice.  And, two, that the plaintiffs ought to be ordered along with their attorneys and their experts and anyone who was in concert with them to do three things:  to identify, protect, and preserve all of the documents and data information that's related to the case prior to any dismissal.

Since you now have the benefit of those 81 exhibits, Judge, and a detailed brief that outlines all of the factual basis for dismissal, I am going to give you just a few words for each of the highlights of the bad faith conduct that I think warrants a dismissal with prejudice.  Hopefully, the words that I say will trigger your recall of what is in the brief and the circumstances and the situations surrounding this bad conduct.

We start with what I consider the most compelling facts.  And that is that we have had two and a half years of unfounded allegations of

homicide, of conspiring to hide a murder when in fact Mr. Baker, Kerry Baker, for the estate and for himself and his family, opened a first probate estate in Faulkner County in which he claimed that the death of his son, Luke, was an accidental death. And why did he do that? In order to recover funds, accidental death benefits in the probate case in Faulkner County. He has at least three times in that case sworn under oath that this was an accident; yet, then he files this law suit, a complaint, and an amended complaint claiming contrary to that that this was somehow a homicide.

The next allegation that they -- that the defendants focus on against them was -- is that they are drug dealers. That they somehow provided drugs to Luke and to others. And what the testimony has shown in the case is that that is totally unfounded. That, in fact, the evidence shows that Savannah Case's husband was one of those who was supplying drugs to Luke Baker.

Another compelling fact that warrants dismissal with prejudice is that there was an illegal and concealed exhumation of the body of Luke Baker. This underlines and starts the sequence of events and wrong doing in this case. What happened in Faulkner

10

County was that using disinterment forms, and permits, and lies, and misrepresentations to the Arkansas State Health Department, the plaintiffs were able to exhume the body of Luke Baker, not disinter it but exhume it, and open the casket at the cemetery, removing the body in a warehouse at the cemetery, putting it in a white vehicle and transporting it, not to the state crime lab as had been represented to everyone who was aware of the exhumation and autopsy, but the body was taken to North Little Rock to a mortuary there where a private autopsy was secretly performed without the knowledge of the defendants in this case and without the knowledge of the coroner in Faulkner County and without a court order. All of which should have been under the case law and the statutes occurred prior to the exhumation of the body. So this conduct allowed this exhumation to be done in secret from the defendants. And it also, the illegal exhumation, also allowed, unfortunately for the defendants, the autopsy to be performed in which the body was absolutely mutilated. And we described that in detail from the witnesses of what was done. You may recall at one of the hearings that Mr. Stephens told us that there was only a scant amount of evidence.

11

Well, that scant amount of evidence was destroyed. The defendants will no longer never be able to do any independent testing of the gunshot wound, the brain, the head, or any of the body of Luke Baker. All of this was critical in terms of preservation of evidence. And instead, all of that evidence was spoliated.

I want to focus on the misrepresentations about the autopsy report. The Court will recall that you raised with counsel for the plaintiffs whether or not there was a written autopsy report because we, the defendants, were complaining that we had never received an autopsy report after we found out that it had been performed. And you were specifically told in court by plaintiff's counsel with other counsel sitting at counsel table that there was no report. This was an absolute misrepresentation and fraud on the Court that there was no written autopsy report because the autopsy was done on Friday, September 7th of 2018. And the one and only final autopsy report was issued seven days later on Friday, September 14th, 2018. That autopsy report was concealed from defendants. And one might ask why. Well, because the autopsy report is contrary to the allegations of the plaintiffs' complaint and amended complaint.

Pure and simple, the report was hidden.  And eventually, after you were told in court and we were told there was no written autopsy report, we come to find out at a later hearing that in fact there really was a written autopsy report.  And not only was there a report, the plaintiffs had it.  The autopsy report was sent to plaintiff's counsel on the same day it was issued.  Now we have the emails showing that on September 14th of 2018, a month prior to the lawsuit ever being filed, they had the autopsy report.  And the autopsy report said that the cause of death was a gunshot wound to the head, but the manner of death could not be determined.  That the deterioration of the body, the suturing of the wound, the preparation of the body by Roller Funeral Home for the funeral and for public display, had destroyed the entrance wound.  And so ten months after the report was in the hands of the plaintiffs, we finally got a copy of the autopsy report.  The autopsy report was attached to second supplemental death certificate that was issued by the coroner in Jefferson County.

Your Honor, when you were told on the record that there was not autopsy report, there were counsel and parties in the room who sat idly by and never revealed to you or to us that indeed there was a

13

report.  There was a written report.  It was a final report.  It had been signed by the Dr. Peretti who had performed the autopsy and that they had a copy of it.  No other report, according to Dr. Peretti, was ever requested, and he had no intention of ever issuing another report.  Andy why is that important?  Because, eventually, we learned in open court that the plaintiffs had a copy of the report and they made a decision not to produce it.  Mr. Sutter told you on the record that it was his call and that he made the decision not to produce the report in discovery in the case.  And why did he do that?  He said, Well, because I was waiting on the final report.  And now we know that that statement to the Court was also not true.  The September 14th, 2018, report was the final report.  No other report was requested.  No other report was issued.  And Dr. Peretti had nothing else to report.

Your Honor, another factual basis for dismissing the case with prejudice is the concealment of a CD.  We learned in Mr. Baker's testimony when you compelled him to sit for a deposition -- and that's another whole story the Court will remember about the misrepresentations about Mr. Baker's --

THE COURT:  Shingles.

14

MS. HENRY: -- medical condition and not being able to -- to appear at his deposition. And when you compelled him to appear at his deposition, what did we find out? We found out that he had, in the family safe at their home, a CD that had never been produced in discovery. And that CD was produced during his deposition. We took a recess, looked at it. And you know what was on it? Eighty-one crystal clear photographs from the night of the accident at the lodge, at the hospital, and the next morning back at the lodge. Why was that not produced in discovery? I'll tell you why it was not produced. Because just like the autopsy report, the 81 photographs exonerate these defendants from a murder from any other bad faith allegations about the death and the concealment of the death of Luke Baker. What those -- what those photographs show is clear stippling on the face of Luke Baker. If the Court has had an opportunity -- we filed those under seal, and they're not pretty, and it's gruesome to look at. But if you see the side of Luke Baker's face, it is crystal clear with everyone who knows anything about stippling or if you compare it to photographs online of what stippling looks like, it is classic stippling, I'm told.

THE COURT: Yes. It is.

MS. HENRY: And those were never produced to us. We got those during the deposition of Mr. Baker. Even more so, those were never produced to the plaintiffs' own experts when the Court ordered those experts to sit for depositions. If you look at the video depositions of them, they were absolutely shocked when they saw those photographs. One of their -- one of their experts even said, That is the best photograph in the case, and I've never seen it. They each said we've been duped. Dr. Peretti was duped because he thought they had a court order. He had been told they had a court order to exhume the body. Nawojczyk, Mr. Nawojczyk, thought there was a court order. He even told the plaintiffs you have to have court order to exhume the body. He didn't get a copy of the photographs either. So when they looked at those photographs in their depositions, they both were stunned. And they both saw stippling. Even the coroner in your county, Judge, on cross-examination when we finally got Chad Kelley Deposed seven months after the plaintiffs took his deposition on direct -- he got a backache. After they finished their deposition, he couldn't sit any longer and couldn't be cross-examined. It took us seven more months to depose him. In March of 2020, we finally got him

16

deposed. And when we got him deposed, do you know what he admitted? He admitted when he looked at the photographs -- these are the very photographs the he had, quote, "opined," about in his second supplemental death report. And I'll talk about those in a minute. He even admitted that there was stippling. He said, Yes, there is slight stippling, and I say slight only because it's a little bit scattered here at the bottom, but yes. And where I say in my second supplemental death report that there was no stippling, um, that's not supported by these photographs.

It also wasn't supported by the first death certificate that his coroner had issued after being there the night of the accident and viewing the body and examining the body with the medical professionals, with the trained ER physician, with the other sheriff's deputies, and the investigators in Jefferson County, all of whom saw stippling. And the deputy coroner had written in the report that there was stippling. And finally, in March of 2020, the coroner of Jefferson County admitted there was stippling. He committed that I just made a mistake. And we asked him, No, that was big mistake; wasn't it? And he said, Yeah, it was a big mistake. A big

mistake changing the death certificate a second time without any -- without ever talking to a single one of those people who had been in the ER that night, without ever viewing the body of Luke Baker.  And he only lived a couple of blocks away from the hospital. The body was there three days.  He could have gone there and viewed the body and he didn't; yet he changed a report years later, years later, after no further evidence, nothing clear that would warrant a change of the report, not once, but twice.

Your Honor, there was another concealment in the case that warrants a dismissal of this case with prejudice and it's a concealment of the plaintiffs and their lawyers once again.  Mr. Baker, in his family safe, had a box of unique bullets.  They've got a blue coating on them.  Martin Kastin's partner, David Wilson, is our ammo expert.  And he could talk all day about the ammunition and the gun and all of that.  Well, how is it important to the motion to dismiss?  Well, the plaintiff's complaint and amended complaint alleged all kinds of theories, and this was an evolving theory.  Every time we would show up at a hearing, either in Faulkner County, in probate court, or in your court, we would hear a new theory.  It was close wound.  It was a distant wound, a distant

18

gunshot wound.  It was a -- it was this gun.  It was a different gun.  There was a drop gun.  I didn't even know what a drop gun was.  And they explained --

THE COURT:  That's because you do civil work.

MS. HENRY:  Sir?

THE COURT:  That's because you do civil work.

MS. HENRY:  Yes, sir.  Well, there wasn't a drop gun.  There wasn't a different gun.  There wasn't a distant gunshot wound.  We know there wasn't a distant gunshot wound because of the stippling.  It's an indication of a close-range gunshot wound.  The experts of plaintiffs, after seeing that, agreed that this wasn't a distant gunshot wound, that it couldn't be, not with the stippling on the face.

And so the bullets and the gun, the bullets in Mr. Baker's safe are a unique bullet. The Taurus .38 Special, when retrieved by the sheriff's office, contained the same exact unique bullets that Mr. Baker had in his safe.  Dr. Peretti extracted the bullet fragments from the head of Luke Baker in the autopsy.  He took those to the crime lab.  Even though it was a private autopsy, they went to the crime lab.  The crime lab did extensive testing on those bullets.  And guess what.  That bullet, those fragments of a bullet matched or are consistent with

19

the bullets in Mr. Baker's safe.  There wasn't a drop gun.  There was one gun.  The kids were not even supposed to have guns there.  But Luke had a gun there because Mr. Baker had authorized him to take that pistol there.  So Luke had a gun there.  They were deer hunting, Judge.  It was bow-hunting season; it wasn't gun season.  And so the gun that was used in the death was Luke's gun.

And the bullets -- the bullet that was fired from that gun was consistent with the bullets, the unique bullets, that were in Mr. Baker's safe.  We still don't have a bullet.  We've asked for it multiple times.  We've asked for just one bullet. Mr. Baker -- I had him bring bullets to the deposition once we found out he had bullets in his safe.  The next -- the next day, I said, I want those bullets.  I want to see those bullets.  We photographed them.  I used my iPhone and photographed them during the deposition.  We've asked for a bullet to test it; never got it.  Wont give it to us.  Even though he has a whole carton of bullets, we still don't have a bullet to test.  So the concealment of the unique bullets by the Baker family, keeping that box of bullets in the safe, is as another basis for dismissal of the case with prejudice.

20

Judge, there were also lies and misrepresentations of public officials in the case, including the Jefferson County Sheriff's Office. We sent you a video that was part of the brief on the motion to dismiss where Mr. Humphrey and the sheriff says another lawyer in the case visited him in his office and represented to him -- he says in the video that the prosecuting attorney had reopened their file on the case. The prosecuting attorney says, I didn't have a file. I did not reopen a file. I had no basis to reopen a file. Based on what the sheriff was told by the them -- he says in the video, I -- you know, I had gotten this Freedom of Information Act request from the defendants. And I told them, Come and get the file. And the next day, Mr. Humphrey and another lawyer in the case visit me. And when I find out the prosecuting attorney has reopened his file, I reopen my file. And I had to -- I had to let that attorney know -- it was Mr. Blake Hendrix, one of the defense counsel on the case for Skylar Wilson -- he said, I had to let him know he couldn't come get the file. We couldn't get that file until two and half months after the lawsuit had been filed. The sheriff didn't do any more investigation. The sheriff ended up December 31st, I

21

think, of 2018, closing his file again and writing us and telling us, Now, I've closed my file. Hadn't changed anything. Hadn't filed any charges. Nothing to investigate. Closed my file. We finally got the file. But they prevented us from getting the file under the Freedom of Information Act by having the sheriff reopen his file in Jefferson County.

Your Honor, I mentioned Mr. Baker attempting to not be deposed in the case with the assistance of his counsel. Finally, when he was deposed, do you know that all of the plaintiffs' attorneys in the case, and that includes Mr. Buchanan and Mr. Humphrey, and Mr. Stephens, and the Sutter Law Firm, all of whom were present, they objected during his deposition over a 1,150 times. They objected. They instructed him not to answer. They -- they -- it was difficult, to say the least, to get through that deposition because of the obstruction throughout the deposition.

Judge, there was witness tampering in the case like I've never seen. I mean it's beyond me. You talk about a Dateline or a 20/20. Trying to get witnesses to change their opinions. Trying to get witnesses to get Chad Kelley to change the death certificate. And we say in the brief, unfortunately, Mr. Kelley didn't have the fortitude that Dr. Peretti

22

and Mr. Nawojczyk had because they refused. Dr. Peretti refused to change his opinion that this was a murder. It's not a murder. He said, It is inconclusive. And this was before he saw the photographs. So he wouldn't change his testimony. Steve Nawojczyk wouldn't change his, but Chad Kelley did. And Nawojczyk's testimony was that Chad Kelley changed the death certificate, the second supplemental death certificate, in a way that was consistent with the way Nawojczyk was being asked to try to get Chad Kelley to change his death certificate. They didn't want it to say non-self -- self-inflicted gunshot wound. And so what did he do? He changed it. Today, now, it says, "Non self-inflicted gunshot wound" even though Kelley admits there was stippling and even though he said at his deposition that he was going to change the death certificate back. Judge, that's been over a year from now. And he has still not changed the death certificate as he said he was going to in his deposition under oath. It reads, "Non self-inflicted gunshot wound to the head - No stippling. Muzzle impression or burn mark leads one to believe distant wound and not self-inflicted." Have you ever seen a death certificate like that? I haven't. But he put

23

every bit of that in the new death certificate.  And there is not one scintilla of evidence to support any of that.  In fact, in his deposition, he contradicted everything he had put in the -- in the second supplemental death certificate.

Sanitizing files.  Not only did the plaintiffs and their attorneys try to get testimony that would support the complaint and the amended complaint from the witnesses.  They -- they tried, and in one -- at least one instance, hid documents.  We have chronicled in detail what happened in the briefs.  They met with Nawojczyk -- Greg Stephens met with Nawojczyk at a local eatery in Little Rock, Panera Bread, Mr. Nawojczyk gave details.  It got heated.  Greg Stephens tried to take the documents out of Nawojczyk's file, tried to get Nawojczyk to change his testimony.  He wouldn't.  That's finally when Nawojczyk got his own counsel and quit hiding behind Mr. Sutter's and the plaintiffs' direction not to appear for a deposition, even though you had ordered him to appear and I had issued a subpoena to him to appear.  It was avoidance, avoidance, avoidance.  And finally, Mr. Nawojczyk hired independent counsel, and he appeared, and he disclosed.  And now I understand why they tried so hard to keep him from being

24

deposed.

Not only did they try to sanitize his file, they also did and succeeded in sanitizing their investigator's file. We sat here in my conference room over an hour waiting for Michael Noble, the investigator for the plaintiffs, to appear for his deposition. We waited, and we waited, and we waited til finally we called -- we called quits. We said we're done. We don't know what's happening. The plaintiffs were -- of counsel were running around. They even had somebody from Mr. Sutter's office with a bug sweeper on his body bug sweeping my office. It was unbelievable, Judge. I -- I told him, You can not be -- y'all can -- y'all got to stay in a conference room. If you don't like this conference room, pick another one. I'll shoo people out and I'll move you. They were running all over the place. And he was in and out of conference rooms with his little bug sweeper sweeping my office. That's what we put up with, Judge.

So we have Mr. Noble, who nobody can find. The plaintiffs are like, We don't know where he is. When then I notice that Mr. Gillham was gone. Well, where is Mr. Gillham? As I told the Court, we finally called it quits. And all the sudden, about 70

25

minutes after the deposition was supposed to start, here comes Mr. Noble and Mr. Gillham.  And Mr. Noble has a story about, Oh, the interstate was crowded.  I was coming from Conway.  Just let's start; let's get the deposition going.  So we go in the room, we get the deposition going.  And you know what I learned during the deposition?  He was -- Mr. Noble was sitting down stairs in the parking lot, and Mr. Gillham met him there.  And they were -- Mr. Gillham was cleaning out his file, took the files, the investigative files, which were under subpoena, and took them to the back of the truck where Mr. Noble couldn't see what he was taking out.  He took documents out the files.  To this day, I still don't know what they took out.  Nobody will tell.  Documents have disappeared.  Again spoliation of evidence.

Your Honor, the coroner's failure to comply with the court order to turn over devices  -- you appointed a data expert to collect the devices of the coroner that were used in the coroner's business.  These are public records, Judge, of a public official.  And the data expert collected information off of those, your court-appointed expert, Avansic.  And Avansic, using a chain of custody, provided it --

26

provided the data to downstream, again under your court order, allowing all the parties to have access to the data. And that data was searched. And we were horrified to find that documents were deleted. Text were deleted. Information was deleted. But there were fragments we could find. The expert found fragments. The expert found something call the photo notations. They never -- they never were saved on the laptop. A USB drive was plugged into the computer. And the photo notations were downloaded. And then they weren't saved again. None of the USB drives -- and we found many instances where Mr. Kelley was using in his coroner's business external USB drives. Somebody had given him or he was downloading stuff, putting it on his laptop and editing it and then downloading it back to the USB drive. But he never turned over any of those USB drives he was using in his business. And that's not Judy Henry saying it. That's the data experts saying it. Why are those photo notes so important? Because of the TAC Air meeting. Private airport here in Little Rock where Mr. Buchanan, and Mr. Humphrey, and Mr. Sutter, Mr. Stephens, Mr. Nawojczyk, and Dr. Peretti, and a Dr. Sperry, a former coroner from Georgia, appeared one Saturday morning. And at that

meeting, those photo notes with the heading across the top of them, "Greg Stephen's notes work product," were distributed by Mr. Nawojczyk at the request of Greg Stephens to all of the lawyers in the case. He took a photo of them. Took a photo of those photo notes. The photo notes were descriptions of the 81 crystal clear photos on the CD that was in Mr. Baker's safe. By the way, we couldn't get the CD from the sheriff's office. All we got from the sheriff's office when we finally got their file were 77 blurry, grainy, four pictures to a page, paper copies of photographs. You couldn't see any stippling. You couldn't see -- sometimes you couldn't -- you could hardly make out what was in the photograph. They were -- they were not very good photographs. So at the TAC Air meeting, every single one of the plaintiffs' lawyers had a copy of Greg Stephens' photo notes July 6th of 2019. Four days -- I'm sorry -- July 5th. Five days later on July 10th of 2019, Jefferson County Coroner, Chad Kelley, issued a second supplemental death report containing photo notes of 81 photographs that were almost identical to the photo notes that were exchanged, passed out at the TAC Air meeting. The only difference was some of the spacing was different, the

font was a little different, but the content was the same.  Chad Kelley had adopted those photo notes as his own in the second supplemental death report.  And plaintiffs and their counsel went to a deposition of Chad Kelley a couple of weeks later, and for six hours, extensively examined him as if those photo notations were his, even though they knew that those photo notations has been passed out at TAC Air a week earlier with Greg Stephens' notations across the top.  When we looked at those in Mr. Kelley's deposition, he even admitted that the paper copies of those photo notes that we had a the deposition had wited out -- someone had wited out the handwritten "Greg Stephens' notes - work product" on them.  So what Chad Kelley had were the same exact photo notes that were circulated at TAC Air.

Judge, Mr. Kelley had met the day before his deposition with Melanie Piazza.  Ms. Piazza is a former prosecuting attorney here in Pulaski County.  She is basically, what I call, plaintiffs' lawyer.  She does plaintiffs' civil work now.  She's highly respected, both in the civil and in the criminal practice.  She met with Chad Kelley to pick up the Freedom of Information Act documents from him before his deposition.  And when she was there, he

specifically told her that he prepared those photo notations July 9th of 2019. He even got a calendar, a big month-at-a-glance calendar, that was sitting on the desktop and confirmed for her the exact date that he prepared those and told her that Greg Stephens had come to his house, which wasn't unusual, Judge. Not to the office, not to the coroner's office, but come to his house after hours and had brought a copy of Dr. Peretti's autopsy report. And that after that, he sat down and created the second supplemental death report, including those photo notations that night. You have an affidavit of Ms. Piazza attached to the motion to dismiss with prejudice where she swears under oath that's what happened and that's what Mr. Kelley told her. There is absolutely no way that Chad Kelley could have prepared those photo notations on the night of July 9th because the lawyers had the photo notations earlier on July 5th at the TAC Air meeting.

Mr. Nawojczyk also testified when he was required to sit for a deposition. He had seen those photo notations three times. He saw them previously in a series of emails where Greg Stephens emailed the top page of the photo notations asking about them, and that was months earlier. And then, he saw them

30

at a meeting where the plaintiffs were hiring new investigators, new private investigators. They had two new investigators. And Mr. Stephens pulled out those photo notations at that meeting -- and this was all before Chad Kelley second supplemental death report -- he circulated those photo notations at that meeting for everybody to read.

Your Honor, to avoid spoliation in this case, further spoliation, in addition to asking for this case to be dismissed with prejudice, we are asking you to direct the plaintiffs and their counsel, their investigators, their experts, their consultants, anybody who is dealing with them or who is supporting them in this case, and Mr. Kelley, who is now intricately involved in this situation, to identify, protect, and, preserve everything. And you know what's so telling? The plaintiffs oppose that. They tell you, You don't have basis to tell us to keep this stuff. We want to dismiss the case without prejudice. We want a year to re-file it. But, Oh, by the way, don't tell us to keep the stuff that would be important to the defendants. We're going to oppose the preservation of the information.

THE COURT: I got a question for you. Now, you're asking to dismiss it with prejudice; why you

want to preserve the information?

MS. HENRY:  Your Honor, I want to preserve it because we now have a pending lawsuit in Faulkner County.

THE COURT:  Okay.  All right.  That makes sense.  All right.

MS. HENRY:  And, Judge, it took us two and a half years to get some of this information.  And you see the spoliation, the destruction, that has already occurred.  My concern is that if you do not issue a condition of a dismissal of the case, more things are going to disappear.  And Jake, my partner, Jake Fair, is going to address briefly the relief from the protective order so that we can use some of the information that's under seal in Jefferson County, in the Faulkner County case.  And he is going to address that in a minute.  But my concern, our concern, is that more information will just disappear.  Why should we have to continue to work to rediscover the information that we already have.  We have no redress without all of the documents and information that we've been able to discover.

Your Honor, six times in this case we have asked you to dismiss this case with prejudice.

THE COURT:  It's been six times?

MS. HENRY: Six times. And I'm going to run through those when we -- when we asked, Judge. And I fully appreciate that we have kind of piecemealed given you the information in the case. And this is -- and we hadn't done it on purpose. We've told you every time we discover something as another basis for dismissal. But this is the first time we've had a chance to have the depositions and to collect all the information and to have the data and see what the data experts say to be able to come back to you. The first time we asked for dismissal was when they filed their fist complaint. Rather than answering the complaint, we moved to dismiss the case at that time. And we were on the eve of you hearing the motion to dismiss -- and what did they do -- they amended the complaint. Okay. So now they've muted our first motion to dismiss. They filed a second amended complaint -- I mean a first amended complaint. And in that complaint, it -- the allegations were even wilder and more egregious than the first one. So we moved to dismiss the complaint with prejudice. And you actually heard that. And we said, There is absolutely nothing supporting the allegations of this complaint. And you talked to them pretty severely. You talked to them about you got big holes, you got

33

gaps in this complaint. I'm not going to dismiss it, but you've got problems with this complaint. And so the Court denied our motion to dismiss with prejudice at that time, and we went forward with discovery trying to get to the position where we could present to the Court something like this motion to dismiss with prejudice or a motion for summary judgement or something that would be dispositive in the case with the full array of the bad conduct. In the context of Mr. Nawojczyk, when they were telling him not to appear for his deposition and we attached those emails to the Court's -- to the motion to dismiss that the Court has, they told him not to appear. They moved to quash his deposition. We had a hearing before you on the motion to quash. You denied the motion to quash. You ordered him to sit for a deposition. They then violated that order and told him again not to appear. So we moved for sanctions and asked you in that sanction motion to dismiss the case with prejudice. And the Court -- we don't have a written order on that motion for sanctions and dismissal with prejudice. I subpoenaed Mr. Nawojczyk for his deposition. I sent him the Court's order. And eventually when he got counsel, separate counsel and not Mr. Sutter directing him what to do, that's

34

when he sat for the deposition.

Your Honor, again, on February 26th, we filed -- of 2020 -- the defendants filed a response to the plaintiffs' motion, which they filed on February 18th, asking for a dismissal without prejudice. That was right on the eve of the depositions that we had lined up to try to gather up more information in the case. And in response to their motion to dismiss without prejudice, the defendants asked for a dismissal with prejudice. And then after the Court ordered the data to be collected from -- from Avansic and turned over to us and after you ordered the Verizon records to be turned over to us, that was at a July 27th, 2020, video hearing in the case. Right after you ordered all of that, the plaintiffs renewed their motion to dismiss again saying dismiss this case without prejudice. And the Court didn't do that. You didn't dismiss it on our response to dismiss it with prejudice. And so after all of that data was produced to us, we found even more egregious conduct. And so those are the six times. And then we filed this motion to dismiss now, Judge. So those are the six times that the defendants have sought a dismissal of the case with prejudice.

I'm going to cover the plaintiffs' arguments.

35

They present four reasons why the dismissal with prejudice shouldn't occur. I'm going to present that, and then I'm going to give you a road map, a pathway, options that you can use even in light of the defendants' -- of the plaintiffs' four arguments.

THE COURT: Ms. Henry, hold on. Hold on for a second.

Mr. Buchanan and Mr. Humphrey, I'm going to go ahead and kind of fast track this a little bit. She just said a mouthful. I read your response. And your response, it doesn't say much at all in response to her allegations. Do y'all intend to dispute these allegations today or rely on your response that you filed?

MR. BUCHANAN: Your Honor, I'm going to rely on my response that I filed essentially, Your Honor.

THE COURT: I figured that.

MR. BUCHANAN: I think we have an absolute right to dismissal pursuant to Arkansas Rule of Procedure 41(a)(1), Your Honor. And these allegations -- every -- everything she stated essentially, Your Honor, we've gone over before in our prior hearings. And there is nothing new. Mr. Kelley hadn't changed his opinion. I never withheld any information from Ms. Henry. She has access to everything that I have in

36

my possession. The photographs were certainly available to the public. It was a public document, Your Honor. Chad Kelley hadn't changed his opinion, but regardless of that, Your Honor, regardless of that, the fact of the matter --

THE COURT: Mr. Buchanan, your video went off, Mr. Buchanan. There you go. All right.

MR. BUCHANAN: The fact of the matter, Your Honor, is this rule is -- I mean the case should be dismissed pursuant to Arkansas Rules and Procedure 41(a)(1). And we have an absolute unfettered right to dismiss the case, Your Honor. We filed it. And so I'm going to rely on our pleadings that were filed. I think they're accurate. I think it's an absolute -- we have an absolute right for dismissal. There's no case law that says we do not, Your Honor; so I'm going to rely on my motion, Your Honor, which I think is supported by all supreme court and court authority, Your Honor.

THE COURT: All right. So you're not going to address these concealment of documents, those photos --

MR. BUCHANAN: Your Honor, I never concealed anything from Ms. Henry. I have no reason to, Your Honor.

THE COURT: I'm not -- I'm just -- I'm just giving you the opportunity. This is some serious stuff here.

MR. BUCHANAN: I can't speak to what happened before I got into the case, Your Honor. I can't speak to what other lawyers did. I can not speak of what other individuals did. But I never concealed anything from Mr. Henry. I have no reason to conceal anything, Your Honor. This is a case that a Jefferson County jury will be able -- would be able to if it ever went to trial -- they can determine what happened, Your Honor. It's a simple case. It's a premises liability case. It's a splatter expert case, Your Honor. It's just not a complicated case. And so I have no reason to conceal anything. And I never have. I've never done anything wrong. I'm not a villain. But I believe that we have an absolute right under all authority to dismiss this case.

THE COURT: Okay. All right.

MR. BUCHANAN: Kerry Baker has never concealed anything, Your Honor.

THE COURT: I'm going to get to them in a second. I got -- Mr. Buchanan, I've been knowing you over 20 years, and I figure I owed it to you to give you a chance to respond.

38

Mr. Humphrey, do you have any response?

MR. HUMPHREY:  Yes, Your Honor.  I would like to say that, first of all, if there's some allegations given the names that have been called as to what attorneys did what, that's all the more reason to grant our motion pursuant to Rule 41(a)(1) and to go ahead and dismiss without prejudice because if there is someone who is done something that these people consider to be wrong -- and my understanding is they've had federal investigators take a look at it and they haven't come up with anything with respect to people who are involved or might have been involved in something -- then these plaintiffs have an absolute right -- their right to dismissal without prejudice under Rule 41 does not turn on what law firm represents the defendants in this case.  It does not turn on who the defendants in this case are. That is just a right.  And so much is in her brief. Ms. Henry has even suggested that you stick your neck out, Your Honor, and go ahead and overlook Rule 41 and do what you want to do rather than follow the Arkansas Supreme Court and the holdings of the Arkansas Supreme Court with respect to Rule 41(a)(1). And that -- we're just here asking that the Court follow the law.  That's all we're here doing.  We're

Case 4:24-cv-00911-BSM  Document 1  Filed 10/22/24  Page 211 of 353

39

asking that this Court follow the law of the State of Arkansas.

Now, let me refer to a certain thing. So she's called my name a couple of times, which I don't particularly appreciate the context in which she called it. She's made some reference to a meeting with Lafayette Woods, who was then the deputy sheriff of Jefferson County. This other side has met with people whenever they got ready. They meet with people all along. And we certainly have as much right. I didn't make any representation to Lafayette Woods with respect to a specific court order. As a matter of fact, I believe that Kerry Baker had a right to pursue exhumation simply because the Court had appointed him by order of a Faulkner County probate court to serve as administrator of the estate of James Luke Baker. And he, as an administrator of the estate, he can take certain actions. As has been pointed out in response to the complaint that filed up in Faulkner County -- and by the way, Your Honor, they're out here forum shopping. It's been pointed out by Chad Kelley's lawyer in that particular case that any case pertaining to Chad Kelley's conduct in Jefferson County the proper venue would be Jefferson County not Faulkner County. It's been pointed out by

40

the attorneys for Roller Funeral Home and by Mr. Baker is that these people have no standing to raise an issue about exhumation. What interest do they have in whether or not a body is exhumed? That is the responsibility of the administrator and the heirs of the estate of James Luke Baker. There are three people who might have had some standing to raise questions about whether or not that body was exhumed. That would be Kerry Baker, Savannah Baker Case, and Gena Baker. Those are his relatives. Anybody else has nothing to do with whether or not they have that body exhumed. They claim that it's illegal. Well, where is the criminal process if it is so illegal? Who have they gone to and asked to file some kind of criminal charge for exhumation of the body? They have a right to do that. And they've acted as though some -- some material has been -- there's some spoliation. There was never a letter sent to any of them saying don't do this or don't do that. No spoliation letter in this case. And they have a right to read the results of the autopsy report.

Now, the complaint that we filed was based upon Chad Kelley's death certificate. And that one -- the one that we've attached to our responses and to our renewed motion for dismissal pursuant to Rule 41 is

dated July 10th, 2019. That's before any second supplementary report that they have been alluding to so much. He had already made a change in what he said was the cause of death. And that's the basis for this. Let me say this too, Your Honor. This thing has gone on with certain representations. Kerry Baker has never believed that his son committed suicide or that his son played Russian roulette.

And as I had pointed out before, I represent Savannah Baker Case. And I also want to say that Ms. Henry made some reference to the fact that objections were made while the deposition of Kerry Baker was going on. I didn't make any objections. I think she lumped us all together and said "they." I represent Savannah Baker Case. I you will not find 1,110 objections to any questions that were directed to her during the time of that deposition; in fact, I made very few objections. They could ask whatever they wanted to ask. Savannah Baker Case does not believe that her brother killed himself. She asked Austin Tate, one of the defendants, one of the young men who was present that night, if he believed the account given by Skylar Wilson. Austin Tate told her, No. And he told her that after the funeral of her brother. I think that people have discounted the

42

concern these three people -- Kerry Baker, Gina Baker, Savannah Baker Case -- after what happened to their loved one.  I don't hear these other attorneys addressing that.

Skylar Wilson, himself, knew that Kerry Baker never believed his account.  In his deposition -- and his deposition was conducted September 25th, 2019 -- the question was asked who didn't believe you.  "ANSWER:  You know, Kerry.  He didn't believe me."  Kerry Baker didn't believe the account back then and this is Skylar Wilson acknowledging that; in fact, Skylar Wilson's daddy, Bryan Adams, had him to take a lie detector test.  There are other people who did not believe him.  They did not believe this account.  In his deposition of September 25th, 2019, this is the first time anyone knows that Skylar Wilson says that James Luke Baker pointed a gun at him.  There's belief on the part of parties on our side that there was s struggle over this gun and that's how this accidental death took place.  And it's based in part of this acknowledgment here subsequently.  It was already in the minds of people that something else happened besides James Luke Baker -- Savannah Baker Case's contingence was always, well, my brother would never play Russian roulette.  He loved himself too

43

much.  He wasn't reckless with a gun.  That's not what he did.

In Skylar Wilson's deposition it also come out that these -- some of these parties who were in charge of the premises permitted these young guys to go there with drugs, and alcohol, and guns.  And they're under 21 years old.  And they want to come in and suggest that their conduct is all so clean and nice.  Well, why did they allow these boys, who are underage, to go there to this lodge with guns, marijuana, and alcohol.  And they were there unattended.  And Kerry Baker has tried to get -- this man lost a child, Your Honor.  This is his son, his only son.  He's not out here trying to get somebody's money because they got a lot of money.  Money isn't everything to everybody.  The life of --

THE COURT:  Mr. Sutter --

MR. HUMPHREY:  -- Luke Baker.  Pardon?

THE COURT:  Mr. Sutter said he just wanted a check.

MR. HUMPHREY:  You didn't hear Marion Humphrey say that.

THE COURT:  No.  I didn't.  I didn't.

MR. HUMPREY:  You never heard me say that.  And you know me.  And folks in your family know me.  I

44

never stood for that.

THE COURT:  That's why -- that's why I'm giving you a chance to respond to that.

MR. HUMPHREY:  And let me respond to that issue of who wants a check.  I grew up with nothing.  And God has taken care of me.  I don't need a check.  I don't need to go after somebody's money because they have something.  That's not why we're here.  We're here to talk about Luke Baker dying.

THE COURT:  All right.  Judge -- Mr. Humphrey --

MR. HUMPHREY:  His death.  And these -- and we have right to pursue this.  And the law gives us a right to have this case dismissed without prejudice. Every lawyer, Your Honor, on this Zoom call knows that, every one of them.

THE COURT:  I'm --

MR. HUMPHREY:  And if they talk about -- if they talk about some kind of conduct based upon that generates some kind of sanctions, the fact that they've gone on and on with that -- look what she acknowledges in her brief on page 10.  "Until now," she says, "Arkansas courts have not presented with a set of facts to warrant an interpretation of Rule 41 to exclude plaintiffs' right to exclude nonsuit when fraud and misrepresentation are present."  How does

45

she know what all Arkansas courts have looked at. She knows that the Arkansas courts -- and the cases -- the case -- one case that I cited throughout my brief -- I'll let you know that despite -- "no matter how strong the motion to dismiss of the defendants might be, the plaintiffs still have an absolute right to a dismissal without prejudice."  I don't think anything can be clearer.  It can't be clearer than that.  We have that right.  And that is all that we're asking is that this Court follow the law and grant this.  And that takes precedence over their motion to dismiss with prejudice.

THE COURT:  So in short, you didn't have anything to do with the concealment of these photos, the 81 photos or the concealment of the bullets? That's what I'm getting at, Mr. Humphrey.

MR. HUMPHREY:  Absolutely not.  And nobody can say that unless they tell a tale.

THE COURT:  Okay.

MR. HUMPHREY:  I haven't concealed anything.

THE COURT:  All right.

MR. HUMPHREY:  And I wouldn't.  And I have never told a witness not to show up before a judge.  I wouldn't have wanted anybody to do that with me. And, Your Honor, I relied on Dr. Peretti.  I has

46

listened to Peretti countless times testify in my court.

THE COURT:  I believe you.  I just want to -- I'm trying to make everything clear.  I just -- now, Mr. Baker, you're -- you're not represented by an attorney anymore, sir.  Can you unmute yourself, Mr. Baker?

MR. HUMPHREY:  Mr. Baker -- that's --

THE COURT:  He's not --

MS. HENRY:  Yes.  Mr. Buchanan represents Mr. Baker and the estate.

THE COURT:  Okay.  Somebody --

TCA DEAN:  Gina Baker, Judge.

THE COURT:  Okay.  Gina Baker.  Is she here?

TCA DEAN:  She is.  Her device is on.

THE COURT:  Okay.

TCA DEAN:  Ms. Baker, I'm going to send you a message to ask you to turn your video on.

THE COURT:  Never mind.  I don't need her. Never mind.  I just wanted to ask her -- but Mr. Buchanan, Mr. Baker since you're representing him, does he have to say anything about those 81 photos found?  Does he dispute that, those 81 photos found in his safe?

MR. BUCHANAN:  Your Honor, that document was a

47

public document, Your Honor.  And once -- we gave those documents, those photos, to Ms. Henry.  Nobody has ever tried to hide anything from Ms. Henry.

THE COURT:  What about the bullets?

MR. BUCHANAN:  Once -- once -- I mean, I never -- I mean, once they were determined to exist, they were given to her.  Also the documents came from Pulaski County Sheriff's Office.  It was a public document.  We never -- we never -- I would never hide any documents or hide any photos.  And the documents were made available to her.  And my client would not -- you know, he was deposed for 34 hours, Your Honor, 34 hours.  And he would never --

THE COURT:  No matter how long he was deposed for, I'm just -- I'm just trying to get at -- get -- I'm trying to narrow it down.

MR. BUCHANAN:  He never withheld anything, Your Honor.  Not to my knowledge, he never withheld anything.

THE COURT:  What about the bullets?

MR. BUCHANAN:  Your Honor, I wrote a letter if my recollection is correct, we provided the bullets to her.  And we -- we -- I wrote a letter trying to set up the testing of the bullets, you know, we were trying to set the time and date and confines, and

48

they never responded.  We have no object -- Your Honor, we have nothing to hide.  And I have never -- I have never -- I have nothing to hide.  I've never had anything to hide.  There's not reason to hide anything, Your Honor.  This is a simple case, a simple product -- I mean, a premise liability case that a Jefferson County jury will be able to render a decision in.  We -- we have nothing to hide.  It's just not that complicated.  And you have to think about why -- why is the defense gumming the -- gumming it up.  Why?  You have to think about that, Your Honor.  We have nothing to hide.  I have -- I've never hid anything and have no reason to hide anything, Your Honor, neither does Kerry Baker, Your Honor.  His son was buried with a bullet in his head, Your Honor.

## RULING OF THE COURT

THE COURT:  All right.  Here is what I'm going to do, Ms. Henry, I know you can go on for days.  Don't take that the wrong way.

MS. HENRY:  Your Honor, I want to address just aa couple points before I address the law that they relied upon and --

THE COURT:  Hold on, hold on, Ms. Henry.

MS. HENRY:  Okay.

49

THE COURT:  I think I can resolve all of this. I wanted to give Mr. Humphrey and Mr. Buchanan the opportunity to speak and clear their name.  From what I see, the defendants are pointing it towards Mr. Stephens, Mr. Sutter, Mr. Gillham.

Now, them bullets and the CDs, that still needs to be explained, but that's not for me to determine. We can do two things:  Either we can have a Rule 11 hearing and they can dig a whole lot deeper and find out what's going on, or I can dismiss this with prejudice and everybody can go about their business and whatever information y'all have that needs to be preserved.  But, quite frankly, I'm tired of theatrics.  A young man died.  A father deserves answers.  I was real patient with everybody because, if that what have happened to my relative, I would want some answers.  And to me, you know, it goes to that old adage, Hurt people hurt people.

Now, I think, by the father being hurt, he was going to the extreme.  And greedy lawyers also hurt people.  And I'm not saying that Mr. Buchanan or Mr. Humphrey is greedy.  But I can tell you for sure, I think Mr. Stephens is and Mr. Gillham.  But it's been enough stuff here to -- for me to sort through it. And the plaintiffs wanted discovery; I gave it to

50

them.  And I think it backfired on them.  And it's not funny now when the rabbit got the gun.  So I think -- I think I'm just going to go ahead and dismiss this with prejudice.

Mr. Buchanan and Mr. Humphrey, y'all got anything for the record?

MR. HUMPREY:  Just an objection.  Our arguments we've made will suffice will Savannah Baker Case.

THE COURT:  All right.  So do -- so with it being dismissal with prejudice, I don't think there is a need for a Rule 11 hearing.  Now if y'all are carrying on, we can have that.  But I just think -- I think that will suffice and everything will be taken care of.

Ms. Henry, you got any comments for the record, ma'am?

Ms. Henry:  Your Honor, not in regard to the motion to dismiss, but we do have the motion for relief that we're asking the Court to allow us to use.  There were four exhibits that I identified, two of which that I think were covered under the protective order that the plaintiffs had presented to the Court.  There was a paragraph in your protective order that indicated that if we need relief from the order that we could come back to you and show cause

51

why we should be able to use the exhibits in a different preceding because the way they had drafted the order was that we couldn't use them in any administrative preceding, which would be a supreme court preceding, would be a committee on professional conduct, would be the Faulkner County case. And their response was: We'll just go get them in discovery in Faulkner County. And I've already articulated why that's not feasible. And so Mr. Fair had -- was prepared to give him a five-minute presentation literally on why we were seeking relief from the protective order if the Court will indulge us on that before the dismissal order is entered.

MR. BUCHANAN: Your Honor, may I interject, Your Honor?

THE COURT: Yes, sir, you may.

MR. BUCHANAN: I just want to make sure that the record reflects that I am renewing my objections that were already stated concerning our motion to dismiss pursuant to Rule 41(a)(1).

THE COURT: I understand.

MR. HUMPHREY: Yes. And I want to renew mine for the record, Your Honor, in my motion for this to be dismissed pursuant to Rule 41.

THE COURT: And just so I'm clear in my -- I'm

52

dismissing it with prejudice through what the Court believes is fraud and mistruth put upon by -- not saying Mr. Humphrey or Mr. Buchanan -- but for sure Mr. Stephens by actions of him.  I believe when Mr. Gillham's -- I can't prove it -- with that investigator taking documents out of the file.  Now, that's why I'm doing it with prejudice.  Based on I believe there is a miscarriage of justice going on here.  So that's why I did it just so I'm clear as well.

Mr. Fair, you -- you say you can do it in five minutes.

MR. FAIR:  Yes, Your Honor.  I'll be brief. Five minutes.

THE COURT:  I'll give you 10 or 15.  I ain't in no rush.

MR. FAIR:  Okay.  Fantastic Judge.

Jake Fair, I represent all the defendants other than the Tates.  We filed a motion for relief from the protective order that was entered in this case. As Ms. Henry alluded to earlier, we have filed a complaint in Faulkner County Circuit Court against some of the plaintiffs and others.  There are some exhibits that would like to file in that -- in that case that may be covered by your protective order

53

entered in this case.  I use the word "may" because it's not completely clear based on the wording of the protective order that they are covered.  But out of an abundance of caution and respect for this Court, we -- you filed this motion for relief for the protective order.

The Court entered a protective order that was prepared by the plaintiffs in October of 2019.  The protective order prevents disclosure of what's called "confidential discovery material" as that term is used in the order.  The opening paragraph in the protective order defines that as:  Plaintiffs produced documents, photographs, charts, reports, recordings, and data.  So the protective order by its terms appears to only cover documents that were actually produced by the plaintiffs to defendants.  It doesn't apply to, for example, documents obtained by the defendants from third parties.  You may recall that the defendants in this case objected to the entry of that drafted protective order by the plaintiffs because it contained statements about the use of documents and confidential discovery material produced by the plaintiffs in discovery.  For example, the order prevents the use of confidential discovery material and I quote, "In any other

54

administrative complaint preceding or civil action." This language is problematic as it would on its face not allow the disclosure of any documents produced by the plaintiffs in this case and the other civil case like the one we have filed in Faulkner County or in any other similar proceeding. So this is obviously problematic. I don't think the protective order was never intended to be a shield to prevent us from using those documents to file a lawsuit or to disclose misconduct. Instead, I think the protective order and the Court's intent behind the protective order was to prevent the public disclosure of graphic and sensitive photographs of Luke Baker, the body of Luke Baker. And you may recall that there were some intimate videos and photographs of Luke Baker and his girlfriend. And I think that was the intent for the Court in entering that protective order was to prevent those -- prevent those from public disclosure.

So briefly, Judge, I'll go over the four exhibits that we would like for leave to file in the Faulkner County case: (1) Is a disc of the 81 JPEG photographs that you've heard today. This was marked as Exhibit 9 to 39 to defendants' motion to dismiss. (2) The grainy or blurry photographs defendants

55

received from the sheriff's office.  This was marked as Exhibit 41 to defendants' motion to dismiss. Exhibit (3) is the two stippling photographs from the 81 JPEG photographs that were obtained from Mr. Baker.  This was marked as Exhibit 49 to defendants' motion to dismiss.  And (4) is the DVD of the deposition of Chad Kelley conducted by the plaintiffs where Mr. Sutter put on photographs of the body.  So we would like to file that deposition video.  But he showed those photographs.

Only two of these photographs were actually produced by the plaintiffs to defendants that may be confidential discovery material.  Although the protective order contained a requirement that you marked these documents as confidential, they never did that on any of these documents so it's not completely clear that they are covered.  But again, out of an abundance of caution, we filed the motion for relief from the protective order.

Ms. Henry hit on it briefly, but in the response filed in this case, the plaintiffs argue that we failed to cite any legal authority that would allow you to give us relief from the protective order. Well, Judge, the protective order itself, paragraph seven of it contains a statement that we may seek

56

modification of the order and you may modify it. So, Judge, we're here today on that basis. The order says we can seek relief or modification. That's exactly what we've done.

They've also argued that we shouldn't be allowed to use these four exhibits in Faulkner County because we could obtain those photographs in discovery in that case. Judge, we've gone through a great deal of discovery and a lot of resources and times has been committed by many lawyers in this Court to obtain this information. So to require -- it's not logical to require us to go over here to a different proceeding, issue the same discovery to get the same documents when Ms. Henry has articulated today very well the struggles that we went through to get it in the first place.

Judge, to summarize, the defendants have previously told this Court that it's not our intent to publish sensitive photographs or other explicit materials produced in discovery to the public. That remains true today. Instead, Judge, we are asking that you give us relief from the protective order and allow us to file these four exhibits under seal in Faulkner County. In Faulkner County, we have already filed a motion asking that Court to file these

57

exhibits under seal, assuming we get your relief from the protective order. So filing these exhibits under seal should alleviate any concern of the plaintiff's or the Court that this sensitive information will become public record. So there's no harm or prejudice to any party. And we're asking that you grant our relief from the protective order and allow us to file these four exhibits under seal. I'm happy to answer any questions that the Court may have.

THE COURT: I don't have any questions. You can use those photos and whatever legitimate need that you may have for them. I think it will help out a lot to find the truth. That family -- well, both families have had their name damaged. And, like I said before, I don't think we'll be here if the defendants worked at UPS. All right. But obviously, they loaded. They got some cash and people want to get out them some. What I will do, you can use those photos however you want to, photos or exhibits, whatever is under seal, use it however you want to. That's not my concern any more. I think I've done a good job of giving a fair opportunity to find the truth in discovery in this matter. But however you want to use those photos, you can use them, photos or discovery --

58

MR. BUCHANAN:  Your Honor --

THE COURT:  Sir?

MR. BUCHANAN:  I'd like to note my objections, Your Honor, in my pleading.

THE COURT:  That's fine.

Not just photos, whatever is sealed, you can use it in whatever manner you want to involving that lawsuit or whatever you may have.

Anything else?  Ms. Henry?

MS. HENRY:  Your Honor, would you like me to take a stab at drafting those orders?

THE COURT:  Yeah, that would save me a whole bunch of time.

Anything else from anybody?

MS. HENRY:  Your Honor, in the order dismissing the case with prejudice, may we include that the Court is ordering them to preserve -- identify, protect, and preserve all of the information?

THE COURT:  Yes, ma'am.

MR. HUMPHREY:  Your Honor, I think I had mine on mute when I said same objections with Mr. Buchanan raised for the record.

THE COURT:  Okay.  That's fine.  All right.

Anything else?

MS. HENRY:  Nothing from us, Judge.

59

MR. BUCHANAN:  No, Your Honor.

THE COURT:  All right.  I realize -- I would say I enjoyed this, but I'll be lying to you.  But it's a job.  But I hate the way it turned out.  I like good lawyers to go out and fight and I get to go eat my popcorn and watch.  But this wasn't -- this wasn't what I expected at all.  But I don't have to worry about seeing y'all ever again.  Not this many people at one time.  Okay.  All right.  So I'm going to go back here and deal with regular folks that have regular problems.

Anybody got anything else?  That's it?

MR. FAIR:  Thank you, Judge.

THE COURT:  Y'all take care.

MR. NEELEY:  No, Your Honor.

MR. BUCHANAN:  No, Your Honor.

THE COURT:  Take care.

MR. HUMPHREY:  No, Your Honor.  Thank you, Your Honor.

MR. FAIR:  Thank you.

**[WHEREUPON, the proceedings were adjourned.]**

60

### CERTIFICATE

I, LaJuana Grady, Official Court Reporter for the Circuit Court, Eleventh District-West Judicial Circuit of Arkansas, certify that I recorded the proceedings by stenomask shorthand recording in the case of **KERRY BAKER, AS ADMINISTRATOR OF THE ESTATE OF JAMES LUKE BAKER, AND KERRY BAKER, INDIVIDUALLY; AND SAVANNAH BAKER CASE, INDIVIDUALLY; AND GENA DOWNEY BAKER, INDIVIDUALLY VS. BRYAN ADAMS; SKYLAR WILSON; TRAVIS JONES; CARSON COOK; KARLA COOK; PRAIRIE WINGS SOUTH, LLC; AUSTIN TATE; JOHN TATE; AND CERTAIN JOHN DOE COMPANIES; AND INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED; AND PRAIRIE WINGS LODGE, LLC; CHRISTIE ADAMS; MARY TATE; RELIANCE HEALTH CARE, INC.; BRANDON ADAMS; TODD ROSS; AND JOE (SIC) WHICKER, Jefferson County Circuit Number 35CV-18-1077, June 2, 2021,** before the Honorable Alex Guynn, Circuit Judge thereof, at Pine Bluff, Arkansas; that said recording has been reduced to a transcription by me, and the foregoing pages numbered 1 through 59 constitute a true and correct transcript of the proceedings held, to the best of my ability, along with all items of evidence admitted into evidence.

WITNESS MY HAND AND SEAL as such Court Reporter on this _____ day of _____ 2021.

_____
LaJuana Grady
Supreme Court Certified Reporter No. ____

(S E A L)


ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
Flora Cook-Bishop, Circuit Clerk
2024-Jun-25 17:33:46
35CV-18-1077
C14WD05 : 13 Pages

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS**
**1ST DIVISION**

| | |
|---|---|
| **KERRY BAKER, ET AL** | **PLAINTIFFS** |
| **vs.** | **CASE NO. 35CV-18-1077** |
| **BRYAN ADAMS, ET AL** | **DEFENDANTS** |
| **vs.** | |
| **LUTHER SUTTER** | **INTERVENOR** |

## MOTION TO INTERVENE & TO RECUSE

Comes the Intervenor, Luther Sutter, for his Motion he states:

1. This Motion is filed to prevent a fraud upon the Court. Luther Sutter represented Gena Baker in order to address any conflict issues that existed between Ms. Baker and her former husband, Kerry Baker. Greg Stephens represented the Estate, then Eric Buchanan replaced him as lawyer for the Estate. Marion Humphrey represented Savannah Baker, who was also estranged from her mother, Gena Baker.

2. Here, Intervenor seeks to participate in this action in order to file appropriate motions under Rule 59 and Rule 60 to expose a fraud on the Court and prevent a miscarriage of justice. Rule 24 allows for intervention when an interest or right may be at stake. Luther Sutter has a property right in his license and reputation. So, Luther Sutter demands Due Process.

3. Luther Sutter was hired December of 2018 by Gena Baker.

4. So, Mr. Sutter undertook the representation of Ms. Baker, but the representation quickly became unpleasant. Throughout the course of this litigation, Defense Counsel, Judy Henry, alleged misconduct on behalf of Luther Sutter. In fact, she attempted to obtain an order in another proceeding that sanctioned the undersigned for actions at a hearing that


EXHIBIT
F

he was not even at. The order of this Court was obtained as part of Defendants' year long quest to "get" the undersigned.

5.    The critical issue is whether or not stippling was present. In close contact gun wounds, stippling is always present.

6.    If stippling is present, then its presence is evidence of a close contact wound. This is the jury question in this case.

7.    After Luke Baker died, there was little to no investigation of his death. It is axiomatic that one never "buries the bullet." This is because if there is an alleged self-inflicted wound, one would want to be able to see if the bullet matched the alleged gun or not. However, in this case, the Assistant Coroner did not request an autopsy that was in breach of the general accepted practices in circumstances involving a claimed suicide. Nonetheless, the Death Certificate incorrectly reflected that Luke Baker had committed suicide.

8.    When Luke Baker died, there were two (2) people in the room, Luke Baker and Skylar Wilson.

9.    Shortly after Luke Baker's death, Mr. Wilson gave several conflicting statements. First, Skylar told the 911 operator that Luke Baker always does this kind of stuff. Then he told the 911 operator that Luke Baker said "see there's nothing in it" after Luke allegedly clicked the gun in the air. In the statement to law enforcement, Skylar said Luke laughed when he said to stop and then put the gun to his head and fired. At no point did Skylar tell the 911 operator or the law enforcement officers that Luke had pointed the gun at him. This change in his account of events occurred during his deposition. Skylar was unable to

provide any rational for not telling law enforcement this. He also was unable to remember most if not all of the events before and after the shooting. See Attached **Exhibit L.**

10. Nonetheless, the Coroner and Jefferson County Sheriff's investigation was shoddy, especially in light of the suspicious nature of Skylar Wilson's conflicting statements. So, because Kerry Baker did not understand the events that occurred that night, Luke Baker was buried, all the while, his father thought his death was an accident.

11. However, Luke Baker's death continued to bother Kerry Baker. So, Kerry Baker hired Greg Stephens to investigate Luke Baker's death.

12. Mr. Stephens opened an Estate and hired Frank Peretti to perform an autopsy in September of 2018. Mr. Stephens then subsequently filed suit in this Court in November 2018. Luther Sutter was not retained until December of 2018.

13. After he was retained, Luther Sutter began acquainting himself with the progress of the case, and it quickly became apparent that the Adams' and their lawyers were adopting a scorched earth strategy in an attempt to halt discovery.

14. During the course of the case, one of the Defendants' lawyers, Efrem Neely, spoke with David Westbrook, a former client of Luther Sutter. Mr. Westbrook testified that Neely spoke with him about the progress of Westbrook's case. After speaking with Mr. Neely, Westbrook allegedly became suspicious that Luther Sutter had settled his case for less money in order to influence the Coroner. *Exhibit A*, Westbrook Depo., 53, 73-76, 95-96, 109

15. Luther Sutter had sued the coroner for David Westbrook, alleging discrimination and retaliation. The case involved same sex discrimination under the Arkansas Civil Rights Act, a fact scenario that had never been addressed by the Arkansas Supreme Court.

Nonetheless, Mr. Sutter undertook representation; and eventually settled his case in May of 2019.

16. The settlement was the result of an arm's length negotiation between Luther Sutter and Burt Newell. See Westbrook testimony attached hereto as *Exhibit A* & Burt Newell Affidavit attached hereto as *Exhibit B*.

17. In the litigation that ensued as a result of Westbrook's allegation, summary judgment was granted in favor of Luther Sutter finding that he had breached no duty to David Westbrook. *See Exhibit J Sutter & Gillham, PLCC v. Westbrook*, Case No. 63CV-19-1060, Order of 9/16/20. That Order was appealed, but Westbrook failed to perfect the appeal, and so it is a final Order.

18. Defense Counsel knew of this order and in fact coordinated with Westbrook's lawyer, Chris Burks. Consequently, there is no factual or legal basis to assert that Luther Sutter committed any misconduct with respect to Westbrook and the Coroner.

19. Judge Alex Guynn and Efrem Neely were long term law partners. The Defendants hired Efrem Neely simply because of this relationship.

20. Judge Alex Guynn disclosed the conflict, and undersigned counsel's client did not object. At the present time, however, Luther Sutter objects to this Court's continued participation in this case because of an appearance of impropriety. So, Luther Sutter asks the Court to recuse just like it has done in every other case besides this one.

21. This Court ignored established Arkansas law and refused to dismiss the lawsuit under Rule 41. Eventually, without Notice to the undersigned or its lawyers, this Court took the extraordinary step of dismissing the lawsuit with prejudice because of alleged discovery misconduct without giving Luther Sutter Due Process.

22. In fact, neither Luther Sutter nor Lucien Gillham committed any type of discovery fraud. The only thing Defendants claim that Lucien Gillham did was commit discovery fraud when he removed documents from his investigator's file. See **Exhibit G** at p. 52:4-6.

23. Acting on instructions from Luther Sutter, Mr. Gillham did indeed meet with the investigator before his deposition and did indeed remove certain documents from Mr. Nobles' file. Once the deposition convened, the witness revealed what had happened without objection from Mr. Gillham. There was no discovery fraud.

24. This Court had held that work product objections and made proper discovery objections, as allowed by the Court. See Transcript at page 122:11-22 attached as **Exhibit C.** The materials removed were work-product. Mr. Gillham's actions were entirely appropriate and approved by Luther Sutter. There was no discovery fraud. Neither Mr. Buchannan or Mr. Humphrey made a record saying that Mr. Gillham's action were improper, nor have they ever accused Mr. Gillham of discovery fraud. But Ms. Judy Henry persists in her misconduct thereby warranting relief under Rule 59 and Rule 60.

25. Ms. Judy Henry continually and unequivocally represented to this Court that the autopsy report was never produced by Plaintiffs on 9/4/2019. See **Exhibit C** at p.35. She alleged among other things that this was a concerted effort by the undersigned to conceal the autopsy report. In fact, in July of 2019, Judy Henry along with all defense counsel received the autopsy report from Attorney Stephens as part of a document production to Defense Counsel. See **Exhibit K**. She continues to allege this today. In the most recent hearing, Ms. Judy Henry told the Court numerous falsehoods regarding the report. Ms. Henry stated:

> I want to focus on the misrepresentations about the autopsy report.
> The Court will recall that you raised with counsel for the plaintiffs

> whether or not there was a written autopsy report because we, the defendants, were complaining that we had never received an autopsy report after we found out that it had been performed. And you were specifically told in court by plaintiff's counsel with other counsel sitting at counsel table that there was no report. This was an absolute misrepresentation and fraud on the Court that there was no written autopsy report because the autopsy was done on Friday, September 7th of 2018. And the one and only final autopsy report was issued seven days later on Friday, September 14th, 2018. That autopsy report was concealed from defendants. And one might ask why. Well, because the autopsy report is contrary to the allegations of the plaintiffs' complaint and amended complaint.
> **Exhibit G** at p. 11.

Contrary to what Defense Counsel has led this Court to believe, Mr. Stephens had turned over the initial autopsy report in the email attached hereto as **Exhibit K**. How could the undersigned conceal an autopsy report at the September 2019 hearing when the autopsy report had been sent to Ms. Judy Henry in July 2019 by Mr. Stephens? Exhibit K. Mr. Sutter did not mislead the court. In fact, the evidence shows Ms. Henry has misled this Court on numerous occasions leading in the culmination of this Court's Order finding the undersigned somehow committed discovery abuse.

26. With respect to Luther Sutter, the Adams' claim that Mr. Sutter bribed, or influenced, the coroner. However, attached as **Exhibit D** is an Order granting Mr. Sutter summary judgment finding that no such evidence existed.

27. The next thing the Adams falsely claim is that Mr. Sutter mislead the Court when he said Dr. Peretti's report was not final. Mr. Sutter had drafted a report for Mr. Peretti to review. As Mr. Sutter told the Court, he could not present this to Peretti until Mr. Skylar Wilson had been deposed. As far as the autopsy report that was created in September 2018, that had been turned over as previously discussed above. Exhibit K. To Mr. Sutter's knowledge, Dr. Peretti received all the files. Mr. Sutter was unaware of any photos in

Kerry Baker's safe and, he did not represent Kerry Baker. Indeed, Mr. Sutter's review of the file indicated that the Dr. Peretti had been provided with *all* of the photographs. See Email attached hereto as **Exhibit E**. Furthermore, Dr. Peretti indicated that he had received all of the photographs.

28. Ms. Henry's allegations that Mr. Sutter mislead the Court about the autopsy report are frivolous. Dr. Peretti's report, attached as **Exhibit F**, shows that the report on the issue of stippling was inconclusive. Mr. Sutter had drafted a supplemental autopsy report for Dr. Peretti's review. Skylar's deposition had not been taken either. Thus, the report was not final, and that was the lawyer's call – not Peretti's. The lawyer controls what the witness sees and what the witness does not see, and Dr. Peretti had not yet had the benefit of Skylar Wilson's sworn deposition. Luther Sutter routinely refuses to turn over expert reports to experts such as Dr. Peretti until the deposition of the parties have been taken. This is a matter of judgment, for which Mr. Sutter cannot be held liable. Nor is it fraudulent. If a final report had been generated without Skylar Wilson's deposition being taken, Henry would no doubt have attacked the expert for not hearing Wilson's side before coming to a conclusion. Sutter never presented the draft report to Dr. Perretti.

29. Even more to the point, the Adams, through their lawyers, have caused this Court to enter an Order without an adequate, factual basis, and without notice of an opportunity to be heard to Mr. Sutter, Mr. Gillham and Sutter & Gillham, P.L.L.C. This Court has recognized that lawyers have that right. See **Exhibit G** 49:1-5. The Court wanted to give the lawyers present an opportunity to clear their name. Now this Court's Order is being utilized to harm the undersigned. Yet, this Court was nothing more than a cat's paw for the Adams and their lawyers. As an example, this Court concluded there was

stippling present.  See Transcript at Page 14:25 attached as **Exhibit G**.  However, Dr. Sperry concluded otherwise.  See Affidavit of Dr. Sperry attached as **Exhibit H**.

30.  The next thing the Adams falsely alleged that Mr. Sutter did was perpetuate false testimony by the Coroner.  This allegation is absolutely false.  Mr. Sutter deposed Chad Kelly to obtain his testimony under oath about his report and the reasons for the changes.  Mr. Sutter did not know any testimony was false.

31.  With respect Chad Kelley's conclusions, neither Luther Sutter nor Lucien Gillham ever had any direct contact with the coroner outside of his deposition.

32.  Mr. Sutter did not know the coroner perjured himself or did anything wrong.  The purpose of the deposition was to see the factual basis for the change in his report.  Indeed, the forensic evidence from the Coroner's computer shows that the report was initially created months before Luther Sutter was even involved.  See **Exhibit I**

33.  Then the Adams falsely alleged that there was improper conduct at the Little Rock airport.  At his own expense, Luther Sutter hired his own lawyer to double-check what he had done in connection with this case and hired an additional expert to figure out exactly what Dr. Peretti was saying.  The Adams and their lawyers do not even accurately allege who attended the meeting at the Tac Air Airport.  Present at the meeting were Marion Humphrey, Eric Buchannan, Greg Stephens, Luther Sutter, his son, Kris Sperry, Steve Nawojczyk, Dr. Peretti and Andrew Clarke, Luther Sutter's lawyer.  The purpose of the meeting at the Tac Air Airport was for Dr. Peretti to explain to Dr. Sperry what his report meant on the issue of stippling.

34.  Introductions were made.  Shortly after introductions were made, Dr. Sperry and Dr. Peretti dismissed everyone from the room so that they could talk expert to expert.  After

Dr. Sperry and Dr. Peretti concluded their discussions, Luther Sutter was informed that they were in agreement and Dr. Sperry memorialized his conclusions in the Affidavit attached as **Exhibit H**. Mr. Humphrey agreed that this affidavit was strong and helped the clients. See Email attached hereto as **Exhibit M.** One wonders why counsel never presented this affidavit to the Court.

35. Defendants authorized their lawyers to make these false statements, even though Defendants and their lawyers knew their allegations were false. So, acting thorough their lawyers, caused the process attached as **Exhibit J** to be issued., as well as wide ranging subpoenas for an improper purpose.

36. Even worse, Defendants have repeatedly led this Court to believe that Luther Sutter has concealed the autopsy report. The axiomatic event in their timeline was the September 4, 2019 hearing. In that hearing,

37. Defendants, through their lawyers, knew Plaintiff, Luther Sutter, and Lucien Gillham were entitled to notice and an opportunity to be heard. Plaintiff requested a copy of the proposed precedent from defense counsel, but defense counsel refused to provide a copy. Defendants have intentionally conspired with each other to obtain an order on false facts, using Judge Guynn as a cat's paw. Thus, the Order attached as **Exhibit "J"** was designed to further perpetuate this fraud that there was no evidence Wilson was the shooter.

38. As alleged above, Luther Sutter hired his own lawyer, Andy Clarke, to review his action and judgment, as well as encouraged Dr. Peretti and Mr. Navochez to obtain their own counsel. These are not the actions of a crook. Defendants' lawyers, acting within the

scope of their authority, obtained the Order attached as Exhibit J in a desperate attempt to destroy Luther Sutter, an improper purpose.

39. So, Plaintiff seeks to intervene to seek an order setting aside the order attached as Exhibit J because no party will adequately protect Luther Sutter's rights. Rule 24 provides for intervention as a matter of right where, "the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." ARCP 24(a)(2). Permissive intervention is appropriate when: "when an applicant's claim or defense and the main action have a question of law or fact in common." ARCP 24(b)(2). "In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Id.

40. Here, Defendants have obtained from the Court an Order that has no basis in fact or in law, without notice or opportunity to be heard for Lucien Gillham, Luther Sutter, or Sutter & Gillham, PLLC. That Order has the Court stating that abuse of process, fraud, and outrage have occurred. This is simultaneous with the lawsuit they improperly filed in Faulkner County. The clear plan is to argue that collateral estoppel and res judicata will impose liability on the Baker Estate, Kerry Baker, Gena Baker, and Savannah Baker, without even letting them have a jury trial. That suit is also filed against Luther Sutter, Lucien Gillham, Sutter & Gillham, PLLC, and Greg Stephens. It is clear Defendants will try to impose collateral estoppel and res judicata against Sutter,

Gillham, Sutter & Gillham, and Stephens, as well, depriving them of a jury trial, without ever giving them Due Process, notice, of the right to be heard.

41. Upon information and belief, Defendants did not consult appropriately in accordance with Rule 37 therefore mandating that the motion be denied under *Jefferson Hosp. Assn. v. Davis*, 2020 Ark. App. 562, 11 (Ark. App. 2020) (the statement must include the names of the parties who conferred or attempted to confer, the manner by which they communicated, the dispute at issue, as well as the dates, times, and results of their discussions, if any).

42. This is a concern because the Order indicates that Buchanan and Humphrey did not even dispute the allegations of misconduct, as was their obligation. If that is true, it is inexplicable, and these issues were not truly contested. Accordingly, this is a basis for permitting intervention.

**WHEREFORE**, Luther Sutter prays this Court recuse and reassign this matter, then to permit him to intervene, to set aside the 6/22/2021 Order due to Defendant's fraud, for costs, and for all other proper relief.

Respectfully Submitted.

**SUTTER & GILLHAM, P.L.L.C.**
310 W. Conway Street
P.O. Box 2012
Benton, AR 72015
(501) 315-1910 - Office
(501) 315-1916 – Facsimile
Luther.sutterlaw@gmail.com

By: */s/ Luther Oneal Sutter*
Luther Oneal Sutter, Ark. Bar #95-031

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon all counsel this 25th day of June, 2021 via Eflex as indicated below:

Mel Sayes
Matthews, Sanders & Sayes, P.A.
825 West Third Street
Little Rock, AR  72201
Email:  msayes@msslawfirm.com

Judy Simmons Henry
Scott A. Irby
Jacob P. Fair
Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR  72201
Emails:  jhenry@wlj.com
sirby@wlj.com
jfair@wlj.com

J. Carter Fairley
Barber Law Firm PLLC
425 West Capital, Suite 3400
Little Rock, AR  72201
Email:  cfairley@barberlawfirm.com

David D. Wilson
Martin A. Kasten
Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3522
Email:  wilson@fridayfirm.com
mkasten@fridayfirm.com

Blake Hendrix
Annie Depper

Thomas G. Williams
Quattlebaum, Grooms & Tull PLLC
111 Center Street, Suite 1900
Little Rock, AR  72201
Email:  twilliams@qgtlaw.com

John E. Moore
Emily M. Runyon
Munson, Rowlett, Moore and Boone, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR  72201
Emails:  john.moore@mrmblaw.com
emily.runyon@mrmblaw.com

Efrem Neely
1514 South Poplar Street
Pine Bluff, AR  71601
Email:  ebneely@neelylaw.net

Andy Turner
Kaleb Jones
Turner Law Firm, PA
PO Box 1225
Cabot, AR  72023
Emails:  andy@turnerlawfirmpa.com
kaleb@turnerlawfirmpa.com

Eric Spencer

Fuqua Campbell, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Emails: bhendrix@fc-lawyers.com
adepper@fc-lawyers.com

Terry F. Wynne
Attorney at Law
415 West 6th Ave, Ste A
Pine Bluff, AR 71601
tfwynne@cablelynx.com

Email: espencer@aristotle.net

Marion Humphreys
Email: marionhumphreys@gmail.com

By:     /s/ Luther Sutter_____
        Luther Oneal Sutter, ARBN 95-031

        luther.sutterlaw@gmail.com

ELECTRONICALLY FILED
ELECTRONICALLY FILED
Jefferson County Circuit Court Clerk
2024 Collins Circuit 7:03:46
2021-Jul-15 12:29:50
35CWD05078 Pages
C11WD01 : 18 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
1ST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY          PLAINTIFFS

VS.                    CASE NO. 35CV-18-1077

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS,
MARY TATE, RELIANCE HEALTH CARE, INC.
BRANDON ADAMS, TODD ROSS,
AND JOE (SIC) WHICKER          DEFENDANTS

### DEFENDANTS' RESPONSE TO MOTION TO INTERVENE AND RECUSE AND BRIEF IN SUPPORT

### I.    INTRODUCTION

On June 25, 2021, Luther Sutter—an attorney who formerly represented separate plaintiff Gena Downey Baker in this case and voluntarily withdrew—filed a motion to personally intervene and for Judge Guynn to recuse ("Motion"). The Motion should be denied for the following reasons, any one of which is alone sufficient for denial:

- Intervention is not timely pursuant to Rule 24(a) of the Arkansas Rules of Civil Procedure.

2348608-v1



EXHIBIT
G

- The Motion seeking to intervene is facially deficient because it does not include a proposed pleading as required by Rule 24(c) of the Arkansas Rules of Civil Procedure.

- Mr. Sutter lacks standing to intervene because he does not claim an interest relating to the property or transaction that is the subject of the case as required by Rule 24(a) of the Arkansas Rules of Civil Procedure.

- The alleged basis for intervention is substantively without merit.

- The Motion seeking recusal of the Court should be denied because it states no legitimate reason for recusal and cites no applicable authority, all relationships were timely disclosed, and Plaintiffs expressly stated their pleasure with the presiding judge and the chosen counsel of Defendants.

This Court has presided over this case for almost three years rendering decisions for and against both sides, after full briefing and most often, after hearing oral arguments from each side.  Mr. Sutter made no objection or request for intervention or recusal until June 25, 2021, after the Court made rulings with which Mr. Sutter, without a client, disagrees.  Request for intervention and recusal should both be denied.

## II.    ARGUMENT

**A.    The motion to intervene should be denied because it was not timely filed.**

Intervention is permissible under Rule 24 of the Arkansas Rules of Civil Procedure so long as (1) a timely application is made by the person seeking to

intervene and (2) "the applicant claims an interest relating to the property or transaction which is the subject of the action."[1]

A threshold question in determining whether intervention should be allowed is whether application was made in a timely manner. *Employers Nat'l Ins. Co. v. Grantors,* 313 Ark. 645, 855 S.W.2d 936 (1993). The issue of timeliness is a matter well within the sound discretion of the trial court and is subject to reversal only where that discretion has been abused. *Id.* Arkansas courts have shown a strong reluctance to grant intervention after final judgment. *See generally Wilson v. Harris,* 227 Ark. 808, 302 S.W.2d 86 (1957) (holding that, generally, once litigation has progressed to final judgment, it is too late for third persons to intervene) and *Bank of Quitman v. Phillips*, 270 Ark. 53, 603 S.W.2d 450 (Ark. App. 1980) (affirming the ruling of the trial court that denied the motion to intervene as untimely when it was filed on the day a case was set for trial).

Here, the motion to intervene was untimely because it was not filed until after a final order was entered granting the motion to dismiss the case with prejudice. Mr. Sutter knew that this case had been pending since October 23, 2018—almost three years—but he did not seek intervention until it was concluded. Nor does Mr. Sutter provide any meritorious reason for his delay in seeking intervention or explain how the existing parties would not be prejudiced by his attempt to enter the case and disrupt the Court's final judgment. Mr. Sutter's

---

[1] Intervention under Rule 24 is also permissible "when a statute of this state confers an unconditional right to intervene"; however, no such statute is raised or exists in this matter.

3

attempt to intervene is untimely and wholly inconsistent with "the just, speedy and inexpensive determination of [this] action." Ark. R. Civ. P. 1. For this reason alone, the motion to intervene should be denied, making the request to recuse moot.

**B.    The request for intervention should be denied because the Motion is facially deficient as it does not include a proposed pleading as required by Rule 24(c) of the Arkansas Rules of Civil Procedure.**

Rule 24(c) of the Arkansas Rules of Civil Procedure provides that the "motion shall state the grounds therefor and _**shall**_ be accompanied by a pleading setting forth the claim or defense for which intervention is sought." (emphasis supplied.) In *Schact v. Garner,* 281 Ark. 45, 661 S.W.2d 361 (1983), a party moving to intervene refused to file a proposed pleading as required by Rule 24(c) but insisted on being allowed to intervene. The trial court denied the motion to intervene, and the Arkansas Supreme Court affirmed the ruling noting that the applicant had not shown entitlement to intervene as a matter of right or permissively because it failed to file a proposed pleading. *Id.*; *see also Polnac-Hartman & Assocs. v. First Nat. Bank in Albuquerque,* 292 Ark. 501, 504, 731 S.W.2d 202, 204 (1987) (affirming the trial court's decision that the appellant did not comply with Rule 24(c) because it failed to file a pleading setting forth a claim or defense).

Here, Mr. Sutter has clearly failed to comply with Rule 24(c) because the Motion does not contain any pleading setting forth Mr. Sutter's claim or defense. The reason Rule 24(c) requires a pleading be attached to a motion to intervene is so the Court can evaluate the applicant's claim that he has an interest relating to the property or transaction which is subject of the action. The pleading requirement

4

also allows the other parties to substantively evaluate the applicant's alleged basis for intervention. Mr. Sutter's failure to comply with the mandatory pleading requirement of Rule 24(c) precludes the Court and parties from making a substantive determination as to intervention. For this reason alone, the motion to intervene should be denied.

> C.    **The Motion should be denied because Mr. Sutter lacks standing to intervene.**

Even assuming Mr. Sutter timely and properly sought to intervene in this case, which he has not, he lacks standing to intervene. To intervene, Mr. Sutter must satisfy the requirement that he "claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest." Ark. R. Civ. P. 24(a). It is a well-recognized general rule that strangers to the record have no standing on which to base an application to vacate a judgment, unless so authorized by statute. *Weill v. Weill*, 226 Ark. 206, 288 S.W.2d 946 (1956).

Here, the property/transaction is a wrongful death case, and Mr. Sutter is neither an heir nor personal representative of the deceased. For this reason, he has no personal interest in this case, and the motion to intervene should be denied.

Mr. Sutter also claims he is seeking to intervene to file a motion to vacate or set aside the final order dismissing this case with prejudice. Because Mr. Sutter was only counsel of record before he voluntarily withdrew as counsel, he has no standing to set aside an order where he was not a party, but rather, an officer of the

2348608-v1

Court. The findings Mr. Sutter seeks to overturn are based on his and his co-counsels' conduct while Mr. Sutter was in the case as Gena Baker's attorney, and that does not provide any standing. For these reasons, the Motion to intervene should be denied, making the recusal request moot.

**D.    The allegations and illogical explanations in the Motion are substantively without merit.**

Unlike the "facts" alleged in the filings by Mr. Sutter in this case, the facts alleged by Defendants in their pleadings, most notably their motion to dismiss this case with prejudice, are supported by numerous exhibits, including photographs, sworn deposition testimony and other solid proof. Conversely, Mr. Sutter's Motion makes several allegations, almost none of which are supported by any evidence (and are, in fact, inconsistent with the evidence) or have anything to do with the actual relief sought in the Motion. Because the Motion to intervene is facially deficient, Defendants do not intend to waste this Court's time refuting all of the illogical explanations and allegations made by Mr. Sutter, but rather will rely on the proof presented in its motion to dismiss. Mr. Sutter's Motion is simply another attempt to muddy the waters and tender some explanation for his and his co-counsels' relentless onslaught of false and baseless allegations they have made throughout the nearly three-year lifespan of this concocted case.

One specific example of Mr. Sutter's attempt to muddy the waters that merits discussion are the allegations contained in paragraph 25 of the Motion regarding Mr. Sutter and his cohort's failure to disclose the autopsy report. Mr. Sutter claims in Paragraph 25 that the Defendants have made some type of misstatements

6

2348608-v1

related to the autopsy report. This is simply another misrepresentation by Mr. Sutter that is inconsistent with the proof and record in this case.

Defendants' motion to dismiss irrefutably demonstrated in great detail how Plaintiffs and their counsel failed to disclose and produce the autopsy report that was finalized and dated September 14, 2018, until ten months later in July 2019. There is also no dispute that Greg Stephens lied in open court about the existence of the autopsy report while other of Plaintiffs' counsel, including Mr. Sutter, sat idly by and remained silent. And it was Mr. Sutter who finally admitted in a later court hearing that he was aware of the autopsy report, but that he had made the decision not to produce it to the Defendants. *See* Defendants' Joint Renewed and Amended Motion to Dismiss Case with Prejudice and for Preservation of Information and supporting brief documenting these facts in detail.[2]

Defendants now know the autopsy report was personally delivered to the home of Jefferson County Coroner Chad Kelley on July 9, 2019, by Greg Stephens, and then the autopsy report was also included as an attachment to the "Chad Kelley Report" dated July 10, 2019—the very next day. We also know that Mr. Sutter notified counsel by e-mail on July 8, 2019, that he intended to depose a third-party witness (which turned out to be Chad Kelley) prior to the issuance of the "Chad Kelley Report," which no one other than the Plaintiffs and their counsel was expecting. The issuance of the "Chad Kelley Report" also occurred shortly after the Tac Air airport meeting that occurred on or about July 6, 2019, where the "Greg

---

[2] The motion to dismiss and brief are incorporated herein pursuant to Ark. R. Civ. P. 10(c).

7

2348608-v1

Stephens Work Product Notes"(which eventually became the "Chad Kelly Report" approximately four days later) were circulated to those present, including Mr. Sutter.  *See* Defendants' Joint Renewed and Amended Motion to Dismiss Case with Prejudice and for Preservation of Information and Brief in Support for more Tac Air details.

Mr. Sutter correctly claims in his Motion that Greg Stephens produced the autopsy report to Defendants on July 11, 2019, but that has never been a point of dispute. The problem with the timing of the production of the autopsy report was that it was not produced until after it was a) provided to Coroner Kelley to include with his second changes to the death certificate, and b) held in secret from Defendants for ten (10) months, during which time Plaintiffs and their counsel lied about its existence to the Court and *continuously filed pleadings containing allegations that were directly contradicted and unsupported by the autopsy report*.

Mr. Sutter's request to intervene changes nothing about the (i) failure to timely disclose a written autopsy report to Defendants, (ii) false statements to the Court about the existence of the report, and (iii) admission by Mr. Sutter that he personally decided, apparently on behalf of all Plaintiffs and their counsel, to conceal the report.  The explanations provided by Plaintiffs and their counsel related to the autopsy report continue to evolve, change and become even more illogical as they are confronted with evidence that contradicts their previous

8

explanations, and this Motion is no different.  Intervention based on factually inaccurate claims would be improper.

E.    **The request for the recusal of the Court is untimely and substantively without merit.**

Mr. Sutter cannot seek recusal of Judge Guynn because Mr. Sutter is not a party to this case.  For this reason alone, the request for recusal should be denied.

Even if the Court permitted Mr. Sutter to intervene in this case, which is unwarranted, the Court should deny his recusal request because the Motion states no legitimate reason for recusal and cites no applicable authority.  This Court's impartiality is presumed, and the Court "has a duty to sit on a case unless there is a valid reason to disqualify." *Perroni v. State*, 358 Ark. 17, 25, 186 S.W.3d 206, 210 (2004).  The burden of proving bias or prejudice to overcome that presumption falls on Sutter as the party seeking recusal. *Turner v. State*, 325 Ark. 237, 244, 926 S.W.2d 843, 847 (1996).  Mr. Sutter has not and cannot meet this burden.

During the case, the Court disclosed relationships he had with the attorneys of record including his relationship with one of Plaintiffs' original attorneys who remains counsel in the case, Marion Humphrey, and with one of Defendants' attorneys, Efrem B. Neely, Sr.  Plaintiffs and their counsel, including Mr. Sutter, never sought recusal.  In fact, when Mr. Neely entered his appearance in the case, it was Mr. Sutter who expressed to the Court that Plaintiffs "welcome" Mr. Neely's entrance in the case as a "fine addition." **Exhibit 1, Hearing Transcript, February 21, 2019, pp. 1- 3, 11-14, 28-31, 257.** Mr. Sutter was so overjoyed, he

9

2348608-v1

sent Mr. Neely a congratulatory text for joining the defense. *Id* at 12.[3] In his Motion, Mr. Sutter acknowledges that he—as counsel of record for one of the Plaintiffs—previously asked the Court to not recuse but rather continue presiding over the case. Motion ¶20. The Court determined that despite the Defendants' concern about the disclosure of these relationships, he had the ability to be impartial.

Now, after this case has been extensively litigated for three years and the Court has made a dispositive ruling adverse to Plaintiffs, Mr. Sutter seeks recusal. This extraordinary attempt to disqualify this Court for lack of impartiality is not only disingenuous, it is baseless and a far cry from the truth, as demonstrated by the entire record of this case.

Although Mr. Sutter complains about certain rulings in the Motion, there is nothing in the record of this case that even remotely suggests any bias on the part of this Court. Showing bias requires more than allegations and complaints about the rulings in the case—it requires actual facts demonstrating that a court cannot fairly preside over the case. The Court has properly considered numerous motions and other pleadings filed by the Plaintiffs and their counsel in this case, including many that were filed and ruled upon before Mr. Sutter withdrew from the case in the face of his bad faith conduct. Judge Guynn has rendered numerous important rulings, but only after providing the opportunity for all parties to be heard.

---

[3] Exhibit 1, pg. 12, beginning at line 6 appears to contain an error in that the statement starting with "But—but I like to have a fair fight..." to line 11 should be attributed to the Court.

10

2348608-v1

Decisions have been impartially made throughout the case, some for Plaintiffs and some for Defendants.

In fact, beginning with their initial pleadings in this case, Defendants sought the dismissal of this case because they knew Plaintiffs' allegations were lies. Had the Court been biased, there were numerous opportunities to dismiss this case before now, but the Court did not do so. Instead, over two years of discovery was permitted, which came at great personal and financial cost to Defendants, before the case was dismissed. Dismissal occurred only after Defendants demonstrated, with uncontroverted proof, that Plaintiffs had indeed concocted this case and engaged in inappropriate and unethical behavior, all as chronicled in Defendants' motion to dismiss with exhibits and brief and as set out in the Court's order dismissing this case. To call the Court the Defendants' "cat's paw" under these circumstances is baseless and reprehensible. Mr. Sutter has the significant burden to show judicial bias, and he has failed to identify a single fact that comes near meeting that burden.

In addition to being baseless, Mr. Sutter's recusal request should be denied because it is untimely. Mr. Sutter has waited too long to seek recusal and, therefore, waived the issue. Waiver of grounds for judicial recusal or disqualification occurs when there is a "failure to seasonably object." *Worth v. Benton Cty. Circuit Court*, 351 Ark. 149, 154, 89 S.W.3d 891, 895 (2002). Objecting seasonably in the context of judicial recusal requires quick action by the party seeking recusal—the Arkansas Supreme Court has found waiver when a party

11

2348608-v1

waited as little as three months to seek recusal. *Id.* (citing case in which waiver occurred after three months and holding that a party that waited four years to seek recusal waived its basis for recusal).

Here, Judge Guynn presided over this case for thirty-two (32) months. Mr. Sutter made no objection or request for his recusal until June 25, 2021. Recusal only became an issue after the Court made rulings that Mr. Sutter did not like. The Arkansas Supreme Court takes a dim view of this. As the Supreme Court put it in *Worth*, "it has long been the law in Arkansas that a party may not speculate on the outcome and thereafter take advantage of a fact supporting disqualification known but not raised by him until after an adverse decision is rendered." 351 Ark. at 155, 89 S.W.3d at 895 (citations omitted). In that case, the party seeking disqualification of the judge knew of the reason for disqualification on the day the complaint was filed but did not raise the issue until it received an adverse ruling on summary judgment. *Id.* Assuming the fact that Mr. Neely is one of many counsel for Defendants is Mr. Sutter's problem, the parties and all counsel, including Mr. Sutter, have known the alleged basis for recusal since February 14, 2019, which is the date Mr. Neely entered his appearance in this case. This fact serves as no basis for recusal per the appellate court.

The Motion fails because it states no legitimate factual basis for recusal. Moreover, the Motion also fails because Mr. Sutter waited until after he received rulings that he did not like to seek the recusal of Judge Guynn. And even if Mr. Sutter had some unstated basis for recusal, the Motion still fails because he waited

12

2348608-v1

too long to raise it, after entry of a ruling with which he disagrees. For these reasons, the Motion should be denied.

### III.    CONCLUSION

For any one of the reasons stated in this response, the untimely and unsupported Motion to intervene and recuse should be denied.

Respectfully submitted,

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
(501) 376-9442 FAX
jhenry@wlj.com; sirby@wlj.com; jfair@wlj.com

By: /s/ Judy S. Henry_____
    Judy Simmons Henry (84069)
    Scott A. Irby (99192)
    Jacob P. Fair (2015167)

    *Attorneys for Bryan Adams,*
    *Skylar Wilson, Travis Jones,*
    *Carson Cook, Karla Cook,*
    *Prairie Wings South, LLC,*
    *Prairie Wings Lodge, LLC,*
    *Christy Adams, Reliance Healthcare, Inc.,*
    *Brandon Adams, Todd Ross and*
    *Joel Whicker*

13

2348608-v1

Neely Law Firm
10515 W. Markham, Suite J2
Little Rock, AR 72205
(501) 823-0621
(870) 619-1690 FAX
ebneely@neelylaw.net

By: /s/ Efrem B. Neely, Sr. _____
    Efrem B. Neely, Sr. (2008047)

*Attorneys for Bryan Adams,*
*Skylar Wilson, Travis Jones,*
*Carson Cook, Karla Cook,*
*Prairie Wings South, LLC,*
*Prairie Wings Lodge, LLC,*
*Christy Adams, Reliance Healthcare, Inc.,*
*Brandon Adams, Todd Ross and*
*Joel Whicker*

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street | Suite 1900
Little Rock, AR  72201
(501) 379-1700
(501) 379-1701 FAX
twilliams@qgtlaw.com

By: /s/ Thomas G. Williams _____
    Thomas G. Williams, Bar I.D. #88186

*Attorneys for Prairie Wings South, LLC*

14

2348608-v1

FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3522
(501) 376-2011
(501) 376-2147 FAX
wilson@fridayfirm.com
mkasten@fridayfirm.com


By: /s/ David D. Wilson _____
        David D. Wilson (90112)
        Martin A. Kasten (99100)

*Attorneys for Prairie Wings South, LLC and
Prairie Wings Lodge, LLC*


Munson, Rowlett, Moore and Boone, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR  72201
501-374-6535
501-374-5906 Fax
emily.runyon@mrmblaw.com


By: /s/ Emily M. Runyon _____
        EMILY M. RUNYON (2005172)

        *Attorneys for Karla Cook and
        Carson Cook*

15

2348608-v1

FUQUA CAMPBELL, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
501-374-0200
EMAIL: bhendrix@fc-lawyers.com
　　　　　adepper@fc-lawyers.com


By: /s/ Blake Hendrix_____
　　　Blake Hendrix (86066)
　　　Annie Depper (2009267)

　　*Attorneys for Skylar Wilson*

16

2348608-v1

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2021, a copy of the foregoing was served by first class United States mail, postage prepaid, upon the following:

Eric S. Buchanan
P.O. Box 166643
Little Rock, AR 72216

*Attorneys for Estate and Kerry Baker*

Hon. Marion Humphrey
108 South Rodney Parham
Little Rock, AR 72205

*Attorney for Savannah Case*

Gena Baker
44 Hawk Drive
Vilonia, AR 72173

*Pro se Plaintiff*

Mel Sayes
Jay Sayes
825 West 3rd St
Little Rock, AR 72201

*Attorneys for John Tate and Austin Tate*

Luther Oneal Sutter
Lucien Gillham
Sutter & Gillham, P.L.L.C.
310 W. Conway Street
Benton, AR 72015

*Pro se non-parties*

17

2348608-v1

Robert S. Tschiemer
P.O. Box 549
Mayflower, AR 72106

*Attorney for Kerry Baker as Administrator*
*of the Estate of James Luke Baker and Individually*

/s/ Judy S. Henry
Judy Simmons Henry

18

2348608-v1

ELECTRONICALLY FILED
Jefferson County Circuit Court
Elana Cook-Bishop, Circuit Clerk
2024-Jun-03 13:46
35CV-18-1077
C11WD01 : 9 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
FIRST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
KERRY BAKER, INDIVIDUALLY;
SAVANNAH BAKER CASE;
AND GENA DOWNEY BAKER                                          PLAINTIFFS

V.                    CASE NO. 35CV-18-1077

BRYAN ADAMS; SKYLAR WILSON;
TRAVIS JONES; CARSON COOK; KARLA COOK;
PRAIRIE WINGS SOUTH, LLC; AUSTIN TATE; JOHN TATE;
CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED;
PRAIRIE WINGS LODGE, LLC; CHRISTIE ADAMS;
RELIANCE HEALTH CARE INC;
BRANDON ADAMS; and TODD ROSS                                  DEFENDANTS

### PLAINTIFFS' REPLY TO RESPONSE TO MOTION TO INTERVENE AND MOTION TO RECUSE

Come Luther Sutter, and for his Reply states as follows:

1.      The Motion sets out the relevant allegations concerning the fraud perpetrated on the Court. Rule 8 requires pleadings to be construed liberally to do substantial justice. Now, Ms. Henry has successfully run out the clock on any Rule 59 motion. Both she and Eric Buchanan refused to send Luther Sutter the proposed precedent. Then took the maximum amount of time to respond to the Motion. Thus, Rule 59 is no longer available. But Rule 60 is. Attached is a proposed Motion which tracks the Motion to Intervene. So, Luther Sutter was not untimely, did not fail to exercise due diligence, and substantially complied with the pleading requirements. Nonetheless, attached is a proposed Rule 60 motion, incorporated by reference herein.

1

**EXHIBIT**
**H**

2.    Clearly, Luther Sutter's interest has not been protected.  Else, why would the Court not have Dr. Sperry's report that certainly creates a fact issue on how Luke died?  And why wouldn't Plaintiffs' counsel show the Court just how dishonest these lawyers have been? Nobody knows.  But the end result is that there has been a fraud on the Court sufficient to invoke Rule 60.

3.    The Arkansas Rules of Professional Conduct are particularly instructive. "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." Ark. R. Prof. Cond. 3.1. Further emphasizing the duty of candor, Rule 3.3(a)(1) states: "A lawyer shall not knowingly make a false statement of fact or law to a tribunal; or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Ark. R. Prof. Cond. 3.3..

4.    As discussed in the Rule 60 Motion, Ms. Henry and the rest of the defense counsel have repeatedly represented to the Court that the autopsy report was never turned over by the Plaintiffs. There are no muddied waters. Ms. Henry told the Court:

> MS. HENRY: - -- I'm sorry. Let me back up.The Peretti report was finished September 14th of 2018. We got the report -- we, being the defendants. We got the report out of Chad Kelley's production on July 15th, 2019. He faxed it to Mr. Blake Hendrick's partner, Annie Depper, and me at 9:00 o'clock that night. To be precise, 8:58 p.m., on July 15th, 2018. We get a 15-page supplemental report from Mr. Kelley, and at the back of his supplemental report is Dr. Peretti's five-page autopsy report.
> THE COURT: So you're saying he used Peretti's autopsy report to help him?
> MS. HENRY: One would -- I'm saying he had it. We're the defendants. We're defending an alleged crime: a murder, a supplying of drugs, a conspiracy. And *we don't have an autopsy report,* but the coroner in Jefferson County who wasn't even at the scene gets the report. He has it in his -- he produced it to us on July 15th at 9:00 o'clock at night.

**Ex. C** p. 35:2-20.(emphasis added)

5.    Lest one believe Ms. Henry misspoke, she did it again:

> I want to focus on the misrepresentations about the autopsy report. The Court will recall that you raised with counsel for the plaintiffs whether or not there was a written autopsy report because we, the defendants, were complaining that *we had never received an autopsy report* after we found out that it had been performed. And you were specifically told in court by plaintiff's counsel with other counsel sitting at counsel table that there was no report. This was an absolute misrepresentation and fraud on the Court that there was no written autopsy report because the autopsy was done on Friday, September 7th of 2018. And the one and only final autopsy report was issued seven days later on Friday, September 14th, 2018. That autopsy report was concealed from defendants. And one might ask why. Well, because the autopsy report is contrary to the allegations of the plaintiffs' complaint and amended complaint.
> **Exhibit G** at p. 11 (emphasis added).

These were just the misrepresentations that were made in open Court.  The misrepresentations continued in the pleadings, including the Motion to Dismiss

6.    But now, in the Response to the Motion to Intervene Defendant's agree that the report was produced in discovery.  But they say that this was never the issue. In their response, Defendants have stated:

> Mr. Sutter correctly claims in his Motion that Greg Stephens produced the autopsy report to Defendants on July 11, 2019, but that has never been a point of dispute. The problem with the timing of the production of the autopsy report was that it was not produced until after it was a) provided to Coroner Kelley to include with his second changes to the death certificate, and b) held in secret from Defendants for ten (10) months, during which time Plaintiffs and their counsel lied about its existence to the Court and continuously filed pleadings containing allegations that were directly contradicted and unsupported by the autopsy report.

3

Defendant's Response to Motion to Intervene, Page 8. As demonstrated above, the Defendants have claimed that the report was concealed from them. They falsely claimed in the September 2019 hearing that they never received the autopsy report from the Plaintiffs. They previously claimed they only received it from Chad Kelley.

7.    Also, Ms. Henry and Mr. Williams claim the report was held in secret from Defendant's for ten months. How?

### TIMELINE OF KEY DATES

COMPLAINT FILED                           10/23/2018

FIRST MOTION TO DISMISS FILED            11/1/2018

MOTION TO STAY DISCOVERY FILED           12/6/2018

LUTHER SUTTER'S ENTRY OF APPEARANCE 12/11/18

HEARING                                  2/21/19

DEFENDANTS SERVE DISCOVERY                       4/22/2019

PLAINTIFFS ANSWER DISCOVERY              6/5/2019

HEARING                                  6/6/19

CHAD KELLY RECEIEVES AUTOPSY REPORT[1]       7/9/19

DEFENDANTS RECEIVE AUTOPSY REPORT   7/11/19

HEARING WITH HENRY'S LIES                9/4/19

LUTHER SUTTER WITHDRAWS                  2/6/20

So, the autopsy report was not concealed for 10 months, as these lawyers claim on page 8 of the Response to the Motion to Intervene. These statements are incapable

---

[1] Luther Sutter cannot confirm this date on personal knowledge.

of reconciliation. In their response, they admit the falsity of their statements in the complaint and the motion to dismiss. But even if Plaintiffs did not send the Autopsy Report to the Defendants, the Court recognized that Plaintiffs could make work product objections.

10.     At the September 4, 2019 hearing, Luther Sutter repeatedly inquired about how to object to specific attempts by Defendants to obtain work product or privileged material. The Court made clear, in denying the Motion to Quash deposition subpoenas, that specific objections to specific questions or requests based upon privilege would be allowed; and the Court would rule on them in the future:

> MR. SUTTER:     The law allows us an immediate appeal when your order   discloses what we believe to be privileged communications. I'm going to put the -
>
> THE COURT:     I didn't say – well, privilege communication – I – what I'm saying is information – I'm not saying privileged information. I'm saying he can be deposed. (R.at 122,13-20).

The Court indicated it was not ruling that privileged material had to be released, but that such objection could be made at the time of questioning on a question by question, or document by document basis.

Then at page 167, line 14 of the September 4, 2019 hearing transcript, Mr. Sutter confirmed:

> MR. SUTTER:     But I think you were clear this morning that I was going to be able to object on appropriate privilege grounds.
>
> THE COURT:     Well, you had it correct. That – that's what I said this morning.

Mr. Irby admitted as much:

> MR. IRBY:     I think the – the issue is he—is that we don't – you haven't heard any objection he's made ... I think the deposition

5

should go forward as scheduled, that – the motion – the denial should be entered of record in the order, and they should go forward. If he feels that he needs to object, then there's going to be – you know, then there's – there's ways to deal with that, Judge.

MR. SUTTER:          We agree, Your Honor.

THE COURT:          Okay. For once. All right. All right. I – I can anticipate what's going to happen, but as of right now, everything goes, like – like you said.
(R. at 168, 3).

14.    Despite this clear instruction from the Court, to which Mr. Irby and Mr. Sutter both stipulated, Ms. Henry contradicted her own firm's representations by claiming all privilege objections were denied and has caused this Court to enter a fraudulent Order. Plaintiffs were entitled to withhold the Autopsy report on work product objections until the Court ruled. But they didn't! Anyone with a law license ought to know better.

15.    There has no been waiver of the right to ask this Court to recuse. Luther Sutter had the highest respect for Efrem Neeley when he entered his appearance, so he stands by that comment because it was true when made. But the comments were made as a lawyer. Now, Luther Sutter is a litigant and believes there is evidence to create an appearance of impropriety at least. The Court and Mr. Neely continue to socialize with each other and are fraternity brothers who have taken a secret oath. What is this oath? Would a reasonable person question the Court's impartiality? Luther Sutter believes so. An evidentiary hearing should be required or Luther Sutter should be allowed to proffer his evidence in camera.

6

WHEREFORE Luther Sutter requests that he be allowed to Intervene, and for all other proper relief.

Respectfully submitted,

SUTTER & GILLHAM, P.L.L.C.
Luther Sutter (AR95031)
P.O. Box 2012
Benton, AR  72018
501-315-1910 Office
501-315-1916 Facsimile
Attorneys for Gena Baker

By:    */s/ Luther Oneal Sutter*
        Luther Oneal Sutter, Ark. Bar No. 95031
        *Luthersutter.law@gmail.com*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing was served upon all counsel this 22nd day of July, 2021 by Eflex copy to the below indicated counsel of record:

Mel Sayes
Matthews, Sanders & Sayes, P.A.
825 West Third Street
Little Rock, AR  72201
msayes@msslawfirm.com
*Attorney for John & Mary Tate, and Austin Tate*

Judy Simmons Henry
Scott A. Irby
Jacob P. Fair
Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR  72201
jhenry@wlj.com
sirby@wlj.com
jfair@wlj.com
*Attorneys for Bryan Adams, Skylar Wilson,*

Thomas G. Williams
Quattlebaum, Grooms & Tull PLLC
111 Center Street, Suite 1900
Little Rock, AR  72201
twilliams@qgtlaw.com
*Attorney for Prairie Wings South, LLC*

John E. Moore
Emily M. Runyon
Munson, Rowlett, Moore and Boone, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR  72201
john.moore@mrmblaw.com
emily.runyon@mrmblaw.com
*Attorneys for Karla Cook and Carson Cook*

J. Carter Fairley

7

*Travis Jones, Carson Cook, Karla Cook,*
*Prairie Wings South, LLC,*
*Prairie Wings Lodge, LLC, Christy Adams,*
*Reliance Healthcare, Inc., Brandon Adams,*
*and Todd Ross*

Barber Law Firm PLLC
425 West Capital, Suite 3400
Little Rock, AR  72201
cfairley@barberlawfirm.com
*Attorney for Joe Whicker*

David D. Wilson
Martin A. Kasten
Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3522
wilson@fridayfirm.com
mkasten@fridayfirm.com
*Attorneys for Prairie Wings South, LLC*
*And Prairie Wings Lodge, LLC*

Andy L. Turner
Turner Law Firm
P.O. Box 1225
Cabot, AR 72023
andy@turnerlawfirmpa.com
*Attorney for Todd Ross*

Efrem B. Neely, Sr.
Neely Law Firm
1514 S. Poplar St.
Pine Bluff, AR 71601
ebneely@neelylaw.net
*Attorneys for Bryan Adams, Skylar Wilson,*
*Travis Jones, Carson Cook, Karla Cook,*
*Prairie Wings South, LLC,*
*Prairie Wings Lodge, LLC, Christy Adams,*
*Reliance Healthcare, Inc., Brandon Adams,*
*and Todd Ross*

J. Blake Hendrix
Fuqua Campbell P.A.
Riviera Tower
3700 Cantrell Road, Ste 205
Little Rock, AR 72202
bhendrix@f-clawyers.com
*Attorney for Skylar Wilson*

Hon. Terry Wynne

8

Jefferson Co. Attorney
415 W. 6th Ave., Ste A
Pine Bluff, AR 71601
*tfwunne@cablelynx.com*

By:    */s/ Luther Oneal Sutter*
       Luther Oneal Sutter, Ark. Bar No. 95031
       *Luthersutter.law@gmail.com*

9

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook Bishop, Circuit Clerk
Saline County Circuit Court
Myka Bono Sample, Circuit Clerk
2020-
C11WD05 : 4 Pages
63CV219-1060
C22D02 : 4 Pages

# UNIFORM COVER PAGE
[To be used when required by Administrative Order No. 2 (g)*]

COURT:    **CIRCUIT**    COURT OF **SALINE**    COUNTY

Docket/Case Number: **63CV-19-1060**

CASE NAME:
PLAINTIFF/
PETITIONER:    **SUTTER & GILLHAM, PLLC**

DEFENDANT/
RESPONDENT:    **DAVID WESTBROOK**

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):    **ORDER**

*Administrative Order No 2.

(g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).

(2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.



EXHIBIT
I

IN THE CIRCUIT COURT OF SALINE COUNTY, ARKANSAS

SUTTER & GILLHAM, PLLC

**PLAINTIFF/
COUNTER-DEFENDANT**

V.                          CASE NO. 63CV-19-1060

DAVID WESTBROOK

**DEFENDANT/
COUNTER-PLAINTIFF**

v.

LUTHER SUTTER                                **THIRD PARTY DEFENDANT**

LUCIEN GILLHAM                               **THIRD PARTY DEFENDANT**

### ORDER

CAME BEFORE THE COURT THE PARTIES, on September 1, 2020, and a hearing was held on the following Motions: Motion to Quash Deposition Regarding Jerri Dean, Westbrook's Motion to Quash, and Counter-Defendant, Sutter & Gillham, P.L.L.C's Motion for Summary Judgment:

1.    Westbrook's Motion to Quash is denied

2.    The grant of summary judgment may be appropriate in a legal malpractice suit. *See Pugh v. Griggs*, 327 Ark. 577, 940 S.W.2d 445 (1997). In a legal-malpractice case, a plaintiff must prove that the attorney's conduct fell below the generally accepted standard of practice and that this conduct proximately caused the plaintiff's damages. *S. Farm Bureau Cas. Ins. Co. v. Daggett*, 354 Ark. 112, 118 S.W.3d 525 (2003). *See Grassi v. Hyden*, 2010 Ark. App. 203, 374 S.W.3d 183. In the absence of such expert testimony, a directed verdict in favor of the defendant is proper. *See id.* The only exception is where the trial court determines that expert testimony is not necessary because the case falls within the common-knowledge exception. *Barnes v. Everett*, 351 Ark. 479, 95 S.W.3d 740 (2003). The Motion for Summary Judgment of Counter-Defendant Sutter & Gillham, P.L.L.C., is granted for the following reasons:

a.      Counter-Defendant Sutter & Gillham, P.L.L.C , moved for summary judg-ment on on Counter-Plaintiff Westbrook's claims for legal malpractice. The facts are reviewed in the light most favorable to Westbrook, with all admissible evidence considered, all reasonable inferences drawn in Westbrook's favor, and fact disputes resolved in Westbrook's favor. However, Westbrook failed to meet proof with proof.

b.      For the first time at the hearing, orally, Westbrook claimed to need more discovery to respond to summary judgment, and not through an affidavit as required under Rule 56, or a Motion, or as part of his Response to the Motion for Summary Judgment. It was undis-puted at the hearing that Westbrook had issued no written discovery, had taken no depositions, had requested no depositions, and had issued no subpoenas. Nor was there any indication that after the motion for summary judgment was filed that Westbrook undertook any efforts to conduct discovery. Although Westbrook argued that the case was "brand new," the case was filed in the Fall of 2019, a hearing was held in January 2020, and the CounterClaim was filed in February 2020. Indeed, on July 8, 2020, Requests for Admissions were filed with the Court by Sutter & Gillham, P.L.L.C., and Westbrook filed no Response to them. The case is nearly a year old and there was opportunity for Westbrook to conduct discovery. Accordingly, the issue of needing more discovery under Rule 56 was waived, and relief on that basis is denied.

c.      Westbrook failed to provide any expert testimony to indicate what the standard of care was, that it was breached at all, how it was breached, that there was a breach of fiduciary duty, or how any alleged breach caused damage to Westbrook. Westbrook's counsel indicated that he had consulted with other lawyers, and that after discovery, if an expert was needed, he would be happy to get one. In light of the evidence in the Counter-Defendant's Motion for Summary Judgment, the Response, the Reply, and supporting materials, expert testimony was required to defeat summary judgment. Therefore, summary judgment is granted.

d.      Westbrook made reference to the Arkansas Rules of Professional conduct in Response, but the Rules are not designed for a basis of civil liability, but are to provide guidance

to lawyers and to provide a structure for regulatory conduct through disciplinary agencies. *Orsini v. Larry Moyer Trucking, Inc.,* 310 Ark. 179, 184, 833 S.W.2d 366, 369 (1992)

    e.    The affidavit of the defense counsel in Westbrook's case against Kelly indicated that the settlement was a good deal for Westbrook.

    f.    Accordingly, Counter-Defendant, Sutter & Gillham, P.L.L.C.'s Motion for Summary Judgment is hereby granted, and Counter-Plaintiff Westbrook's Counter Claim is dismissed with Prejudice.

5.    After the Court's ruling on the Motion for Summary Judgment, Plaintiff Sutter & Gillham, P.L.L.C., moved to dismiss their Complaint without prejudice. That motion is hereby granted. Sutter & Gillham, P.L.L.C.'s Complaint is hereby dismissed without prejudice.

    IT IS SO ORDERED, on this, the ___11___ day of ___September___, 2020.

_____
THE HONORABLE DAVID LASER
Special Circuit Judge sitting by assignment.

Prepared by:

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501/315-1910 Office
501/315-1916 Facsimile
Attorneys for the Plaintiff

/s/ Luther Oneal Sutter
Luther Oneal Sutter, Esq., ARBN 95-031
luther.sutterlaw@gmail.com

cc:

Counsel for Defendant/Counter-Plaintiff, David Westbrook

Chris Burks
Chris@whlawoffices.com

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
ELEC2024NIGA03 FILED:46
Jefferson County Circuit Court
Barbara A Collins Circuit Clerk
2021-Jun-22 12:59:30
35CV-18-1077
C11WD01 : 8 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## 1ST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY                    **PLAINTIFFS**

VS.                              **CASE NO. 35CV-18-1077**

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS,
MARY TATE, RELIANCE HEALTH CARE, INC.
BRANDON ADAMS, TODD ROSS,
AND JOE (SIC) WHICKER                              **DEFENDANTS**

## ORDER GRANTING DEFENDANTS' JOINT RENEWED AND AMENDED
## MOTION TO DISMISS CASE WITH PREJUDICE AND
## FOR PRESERVATION OF INFORMATION

Before the Court is Defendants'[1] Joint Renewed and Amended Motion to

Dismiss Case With Prejudice and for Preservation of Information, with 81 exhibits,

and Brief in Support, all filed on April 13, 2021, (collectively, the "Motion"). On

April 14, 2021, separate defendants Austin Tate, John Tate, and Mary Tate ("Tate

Defendants") filed a joinder in and adoption of the Motion. On April 21, 2021, and

---

[1] "Defendants" includes Bryan Adams, Skylar Wilson, Travis Jones, Carson Cook, Karla Cook, Prairie Wings South LLC, Prairie Wings Lodge, LLC, Christy Adams, Brandon Adams, Reliance Health Care, Inc., Todd Ross and Joel Whicker.

**EXHIBIT**

J

April 26. 2021. responses to the Motion were respectively filed by the Estate of James Luke Baker. Kerry Baker. and Savannah Baker Case (collectively. the "Responses"). On April 27, 2021. a reply ("Reply") was filed by Defendants with legal authorities and optional pathways to a dismissal with prejudice. *Pro se* plaintiff Gena Baker filed a motion for extension of time to respond to the Motion on April 30, 2021.

The Court held a hearing on the Motion and Responses on June 2, 2021. Upon consideration of the Motion, Responses, Reply, arguments of counsel, other evidence and proof, and being fully knowledgeable about this case from prior hearings and filings, and for the reasons stated at the conclusion of the hearing on the record during the June 2, 2021 hearing, which are attached as Exhibit A and incorporated herein, the Court FINDS and ORDERS as follows:

1.      Based on the arguments, and the legal authorities, including both case law and Arkansas Rules of Civil Procedure, that provide this Court with discretion as and optional pathways provided by Defendants in their Motion, Reply, and in argument at the hearing, the Motion is hereby GRANTED. The complaint and amended complaint filed by Plaintiffs against Defendants and Tate Defendants are hereby dismissed with prejudice.

2.      The Motion was supported by 81 exhibits evidencing misconduct and a pattern of the abuse of the judicial process by the Plaintiffs and at least some of their counsel and certain conduct warranting the dismissal of the complaint and amended complaint with prejudice, including at least the following:

2

- Baseless allegations pending for over two years resulting in a miscarriage of justice;

- Use of fraudulent paperwork to allegedly disinter a body;

- Misrepresentations to government officials regarding illegal exhumation of a body in Faulkner County;

- Failure to comply with Arkansas exhumation law including failure to notify Faulkner County Coroner and failure to obtain a court order authorizing an exhumation;

- Spoliation of key evidence;

- False representations regarding a secret autopsy, concealment of the autopsy report and misrepresenting the status of the autopsy report to the Court and Defendants;

- Obstruction of FOIA at the Jefferson County Sheriff's Office, misrepresentations to Sheriff about the autopsy and report, and the origin of the re-opened case;

- Concealment and false representations regarding exonerating photographs;

- Wrongfully attempting to influence a public official, the Jefferson County Coroner, who was to be used as Plaintiffs' expert witness;

- Deliberate concealment and false representations regarding the Photo Notations (as defined in the brief supporting the Motion), allowing the Jefferson County Coroner to include the Photo Notations as a public record in a July 10, 2019 Addendum as if he were the author;

- Knowingly eliciting false testimony from the Jefferson County Coroner regarding the Photo Notations;

- Discovery abuses including but not limited to directing witnesses to ignore a subpoena duces tecum and Court Order and attempting to improperly influence fact and expert witness testimony;

- Discovery abuses including concealing documents and information from witnesses and Defendants, and removing or attempting to remove documents and information from witnesses' files; and

3

- Witness tampering including attempts to have witnesses change their testimony.

3.      In Responses filed by Plaintiffs and on the record at the hearing. Plaintiffs did not dispute or refute the allegations set forth in the Motion or presented at the hearing.  Instead, Plaintiffs solely relied on Rule 41(a)(1) of the Arkansas Rules of Civil Procedure as their basis to request dismissal of the case without prejudice.  None of the facts stated in the Motion and supported by the 81 exhibits were refuted with any evidence other than blanket arguments of counsel for Plaintiffs present at the hearing that they did not personally participate in the conduct.

4.      The Court FINDS that (i) it has the inherent authority under the Rules and authorities cited by Defendants to protect the integrity of the court in actions pending before it, and (ii) Rule 41(a)(1) is not intended to be a bar from a Court exercising its inherent authority by dismissing a case with prejudice when unique facts and circumstances of misconduct, abuse of process, fraud, misrepresentations, spoliation, and other misconduct, to address the miscarriage of justice are present.

5.      The Court FURTHER FINDS that abuse of process, fraud, misrepresentations, spoliation, and other misconduct resulting in a miscarriage of justice occurred in this case, all of which warrant dismissal of the case with prejudice.

4

6.      The Court FURTHER FINDS that it has the authority to dismiss the case with a prejudice as one remedy for the misconduct as set out in the Motion and Reply.

7.      The Court hereby FURTHER FINDS AND ORDERS that Plaintiffs', Plaintiffs' current and former attorneys, investigators, witnesses. experts and consultants (including the Jefferson County Coroner Chad Kelley), and anyone acting with Plaintiffs or at their direction, immediately identify, and indefinitely protect and preserve any and all documents, data and other information in any way related to this case or the death of Luke Baker.  Plaintiffs are ORDERED to immediately notify all of their current and former attorneys, investigators, witnesses, experts and consultants (including the Jefferson County Coroner Chad Kelley) of this Court's order.

8.      Rule 11 of the Arkansas Rules of Civil Procedure allows the Court to impose an appropriate sanction on its own initiative.

9.      The Court may also utilize Rule 11 of the Arkansas Rules of Civil Procedure on its own initiative to sanction Plaintiffs and their attorneys in its sole discretion.  The Court is greatly concerned that the complaint, amended complaint, and other filings may be in violation of Rule 11.  One example of such conduct would be the filing of numerous pleadings that contained allegations Plaintiffs and their counsel knew were entirely inconsistent with the photographs and the autopsy report that were in their possession but not timely disclosed or provided to Defendants in discovery.

5

10.   Although the Court is ORDERING the dismissal with prejudice on the Defendants' Motion on other grounds. the Court alternatively FINDS that another pathway to achieve the same result could be to conduct a Rule 11 hearing. The Court offered Plaintiffs this alternative, and they chose not to address the alternatives.

11.   *Pro se* plaintiff Gena Baker appeared at the hearing on June 2, 2021, and had the opportunity to be heard on her request for extension of time to respond to the Motion. The Court FINDS that the motion for extension of time filed by *pro se* plaintiff Gena Baker is hereby DENIED as MOOT. Any other motions currently pending before the Court and not addressed at the hearing on June 2, 2021, if any, are hereby DENIED as MOOT.

12.   This is a final order under Rule 54 of the Arkansas Rules of Civil Procedure.

IT IS SO ORDERED.

_____
HONORABLE ALEX GUYNN

_____
DATE

6

PREPARED AT THE COURT'S REQUEST BY:

WRIGHT. LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL:  jhenry@wlj.com
         sirby@wlj.com
         jfair@wlj.com

By: /s/ Judy S. Henry
    Judy Simmons Henry (84069)
    Scott A. Irby (99192)
    Jacob P. Fair (2015167)

    *Attorneys for Bryan Adams, Skylar Wilson, Travis Jones,*
    *Carson Cook, Karla Cook, Prairie Wings South, LLC,*
    *Prairie Wings Lodge, LLC, Christy Adams, Reliance Healthcare, Inc.,*
    *Brandon Adams and Todd Ross*

Copies provided to:

Terry F. Wynne (via email: tfwynne@cablelynx.com)
Eric Buchanan (via email: eric.buchanan@thebuchananfirm.com)
Hon. Marion Humphrey (via email: marionhumphreysr@gmail.com)
Efrem Neely (via email: efneely@neelylaw.net)
Blake Hendrix (via email: bhendrix@fc-lawyers.com)
David D. Wilson (via email: wilson@fridayfirm.com)
Martin A. Kasten (via email: mkasten@fridayfirm.com)
Tommy Williams (via email: twilliams@qgtlaw.com)
Emily Runyon (via email: emily.runyon@mrmblaw.com)
Carter Fairley (via email: cfairley@barberlawfirm.com)
Andy Turner (via email: andy@turnerlawfirmpa.com)
Kaleb Jones (via email: kaleb@turnerlawfirmpa.com)
Mel Sayes (via email: msayes@msslawfirm.com)
Jay Sayes (via email: jsayes@msslawfirm.com)
Gena Baker, *pro se*  (via U.S. mail)

7



Arkansas Judiciary

**Case Title:**    KERRY BAKER ET AL VS BRYAN ADAMS ET AL

**Case Number:**    35CV-18-1077

**Type:**    ORDER MOTION GRANTED

So Ordered

Alex V. Guynn, 11th W Circuit Division
1 Judge

Electronically signed by AVGUYNN on 2021-06-22 12:59:46    page 8 of 8

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Jun-03 17:33:46
35CV-24-455
ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Cullen Circuit Clerk
2022-May-02 09:00:46
35CV-17-16
C11WD01 2 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY
DIVISION

LEE ANDREW DAVIS                                    PLAINTIFF

    VS.             CASE NO. 35cv-17-16

JEFFERSON HOSPITAL ASSOCIATIONON, INC.,
ET AL.                                             DEFENDANTS

<u>ORDER GRANTING MOTION TO WITHDRAW</u>

On this day is presented the Motion to Withdraw as counsel for Plaintiff Lee Davis, by Sutter & Gillham, P.L.L.C., L. Oneal Sutter, and Lucien Gillham. Plaintiff is still represented by Gene McKissic. Accordingly, the Court finds that the Motion to Withdraw should be, and is, hereby granted.

IT IS THEREFORE ORDERED that Sutter & Gillham, P.L.L.C., L.Oneal Sutter, anddLucien Gillham are relieved as counsel for Plaintiff Lee Davis, on this, the _____ day off _____, 2022.

_____
HONORABLE ALEX GUYNN

DATED:      _____ _____

PREPARED BY:

Lucien Gillham
Sutter & Gillham, PLLC
310 W. Conway
Benton, AR 72015

/s/ Lucien Gillham



EXHIBIT
K



Arkansas Judiciary

**Case Title:**   LEE ANDREW DAVIS V JEFFERSON HOSPITAL ORG
             ET AL

**Case Number:**   35CV-17-16

**Type:**      ORDER MOTION GRANTED

So Ordered

Alex V. Guynn, 11th W Circuit Division
1 Judge

Electronically signed by AVGUYNN on 2022-05-02 09:00:32    page 2 of 2

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Jun-03 17:33:46
35CV-24-455
C11WD05 : 4 Pages

## DECLARATION UNDER OATH OF KRIS SPERRY, M.D.

### MANNER OF DEATH

In determining the manner of death in this case, I have been provided with documentation concerning the events which includes the coroner's reports, autopsy report of Frank Peretti, MD, AR089-18 (9/7/18), crime scene investigation, death certificate, photographs from the scene, hospital, and the exhumation autopsy, 911 tape and transcript, and written statement of Skylar Wilson.

### PERTINENT FACTS TO DETERMINATION OF MANNER OF DEATH

1. Autopsy Report, Analysis of Gunshot Wound – no obvious muzzle imprint, identifiable soot deposition or gunpower residue.

2. Analysis of Gun – no evidence of fingerprints, blood or blood spatter found on gun.

3. Analysis of Gun Powder Residue on Hands of James Baker – No evidence of gun powder residue on hands of James Baker.

4. Analysis of 911 Tape – Skylar Wilson notes the following on the 911 Tape concerning the facts of the shooting:

"We were in the living room and he pulled out his gun and he took out three bullets and said, 'Let's play Russian Roulette.' And I said, 'No, bro, that's not even funny.' Cause he always does that shit. And he clicked it in the air and he said, 'See, there's nothing in it.' And then he put it to his head and pressed it and it shot him."

5. Analysis of Written Statement of Skylar Wilson – in a handwritten statement Skylar Wilson notes the following concerning the facts of the shooting:

"... He pulled out his gun and said let's play Russian Rolet [sic] and I said no this is not funny bro put I away. Then he took out 3 bullets and put it at the cealing [sic] and fired and nothing happened. Then he laughed and put it to his head and fired. Then I went into my friends room and yelled at them at what he did and they thought it was a joke..."



EXHIBIT

L

OPINIONS

Based on a review of the pertinent facts, there was only one witness to the death of Mr. Baker, Mr. Skylar Wilson. The facts of the shooting as set forth by Mr. Wilson indicate that Mr. James Baker suffered a self-inflicted gunshot wound at contact range to his head when he pushed the handgun to his head and pulled the trigger. Based on the forensic evidence set forth above, this version of events is a forensic impossibility and the gunshot wound to Mr. Baker's head was fired from an approximate distance of greater that two feet. Based on my review of the evidence, this death should be classified as a homicide based on the following analysis.

1.      The examination of the wound trajectory showed an angled path from right to left, front towards back and upward. The wound trajectory indicated that the projectile went through both parietal lobes of the brain, which would have produced instantaneous unconsciousness and produced death rapidly.

2.      Based upon the description of the shooting by Skylar Wilson, the only eye witness to the death, when the decedent "put" the gun to his head and shot himself, this maneuver would create a contact wound, which means that the weapon's muzzle would be in contact with (touching) the skin of the head. If this description was accurate, there would be a contact wound to the scalp where the gun barrel came in contact to the scalp. Further, if the gun was held within a few centimeters from the scalp, this would produce a very close range wound pattern, with dense soot and gunpowder deposition throughout the wound margin, the skin surrounding the wound, and along the missile track in the scalp and onto the bone periosteum around the missile perforation. Further, with a contact wound, near contact wound, or very close range gunshot wound, you would also see evidence of singing of the hair. Finally, with a contact wound, near contact wound or very close range wound, you would expect to see evidence of blood or blood spatter on the gun. In this case, there is no evidence of burning at the site of the entrance wound, any evidence of singing of the hair or blood or blood spatter on the gun. Therefore, it is my opinion that the projectile that caused James Baker's death was not fired while the firearm muzzle was either pressed to his head or in immediate proximity to his head.

3.      Further, in contact gunshot wounds, near contact gunshot wounds or very close range gunshot wounds of the head, soot, gunpowder, small metal fragments and vaporized metals would be deposited in and along the wound track, which would include deposition onto and into the skin, the periosteum, and the cranial bones. No such deposition could be found anywhere in this autopsy. While the absence of soot on the skin at a time point three years after death might be inconclusive given the time delay and cleaning of the body for the funeral, you would expect to find some deposition, especially embedded in the bone around the wound margin if it were a contact or near contact wound, even years later, and none could be found.

4.    Based on my years of experience as a medical examiner and examination of numerous bodies after burial and exhumation, evidence of a contact wound would still be observable at a three-year post-mortem examination. As set forth in the autopsy, there were peri-mortem wounds still visible, including injuries on the right cheek.

5.    If the gun would have been pointed at the head and fired from further out, from approximately six inches up to approximately two feet, this would produce an intermediate range wound. With an intermediate wound, one would expect to find evidence of stippling or gun powder tattooing on the skin of the head and face. Further, at this distance, one would also expect to see some soot, gunpowder residue or deposition of metal fragments impacted into the skin, the periosteum, and the cranial bones and blood or blood spatter on the gun. While this is not what was described by the only witness, there was no evidence of stippling or gunpowder tattooing at the autopsy nor within the post-mortem photos taken in the ER which showed only dried blood particles with no evidence of punctate tattooing on the scalp which would be expected in an intermediate wound. The autopsy did not reveal any evidence of gunpowder or metal fragment tattooing in the area around the wound.

6.    Given this lack of evidence of any contact wound, near contact wound, or intermediate wound, it is my opinion that the wound to Mr. Baker's head would be described as a distant-range gunshot wound. A distant gunshot wound is a gunshot wound from a weapon fired at a distance too far away from the head to leave evidence of stippling or gunpowder tattooing, and with respect to the weapon that was used in the shooting, this would comprise a distance of approximately of at least two feet. The absence of burn marks, singing to the hair, soot or gunpowder residue in the wound, soot, gunpowder residue, vaporized metals in the underlying bone, metal fragments in the skin or the periosteum, the absence of tattooing and blood or blood splatter on the gun, among other things, support my opinion that this was a distant gunshot wound. This is also supported by the autopsy, examination of the body, examination of the photos from the ER and the other evidence reviewed in this case.

7.    Based on my evaluation of all the evidence in this case, it is my opinion that Mr. Baker did not sustain a self-inflicted gunshot wound to the head. There is no physical evidence that the gunshot wound was from contact range, near-contact range, or intermediate range. Therefore, it is my opinion that Mr. Baker was killed from a distant shot, more than approximately two feet, and that his manner of death would be classified as a homicide.

8.    All of the opinions expressed herein are held to a reasonable degree of forensic certainty.

Pursuant to 28 U.S.C. § 1746, I, Kris Sperry, M.D. do declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and belief.

Kris Sperry, M.D.

Date: July 19, 2019

From: Kayla Marple        Fax: 15012223027        To:              Fax: (501) 303-1592        Page: 2 of 15

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook Bishop, Circuit Clerk
2024-Jun-03 17:33:46
35CV-24-455
C11WD05 : 13 Pages

SALINE COUNTY
CIRCUIT CLERK

2020 FEB -4 AM II: 38

BY: _____

IN THE CIRCUIT COURT OF SALINE COUNTY, ARKANSAS
SECOND DIVISION

SUTTER & GILLHAM, PLLC                                    PLAINTIFF

VS.                        CASE NUMBER 63CV-19-1060

DAVID WESTBROOK                                          DEFENDANT

LUTHER SUTTER                              COUNTER-DEFENDANT

LUCIEN GILLHAM                            COUNTER-DEFENDANT

### COUNTERCLAIM FOR BREACH OF FIDUCIARY DUTIES, BREACH OF CONTRACT, FRAUD, AND FOR UNJUST ENRICHMENT

COMES NOW Defendant David Westbrook, ("Defendant") by and through his attorneys, Brandon Haubert and Chris Burks of WH Law, PLLC, and for his Counterclaim against Plaintiff Sutter & Gillham, PLLC ("Sutter & Gillham"), and Counter-Defendants Luther Sutter and Lucien Gillham, does state as follows:

### I. PARTIES, JURISDICTION AND VENUE

1. Defendant Luther Sutter is an individual citizen attorney and member of Sutter & Gillham, PLLC, a Saline County, Arkansas law firm. Luther Sutter has entered into personal and business transactions in Saline County, Arkansas.


EXHIBIT

2.      Plaintiff Sutter & Gillham, PLLC, is an Arkansas limited liability company headquartered in Saline County, Arkansas and licensed to do business in the State of Arkansas. Plaintiff Sutter & Gillham, LLC, has entered into business transactions in Saline County, Arkansas.

3.      Defendant Lucien Gillham is an individual citizen attorney and has entered into personal and business transactions in Saline County, Arkansas. Defendant Lucien Gillham works as an attorney of Plaintiff Sutter & Gillham, PLLC.

4.      This is an action for breach of fiduciary duties, breach of contract, fraud, and/or unjust enrichment stemming from the actions of Plaintiff Sutter & Gillham, PLLC, and Counter-Defendants and regarding the settlement of two other lawsuits, which occurred in Saline County, Arkansas.

5.      This Court has subject matter jurisdiction and personal jurisdiction over the issues and persons before it.

6.      Venue is proper before this Court.

## II. BACKGROUND FACTS

7.      On October 24, 2013, Plaintiffs and Defendant David Westbrook entered into a contractual agreement (hereinafter "the attorney employment contract") for adverse employment law claims David Westbrook had against his employer, Coroner Chad Kelley. A true and correct copy of said attorney employment contract is attached hereto as Exhibit A, and is incorporated by reference as though fully and completely set forth at this point.

8.      The attorney employment contract provided that David Westbrook was a client of Sutter & Gillham, Luther Sutter and Lucien Gillham.  Therefore that Arkansas Rules of

From: Kayla Marple      Fax: 15012223027      To:          Fax: (501) 303-1592      Page: 4 of 15    02/04/2020 11:29 AM

Professional Conduct 1.3, 1.4, 1.7(a)(2), 1.8, 1.9, 3.2, 4.1, and 8.4 applied to the attorney-client relationship.

9.  On December 12, 2013, Sutter & Gillham, Luther Sutter and Lucien Gillham, first filed David Westbrook's claim in Jefferson County Circuit Court in case No. 35CV-13-589.

10.  For *six months* afterwards, there were no further filings on the case at all until Sutter & Gillham, Luther Sutter and Lucien Gillham inexplicably dismissed David Westbrook's first case on June 02, 2014.

11.  On Nov. 17, 2014, Defendant David Westbrook emailed Sutter & Gillham, confirming that he had paid his retainer for the case, had been calling them for 4 weeks, and that he hadn't been able to confirm that they were still prosecuting his claims against Chad Kelley.

12.  *Over a year* after first signing the attorney employment contract, on November 10, 2014, David Westbrook's claim was re-filed in a new, second Jefferson County Circuit Court case.

13.  An Answer was filed in the second case on January 09, 2015.

14.  *For the following four years*, Sutter & Gillham, Luther Sutter and Lucien Gillham, filed no pleadings in the Westbrook case.

15.  *More than five years* after first agreeing to prosecute David Westbrook's claim and after David Westbrook's repeated efforts to get communications regarding his claim, on April 4, 2019, Sutter & Gillham, Luther Sutter and Lucien Gillham, filed a notice of deposition in Westbrook's case.

16.  David Westbrook's case was then settled and closed on May 13, 2019, at the direction of Sutter & Gillham, Luther Sutter and Lucien Gillham.

17.  After considering this inexplicably long timeline, any inquiring mind would want to know:

a.  Why did David Westbrook's relatively simple single-Plaintiff employment claim sit for *four years*, when most such cases are resolved in a year?;

b.  What advantage inured to Westbrook by his lawyers' actions in sitting on the case?;

c.  And after its' conclusion, why did Westbrook's former lawyers rush to sue him in this case?; and

d.  Why was Westbrook told by them he should consider getting out of Pine Bluff?

18.  Fortunately, we do know more detailed facts.

19.  We know that Westbrook's claims that Sutter & Gillham, Luther Sutter and Lucien Gillham, agreed to prosecute were against Westbrook's former boss Jefferson County Coroner Chad Kelley.

20.  And Jefferson County Coroner Chad Kelly is the key material and cooperating witness in a wrongful death claim Sutter & Gillham, Luther Sutter and Lucien Gillham, have been prosecuting for some time.

21.  In other words, the very coroner Sutter & Gillham, Luther Sutter and Lucien Gillham agreed to sue on David Westbrook's behalf, is their star witness in a wrongful death claim where Chad Kelley issued an original and two amended death certificates that are essential to Sutter & Gillham, Luther Sutter and Lucien Gillham's chances of success in the wrongful death claim.

22.  Soon after this material and undisclosed conflict with David Westbrook was brought to light, including that Luther Sutter had communicated with Chad Kelley regarding Chad

Kelley amending his death certificate in a way that was favorable to Luther Sutter's wrongful death case, Sutter & Gillham, Luther Sutter and Lucien Gillham rushed to bring the present case in September of 2019.

23.    In doing so, they revealed the terms of the May 13, 2019 settlement with David Westbrook and Chad Kelley.

24.    Further, David Westbrook never would have settled his claim for the amount he did if he had known at the time of the communications in 2019, that the adverse party Chad Kelly was the key material and cooperating witness in a wrongful death claim Sutter & Gillham, Luther Sutter and Lucien Gillham, have been prosecuting for some time.

25.    Specifically, Sutter & Gillham, Luther Sutter and Lucien Gillham induced David Westbrook into the settlement agreement by not telling him about that the adverse party Chad Kelly was the key material and cooperating witness in a wrongful death claim Sutter & Gillham, Luther Sutter and Lucien Gillham were bringing, and that they had been in touch with Chad Kelley regarding amending Chad Kelley's death certificate in a way that was favorable to Luther Sutter's wrongful death case.

26.    But for these false representations, fraudulent actions, and dishonest behavior by Sutter & Gillham, Luther Sutter and Lucien Gillham, David Westbrook would not be damaged by the lessened amount he received in his settlement.

### III. LEGAL COUNTS

#### Count 1.

### BREACH OF FIDUCIARY DUTIES

27.    Sutter & Gillham, Luther Sutter and Lucien Gillham, David Westbrook damaged Westbrook in the form of a smaller settlement and breached their fiduciary duties that they owed to David Westbrook as a client and former client in the following ways:

28.    Arkansas Rules of Professional Conduct 1.3 requires that "a lawyer shall act with reasonable diligence and promptness in representing a client," but in sitting on Westbrook's case for so long and holding it open while communicating with Defendant Chad Kelley, Sutter & Gillham, Luther Sutter and Lucien Gillham, did not act with reasonable diligence and promptness.

29.    Arkansas Rules of Professional Conduct 1.4 requires that "a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation," "promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules" and "reasonably consult with the client about the means by which the client's objectives are to be accomplished." In not informing Westbrook of their involvement with Kelley, in sitting on Westbrook's case for so long and holding it open while communicating with Defendant Chad Kelley, Sutter & Gillham, Luther Sutter and Lucien Gillham, did not properly explain, inform, or consult with David Westbrook.

30.    Arkansas Rules of Professional Conduct 1.7(a)(2) requires that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if...there is a significant risk that the representation of one or more clients

will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer," but in representing Westbrook against the same Chad Kelley whose testimony they were relying on in the wrongful death case, Sutter & Gillham, Luther Sutter and Lucien Gillham, created an impermissible concurrent conflict of interest that was not disclosed.

31.    Arkansas Rules of Professional Conduct 1.8 requires that "a lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, in a writing signed by the client, except as permitted or required by these Rules," but in representing Westbrook against the same Chad Kelley whose testimony they were relying on in the wrongful death case, Sutter & Gillham, Luther Sutter and Lucien Gillham, used information relating to their representation of Westbrook both in the matter with Chad Kelley as a material witness, and to the detriment of Westbrook in his own case.

32.    Arkansas Rules of Professional Conduct 1.9 requires that "a lawyer who has formerly represented a client in a matter shall not thereafter use information relating to the representation to the disadvantage of the former client" nor "reveal information relating to the representation except as these Rules would permit or require with respect to a client." But in representing Westbrook against the same Chad Kelley whose testimony they were relying on in the wrongful death case, Sutter & Gillham, Luther Sutter and Lucien Gillham, used information relating to their representation of Westbrook both in the matter with Chad Kelley as a material witness, and to the detriment of Westbrook in his own case.

33.    Arkansas Rules of Professional Conduct 3.2 requires that "a lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." In not informing

Westbrook of their involvement with Kelley, in sitting on Westbrook's case for so long and holding it open while communicating with Defendant Chad Kelley, Sutter & Gillham, Luther Sutter and Lucien Gillham, did not make reasonable efforts to expedite litigation.

34.    Arkansas Rules of Professional Conduct 4.1 requires that "in the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person," but in telling Westbrook and others in the present action that the settlement was reasonable and that it did not have anything to do with Chad Kelley when they knew their involvement with Chad Kelley, Defendant Chad Kelley, Sutter & Gillham, Luther Sutter and Lucien Gillham, made a knowingly false statement material to the issue of whether their settlement was reasonable or they breached any duties to Westbrook.

35.    Arkansas Rules of Professional Conduct 8.4 mandates that "it is professional misconduct for a lawyer to (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another…(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation" but in sitting on Westbrook's case for so long and holding it open while communicating with Defendant Chad Kelley without informing Westbrook, Sutter & Gillham, Luther Sutter and Lucien Gillham, violated the rules of professional misconduct and engaged in dishonest and deceitful behavior.

### Count 2.

### FRAUD IN THE INDUCMENT

36.    Defendant David Westbrook incorporates herein each and every allegation set forth above.

37.    Defendant Sutter & Gillham, Luther Sutter and Lucien Gillham made false representations regarding the settlement of David Westbrook's claim.

38.    It is now clear that from the beginning of the communication about the settlement agreement that Sutter & Gillham, Luther Sutter and Lucien Gillham were not communicating with David Westbrook regarding their relationship and communication with Chad Kelley, that they held off on settling Westbrook's claim, and that they induced Westbrook to settle for cheaper than he might have by telling him it was a good settlement.

39.    David Westbrook relied on Sutter & Gillham, Luther Sutter and Lucien Gillham prior representations in entering into the settlement agreement with David Westbrook.

40.    Plaintiff has suffered losses as described above, and is entitled to a judgment against Sutter & Gillham, Luther Sutter and Lucien Gillham.

## Count 4

### BREACH OF CONTRACT & INDEMNITY

41.    Defendant David Westbrook incorporates herein each and every allegation set forth above.

42.    Defendant entered into a settlement agreement on May 6, 2019, settling his claims against Sutter & Gilham's witness David Westbrook.

43.    All agreed in the settlement agreement to refrain from any disclosures to others of the nature and terms of the settlement.

44.    Defendant more than fully complied with his obligations under the terms of the settlement agreement.

45.    However, Sutter & Gillham filed on October 17, 2019, a public pleading in this case, detailing that "checks were delivered" and there was a "reasonable fee and reimbursed costs." *October 17, 2019 Amended Complaint*, p. 1-2, ¶¶ 3, 5.

46.    Both that there was a settlement amount, and that there were fees and costs paid, are confidential terms of the settlement.

47.    Sutter & Gillham thus, without the approval, knowledge or permission of Defendant David Westbrook, breached the settlement agreement and exposed Westbrook for the damages for the breach.

48.    Sutter & Gillham should thus indemnify David Westbrook for the damages for the breach of the settlement agreement.

## Count 5

### UNJUST ENRICHMENT

49.    Defendant David Westbrook incorporates herein each and every allegation set forth above.

50.    In reaping the benefit of the Chad Kelley's cooperation in the wrongful death case, and in not allowing David Westbrook to get more in a settlement, Sutter & Gillham, Luther Sutter and Lucien Gillham, have received a benefit at the expense of David Westbrook.

51.    But for the false representations, fraudulent action, and other dishonest behavior described above, Sutter & Gillham, Luther Sutter and Lucien Gillham, would not have received Chad Kelley's cooperation in the wrongful death case, and David Westbrook's agreement to settle his claims against Kelley.

52.    It would be inequitable for this Court to refuse to disgorge the benefit of Westbrook's settling for less.

53.    As such, David Westbrook is entitled to a judgment against Sutter & Gillham, Luther Sutter and Lucien Gillham.

## IV.

## PIERCING THE CORPORATE VEIL

54.    Defendant David Westbrook incorporates herein each and every allegation set forth above.

55.    The facts herein warrant the application of the doctrine of piercing the corporate veil in order to prevent injustice to Defendant David Westbrook.

56.    Because the corporate form taken by Sutter & Gillham has been used to injure Defendant David Westbrook, this Court should allow the piercing of the corporate veil in order to hold Defendants Luther Sutter and Lucien Gillham personally liable for the damages herein. *Enviroclean, Inc. v. Arkansas Pollution Control and Ecology Commission,* 858 S.W.2d 116, 314 Ark. 98 (1993).

57.    Defendants Luther Sutter and Lucien Gillham, are one and the same with Sutter & Gillham, as evidenced by their intermingled financial accounts, transfers and withdraws.

58.    As such, Defendant David Westbrook is a third-party from the corporation suffering immediate and irreparable harm. (The corporation is the first party, the corporation owners, the remaining Luther Sutter and Lucien Gillham, is the second party)

From: Kayla Marple        Fax: 15012223027        To:              Fax: (501) 303-1592        Page: 13 of 15      02/04/2020 11:29 AM

## V.

### MITIGATION AND COVER DAMAGES

59.    Defendant David Westbrook attempted to mitigate his damages, but Sutter & Gillham, Luther Sutter and Lucien Gillham, have to-date refused to make Defendant whole.

60.    Sutter & Gillham, Luther Sutter and Lucien Gillham, litigiousness and stubborn intransigence has only generated more litigation and costs as Defendant David Westbrook was sued and thus forced to bring this counterclaim.

## VI.

### PUNITIVE DAMAGES

61.    Arkansas Code Annotated § 16-55-206 states that a claimant may be awarded punitive damages if the plaintiff shows that the "defendant knew or ought to have known, in light of the surrounding circumstances, that his or her conduct would naturally and probably result in injury or damage and that he or she continued the conduct with malice or in reckless disregard of the consequences."

62.    Sutter & Gillham, Luther Sutter and Lucien Gillham, knew or should have known of their obligations to David Westbrook before inducing Defendant David Westbrook into the settlement agreement

63.    Sutter & Gillham, Luther Sutter and Lucien Gillham, s knew or should have known that their failure to timely prosecute Westbrook's case, communicate with Westbrook and disclose their relationship with Chad Kelley, would naturally result in damage to David Westbrook in the form of less money to Westbrook, yet continued their course of conduct with reckless disregard for the consequences to Westbrook.

64.    Sutter & Gillham, Luther Sutter and Lucien Gillham, are liable to David Westbrook

for punitive damages in accordance with the Arkansas Civil Justice Reform Act, Ark. Code Ann. §

16-55206, to the fullest extent allowed under the Arkansas and United States Constitutions, for

their knowing and unlawful failure to timely prosecute Westbrook's case, communicate with

Westbrook and disclose their relationship with Chad Kelley.

WHEREFORE, premises considered, Defendant David Westbrook prays that Defendants

Sutter & Gillham, Luther Sutter and Lucien Gillham, be summoned to appear and answer herein;

for judgment as set forth herein above; for all costs and a reasonable attorney's fee; and for all other

just and proper relief to which he may be entitled, whether or not specifically prayed for herein.

Respectfully submitted,

**DAVID WESTBOOK,**
**DEFENDANT**

WH Law, PLLC
1 Riverfront Pl. STE 745
North Little Rock, AR 72114
501.891.6000

By:    /s/ Chris W. Burks
       Chris W. Burks ABN: 2010207
       chris@whlawoffices.com

       Brandon M. Haubert ABN: 2013137
       brandon@whlawoffices.com



ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
Barbara A. Collins, Circuit Clerk
2021-A35CV-24-1657
35CV-2018-1077
C11WD01 : 3 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
CIVIL DIVISION

| | |
|---|---|
| KERRY BAKER, AS ADMINISTRATOR OF THE ESTATE OF JAMES LUKE BAKER, AND KERRY BAKER, INDIVIDUALLY, AND SAVANNAH BAKER CASE, INDIVIDUALLY, AND GENA DOWNEY BAKER, INDIVIDUALLY | PLAINTIFFS |

VS.                    NO. 35CV-2018-1077

| | |
|---|---|
| BRYAN ADAMS, SKYLAR WILSON, TRAVIS JONES, CARSON COOK, KARLA COOK, PRAIRIE WINGS SOUTH, LLC, AUSTIN TATE, JOHN TATE, AND CERTAIN JOHN DOE COMPANIES TO BE DETERMINED, INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED, AND PRAIRIE WINGS LODGE, LLC, CHRISTIE ADAMS, MARY TATE, RELIANCE HEALTH CARE, INC., BRANDON ADAMS, TODD ROSS, JOE WICKER | DEFENDANTS |

## JOINDER IN AND MOTION TO ADOPT DEFENDANTS' JOINT RENEWED AND AMENDED MOTION TO DISMISS WITH PREJUDICE AND PRESERVATION OF INFORMATION

COME NOW Separate Defendants Austin Tate and John Tate, and Mary Tate (the Tate Defendants), by and through their attorneys, Matthews, Sanders & Sayes, P.A., and for their Joinder In And Motion To Adopt Defendants' Joint Renewed and Amended Motion to Dismiss With Prejudice and Preservation of Information, state:

1.     Pursuant to Arkansas Rule of Civil Procedure 10(c), the Tate Defendants join in, adopt, and incorporate by reference any and all statements, arguments, and exhibits contained in and attached to the Defendants' Joint Renewed and Amended Motion to Dismiss With Prejudice and Preservation of Information, which equally apply to the Tate Defendants warranting dismissal of the Complaint and all amendments thereto with prejudice.



EXHIBIT

2.    The Tate Defendants also renew and adopt by reference their previous Joinders In and Motions to Adopt all Motions to Dismiss With Prejudice filed by the non-Tate Defendants that also equally apply to them and warrant dismissal of the Complaint and all amendments thereto with prejudice.

WHEREFORE, premises considered, the Tate Defendants respectfully requests the Court grant their Joinder In And Motion to Adopt the Joint Renewed and Amended Motion to Dismiss With Prejudice and Preservation of Information, an dismiss the Complaint and all amendments thereto filed against them with prejudice.

Respectfully Submitted,

Matthews, Sanders & Sayes, P.A.
825 West Third Street
Little Rock, AR 72201
PH 501-378-0717 | FX 501-375-2924
msayes@msslawfirm.com
jsayes@msslawfirm.com

By:    /s/ Mel Sayes
      MEL SAYES #77120
      JAMES T. SAYES #2011191

2

## CERTIFICATE OF SERVICE

I, MEL SAYES, hereby certify that a true and correct copy of the above and foregoing has been served on the parties listed below this **14th** day of **APRIL, 2021**, via electronic mail and/or U.S. Mail:

Eric S. Buchanan
eric.buchanan@thebuchananfirm.com

Gena Baker
44 Hawk Drive
Vilonia, AR 72173

Judy Simmons Henry
jhenry@wlj.com

Scott A. Irby
sirby@wlj.com

Jacob P. Fair
jfair@wlj.com

Emily M. Runyon
Emily.runyon@mrmblaw.com

Andy L. Turner/Kaleb M. Jones
andy@turnerlawfirmpa.com

Hon. Marion Humphrey
marionhumphreys@gmail.com

Efrem B. Neely, Sr.
ebneeley@neelylaw.net

Thomas G. Williams
twilliams@qgtlaw.com

David Wilson
wilson@fridayfirm.com

Martin Kasten
mkasten@fridayfirm.com

Blake Hendrix
bhendrix@fc-lawyers.com

Annie Depper
adepper@fc-lawyers.com

/s/ Mel Sayes
MEL SAYES

3

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Jun-03 17:33:46
35CV-24-455
C11WD05 : 1 Page

## AFFIDAVIT OF CHRIS BURKS

1.    My name is Chris Burks. I am over the age of eighteen (18) years and am competent to testify to the matters herein based on my personal knowledge and information.

2.    After conducting discovery in *Sutter & Gillham PLLC v. Westbrook*, Case No. 63CV-19-1060, Saline County Circuit Court, I have no evidence that Luther Sutter or Lucien Gillham had been in touch with Chad Kelley regarding amending Luke Baker's death certificate.

_____
CHRIS BURKS

## ACKNOWLEDGMENT

STATE OF ARKANSAS          )
                          ) ss.
COUNTY OF PULASKI          )

On this day, before me, a Notary Public, appeared the within named Chris Burks, to me personally well known (or satisfactorily proven to be such person or persons), who stated and acknowledged that they had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _7_ day of _MAY_, 2024.

_____
NOTARY PUBLIC

My Commission Expires:

_11·20·33_

MITCHELL LEA CRISP
PULASKI COUNTY
NOTARY PUBLIC — ARKANSAS
My Commission Expires November 20, 2033
Commission No. 12725603



EXHIBIT
O

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS**
**CIVIL DIVISION**

SUTTER & GILLHAM, P.L.L.C., *et al*                                    **PLAINTIFFS**

vs                              **CASE NO. 35CV-24 _____**

EMILY RUNYON, *et al*                                    **DEFENDANTS**

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

**FRIDAY, ELDREDGE & CLARK, LLP**

A lawsuit has been filed against you.  The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: **Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.**

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED**:  Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

CLERK OF COURT

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque                              _____
Pine Bluff, AR 71603                        [Signature of Clerk or Deputy Clerk]

                                            _____

                                            [SEAL]

**This summons is for:  FRIDAY, ELDREDGE & CLARK, LLP**

## PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☐ On_____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____    SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
       [signature of server]

_____
       [printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____

By: _____
       [signature of server]

_____
       [printed name]

Address: _____

      Phone: _____

Subscribed and sworn to before me this date: _____

      Notary Public _____

My Commission Expires: _____

Additional information regarding service or attempted service:

_____
_____
_____
_____



**Case Title:**     SUTTER & GILLHAM, ET AL  V EMILY RUNTON, ET AL

**Case Number:**    35CV-24-455

**Type:**           SUMMONS - FILER PREPARED


So Ordered

*Sonya Hall*

Sonya H. Hall, Jefferson County Deputy Circuit Clerk


Electronically signed by SHHALL on 2024-06-04    page 4 of 4

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Jun-04 09:22:27
35CV-24-455
C11WD05 : 2 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY

SUTTER & GILLHAM, P.L.L.C.; LUTHER SUTTER, and
LUCIEN GILLHAM                                                     PLAINTIFFS

VS.                    CASE NO: 35CV-24 - 455

EMILY RUNYON; MUNSON, ROWLETT, MOORE AND BOONE, P.A.; ANNIE
DEPPER; BLAKE HENDRIX; FUQUA CAMPBELL, P.A.; DAVID WILSON;
FRIDAY, ELDREDGE & CLARK, LLP; MEL SAYES; MATTHEWS, SANDERS
& SAYES, P.A.; AND JOHN DOES 1-100
                                                                  DEFENDANTS

### JOHN DOE AFFIDAVIT OF PLAINTIFF'S COUNSEL

Comes now, counsel for the Plaintiffs, **SUTTER & GILLHAM, P.L.L.C.**,

and, for this Affidavit, being competent to testify, states that the statements below

are true and accurate:

1.    I am a licensed attorney in good standing in the State of Arkansas and

am the Partner and owner of **SUTTER & GILLHAM, P.L.L.C.**, who are the

attorneys of record for the Plaintiff, in the attached Complaint.

2.    Plaintiff has made reasonable effort to obtain the identity of John

Does 1-100, &/or individuals who are likely to be additional Defendants in the

above-captioned case.

3.    The identities of all individuals and entities are presently unknown.

Plaintiff hereby designates John Doe 1-100 for the purpose of tolling the statute of

limitations pursuant to ACA § 16-56-125.

1

4.    John Does 1-100 are currently unknown persons who is believed to be a person of interest, presently unknown to the Plaintiff.

5.    The pseudo-name will continue to be named &/or submitted with the actual name upon further discovery, if applicable.

**FURTHER AFFIANT SAITH NAUGHT.**

<u>**VERFICIATION**</u>

I, Luther Oneal Sutter,  do hereby certify and state, under oath, that the above facts contained herein are true and correct to the best of my knowledge and belief.

By:   /s/ Luther Oneal Sutter

Luther Oneal Sutter, Esq.
*Counsel for Plaintiffs*

<u>**ACKNOWLEDGMENT**</u>

State of Arkansas            )
                             ) SS.
County of Pulaski            )

Subscribed and sworn before me, a Notary Public, this 4th day of May, 2024.

ELIZABETH ANN HODGES
Notary Public-Arkansas
Lonoke County
My Commission Expires 09-14-2031
Commission # 12716016

Notary Public

My commission Expires:
9/14/31

2

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01  15:14:24
35CV-24-455
C11WD05 : 4 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## CIVIL DIVISION

SUTTER & GILLHAM, P.L.L.C., *et al*                          **PLAINTIFFS**

vs                          CASE NO. 35CV-24 455

EMILY RUNYON, *et al*                          **DEFENDANTS**

### SUMMONS

### THE STATE OF ARKANSAS TO DEFENDANT:

**ANNIE DEPPER**

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint. Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED:** Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

CLERK OF COURT

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque                          [Signature of Clerk or Deputy Clerk]
Pine Bluff, AR 71603

_____

[SEAL]

This summons is for: **ANNIE DEPPER**

To be completed if service is by a sheriff or deputy sheriff

Date: _____    SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
     [signature of server]


_____
     [printed name, title, and badge number]

To be completed if service is by a person other than a sheriff or deputy sheriff

Date: 9-26-24

By: _____
     [signature of server]

_____ TIM SIBERT _____
     [printed name]

Address: _____

Phone: _____

Subscribed and sworn to before me this date: 9/26/2024

Notary Public _____

My Commission Expires: _____

Additional information regarding service or attempted service:
_____
_____
_____
_____

## PROOF OF SERVICE

☑ On 9·24·24 1249 [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or 3700 Cantrell Ste200 LR, AR

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☐ On_____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____

[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.

To be completed if service is by a sheriff or deputy sheriff:

Date: _____   SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
     [signature of server]


_____
     [printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff.**

Date: _9-26-24_

By: _____
     [signature of server]

_____
     [printed name]

Address: _____

Phone: _____

Subscribed and sworn to before me this date: _9/26/2024_

Notary Public _____

My Commission Expires: _____

Additional information regarding service or attempted service:
_____
_____
_____
_____

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01 15:14:24
35CV-24-455
C11WD05 : 4 Pages

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
### CIVIL DIVISION

SUTTER & GILLHAM, P.L.L.C., *et al*                          **PLAINTIFFS**

vs                          **CASE NO. 35CV-24 _____**

EMILY RUNYON, *et al*                          **DEFENDANTS**

### SUMMONS

## THE STATE OF ARKANSAS TO DEFENDANT:

**BLAKE HENDRIX**

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint. Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED:** Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

**CLERK OF COURT**

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque                          _____
Pine Bluff, AR 71603                          [Signature of Clerk or Deputy Clerk]


_____

[SEAL]


This summons is for: **BLAKE HENDRIX**

**To be completed if service is by a sheriff or deputy sheriff.**

Date: _____    SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
     [signature of server]


_____
     [printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff.**

Date: _9-24-24_

By: _____
     [signature of server]

_____
     [printed name]

Address: _____

Phone: _____

Subscribed and sworn to before me this date: _____

Notary Public _____

My Commission Expires: _____

Additional information regarding service or attempted service:
_____
_____
_____
_____

## PROOF OF SERVICE

☑ On **G·Z4·Z4 /Z4𝄢**[date] I personally delivered the summons and complaint to the defendant at _____ [place]; or **3700 Cantrell Ste 200 LR, AR**

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☐ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with

_____
[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.

To be completed if service is by a sheriff or deputy sheriff:

Date: _____ SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
      [signature of server]

_____
      [printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: 9-26-24

By: _____
      [signature of server]

_____
      [printed name]

Address: _____

Phone: _____

Subscribed and sworn to before me this date: 9/26/2024

Notary Public _____

My Commission Expires: _____

Additional information regarding service or attempted service:

_____
_____
_____

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01  15:14:24
35CV-24-455
C11WD05 : 5 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## CIVIL DIVISION

SUTTER & GILLHAM, P.L.L.C., *et al*                          PLAINTIFFS

vs                          CASE NO. 35CV-24 455

EMILY RUNYON, *et al*                          DEFENDANTS

### SUMMONS

THE STATE OF ARKANSAS TO DEFENDANT:

DAVID WILSON

A lawsuit has been filed against you.  The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

ADDITIONAL NOTICES INCLUDED:  Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

CLERK OF COURT

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque                          _____
Pine Bluff, AR 71603                          [Signature of Clerk or Deputy Clerk]

                                        _____
                                        [SEAL]

This summons is for:  DAVID WILSON

## PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☐ On_____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with

_____

[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☑ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.



**Case Title:** SUTTER & GILLHAM, ET AL  V EMILY RUNTON, ET AL

**Case Number:** 35CV-24-455

**Type:** SUMMONS - FILER PREPARED

So Ordered

*Sonya Hall*

Sonya H. Hall, Jefferson County Deputy Circuit Clerk

Electronically signed by SHHALL on 2024-06-04   page 4 of 4

**Google**    usps tracking number

All    Images    Videos    News    Forums    Shopping    Web    ⋮ More                Tools

---

**Track your package**                                                        ⋮
Data provided by USPS

Tracking number 9589071052701765277789

**Delivered** ⊘
September 23, 08:50AM
Little Rock, AR

🌐    View details on USPS

📞    Call 1-800-275-8777

🚚    Track another package

---

    **USPS**
        https://tools.usps.com  ⋮

# USPS.com® - USPS Tracking®

Your **tracking number** can be found in the following places: · The shipping confirmation email
you received from an online retailer · The bottom peel-off portion of ...

## Where is my package?
Knowledge. USPS Tracking ®Featured Tracking. Related ...

## USPS Tracking ® Results
Track the delivery status of packages without entering a ...

**ALERT: TROPICAL CYCLONE HELENE, FLOODING, AND SEVERE WEATHER IN THE SOUTHEASTERN U.S. MAY IMPACT DELIVERY. READ MORE › (HTTPS://ABOUT.USPS.COM/NEWSROOM/SERVICE-ALERTS/)**

# USPS Tracking®

FAQs >

**Track Packages
Anytime, Anywhere**

Get the free Informed Delivery® feature to receive automated notifications on your packages

**Learn More**

(https://reg.usps.com/xsell?
app=UspsTools&ref=homepageBanner&appURL=https%3A%2F%2Finformeddelivery.usps.com/box/pages/intro/start.action)

Feedback

Remove ✕

**Tracking Number:**

## 9589071052701765277789

Copy          Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item has been delivered and is available at a PO Box at 8:50 am on September 23, 2024 in LITTLE ROCK, AR 72202.

**Delivered**

**Delivered, PO Box**

LITTLE ROCK, AR 72202
September 23, 2024, 8:50 am

**See All Tracking History**

**Get More Out of USPS Tracking:**

    **USPS Tracking Plus®**

**What Do USPS Tracking Statuses Mean?**
(https://faq.usps.com/s/article/Where-is-my-package)

https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9589071052701765277789

1/2

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01 15:14:24
35CV-24-455
C11WD05 : 5 Pages

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
### CIVIL DIVISION

SUTTER & GILLHAM, P.L.L.C., *et al*                                    PLAINTIFFS

vs                    CASE NO. 35CV-24-~N455

EMILY RUNYON, *et al*                                                  DEFENDANTS

### SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

**FRIDAY, ELDREDGE & CLARK, LLP**

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint. Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: **Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.**

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED:** Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

CLERK OF COURT

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque                          _____
Pine Bluff, AR 71603                    [Signature of Clerk or Deputy Clerk]


                                        _____
                                        [SEAL]

**This summons is for: FRIDAY, ELDREDGE & CLARK, LLP**

## PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☐ On_____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____
[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☑ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.



**Case Title:**      SUTTER & GILLHAM, ET AL  V EMILY RUNTON, ET AL

**Case Number:**    35CV-24-455

**Type:**            SUMMONS - FILER PREPARED

So Ordered

*Sonya Hall*

Sonya H. Hall, Jefferson County Deputy Circuit Clerk

Electronically signed by SHHALL on 2024-06-04    page 4 of 4



*FEC*

9/24/24, 10:27 AM                                USPS.com® - USPS Tracking® Results

**ALERT: TROPICAL CYCLONE HELENE, FLOODING, AND SEVERE WEATHER IN THE SOUTHEASTERN U.S. MAY IMPACT DELIVERY. READ MORE › (HTTPS://ABOUT.USPS.COM/NEWSROOM/SERVICE-ALERTS/)**

# USPS Tracking®

FAQs >

**Track Packages Anytime, Anywhere**

Get the free Informed Delivery® feature to receive automated notifications on your packages

**Learn More**

(https://reg.usps.com/xsell?app=UspsTools&ref=homepageBanner&appURL=https%3A%2F%2Finformeddelivery.usps.com/box/pages/intro/start.action)

Feedback

**Remove ✕**

**Tracking Number:**

## 9589071052701765277796

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item has been delivered and is available at a PO Box at 8:50 am on September 23, 2024 in LITTLE ROCK, AR 72202.

---

**Get More Out of USPS Tracking:**

   **USPS Tracking Plus®**

**Delivered**

**Delivered, PO Box**

LITTLE ROCK, AR 72202
September 23, 2024, 8:50 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9589071052701765277796

1/2

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01  15:14:24
35CV-24-455
C11WD05 : 5 Pages

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
### CIVIL DIVISION

SUTTER & GILLHAM, P.L.L.C., *et al*                    PLAINTIFFS

vs                          CASE NO. 35CV-24 455

EMILY RUNYON, *et al*                                  DEFENDANTS

#### SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

**MATTHEWS, SANDERS & SAYES, P.A.**

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint. Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: **Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.**

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED:** Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

CLERK OF COURT

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque
Pine Bluff, AR 71603

_____
[Signature of Clerk or Deputy Clerk]

_____
[SEAL]

**This summons is for: MATTHEWS, SANDERS & SAYES, P.A.**

## PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☐ On_____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with

_____

[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☑ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:


My fee is $ _____.



**Case Title:**     SUTTER & GILLHAM, ET AL  V EMILY RUNTON, ET AL

**Case Number:**   35CV-24-455

**Type:**          SUMMONS - FILER PREPARED

So Ordered

*Sonya Hall*

Sonya H. Hall, Jefferson County Deputy Circuit
Clerk

Electronically signed by SHHALL on 2024-06-04    page 4 of 4



USPS
https://tools.usps.com ⋮

## USPS.com® – USPS Tracking®

Your **tracking number** can be found in the following places: · The shipping confirmation email you received from an online retailer · The bottom peel-off portion of ...

### Where is my package?
Knowledge. USPS Tracking ®Featured Tracking. Related ...

### USPS Tracking ® Results
Track the delivery status of packages without entering a ...

**ALERT: TROPICAL CYCLONE HELENE, FLOODING, AND SEVERE WEATHER IN THE SOUTHEASTERN U.S. MAY IMPACT DELIVERY. READ MORE › (HTTPS://ABOUT.USPS.COM/NEWSROOM/SERVICE-ALERTS/)**

# USPS Tracking®

FAQs >

**Track Packages Anytime, Anywhere**

Get the free Informed Delivery® feature to receive automated notifications on your packages

**Learn More**

(https://reg.usps.com/xsell?app=UspsTools&ref=homepageBanner&appURL=https%3A%2F%2Finformeddelivery.usps.com/box/pages/intro/start.action)

Feedback

**Remove ✕**

**Tracking Number:**

## 9589071052701765277727

Copy    Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item has been delivered and is available at a PO Box at 12:29 pm on September 23, 2024 in LITTLE ROCK, AR 72202.

**Get More Out of USPS Tracking:**

**USPS Tracking Plus®**

●

**Delivered**

**Delivered, PO Box**

LITTLE ROCK, AR 72202
September 23, 2024, 12:29 pm

**Available for Pickup**

LITTLE ROCK
600 E CAPITOL AVE
LITTLE ROCK AR 72202-9998
September 23, 2024, 12:24 pm

**Available for Pickup**

https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9589071052701765277727                                                1/3

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01 15:14:24
35CV-24-455
C11WD05 : 3 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## CIVIL DIVISION

SUTTER & GILLHAM, P.L.L.C., *et al*                    PLAINTIFFS

vs                          **CASE NO. 35CV-24 _____**

EMILY RUNYON, *et al*                                  DEFENDANTS

### SUMMONS

### THE STATE OF ARKANSAS TO DEFENDANT:

### MUNSON, ROWLETT, MOORE AND BOONE, P.A.

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint. Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: **Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.**

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED:** Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

CLERK OF COURT

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque                          _____
Pine Bluff, AR 71603                    [Signature of Clerk or Deputy Clerk]


                                        _____
                                        [SEAL]

This summons is for: **MUNSON, ROWLETT, MOORE AND BOONE, P.A.**

## PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ _ __ [address], a place where the defendant resides; or

☑ On *9-27-24 / 0.57 AM* [date] I delivered the summons and complaint to *Greg Hopkins* [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or *1000 W 2nd*
*Munson, Rowlett, Moore And Boone, P.A. of LR, AR*
*72201*

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with

_____
[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____  SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[signature of server]

_____
[printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: 9-27-24

By: _____
[signature of server]

_____ Tim Sibolt _____
[printed name]

Address: _____

Phone: _____

Subscribed and sworn to before me this date: 9/27

Notary Public _____

My Commission Expires: _____

Additional information regarding service or attempted service: _____

_____
_____
_____
_____

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01  15:14:24
35CV-24-455
C11WD05 : 5 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## CIVIL DIVISION

SUTTER & GILLHAM, P.L.L.C., *et al*                                    **PLAINTIFFS**

vs                              CASE NO. 35CV-24.255

EMILY RUNYON, *et al*                                                  **DEFENDANTS**

### SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

**MEL SAYES**

A lawsuit has been filed against you.  The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: **Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.**

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED**:  Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

CLERK OF COURT

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque
Pine Bluff, AR 71603

_____
[Signature of Clerk or Deputy Clerk]

_____
[SEAL]

**This summons is for: MEL SAYES**

## PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☐ On_____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of_____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with

_____
[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☑ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.



**Case Title:**    SUTTER & GILLHAM, ET AL  V EMILY RUNTON, ET AL

**Case Number:**    35CV-24-455

**Type:**    SUMMONS - FILER PREPARED

So Ordered

*Sonya Hall*

Sonya H. Hall, Jefferson County Deputy Circuit Clerk

Electronically signed by SHHALL on 2024-06-04    page 4 of 4



Google    usps tracking number          ✕  🎤  📷  🔍          ⚗  ⋮⋮⋮  Ⓔ

All    Images    Videos    News    Forums    Shopping    Web    ⋮ More                    Tools

**Track your package**
Data provided by USPS                                                    ⋮

Tracking number 9589071052701765277741

**Delivered** ⊘
September 23, 12:29PM
Little Rock, AR

🌐    View details on USPS

📞    Call 1-800-275-8777

🚚    Track another package

📧    USPS
     https://tools.usps.com    ⋮

## USPS.com® - USPS Tracking®

Your **tracking number** can be found in the following places: · The shipping confirmation email
you received from an online retailer · The bottom peel-off portion of ...

### Where is my package?
Knowledge. USPS Tracking ®Featured Tracking. Related ...

### USPS Tracking ® Results
Track the delivery status of packages without entering a ...

**ALERT: TROPICAL CYCLONE HELENE, FLOODING, AND SEVERE WEATHER IN THE SOUTHEASTERN U.S. MAY IMPACT DELIVERY. READ MORE › (HTTPS://ABOUT.USPS.COM/NEWSROOM/SERVICE-ALERTS/)**

# USPS Tracking®

FAQs >

**Track Packages Anytime, Anywhere**

Get the free Informed Delivery® feature to receive automated notifications on your packages

**Learn More**

(https://reg.usps.com/xsell?app=UspsTools&ref=homepageBanner&appURL=https%3A%2F%2Finformeddelivery.usps.com/box/pages/intro/start.action)

Feedback

**Remove ✕**

**Tracking Number:**

## 9589071052701765277741

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item has been delivered and is available at a PO Box at 12:29 pm on September 23, 2024 in LITTLE ROCK, AR 72202.

**Delivered**
**Delivered, PO Box**

LITTLE ROCK, AR 72202
September 23, 2024, 12:29 pm

**See All Tracking History**

**Get More Out of USPS Tracking:**

**USPS Tracking Plus®**

**What Do USPS Tracking Statuses Mean?** (https://faq.usps.com/s/article/Where-is-my-package)

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01  15:14:24
35CV-24-455
C11WD05 : 5 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## CIVIL DIVISION

SUTTER & GILLHAM, P.L.L.C., *et al*                         PLAINTIFFS

vs                          CASE NO. 35CV-24-455

EMILY RUNYON, *et al*                                       DEFENDANTS

## SUMMONS

### THE STATE OF ARKANSAS TO DEFENDANT:

**EMILY RUNYON**

A lawsuit has been filed against you.  The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: **Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.**

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED:**  Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

CLERK OF COURT

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque                       _____
Pine Bluff, AR 71603                 [Signature of Clerk or Deputy Clerk]


                                     _____
                                     [SEAL]


**This summons is for: EMILY RUNYON**

## PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☐ On_____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with

_____
[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☑ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.



**Case Title:**      SUTTER & GILLHAM, ET AL  V EMILY RUNTON, ET AL

**Case Number:**     35CV-24-455

**Type:**            SUMMONS - FILER PREPARED

So Ordered

_Sonya Hall_

Sonya H. Hall, Jefferson County Deputy Circuit Clerk

Electronically signed by SHHALL on 2024-06-04    page 4 of 4

Google    usps tracking number    ✕  🎤  📷  🔍        ⚗  ⚏  Ⓔ

All    Images    Videos    News    Forures    Shopping    Web    ⋮ More    Tools

*E. Runyan*

**Track your package**    ⋮
Data provided by USPS

Tracking number 9589071052701765277802

**Delivered** ⊘
September 23, 01:40PM
Rogers, AR

🌐    View details on USPS

📞    Call 1-800-275-8777

🚚    Track another package

 USPS
https://tools.usps.com ⋮

# USPS.com® – USPS Tracking®

Your **tracking number** can be found in the following places: · The shipping confirmation email
you received from an online retailer · The bottom peel-off portion of ...

## Where is my package?

Knowledge. USPS Tracking ®Featured Tracking. Related ...

## USPS Tracking ® Results

Track the delivery status of packages without entering a ...

9/24/24, 10:30 AM                                    USPS.com® - USPS Tracking® Results

**ALERT: TROPICAL CYCLONE HELENE, FLOODING, AND SEVERE WEATHER IN THE SOUTHEASTERN U.S. MAY IMPACT DELIVERY. READ MORE › (HTTPS://ABOUT.USPS.COM/NEWSROOM/SERVICE-ALERTS/)**

# USPS Tracking®

FAQs >

**Track Packages Anytime, Anywhere**

Get the free Informed Delivery® feature to receive automated notifications on your packages

**Learn More**

(https://reg.usps.com/xsell?app=UspsTools&ref=ho nepageBanner&appURL=https%3A%2F%2Finformeddelivery.usps.com/box/pages/intro/start.action)

Feedback

Remove ✕

**Tracking Number:**

## 9589071052701765277802

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered to an individual at the address at 1:40 pm on September 23, 2024 in ROGERS, AR 72758.

**Delivered**

**Delivered, Left with Individual**

ROGERS, AR 72758
September 23, 2024, 1:40 pm

**See All Tracking History**

**Get More Out of USPS Tracking:**

    **USPS Tracking Plus®**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

https://tools.usps.com/go/TrackConfirmAction?qtc_tLabels1=9589071052701765277802

ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2024-Oct-01 15:14:24
35CV-24-455
C11WD05 : 4 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## CIVIL DIVISION

**SUTTER & GILLHAM, P.L.L.C.,** *et al*                                      **PLAINTIFFS**

**vs**                                    **CASE NO. 35CV-24 _____**

**EMILY RUNYON,** *et al*                                      **DEFENDANTS**

## SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

**FUQUA CAMPBELL, P.A.**

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint. Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the Plaintiff or Plaintiff's attorney, whose name and address are: Luther Sutter, Lucien Gillham, or Caleb Baumgardner, of SUTTER & GILLHAM, P.L.L.C., 1501 N. Pierce Ste. 105, Little Rock, AR 72207.

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**ADDITIONAL NOTICES INCLUDED:** Summons, Complaint, John Doe Affidavit and Notice of Consent if and when issued by the Circuit Court Clerk's Office.

**CLERK OF COURT**

Address of Clerk's Office
Jefferson County Circuit Clerk
101 W Barraque                                      _____
Pine Bluff, AR 71603                               [Signature of Clerk or Deputy Clerk]


                                                    _____

                                                    [SEAL]


This summons is for: **FUQUA CAMPBELL, P.A.**

'To be completed if service is by a sheriff or deputy sheriff:

Date: _____    SHERIFF OF _____ COUNTY, ARKANSAS

By: _____

    [signature of server]


_____

    [printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: *9-26-24*

By: _____

    [signature of server]

_____

    [printed name]

Address: _____

Phone: _____

Subscribed and sworn to before me this date: *9/26/2024*

Notary Public _____

My Commission Expires: _____

Additional information regarding service or attempted service:

_____

_____

_____

_____

## PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the defendant at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☑ On 9-24-24 / 12:47pm [date] I delivered the summons and complaint to *Patrick Spivey* [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of *Fuqua Campbell, PA* [name of defendant]; or

☐ On _____ [date] at _____ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

My fee is $ _____.

To be completed if service is by a sheriff or deputy sheriff:

Date: _____    SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
   [signature of server]

_____
   [printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: 9-26-24

By: _____
   [signature of server]

_____TIM SIBERT_____
   [printed name]

Address: _____

Phone: _____

Subscribed and sworn to before me this date: 9/26/2024

Notary Public _____

My Commission Expires: _____

Additional information regarding service or attempted service:

_____
_____
_____
_____